# EXHIBIT 7

Gregory N. Lewis, Psy.D.
Licensed Clinical Psychologist
5636 N. Virginia Avenue
Chicago, IL 60659

February 27, 2018

Theodore A. Howard, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Re: John Doe, et al. v. Shenandoah Valley Juvenile Center Commission

Dear Mr. Howard:

On November 10, 2017 we discussed my willingness to serve as an expert witness on the case referenced above and agreed that I would serve in that capacity. The following is a report addressing: 1) my psychological evaluation of Plaintiff John Doe 1 (who was a detainee at the Shenandoah Valley Juvenile Detention Center for an extended period of time), the conditions under which he was detained, and the appropriateness of the treatment he received; 2) my review of the declarations of the two other plaintiffs and three other individuals who were formerly detained at Shenandoah; 3) my prior clinical experiences in evaluating unaccompanied alien children who are in detention in the United States; 4) standards of care for treating UACs and other youth who are in detention; and 5) my opinions regarding the appropriateness of care offered to the plaintiffs at Shenandoah and how their experiences there impacted them.

**Executive Summary:**

Shenandoah Valley Juvenile Center (SVJC) staff do not understand the manifestations of trauma and stress in youth and are not well trained in utilizing trauma-informed approaches that are the standard of care in all stages of the juvenile justice system. The predominant approach utilized to manage youth at SVJC is punishment and behavioral control through methods such as solitary confinement, physical restraint, strapping to a chair, and loss of behavioral levels. These approaches are not only ineffective, but have a profound negative impact on youth, can seriously impair their development and psychological well-being, and can cause or exacerbate mental health problems including panic attacks, suicidal and self-injurious behavior, psychotic symptoms, paranoia, and hopelessness. Because of their special vulnerabilities and needs as adolescents, the use of these approaches is a cruel and harmful practice when utilized and can have long-term deleterious consequences that are difficult to remediate. The mental health care and the overall care provided at SVJC are deficient and fall well below the standards of care in the juvenile justice system.

1

### Qualifications/Background:

1. I am a licensed clinical psychologist. I received my doctorate in clinical psychology from the Illinois School of Professional Psychology in 1989. I became licensed in Illinois in 1990. As part of my professional training, I completed a one-year internship in clinical psychology and a one-year fellowship in adolescent health psychology at Cook County Hospital (now John H. Stroger, Jr. Hospital of Cook County).

2. I was a Clinical Psychologist in the Department of Psychiatry at Stroger Hospital from September 1987 – July 2013. I worked with children, adolescents, and adults including those who had chronic medical illnesses and/or were traumatized or abused. I was Co-Director of the Adolescent & Young Adult Clinic and Coordinator of the Child & Adolescent Inpatient Consultation-Liaison Service that provided assessment and consultation to the pediatric, trauma, and ob-gyn units, as well as to the Child Protective Services team and the pediatric emergency room. During my time at Stroger, I evaluated many detainees from the Cook County Juvenile Temporary Detention Center and worked at the center for a period of four months when they were understaffed.

3. In addition to working at Stroger Hospital, I was a Lecturer in the Department of Behavioral Sciences at Rush University Medical Center in Chicago from January 1998 - July 2013. I have had a private practice in Wheaton, Illinois since 1987, working primarily with adults providing individual, couples, and family therapy. Since 2013 I have also been the Clinical Director of The Counseling Center at the First Presbyterian Church of Evanston. In addition, I provide psychological services in a school-based health center in a Chicago area high school that is predominantly Latino.

4. I have served on two medical missions with the Syrian American Medical Society providing psychological trauma services to Syrian refugees living in Jordan, primarily to those living at the Zaatari Refugee Camp.

5. I was guest co-editor for a special issue of the *Journal of Child and Adolescent Trauma*: Resilience-Based Approaches to Trauma Intervention for Children and Adolescents (Volume 9, Issue 1, March 2016).

6. I am a member in good standing of both the American Psychological Association and the Illinois Psychological Association.

7. I have done numerous forensic psychological assessments in Special Immigrant Juvenile Status and asylum cases in the United States and have also done several forensic psychological assessments of immigrants involved in civil cases. I have completed the training by the Physicians for Human Rights Asylum Program on "Aiding Survivors of Torture & Other Human Rights Abuses: Physical and Psychological Documentation of Individuals Seeking Humanitarian

2

Protection in the U.S." I am familiar with the Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. I have received training in forensic psychological assessment and testimony from the American Psychological Association and in forensic report writing, comprehensive assessment of feigning in forensic contexts, and forensic assessments in immigration proceedings from the American Academy of Forensic Psychology. I have done trainings for Physicians for Human Rights, the Vera Institute of Justice, the Young Center for Immigrant Children's Rights, and the Loyola Center for the Human Rights of Children on the topic of forensic psychological evaluation of trauma in the context of asylum and immigration.

8.     I have personally evaluated about 25 UACs since 2004 for reasons of asylum and Special Immigrant Juvenile Status. Most have been referred to me from the Young Center for Immigrant Children's Rights, but others have been referred from the National Immigrant Justice Center, the DePaul Asylum & Immigration Law Clinic, the Loyola Civitas ChildLaw Center, as well as various law firms. I have also done numerous evaluations on adults seeking asylum.

9.     I was involved in a civil class action lawsuit brought by several women from Central America against the federal government and the Corrections Corporation of America after these women were sexually assaulted by a guard during transport. I did not testify, but did provide deposition testimony. This case was eventually settled (see Appendix B No. 1).

10.    I, along with several others, submitted a brief to the United States Court of Appeals for the Fourth Circuit in support of an alien child who was detained by the Office of Refugee Resettlement (ORR) despite the availability of his mother to care for him in the United States (see Appendix B No. 2).

11.    I am familiar with conditions of detention and mental health treatment for unaccompanied minors who reside in facilities similar to the Shenandoah Valley Juvenile Justice Center as a result of my work in doing Special Immigrant Juvenile Status and asylum evaluations, as well as my involvement in civil cases brought against other juvenile facilities.

12.    I have evaluated UACs as part of two civil class action lawsuits against detention centers in the U.S. that did not provide appropriate care to UACs. I evaluated five youth as part of a civil case in 2009 brought against the Abraxas Hector Garza Center ("Abraxas"), Cornell Companies, the Office of Refugee Resettlement, U.S. Immigration and Customs Enforcement, the Texas Department of Family and Protective Services, and the city of San Antonio alleging that these youth were physically and emotionally abused while residing at Abraxas. I did not testify and did not provide deposition testimony. This case was eventually settled (see Appendix B No. 3). The Division of Unaccompanied Children's Services (DUCS) terminated its contract with Abraxas for many

3

reasons including inadequate services.[1] I evaluated six youth as part of a civil class action lawsuit brought against the federal government alleging that these youth were sexually, physically, and emotionally abused while residing at the Texas Sheltered Care Facility in Nixon, TX. I did not testify, but did provide deposition testimony. A settlement agreement was reached with the facility and its employees, but the case against the United States and its employees was lost. The case has been filed with the Inter-American Commission on Human Rights (see Appendix B No. 4). DUCS had been previously alerted to problems at Nixon by child advocates, but no action had been taken.[2]

13.  The boys that I evaluated for both of these lawsuits were all UACs from Central America. Most of them had experienced various forms of abuse, neglect, abandonment, and violence from their families and communities, and many had also been traumatized during their journey to the U.S. They came to the U.S. to get away from their abusive environments in the hopes of obtaining a better life.

14.  The youth who were at Abraxas reported physical and verbal abuse; inadequate medical care; confinement; denied access to attorneys; and abrupt transfers to other facilities with no explanation. The youth I evaluated for the Nixon litigation also reported significant abuse.

15.  It was my opinion that all but one of the youth I evaluated at both facilities had suffered substantial physical, mental, and emotional harm as a result of the abuse they experienced while in detention. Most had experienced prior traumas that were exacerbated due to the traumas they experienced in detention. Most were diagnosed with PTSD, depression, and/or anxiety.

16.  It was also my opinion that these youth had not been provided with a safe and humane environment in which to live and that they had not received adequate mental health care.

**Materials Reviewed:**

17.  See Appendix A.

**Unaccompanied Alien Children and Complex Trauma:**

18.  Children who come to the United States unaccompanied from other countries ("unaccompanied alien child – "UAC") come for a variety of reasons including: fleeing parental abuse and neglect; fleeing violence and unsafe conditions in

---

[1] *Halfway home: Unaccompanied children in immigration custody.* (2009). Women's Refugee Commission.
https://www.womensrefugeecommission.org/resources/document/196-halfway-home-unaccompanied-children-in-immigration-custody
[2] Ibid.

4

their home country; fleeing persecution; to join parents or other relatives already living in the U.S.; and a desire for a better life in which they will have opportunities to work and go to school. Some children are also involuntarily trafficked into the U.S. as part of the worldwide labor and sex trafficking industry.[3] UAC's are vulnerable before, during, and after their journey to the U.S. because they do not have adult protection and are unable to properly care for themselves.[4]

19.     Most UACs have experienced abuse, neglect, and trauma within their home countries, but are then faced with the additional stresses of migrating to the U.S. often traveling through unsafe and dangerous countries over a period of weeks and months. During their journey - which may take them through multiple countries - UACs may undergo highly traumatic experiences including: going days without food, water, or shelter; being exposed to unsanitary conditions; getting sick or injured; being robbed or kidnapped; being beaten; being raped; watching others being tortured or murdered; having to survive in the jungle; and having to survive crossing through deserts and rivers. Once they arrive in the U.S., UACs may **be further traumatized** if apprehended by Immigration and Customs Enforcement and detained. In addition, they have to adjust to living in a country in which they often do not speak the language and are unfamiliar with the customs. All of these experiences contribute to UACs who are likely to have suffered extensive and multiple instances of abuse and trauma, often referred to as complex trauma, prior to any trauma they may experience if detained.

20.     Complex trauma occurs when a child has been exposed to multiple, chronic, and prolonged traumatic experiences that are often of an interpersonal nature (e.g., abuse from a caretaker).[5] When untreated, these lead to changes in the brain (i.e., prolonged activation of the body's stress response system) and result in a loss of core capacities for self-regulation and interpersonal relatedness.[6] Trauma-exposed children develop psychological symptoms including hypervigilance, over reactivity to perceived threats of danger, difficulties in calming themselves, and avoidance or dissociation – i.e., they try not to think about their traumatic experiences so as not to be overwhelmed by them and can

[3] Levinson, A. (2011). Unaccompanied immigrant children: A growing phenomenon with few easy solutions. Migration Policy Institute. https://www.migrationpolicy.org/print/4328

[4] Young, W., & McKenna, M. (2010). The measure of a society: The treatment of unaccompanied refugee and immigrant children in the United States. *Harvard Civil Rights-Civil Liberties Law Review*, 45, 247-260. http://harvardcrcl.org/wp-content/uploads/2009/06/247-260.pdf

[5] Van der Kolk, B. (2005). Developmental trauma disorder. *Psychiatric Annals*, 35, 401-408.

[6] Cook, A. et al. (2005). Complex trauma in children and adolescents. *Psychiatric Annals*, 35, 390-398.

Case 5:17-cv-00097-EKD-JCH   Document 34-7   Filed 02/28/18   Page 6 of 30   Pageid#: 276

become very distressed when these experiences come to mind.[7] Children who have been abused develop strategies and mechanisms to manage their anxiety and to cope with their abuse (e.g., fleeing the abuse, fighting back, or emotionally detaching from the abuse). This is what is typically referred to as the "fight" or "flight" response and gets activated when the child is in a situation or interacting with someone that triggers past memories of the abuse. The child is essentially doing his or her best to "survive-in-the-moment" in response to a threat or perceived threat that is overwhelming and for which they have limited abilities to soothe and regulate themselves.

21. The responses of children who have experienced complex trauma are rooted in their past traumatic experiences (which may include parental abuse and neglect) that can be easily triggered in an environment - such as a detention center - where staff are not trained to see how their own actions and words can precipitate traumatic memories and, therefore, survival-in-the-moment responses on the part of detainees as a way of managing these traumatic memories. Once a child knows what it is like to feel danger and terror, it takes very little new threat to reignite it.[8] Children who have been abused develop strategies and mechanisms to manage their anxiety and to cope with their abuse (e.g., fleeing the abuse, fighting back, or emotionally detaching from the abuse), and these strategies become activated by the parts of the brain that control basic emotionality and survival-motivated behavior and prepare the body for emergency responses. Sensory information from the environment is transmitted very quickly and unconsciously so that the child has a chance to respond immediately to the danger or perceived danger. Analysis of details and the context of the situation are sacrificed for speed of transmission so that the child can survive.[9]

22. Youth who experience complex trauma often do not meet criteria for Posttraumatic Stress Disorder (PTSD), but instead are given several diagnoses that reflect their various symptoms and behaviors (e.g., depression, conduct disorder, anxiety). This often leads to attempts to treat each of these particular diagnoses rather than seeing that all of these are part of a complex trauma presentation. It is not that these youth are not depressed or anxious or have behavioral problems, it is that these need to be viewed as manifestations of, and coping methods for dealing with, their past abuse and trauma.

---

[7] Dudley, R. (2015). Childhood trauma and its effects: Implications for police. *New Perspectives in Policing Bulletin.* Washington, D.C.: U.S. Department of Justice, National Institute of Justice. NCJ 248686.

[8] Garbarino, J. (2008). *Children and the dark side of human experience.* New York: Springer.

[9] Saxe, G., Ellis, B., & Kaplow, J. (2007). *Collaborative treatment of traumatized children and teens: The trauma systems therapy approach.* New York: The Guilford Press.

6

23.    Youth who have been abused will often unconsciously get drawn into, or draw others into, situations in which they can try to master their past abuse. For example, a youth who felt powerless and helpless when physically abused as a child might be drawn to, or draw others into, situations in which he/she could feel powerful and in control and, in this way, undo or master their previous victimization and abuse.

## Evaluation of Plaintiff John Doe 1:

24.    On August 10 and August 11, 2017 I evaluated Plaintiff John Doe 1 at the request of the Young Center for Immigrant Children's Rights. The evaluation was requested to provide an understanding of Doe 1's past trauma and detention history, the impact this had on him, and recommendations for future placement and treatment. The evaluation was conducted at the Legal Aid Justice Center in Charlottesville, VA over a period of 10 hours with the assistance of Mr. Jeff Divers, who served as my Spanish-English interpreter. Doe 1 was also administered several psychological tests and questionnaires (as adjuncts to the clinical interview) that assess for anxiety, depression, traumatic life events, behavioral problems, self-esteem, and cognitive functioning. At the time of the evaluation, Doe 1 was a UAC at the Shenandoah Valley Juvenile Center (SVJC).

25.    Doe 1 is a 17-year-old Mexican youth. His childhood history in Mexico indicates that he had experienced abuse and neglect from his parents and struggled with depression. Doe 1's father drank a lot and would become violent. He physically abused Doe 1 (this was confirmed by the Young Center after conversations with Doe 1's mother) with objects such as shoes, belts, and cables and psychologically abused him by saying Doe 1 was not his child and by making other disparaging remarks.  His mother was unable to adequately protect him from the father's abuse and appears to have been unable to provide Doe 1 with the nurturance and support he needed to process, understand, and cope effectively with his father's abuse. Doe 1 has no positive memories of his father.

26.    Doe 1 would cry and feel scared and angry when his father abused him and would frequently run away from the house to escape the abuse. He would run and hang out on the streets or hide near the river and either his mother would come and get him or he would return home on his own after about half a day.

27.    Doe 1 was frequently teased about his physical appearance when he was a child. He dropped out of school when he was 14 years old because he lost interest and was getting into fights.

28.    Doe 1 came to the U.S. right after his 15th birthday because he felt unsafe and unhappy in Mexico due to the violence there and because he wanted the opportunity for a better life. He would eventually like to have a family and work in a car factory.

7

29. Doe 1 expressed fears of being killed by the drug cartels if returned to Mexico.

30. I diagnosed Doe 1 with: 1) Child Physical Abuse, Confirmed; 2) Child Psychological Abuse, Suspected; 3) Major Depressive Disorder (MDD), Recurrent Episode, Moderate; 4) Persistent Depressive Disorder (Dysthymia); and 5) Conduct Disorder, Unspecified onset, Moderate.

31. Results of the evaluation indicate that Doe 1 is a very depressed young man with serious doubts about his self-worth who has limited abilities to regulate his mood and behavior when upset. He desires to better control his temper and admits to feeling bad when he hurts someone. He experiences a high degree of behavioral and emotional maladjustment and does not easily trust others because he fears being taken advantage of. Doe 1 vacillates between feeling depressed and sad about where his life is at and that others do not like him vs. liking that others are afraid of him because it gives him a sense of feeling powerful and in control over them. He believes it is a sign of weakness to show that he is depressed. Results of the evaluation also suggested that Doe 1 has below average intellectual functioning.

32. Doe 1 became highly distressed during the evaluation when asked to talk about his father. He had trouble discussing the abuse that he experienced with any detail and at times completely shut down emotionally. He reported forgetting and not wanting to remember things from his past – especially memories regarding his father. While detaching from these painful memories allows Doe 1 to not have to feel the emotional pain associated with these memories, it also serves to keep these hurtful memories buried inside him like an old wound that can be all too easily opened up in situations in which he is reminded of the abuse.

33. Although Doe 1 did not meet criteria for Posttraumatic Stress Disorder (PTSD), it is my opinion that, from a complex trauma framework, his behavioral and emotional difficulties have most likely resulted from and been shaped by his early childhood abuse and neglect and have been exacerbated while he has been in detention. Complex trauma is not a diagnosis listed in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DMS-5), but is likely to be included in the next edition of the DSM. Viewing Doe 1's problems from a complex trauma perspective is critical in that it not only helps to explain his behaviors and moods, but also helps to understand both the type of treatment and environment that he will best respond to and how his experience at SVJC has exacerbated his pre-existing trauma. In other words, understanding that youth such as Doe 1 are traumatized can avoid creating additional harm and improve the diagnoses and facilitate matching them to trauma-informed services.

34. It was my opinion that it would be detrimental for Doe 1 to be returned to Mexico and I recommended that he receive services in a trauma-focused residential treatment facility. It was my belief that his depression and aggressive

8

behaviors originated in his adversity and trauma and would likely not improve without proper trauma-focused treatment in a safe environment over an extended period of time. It was also my opinion that Doe 1 would probably never fully recover from the traumatic events that he experienced as a child (and while detained at SVJC) without proper trauma-informed treatment.

## Doe 1's Experiences in Detention at SVJC:

35.     Doe 1 reported feeling very depressed while in detention at SVJC. He felt "stuck" and "trapped" because he was not allowed to go outdoors much. At times he felt so depressed that he struggled to get out of bed in the morning and had thoughts that he would be better off dead.

36.     Doe 1 experienced many forms of repeated and prolonged abuse and punishment while in SVJC detention including teasing and physical assault from staff, humiliation when being observed using the toilet, being confined to his room or restrained to a chair (sometimes with a mask put over his head) for long periods of time, and being forced to wear handcuffs and shackles. These actions on the part of staff replicated and exacerbated the abuse and teasing that he experienced as a child from his father and his peers, and further traumatized Doe 1. Several examples will be provided below.

37.     Doe 1 tended to respond to his traumatic experiences in both internalizing and externalizing ways. At times he would internalize by withdrawing from others and engaging in self-injurious acts such as cutting himself with an object or hitting his head against the wall when upset. On several occasions, he talked about or made suicide attempts. He felt he was frequently blamed for things that were not his fault.

> *"I feel all torn up inside, but I don't show this to people because it is a sign of weakness. I feel like there is something broken with me. When I feel bad, it comes up on me suddenly and I just want to be left alone and sit in the sun."*

38.     For example, on 07/10/16, Doe 1 refused to leave his room and engaged in self-injurious behavior (carving initials on his chest and banging his head against the wall). Subsequent discussion with his counselor on 07/11/16 suggested that Doe 1's self-destructive behavior was in response to being chronically bullied by one of his peers. The counselor seemed more concerned with why Doe 1 self-harmed and what the meaning was of the initials he carved on his chest than on understanding his experience of being bullied, the feelings that this triggered in him (e.g., fear, anger, shame, self-loathing), and more appropriate ways to manage these feelings.

39.     At other times Doe 1 would get "really angry" and act out aggressively. He thought that others did not like him and would get upset and feel "bad" when others insulted or pushed him, and would want to retaliate. He stated that his

9

"adrenalin would kick in" when he felt insulted or abused and this would sometimes cause him to respond aggressively.

> *"I feel depressed and rejected and take it out on whoever is around. There is nothing I can do about my bad feelings, so I attack people because I can't tolerate my bad feelings."*

40.    For example, Doe 1 was involved in an incident during recreation time on 04/20/16 in which he was verbally redirected several times to not forcefully throw the ball. Doe 1 failed to obey and continued to throw the ball. He cursed at staff and a physical altercation ensued. This resulted in Doe 1 being physically restrained, confined to his room, and losing all of his behavioral levels or "points".[10] This altercation occurred only five days after Doe 1 had been transferred to SVJC and appears to have set the tone for further aggression from both Doe 1 and staff throughout his detainment. The progress note dated 04/20/16 said, "UC stated that this staff member spoke to him 'like my father' which caused him to react with physical aggression." This statement and the above incident are significant for several reasons. First, Doe 1 himself is providing his mental health counselor the link between his prior abuse and his current reaction, yet there was no attempt by the counselor to process this with Doe 1 despite their meeting for 60 minutes. Had this been recognized as a traumatic trigger for Doe 1, a different treatment approach could have been utilized which would have included working with Doe 1 to calm himself and express his anger in other ways and to work with the staff member to be aware of how his words triggered Doe 1 so as to be more aware of this in their future interactions. Second, things appear to have escalated after Doe 1 cursed at the staff member. A staff member asked Doe 1 if he had directed the curse words towards staff and a fight ensued. While it is understandable that the staff member likely felt disrespected, it appears that this staff member may have unnecessarily provoked Doe 1 through his words and actions. This would have been an opportunity to utilize de-escalation strategies to defuse the situation. However, there is no indication that this was done. Instead, "with no time left for less intrusive intervention, Doe 1 was placed in a physical restraint." Third, this incident exemplifies that the predominant approach utilized at SVJC is one of behavioral control and punishment. This incident very likely set the stage for Doe 1 to not feel safe at or understood by the staff at SVJC and to feel angry for being unjustly treated. Fourth, for many youth times of transition are often difficult to manage because of the ensuing anxiety. Doe 1 had recently transitioned from NOVA, a staff secure facility in Virginia, and may have been

---

[10] Points are given to reinforce behaviors such as turning in schoolwork and taken away to punish behaviors such as fighting or cursing. The total number of points is used to determine the behavioral level of a detainee. The lower the behavioral level, the less privileges the detainee has. Unfortunately, staff may arbitrarily give or not give points based on their own attitude and mood at a particular time rather than relying on objective criteria and administering the point system consistently.

Case 5:17-cv-00097-EKD-JCH   Document 34-7   Filed 02/28/18   Page 11 of 30   Pageid#: 281

confused about the expectations at SVJC. He may have also been experiencing shame as a result of being sent to a more secure facility. However, there was no attempt on the part of his counselor to discuss Doe 1's feelings about the recent transition and the adjustments he was having to make.

41. Four days later, on 04/24/16, Doe 1 again lost all of his behavioral levels and was restricted to his room for disruptive behavior and assault on staff. When meeting with his mental health counselor the following day, the "clinician emphasized to UC the significant consequences that can occur if he were to continue assaulting staff/peers while at the facility." Again, there was no effort to process with Doe 1 what his feelings and thoughts were during this incident and to help him learn more adaptive ways to cope; instead, the main intervention was to punish him and to emphasize his need to behave better.

42. On 05/03/16, Doe 1 lost all of his behavioral levels and was confined to his room for stealing a pencil. On 05/04/16, he was put in restraints and confined to his room for assaulting a peer. In his therapy session on 05/05/16, his counselor "emphasized both the immediate and long-term consequences of his aggressive behavior at the facility/outside in the community." The only effort made to help Doe 1 process his behaviors was when the counselor tried to get him to discuss his "motives," which Doe 1 had difficulty doing. This is not an effective approach with impulsive youth, as they often do not know why they are behaving in certain ways. An effective approach would have been to ask him what he was thinking and feeling before he took the pencil and before he assaulted the peer, to link these thoughts and feelings to his subsequent behaviors, and to help Doe 1 understand how his behaviors were likely efforts to survive in the moment and to self-regulate emotions (such as depression, loneliness, fear, or anger) that were distressing him.

43. In his session with his counselor on 08/01/16, Doe 1 attributed much of his acting out at the facility to "bad dreams" that upset him during the day. "UC stated that his dreams often include staff members and previous cartel members involved in violent acts." This was a clear indication that Doe 1 was carrying around a great deal of traumatic anxiety with him during the day and was an opening for the counselor to further process Doe 1's experiences of trauma, as well as to provide education for Doe 1 as to what trauma is, how it is carried in our bodies, and how to manage it. Instead, the counselor seemed to mostly focus on whether the content of the dreams was true and to reiterate the consequences that would occur if Doe 1 were to continue assaulting others.

44. A psychological evaluation was completed by Gustavo Rife, Psy.D on 05/04/16 at the request of Mr. Evenor Aleman, Doe 1's mental health counselor at SVJC. The results of this evaluation and the recommendations appear to have contributed to the behavior control and punishment approach utilized at SVJC rather than a more trauma-focused approach. For example, Dr. Rife states, "Testing also indicated that [Doe1] consistently approves of antisocial behavior

11

and has a generalized predisposition to resolve problems of social and personal adjustment in ways that disregard social customs and rules." This statement sets up Doe 1 to be viewed as being predisposed to antisocial behavior vs. considering that his "antisocial behavior" may, instead, be behavior that has been learned in response to his past abuse and distrust of others and which can be easily triggered in situations in which he is treated (or perceives that he is being treated) unfairly and harshly.

45.     Dr. Rife also states, "There was also a history of physical abuse and possible exposure to other trauma, but there are no evident symptoms for PTSD at this time." While I agree with this statement, it does not go far enough in recognizing that youth with complex trauma often do not meet criteria for PTSD and often have several diagnoses (e.g., depression, conduct disorder, etc.) that become the focus of treatment rather than the underlying trauma and abuse that drives these moods and behaviors. Dr. Rife goes on to state, "...testing indicates that his interpersonal difficulties may be due more to social anxiety than a complete lack of regard for other people....he also had a very low score on his sense of relatedness suggesting great difficulties being in relationships." It is my opinion that this more accurately captures the trauma and anxiety that gets easily triggered in reactively aggressive ways when Doe 1 is around others. However, rather than focusing on ways to address his underlying anxiety and trauma, the approach taken at SVJC was largely to just control his aggression and self-injurious behavior. This was further reinforced by Dr. Rife's recommendation that "[Doe 1's] persistent anger, self-centeredness, lack of respect for authority and lack of concern about others put him at high risk for antisocial acting out which needs to be directly confronted and contained." Again, the emphasis here is on controlling antisocial behavior rather than considering that his acting out behaviors may be defensive reactions to protect himself from further victimization by those in his environment.

46.     In his summary of Doe 1, Dr. Rife states, "He does not appear to suffer from active symptoms of serious mental illness that significantly impairs his cognitive competence to make informed decisions although his cognitive abilities may be temporarily impaired when he is highly angered or upset. " It is my opinion that this statement minimizes the impact of Doe 1's depression and past abuse/trauma on his ability to function in the moment when his reaction to past trauma gets triggered. This would have been an opportunity to explain in the report that Doe 1's behaviors are often in reaction to his environment and to those around him and are an attempt to "survive" in the moment when there are reminders of his past abuse and traumas, rather than simply manifestations of disregard for others and delinquency.

47.     During the course of my evaluation of Doe 1, he was noticeably agitated and restless when discussing his experiences in detention. His legs were constantly shaking, he pulled apart the paper cup he was drinking from, and kept looking down at his feet. He said that talking about these experiences reminded him of

12

when he was growing up and would feel bad about himself because kids would tease and make fun of him. He also said that witnessing other boys being mistreated was upsetting to him because it reminded him of his father's abuse. He would sometimes try to defend the other boys and would then be punished for this by being put in restraints or confinement.

48. Based on the information provided above, it is my opinion that Doe 1's traumatic childhood history of abuse, neglect, and teasing has been replicated while in detention. Individuals with this kind of history are extremely vulnerable to becoming emotionally and behaviorally dysregulated in situations where others are saying or doing things that are abusive or demeaning. Even such subtle interpersonal signals as a harsh look, a critical tone of voice, or a humiliating comment could be enough to trigger a traumatic reaction of "fight" or "flight" in someone like Doe 1. As described above, his usual responses vacillate between those that are internalized (i.e., fleeing or detaching) and those that are externalized (i.e., fighting). "Fleeing" is a survival behavior that he learned as a child to get away from his father's abuse and may partly explain his threats to run away from the detention center and being labeled a "flight risk." However, Doe 1 also reported numerous situations in which he felt insulted or humiliated by things staff said or did to him and would go into fight mode and become reactive and aggressive. Later, when staff would ask him why he responded the way he did, he would often not know why. He was simply surviving in the moment.

49. Doe 1 has difficulties self-regulating his emotions (e.g., humiliation, fear, anger, self-loathing) and behaviors (e.g., aggressiveness), especially when faced with situations in which he does not feel safe. It is my opinion that it is highly likely that many of Doe 1's aggressive behaviors (both self and other directed) in detention were survival responses to situations in which he felt in danger (or felt another detainee was in danger), much as he felt with his dad. An environment in which people intentionally or unintentionally provoke an abused child and then focus on limiting, shaming, and punishing the child can lead to further acting out (because the child does not feel understood and feels angry and helpless) and to the child's being labeled as antisocial or delinquent rather than as a previously abused and traumatized child who is trying to survive in an environment that is triggering him and not understanding or supporting him in appropriate ways.

50. In my professional opinion, the abusive punishment Doe 1 experienced at SVJC exacerbated his prior trauma and caused additional, long-term harm.

**Declaration of John Doe 2:**

51. Plaintiff John Doe 2 is a 16-year-old Mexican youth. He has been living in the U.S. since the age of 10 months and was taken into custody at the age of 16 by immigration simply for not having identification. Doe 2 was detained at two

13

other facilities prior to being transferred to SVJC for behavioral problems. He has not been allowed outside of the facility for recreation. He attends school, but finds the academic work well below what he is capable of doing. He is likely bored as a result of this and this, in turn, may be contributing to his frustration in the classroom.

52.     Doe 2 was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), depression, and anger management issues while residing at a staff secure facility in Texas. He was prescribed four medications for these problems including Prozac and Trazodone. While it is possible that Doe 2 is in need of and benefits from some, or all, of these medications, it is also possible that these medications are used primarily to try to control his behavior in lieu of other therapeutic strategies (e.g., trauma-focused therapy) and environmental modifications (e.g., more recreational and social opportunities, more appropriate educational opportunities) that would improve his attitude, increase his ability to cope, and decrease his acting out.

53.     Doe 2 witnessed many of the SVJC staff insulting and making derogatory remarks about many of the Hispanic youth. He was retaliated against (i.e., he lost points) for informing the other kids as to what the staff was saying about them. Doe 2 experienced racism and discrimination at SVJC and submitted a report to the facility director. He complained that the immigrant kids did not receive the same privileges as the local kids (e.g., they were not allowed to go outside as much and did not have X-boxes in their pods or computers in their classrooms).

54.     Doe 2 reports several instances of harsh and abusive treatment while at SVJC. On one occasion, he cursed in the classroom and was taken to his room. He became resistive and was handcuffed and had his face pushed into the wall. He was confined to his room until the next day. On another occasion, after being confined to his room for a day and a half, he had an altercation with staff which led to his being strapped to a chair with a bag (with holes in it) put over his head. He was kept tied to the chair for 30 - 40 minutes, after which he was again confined to his room for one and a half days. Doe 2 was confined to his room on several occasions for resisting staff's attempts to remove him from the program. His mattress, blanket, personal items, and clothes were taken from him during his confinements. These above experiences of confinement for long periods of time, being handcuffed, having his head physically pushed into a wall, being strapped to a chair with a bag over his head, and having his mattress and other belongings removed from him are, in my opinion, highly detrimental, unreasonable and abusive. They fall below all professional standards of which I am aware.

55.     Doe 2 reports several instances of being restrained by staff and taken to the floor, often by three or four men using force against him. He was often left with bruises as a result of this. While there are times that some youth may need to be

14

physically restrained for their own safety or that of others (much as an inconsolable baby sometimes needs to be swaddled or a small child who is out of control needs to be put in "time out"), these types of interventions should only come after other efforts have been made to de-escalate the situation, and should only be used for the period of time it takes for the youth to regain control. Once control has been established, the restraints should be removed. In my opinion, there are very few, if any, situations in which it is justified to have three or four large men jump on a smaller youth (much less push his head into a wall) or for a youth to have to be strapped to a chair with a bag over his head.

56.    Doe 2 reports feeling sadness, anger, and frustration at being locked up at SVJC. This is likely compounded by the fact that he has lived in the U.S. for over 15 years and was only arrested for failure to have identification on him. On one occasion he cut himself and on several occasions got into verbal and/or physical fights with the other kids. This suggests that he does not know how to emotionally self-regulate and self-soothe. He does not report any efforts by staff to talk to him about his feelings and thoughts, so it is not clear whether he was provided with any type of therapy that might have helped him.

**Declaration of John Doe 3:**

57.    Plaintiff John Doe 3 is a 15-year-old Honduran youth who fled Honduras due to gang violence and death threats. He took busses and trains through Guatemala and Mexico to get to the U.S. border. He was assumed to be a gang member and was told that, for this reason, he was transferred from a facility in Texas to SVJC. Doe 3 reports several situations in which punishment resulted for no reason or from minor infractions of the rules. In one situation, Doe 3 was yelled at by staff for holding the door to the art room open. This escalated and led to staff restraining Doe 3, pushing his face into the wall, and then two staff members slamming him to the ground. Subsequent to this, he was put on room confinement for the remainder of the day with no mattress or blanket, and only allowed to wear his boxers. The room was cold and he did not get his clothes back until the next day (although he did get his mattress and blanket back that evening). He reports numerous times in which his clothes were taken away. On at least one occasion, he was strapped to a chair with only his boxers on.

58.    Doe 3 reports being handcuffed several times and that staff would hit him while he was handcuffed. He felt the staff would intentionally try to get him to hit them so they could punish him further. He tried to cover the window in the door to his room for privacy, but this led to several staff entering his room with plastic shields and becoming physical with him. Doe 3 felt the staff was racist and discriminatory in their treatment of the Hispanic kids compared to the American kids. He also felt the staff was intentionally disrespectful and provocative and that they administered the point system in an arbitrary and inconsistent manner which led to his earning fewer points than he should have earned.

15

**Declaration of J.A.:**

59.     J.A. is a 15-year-old Mexican youth. He does not recall being given any explanation as to why he was being transferred from BCFS in San Antonio to SVJC and does not remember getting anything in writing explaining this. This lack of transparency can create confusion, anxiety, suspicion, and misunderstandings for the detainee. Transitions can be difficult in the best of circumstances, but can be particularly stressful for youth such as UACs who have not come from stable family situations.

60.     The Division of Unaccompanied Children's Services (DUCS) Manual states that all children placed in secure and staff-secure facilities will be given a *Notice of Placement in Secure and Staff-Secure* form[11], which will explain the reasons for the placement in that kind of facility and written in language the child understands.[12]

61.     J.A. reports considerable mistreatment during his time at SVJC. He reports receiving demeaning remarks from staff, being provoked by staff, seeing staff hit other detainees, and being put in solitary confinement – often for long periods of time.  During some of these confinements he was not allowed to leave for any reason.

62.     J.A. was restrained in a chair as punishment on at least one occasion. He was stripped of his clothes, handcuffed, strapped across his chest, had his feet and hands strapped to the chair, and had a white bag put over his head. He was left naked and attached to the chair for more than two days. This is highly unusual punishment and was likely highly traumatizing for J.A. In my opinion, this borders on a form of torture. Torture, as defined by the Istanbul Protocol, is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person, has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such or pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."[13]

---

[11] DUCS Manual, Section 5.02 cited in *Halfway home: Unaccompanied children in immigration custody*. (2009). Women's Refugee Commission.
[12] DUCS Manual, Section 2.05 and 3.02 cited in *Halfway home: Unaccompanied children in immigration custody*. (2009). Women's Refugee Commission.
[13] *Istanbul protocol: Manual on the effective investigation and documentation of torture and other cruel, inhuman or degrading treatment or punishment.* (2004). Office of the United Nations High Commissioner for Human Rights.

**Review of Declaration of R.B.:**

63.     R.B. is an 18-year-old male from Guatemala. He came to the U.S. with his mom when he was young, but ran away from home at the age of 13 and was picked up by immigration authorities. Due to his behavioral problems, he was eventually sent to SVJC.

64.     While at SVJC, R.B. was frequently placed on room confinement for 3-5 days at a time for up to 23 hours a day. His mattress would be removed early in the morning and he would only be left with a book and a Bible. This isolation was difficult for him and led him to start talking to himself and banging his head against the wall. He felt like he was going crazy.

65.     When he got into fights, he felt the guards used excessive force to subdue him. He was frequently put into a restraint chair and left in it for long periods of time, sometimes for up to half a day, or "two shifts." He described his feet, legs, arms, and head being strapped to a metal chair. On one occasion, he had a mask put over his face after he spit at a guard. He described the chair as a physically painful and humiliating experience. One time he peed on himself when he was not allowed to go to the bathroom.

66.     R.B. witnessed the guards provoking some of the other detainees into fights and then pushing them to the ground and forcing them into restraints.

67.     R.B. was undoubtedly traumatized by his confinement and restraint chair experiences at SVJC and experienced what I believe to be a form of torture and cruel, degrading punishment. He describes not being himself since being detained at SVJC.

> *"When I left home I was just a little boy, but being there changed me. I'm not optimistic anymore. Even now, my mom tells me that I changed a lot, that I'm not the same person. I rarely go out with friends. I just spend time with my family now."*

**Review of Declaration of D.M.:**

68.     D.M. is a 20-year-old Honduran male who resided at SVJC for 11 months. He witnessed another boy being slammed to the floor after hitting a guard who had physically provoked the boy by grabbing his shirt and then pushing him. D.M. says this incident started because the guard was upset that the boy was not reading a book like he was supposed to. D.M. felt this whole incident was unnecessary.

69.     D.M. believes the guards wrote up biased incident reports on the detainees and did not allow the "kid's side of the story to be heard. They never came and talked to us about what was going on inside of us."

17

70.     D.M. reported that the guards were prejudicial and discriminatory in how they dealt with UACs vs. local American youth. The UACs were not allowed to have a roommate and lies were told to the local youth that the UACs had raped someone or had HIV. The guards called the youths derogatory names and insulted them.

71.     D.M. had been previously diagnosed with PTSD, major depressive disorder, and bipolar disorder. He had taken medications when at the previous facility (Shiloh Treatment Center), but then did not receive medications for six weeks after transferring to SVJC. D.M. experienced periods of crisis in which he would want to hurt himself and, instead of receiving counseling, would be taken out of his cell and put in a restraint chair for about one hour. He would be handcuffed and strapped in the chair from his feet to his chest. A bag with little holes was put over his head, which made him feel like he was being suffocated. "They are going to suffocate me. They are going to kill me." This was undoubtedly a very traumatizing and humiliating experience for D.M. and, in my opinion, borders on a form of torture and cruel, inhumane punishment. This type of controlling and degrading response suggests that the facility staff were not trained in dealing with mental illness and were simply trying to control D.M. because of their own fears. It is situations like this that breed fear, distrust, and resentment amongst detainees and lead to further acting out as a way to protect themselves.

72.     D.M. witnessed two other boys being put in the restraint chair as a punishment for fighting. However, he never had any fights and was only put in the restraint chair when he was in crisis.

### Youth in the Juvenile Justice System/Detention:

73.     Immigration detention has a significant detrimental effect on the mental health of all children and youth no matter whether they have suffered previous trauma or whether they are UACs. Psychological harm has consistently been associated with detention.[14] Children held in detention are at risk for many psychological problems such as depression, anxiety, PTSD, suicidal ideation, and self-destructive behavior. The longer children and youth are detained, the greater the chance of mental health problems developing.[15] Immigrant children

---

[14] Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: A qualitative study. *American Journal of Orthopsychiatry*, 85, 287-294.

[15] Australia Human Rights and Equal Opportunity Commission. (2004). A last resort? National inquiry into children in immigration detention, 357-454, https://www.humanrights.gov.au/sites/default/files/document/publication/alr_complete.pdf

18

and youth who are detained even for very short periods of time show signs of psychological deterioration.[16]

74.    Research indicates that a high percentage of youth involved in the juvenile justice system have been exposed to multiple types of traumatic events including violence, family abuse, and traumatic losses.[17] These youth often become distrustful, hypervigilant, impulsive, reactively aggressive, and display lack of empathy for others.[18]

75.    Punitive approaches such as prolonged isolation, restraints, and physical abuse are harmful and ineffective.  For example, 50% of all suicides in juvenile facilities occur while youth are held in isolation.[19]  Facilities, including SVJC, continue to harm youth by using force (e.g., aggressively restraining youth) and isolation as means of behavioral control rather than using de-escalation, conflict resolution, and trauma-informed strategies that are more effective and not harmful.[20]

76.    UACs, asylum-seekers, and other displaced persons experience mental health problems at higher rates than the general population.[21] Their mental illnesses get worse when they are detained, especially when interventions such as solitary confinement and force are utilized.[22]These types of practices serve to re-traumatize already vulnerable youth and can retrigger painful feelings of fear,

---

[16] Lorek, A., Ehntholt, K., Nesbit, A., Wey, E., Githinji, C., Rossor, E., & Wickramasinghe, R. (2009). The mental and physical health difficulties of children held within a British immigration detention center: A pilot study. *Child Abuse & Neglect: The International Journal, 33,* 573-585. http://dx.doi.org/10.1016/j.chiabu.2008.10.005

[17] Ford, J., Grasso, D., Hawke, J., & Chapman, J. (2013). Poly-victimization among juvenile justice-involved youths. *Child Abuse and Neglect, 37,* 788-800, http://dx.doi.org/10.1016/j.chiabu.2013.01.005

[18] Report of the Attorney General's National Task Force on Children Exposed to Violence (2012).

[19] Puzzancherra, C., & Hockenberry, S. (2016). *Data reflect changing nature of facility populations, characteristics, and practices.* Pittsburgh, PA: National Center for Juvenile Justice. https://www.ojjdp.gov/ojstatbb/snapshots/DataSnapshot_JRFC2014.pdf

[20] Bilchik, S., Umpierre, M., & Lenhoff, C. (2017). A roadmap for change: How juvenile justice facilities can better serve youth with mental health issues. *Focal Point, 31,* 13-16, www.pathwaysrtc.pdx.edu/publications

[21] Fujio, C. (2011). *Dual loyalties: The challenges of providing professional health care to immigration detainees.* Physicians for Human Rights, www.physiciansforhumanrights.org

[22] Holman, B., & Ziedenberg, J. (2006). *The dangers of detention: The impact of incarcerating youth in detention and other secure facilities.* Justice Policy Institute, www.justicepolicy.org

Case 5:17-cv-00097-EKD-JCH   Document 34-7   Filed 02/28/18   Page 20 of 30   Pageid#: 290

helplessness, powerlessness, and loneliness.[23]Furthermore, the harm caused by these practices can often be long-term and difficult to remediate. Their use falls well below professional standards for treating detained youth.

## Use of Solitary Confinement and Seclusion in Youth:

77.    Solitary confinement can lead to severe psychological and physical effects including difficulties with thinking, overt paranoia, panic attacks, illusions and hallucinations, self-injurious behavior, hopelessness, sleep disturbances, headaches, heart palpitations, and dizziness.[24]

78.    Youth are frequently subjected to solitary confinement for one of three reasons: to punish them (disciplinary segregation); to manage them because they are considered dangerous (administrative segregation) or vulnerable to abuse (protective custody); or as a form of treatment (e.g., seclusion after a suicide attempt). Youth held in solitary confinement, especially when it is frequent or prolonged, needlessly suffer a great deal and can become depressed and suicidal, self-injurious, acutely anxious or psychotic, and aggressive. They are at increased risk of having psychological problems if they have a history of trauma and abuse. Youth are also at increased risk simply because their bodies and brains are still developing physically and psychologically. When youth are placed in solitary confinement they are often restricted from getting adequate exercise and recreation, socialization, nutrition, and education.[25]

## Interpersonal dynamics in working with youth in facilities such as hospitals, schools, and detention centers:

79.    Youth who are hospitalized for psychiatric reasons (e.g., being a danger to themselves or others) will sometimes "act out" towards themselves or others while hospitalized. While these episodes may be a manifestation of their mental illness (e.g., their depression or psychosis), they may also occur in response to either inappropriate actions or inappropriate monitoring on the part of the staff. For example, staff that react in verbally or physically aggressive and punitive ways to youth who are getting out of control will often trigger further acting out because the youth feel angry and unsafe. Milieu meetings (when staff and adolescents meet together) and team meetings (when the entire treatment team

[23] Burrell, S. (2013). *Trauma and the environment of care in juvenile institutions.* Los Angeles, CA & Durham, NC: The National Center for Child Traumatic Stress, www.NCTSN.org

[24] Fujio, C., & Corradini , M. (2013). *Buried alive: Solitary confinement in the US detention system.* Physicians for Human Rights, http://physiciansforhumanrights.org/solitary

[25] Human Rights Watch/American Civil Liberties Union. (2012). Growing up locked down: Youth in solitary confinement in jails and prisons across the United States, https://www.aclu.org/files/assets/us1012webwcover.pdf

20

meets) are held regularly to address these issues. Periodic staff trainings address the kinds of psychological problems youth experience and appropriate ways of treating them while hospitalized.

80.     Youth who are hospitalized for medical reasons (e.g., complications of a chronic illness or surgery) often display behavioral and emotional difficulties due to such things as the degree of pain they are experiencing, the enforced dependency brought about by being hospitalized, anxieties about their illness and the treatment they will need to undergo, and being separated from their parents. However, hospitalized youth will also exhibit behavioral and emotional difficulties (e.g., refusing to comply with recommended treatments) when they feel misunderstood or mistreated by medical and nursing staff. For this reason, multidisciplinary team meetings, case conferences, and regular staff trainings are held to enable staff to discuss their frustrations and concerns regarding particular adolescent patients, to coordinate patient care, to educate staff on the problems the youth are experiencing and more effective approaches in dealing with these problems, and to help the staff become aware of how their communication and behavior at times triggers their adolescent patients' noncompliance and acting out.

81.     All teachers, but especially those working with youth with various developmental and psychological difficulties, need help in understanding the emotional and learning needs of their students, to develop appropriate ways of behavior management, and to understand how their own verbalizations and behaviors may at times unintentionally provoke their students to act out. In-service training and consultation are provided to assist teachers with these issues.

82.     The interpersonal dynamics that exist in hospitals and schools that treat and work with youth are also manifested in juvenile detention centers. Just as medical personnel and teachers need education, training, and consultation to understand how their own reactions can provoke negative reactions in youth, so too do detention center staff that work with youth. Training juvenile detention center staff in conflict de-escalation strategies and trauma-informed care would help them to better understand youth who are traumatized, to better understand interpersonal situations and dynamics that can trigger traumatic reactions in youth, and to learn more effective ways to manage these situations. This, in turn, would enable staff to meet basic professional standards of care in ways that are not harmful to detainees.

21

**Trauma-Informed Treatment of Juveniles:**

83.     Trauma-informed approaches are the standard of care in all stages of the juvenile justice system.[26] UACs, because of their substantial histories of trauma and loss, are members of a particularly at-risk population that is in need of specialized mental health services including comprehensive clinical assessments that consider both their early traumas as well as their current hardships and stressors.[27]

84.     Recent research suggests child abuse and neglect targets certain brain regions and pathways and can lead to brain abnormalities. Essentially, once a child has experienced maltreatment, the world is experienced with a different nervous system.[28] Psychological treatment must address the chronic emotional dysregulation, ruptured attachments with caregivers, and deficiencies in personal identity and competence caused by the trauma of the abuse and neglect. Treatments and approaches that simply try to control behavior rather than working to restore the underlying brain abnormalities and treating the "trauma" will be ineffective and likely harmful.[29]

85.     Treatment of detained youth is served when the social ecology in which these youth are embedded is addressed – i.e., when it is understood that the social environment and the interpersonal dynamics to which the youth is exposed can also contribute to the youth's problems and re-victimize them. More specifically, there needs to be an assessment of the extent to which a detention facility is capable of helping traumatized, emotionally-dysregulated youth to regulate their emotions and behaviors.[30] Often, there is a disconnect between these two leading to a punitive, coercive approach that just treats the particular youth as the problem and easily leads to punishment, seclusion, aggressive force, and over reliance on medication to control the youth's "bad behavior." This approach essentially ignores the fact that many, if not most, detained youth have been

[26] The National Child Traumatic Stress Network. (2016). Essential elements of a trauma-informed juvenile justice system, www.NCTSN.org

[27] Betancourt, T., Newnham, E., Birman, D., Lee, R., Ellis, H., & Layne, C. (2017). Comparing trauma exposure, mental health needs, and service utilization across clinical samples of refugee, immigrant, and U.S.-origin children. *Journal of Traumatic Stress*, 30, 209-218.

[28] Teicher, M. and Samson, J. (2016). Annual research review: Enduring neurobiological effects of childhood abuse and neglect. *Journal of Child Psychology and Psychiatry*, 57, 241-266.

[29] Van der Kolk, B. (2016). Commentary: The devastating effects of ignoring maltreatment in psychiatry – a commentary on Teicher and Samson 2016. *Journal of Child Psychology and Psychiatry*, 57, 267-270.

[30] Saxe, G., Ellis, B., & Kaplow, J. (2007). *Collaborative treatment of traumatized children and teens: The trauma systems therapy approach*. New York: The Guilford Press.

previously traumatized and/or will be traumatized while in detention and that their "bad behaviors" are often trauma based. That is, the "bad behaviors" are often traumatic reactions to being detained or to provocative peer and staff behavior.

86.    The primary purpose of a trauma-informed juvenile detention system is to provide an environment in which youth feel safe, are assisted in coping when past traumatic experiences are triggered, and in which exposure to potentially traumatizing reminders or events is reduced.[31] This would necessitate: appropriate trauma-informed policies and procedures; appropriate methods of screening, assessing, and treating traumatized youth; culturally sensitive, trauma-informed programs that strengthen the resilience of youth; and culturally sensitive, trauma-informed staff education and training.[32]

87.    There are three major implications of utilizing a trauma-informed approach. The first is that understanding behaviors as symptoms of trauma will lead to appropriate interventions that can reduce these symptoms and improve overall functioning. The second is that this type of approach will encourage a more global or systems perspective on traumatized youth such that other alternatives to detention can be considered which are less restrictive and allow for more comprehensive trauma treatment.[33]The third is that staff trained in trauma-informed care rely less on the use of restraint and seclusion, are better able to manage their own emotions and behaviors, and find their work more rewarding.[34]

### Failure to Utilize a Trauma-Informed Approach at SVJC:

88.    My evaluation of Doe 1 and the records provided me, along with my review of the declarations of the other plaintiffs, suggests that the approach utilized with the detainees at SVJC was primarily based on behavioral control and punishment that was often of a humiliating and abusive nature. Although there is documentation that Doe 1 received some mental health treatment, there is no documentation or other indication of efforts to utilize a trauma-informed treatment approach, or to address staff behaviors that were abusive and

[31] Buffington, K., Dierkhising, C., & Marsh, S. (2010). *Ten things every juvenile court judge should know about trauma and delinquency.* Reno, NV: National Council of Juvenile and Family Court Judges.

[32] The National Child Traumatic Stress Network. (2016). Essential elements of a trauma-informed juvenile justice system, www.NCTSN.org

[33] Kretschmar, J., Capizzi, A., & Shafer, E. (2017). A decade of diversion: Ohio's behavioral health juvenile justice initiative. *Focal Point*, 31, 22-24, www.pathwaysrtc.pdx.edu/publications

[34] Marrow, M., Knudsen, K., Olafson, E., & Bucher, S. (2012). The value of implementing TARGET within a trauma-informed juvenile justice setting, *Journal of Child & Adolescent Trauma*, 5(3), 257-270.

Case 5:17-cv-00097-EKD-JCH   Document 34-7   Filed 02/28/18   Page 24 of 30   Pageid#: 294

provocative in contributing to the detainees' behavior. In other words, the approach utilized at SVJC is based on the notion of needing to control and punish "bad behavior" on the part of youth vs. understanding that many, if not most, of these youth are demonstrating traumatic "fight or flight" reactions in response to being detained, as well as in response to being secluded, confined, mistreated, and misunderstood by staff.

89.     When the behavior of youth in juvenile facilities is simply seen as "bad" behavior and not seen from a trauma-informed lens (in which the behaviors are viewed as originating in trauma and adversity) then the behavioral problems worsen, the chances for rehabilitation are reduced, and the likelihood of youth becoming further involved in the juvenile justice system is increased.[35]

90.     Simply put, it is not sufficient to offer general mental services to youth who are UACs and/or are involved in the juvenile justice system, given the high likelihood they have been previously traumatized. When youth have been exposed to violence, abuse, and neglect growing up they may respond by becoming defiant, appearing indifferent, or becoming aggressive as a means of protecting themselves. Their attempts to protect themselves from further victimization and helplessness when in detention are often motivated by a desire to feel safe and in control rather than by the callous indifference and antisocial qualities often attributed to them as "delinquents."[36] When this difference is not understood and the role played by traumatic stress is overlooked (as is often the case in detention facilities), then harsh, punitive, and harmful approaches such as seclusion, restraint, and staff aggression become the default methods utilized.

## Opinions:

91.     Plaintiff John Doe 1 experienced abuse and neglect from his parents, as well as teasing from his peers, when growing up in Mexico. These traumatic experiences were replicated when he was detained at SVJC. He experienced teasing, humiliation, physical assault, confinement, chair restriction for long periods of time, and was handcuffed and shackled many times. Experiences like these have instilled a legacy of shame, resentment, fear, and distrust in Doe 1 that he will likely never fully recover from without proper trauma-informed treatment over a considerable period of time in a safe setting.

---

[35] Kinscherff, R., & Keator, K. (2017). Adversity, trauma, and behavioral health needs among justice involved youth. *Focal Point*, 31, 17-19, www.pathwaysrtc.pdx.edu/publications

[36] Ko, S., Ford, J., Kassam-Adams, N., Berkowitz, S., Wilson, C., & Wong, M. (2008). Creating trauma-informed systems: Child welfare, education, first responders, juvenile justice. *Professional Psychology: Research and Practice*, 39 (4), 396-404.

24

92. The mental health care provided to Doe 1 at SVJC was deficient. The main approach was to emphasize the consequences of his continuing to engage in aggressive behavior as a way to deter him. There was no attempt to understand the underlying traumas that were being triggered in Doe 1, and there was very little effort to help him learn more adaptive self-soothing and self-regulating strategies.

93. Although Doe 1 had a history of being depressed as a child in Mexico, nevertheless, his feelings of being abused and trapped at SVJC greatly exacerbated his depression and at times led to self-injurious and suicidal behavior. At other times this led to aggressive behavior. However, rather than viewing these behaviors as "survival-in-the-moment" behaviors in which Doe 1 was essentially coping the best that he could in a prison-like environment, these behaviors were viewed as "bad" behaviors in need of punishment through confinement and loss of behavioral levels.

94. The psychological evaluation conducted by Gustavo Rife, Psy.D appears to have been heavily relied upon to direct Doe 1's treatment. Dr. Rife largely viewed Doe 1 as a depressed, conduct-disordered adolescent in need of confrontation and containment for his antisocial and delinquent tendencies. There was no attempt to understand these behaviors from a complex trauma framework in which his aggression could be seen as reactive to his environment and those around him as a way to protect himself from being victimized. As a result, Dr. Rife's report served to further justify the behavioral control and confrontation approach utilized by both mental health and other staff, which exacerbated Doe 1's preexisting trauma.

95. A review of the Declaration of John Doe 2 suggests that he may have been overmedicated as a means of behavioral control and that he suffered from racist and discriminatory attitudes and behaviors of staff. When the environment in which youth reside does not treat them equally and justly, it is not unusual to expect that they would feel humiliated and would talk back and/or become aggressive as a way to survive and try to maintain their dignity. Doe 2's aggressive behaviors were punished with prolonged confinements, unnecessary physical force, and being strapped to a chair with a bag over his head - all of which represent cruel, traumatizing, and degrading forms of punishment. Such punishment, which falls below any professional standards of which I am aware, is likely to result in compounding prior trauma and causing longstanding harm.

96. A review of the Declaration of John Doe 3 suggests that he was a victim of excessive force on multiple occasions; suffered humiliation and degradation as a result of racial and derogatory staff remarks, lack of privacy in his room, and being stripped of all his clothes except for his underwear; and was unreasonably restrained, handcuffed and/or confined, for minor infractions. Doe 3's history of fleeing gang violence and death threats in Honduras, as well as his dangerous journey to the U.S. suggests a youth with considerable past trauma who was

25

likely retraumatized while in detention due to the excessive punishment and degrading experiences he suffered there. A youth such as Doe 3 is in need of an environment that is safe and responsive to his needs vs. a detention facility such as SVJC that appears to discriminate against immigrant youth, that enforces rules inconsistently and arbitrarily, and that utilizes harsh and cruel punishment as a means of controlling youth who act out. This form of control leads to shame and helpless rage on the part of the youth (who feel misunderstood and treated unfairly) and inadvertently leads these youth to continue to act out further through self-destructive and/or outwardly aggressive behavior.

97.    A review of the Declaration of J.A. suggests that he was subject to extremely and unreasonably harsh punishment including: being put in solitary confinement for long periods of time; and left naked and strapped to a chair for more than two days. These experiences were likely highly traumatizing to him.

98.    A review of the Declaration of R.B. suggests that he was highly traumatized while at SVJC and may have had a psychotic episode when in solitary confinement. He began talking to himself, hitting his head against the wall, and felt he was going crazy. His experiences at SVJC appear to have been highly disturbing to him and to have had an enduring impact – he said he had lost his optimism for life and that both he and his mom noticed that he had changed and was not the same person anymore.

99.    A review of the Declaration of D.M. suggests that he did not receive appropriate mental health care for his psychiatric conditions. He not only was not given his medications for six weeks after being transferred to SVJC, but was put in a restraint chair on several occasions when he was in "crisis" and wanting to hurt himself. While in the restraint chair, a bag with holes was put over his head causing D.M. to fear that he would suffocate and die. This was undoubtedly highly frightening and traumatizing for D.M. It would not be surprising if he developed PTSD symptoms as a result of these experiences.

100.    The predominant approach utilized at SVJC is that of punishment and behavioral control through such methods as solitary confinement, physical restraint, strapping to a restraint chair, and loss of behavioral levels. These approaches are not only unsuccessful, but are extremely detrimental to detained, traumatized youth – especially to UACs. At times the use of solitary confinement and restraint chairs reached the level of what could be considered torture and other cruel, inhuman or degrading treatment or punishment. The use of these kinds of methods leads to a vicious cycle in which youth, who are already distrustful and traumatized, become further distrustful and traumatized when staff punish them. This leads them to act out even more and then justifies to the staff the need for further efforts to control and punish the youth.

101.    From my evaluation of Doe 1 and the materials I reviewed, it is my opinion that SVJC facility staff do not understand the manifestations of trauma and stress

26

in youth and are not well trained in dealing with highly traumatized children and youth. To avoid harming youth, SVJC needs to implement trauma-focused approaches that will help staff to understand how easily the past experiences of abuse and trauma in some youth, especially UACs, can be triggered, especially when staff are abusive or insensitive. Implementing these approaches will require appropriate trauma-informed policies and procedures, appropriate methods of screening, assessing, and treating traumatized youth, culturally sensitive and trauma-informed programs that strengthen the resilience of youth, and culturally sensitive, trauma-informed staff education and training.

102. While all detainees (adults as well as children) should be treated with dignity and respect, this is especially critical for children and youth because of their inherent vulnerabilities. Approaches that violate the rights of children and youth, that do not consider their "best interests", and that are punitive are detrimental to them and have no place in the juvenile justice system. Irreparable harm can result from punitive, physically abusive approaches because of the residual psychological scars brought about by youth no longer feeling safe in the world and no longer being able to trust others to treat them with dignity and respect. While the extent of damage caused by these approaches cannot always be determined in the moment, it is likely that many of these detained youth will never fully recover from their traumatic experiences prior to and during detention, particularly if effective trauma-informed treatment is not available to them.

103. SVJC staff frequently violated the rights of youth in their custody and became outright abusive as a way to maintain control. The punitive methods used by SVJC staff often reached the threshold of torture and cruel, inhuman, and degrading punishment and likely did substantial, if not irreparable, harm to these youth.

104. Detention, in and of itself, is traumatizing to youth, but even more so when their physical and emotional needs are not met, when they are subjected to abuse, and when their environment does not keep them safe. It is my opinion that the mental health care and the overall care provided at SVJC are deficient and fall far short of the standards of care expected in the juvenile justice system, and that this represents deliberate indifference to the health and mental health needs of the Plaintiffs, as well as the other detainees at SVJC.

Sincerely,

*Gregory N. Lewis*

Gregory N. Lewis, Psy.D.

27

## Appendix A:

1. Declaration of Plaintiff John Doe 1, dated January 17, 2018

2. Declaration of Plaintiff John Doe 2, dated January 05, 2018

3. Declaration of Plaintiff John Doe 3, dated January 05, 2018

4. Declaration of J.A., dated January 08, 2018

5. Declaration of R.B., dated January 08, 2018

6. Declaration of D.M., dated January 02, 2018

7. Forensic Psychological Assessment of Plaintiff John Doe 1 by Gregory N. Lewis, Psy.D., dated October 10, 2017

8. John Doe v. Shenandoah Valley Juvenile Center Commission Class Action Complaint, filed October 4, 2017

9. John Doe v. Shenandoah Valley Juvenile Center Commission First Amended Class Action Complaint, filed January 31, 2018

10. Office of Refugee Resettlement Records for Plaintiff John Doe 1:
    - Case Management and Progress Notes
    - Clinical Addendum by Evenor Aleman, M.A., Ed.S., dated May 2, 2016
    - Medical Evaluations by Timothy J. Kane, M.D.
    - Psychological Evaluation by Angela Medellin, M.Ed., LPC and Anne M. Esquivel, Ph.D., not dated
    - Psychological Evaluation by Gustavo E. Rife, Psy.D., dated May 4, 2016

**Appendix B:**

1. *Kimberly Doe, et al. v. United States*, 1:11-cv-907-LY (WD. Tex. – Austin Division)

2. D.B., as next friend of R.M.B, a minor, v. Cardall et al., 1:15-cv-00745-JCC-JFA (ED. VA. – Alexandria Division): Brief of Amici Curiae Linda Brandmiller, Holly Cooper, Greg Lewis, Carter White and Lorilei Williams in support of appellant's petition for panel rehearing or rehearing en banc

3. Abraxas Litigation: *L.M.V.F., et al. v. United States*, 5:08-CA-124-XR (WD. Tex. – San Antonio Division)

4. Nixon Litigation: *Gaitan-Fabian, et al. v. Dunn, et al.*, 5:08-CV-269-XR (WD. Tex. – San Antonio Division)

Case 5:17-cv-00097-EKD-JCH   Document 34-7   Filed 02/28/18   Page 30 of 30   Pageid#: 300