# EXHIBIT 8

**ANDREA WEISMAN, Ph.D.**
**Juvenile and Correctional Mental Health Consultant**
**Phone: (202) 531-0488 Email: aweisman@aol.com**

Date of Report: 2/27/18

To: Theodore A. Howard, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, DC 20006

## MY INVOLVEMENT IN THIS CASE

1. I was retained by Theodore A. Howard, Esq. with Wiley Rein, LLP to provide an overview of established national standards regarding the essential ingredients in an adequately functioning juvenile correctional facility and to comment on current practices at the Shenandoah Valley Juvenile Center as revealed by the evidence made available thus far. This declaration is submitted in support of the motion for a preliminary injunction submitted by the plaintiffs. If called upon to testify I would do so competently as follows.

## MY QUALIFICATIONS

2. I am a licensed clinical psychologist in Washington, D.C. My experience as a clinical psychologist spans nearly 30 years. I have extensive experience evaluating juveniles who have been subjected to stringent conditions of confinement, a very large percentage of whom have experienced severe trauma or are diagnosed with mental or intellectual disabilities. I have evaluated several hundred juveniles during my career.

3. I have worked with juveniles in correctional settings for over 25 years. Most recently I served as the Chief of Health Services for the Department of Youth Rehabilitation Services (DYRS) in Washington. DC from 2007 - 2011. While there, I was responsible for the oversight of all medical and behavioral health programs and services for youth detained in or committed to DYRS facilities or in the community. DYRS had been under court order (*Jerry M.*) since 1987, in large part due to the inadequacy of medical and mental health services. During my tenure, both medical and behavioral health services came into substantial compliance with

1

the consent decree. In addition, I oversaw the development of specialized programs, including programs introducing trauma informed care.

4. From *December, 2004 – April, 2007,* I was Director of the Division of Behavioral Health Services for the Maryland Department of Juvenile Services in Baltimore, Maryland. I was responsible for the development, implementation and oversight of a continuum of behavioral health services (i.e., mental health and substance abuse) for youth in the 15 Department of Juvenile Services (DJS) facilities, encompassing both detention and commitment. DJS was operating under agreements with the U.S. Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA) in three facilities (Baltimore City Juvenile Justice Center, Cheltenham Youth Facility and Charles H. Hickey School). During my tenure, we came into partial or substantial compliance on most CRIPA-related indicators.

5. From *December, 1995 – July, 2000,* I was the Director of Mental Health Services at the Central Detention Facility (DC Jail) during the time it was under federal receivership (*Campbell v. McGruder).* Under my leadership, the D.C. Jail developed protocols, procedures and policies that conformed with, and in many instances went beyond, the National Commission on Correctional Health Care standards.

6. I have been appointed to serve as the mental health expert for monitors of consent decrees involving reforms in the juvenile justice systems in Pennsylvania, Illinois, Kentucky, California, Ohio, Maine and Georgia. In my role in Ohio, I aided in the restructuring of the mental health system and revamping of the disciplinary process in the State's three secure juvenile facilities. Ohio's use of isolation and programmatic restraint was a central part of the litigation. *See S.H. v Reed* 2:04-cv-1206 (S.D. Ohio). In Georgia, I assisted the US Department of Justice (DOJ) in monitoring a memorandum of understanding DOJ reached with the State. My focus was on the conditions of confinement juveniles were subjected to and the adequacy of mental health services provided to the juveniles.

2

7.  I have written and spoken extensively on the issues of isolation and mental health services for juveniles involved with the justice system.  In 2007, I testified before Congress on mental health issues among youth in the juvenile justice system.

8.  I obtained my Doctor of Philosophy (Ph.D.), in clinical psychology from Clark University in 1988.  I am a licensed clinical psychologist in Washington D.C.

9.  I have included a copy of my curriculum vita as Exhibit A.

## MATERIALS REVIEWED

I reviewed the declarations of six immigrant youth who were or are at the Shenandoah Valley Juvenile Center Commission: John Doe 1, John Doe 2, John Doe 3, D.M., J.A. and R.B.

I reviewed Dr. Greg Lewis' declaration.

I also relied on my extensive knowledge of best practices in the field of juvenile justice. In addition, I relied on the national standards promulgated by the National Commission on Correctional Health Care, the Juvenile Detention Alternatives Initiative and the American Correctional Association. Finally, as will be evident throughout this declaration, I referenced professional literature on adolescent development/brain development, prevalence and presentation of youth in the juvenile justice system with complex trauma, consequences of solitary confinement and the effectiveness of incentivized behavior management programs.

### THE BACKGROUNDS OF THE IMMIGRANT YOUTH

Immigrant youth at Shenandoah Valley Juvenile Center (SVJC) were picked up because they crossed the border while fleeing from trauma and abuse they were suffering at home and in their communities. As Dr. Lewis notes in his report:

> Children who come to the United States unaccompanied from other countries (unaccompanied alien child – "UAC") come for a variety of reasons including: fleeing

3

parental abuse and neglect; fleeing violence and unsafe conditions in their home country; fleeing persecution; to join parents or other relatives already living in the U.S.; and a desire for a better life in which they will have opportunities to work and go to school. Some children are also involuntarily trafficked into the U.S. as part of the worldwide labor and sex trafficking industry.[1] UAC's are vulnerable before, during, and after their journey to the U.S. because they do not have adult protection and are unable to properly care for themselves.[2]

Most UACs have experienced abuse, neglect, and trauma within their home countries, but are then faced with the additional stresses of migrating to the U.S. often traveling through unsafe and dangerous countries over a period of weeks and months. During their journey - which may take them through multiple countries - UACs may undergo highly traumatic experiences including: going days without food, water, or shelter; being exposed to unsanitary conditions; getting sick or injured; being robbed or kidnapped; being beaten; being raped; watching others being tortured or murdered; having to survive in the jungle; and having to survive crossing through deserts and rivers. Once they arrive in the U.S., UACs may be further traumatized if apprehended by Immigration and Customs Enforcement and detained. In addition, they have to adjust to living in a country in which they often do not speak the language and are unfamiliar with the customs. All of these experiences contribute to UACs who are likely to have suffered extensive and multiple instances of abuse and trauma, often referred to as complex trauma, prior to any trauma they may experience if detained.

These already significantly traumatized youth are then detained in the SVJC and subjected to additional traumatization as will be discussed in this report.

---

[1] Levinson, A. (2011). Unaccompanied immigrant children: A growing phenomenon with few easy solutions. Migration Policy Institute, *available at* https://www.migrationpolicy.org/print/4328

[2] Young, W., & McKenna, M. (2010). The measure of a society: The treatment of unaccompanied refugee and immigrant children in the United States. *Harvard Civil Rights-Civil Liberties Law Review*, 45, 247-260, *available at* http://harvardcrcl.org/wp-content/uploads/2009/06/247-260.pdf

4

## THE YOUTHS' DECLARATIONS

All six youth spoke of spending repeated, extended periods of time in solitary confinement, often for minor infractions. While in solitary, the youth's clothes, personal items, mattress and bedding are typically removed from the cell. They are left in the cell in only their boxer shorts. They are afforded one book and a bible.

All youth also spoke of having been excessively restrained by the use of a restraint chair to which they are physically attached for hours (shifts), sometimes days at a time. Several youths told of having been placed in the restraint chair as an intervention to address their suicidality.

The youth also detailed the physical and verbal abuse they experienced at the hands of the staff members. These experiences will be discussed in detail in this report.

## MY OPINION

### I.    SOLITARY CONFINEMENT: PRACTICES AT THE SHENANDOAH VALLEY JUVENILE CENTER

1.    It is my opinion, within a reasonable degree of certainty in the field of clinical psychology, that all juveniles subjected to the SVJC policy and practice of solitary confinement as described above are at a substantial risk of serious harm to their social, psychological, and emotional development.

2.    Solitary confinement can be dangerous for anyone. Severely limiting an individual's environmental and social stimulation has a profoundly deleterious effect on mental functioning.

3.    Research over the last half-century has demonstrated that solitary confinement can worsen mental illness and produce symptoms even in prisoners who start out

5

psychologically robust. Individuals who are deprived of meaningful external stimuli are soon unable to maintain an adequate state of alertness and attention to the environment. Even a short time in solitary confinement will predictably shift the encephalogram (EEG) pattern towards an abnormal pattern characteristic of stupor or delirium.[3]

4.   Due to their developmental vulnerability, solitary confinement causes juveniles much greater harm than does such confinement of adults, and the risks of solitary confinement to juveniles are alarming.

5.   Because juveniles are still developing socially and emotionally and psychologically, they are especially susceptible to psychological and neurological harms when they are deprived of environmental and social stimulation. For a juvenile, simply being placed in isolation – the utter helplessness of it – is enormously stressful. This surge of cortisol – of fear, anxiety, and agitation – will be especially severe in juveniles. The consequences, including actual changes in brain structure, have been demonstrated to persist into adulthood.[4]

6.   Our knowledge of the harms caused to juveniles in solitary confinement is based on extrapolation from the clinical interviews of adults and the expanding knowledge of adolescent development. It is widely accepted that, in the adolescent brain, the connections between the frontal lobe and the mid-brain are still developing.[5] The frontal lobe sits just behind the forehead. As it develops, teenagers can reason better,

---

[3] These harms are discussed in further detail in Psychiatric Effects of Solitary Confinement, 22 Wash. U. Journal of Law & Policy 325 (2006) an article written by Stuart Grassian, M.D. one of the leading experts on the harmful effects of solitary confinement.
[4] Tottenham, N, Galvan, A. (2016). Stress and the adolescent brain; Amygdala-prefrontal cortex circuitry and ventral striatum as developmental targets. Neuroscience and Behavioral Reviews, 70, 217-227.
[5] See, e.g.: Casey, B.J., Jones, R.M., and Hare, T.A., (2008) The Adolescent Brain, Ann. N.Y. Acad. Sci. 1124: 111-126; Ernst, M., Mueller, S.C. (2008) The adolescent brain: Insight from functional neuroimaging research. Dev. Neurobiol 68(6) 729-743.

develop more control over impulses and make better judgments. [6] This part of the brain continues to develop until an individual's mid-twenties.

7. Exposure to chronic, prolonged traumatic or stressful experiences, such as solitary confinement, has the potential to permanently alter an adolescent's brain which may cause longer-term problems in the following domains:

   a. **Attachment:** Trouble with relationships, boundaries, empathy, and social isolation;

   b. **Emotional (Dis)Regulation:** Difficulty identifying or labeling feelings and communicating needs;

   c. **Cognitive Ability:** Problems with focus, learning, processing new information, language development, planning and orientation to time and space;

   d. **Behavioral (Dis)Control:** Difficulty controlling impulses, oppositional behavior, aggression, disrupted sleep and eating patterns, trauma re-enactment.[7]

8. The American Academy of Child and Adolescent Psychiatry, the American Medical Association, the World Health Organization and the United Nations have all concluded that, due to their developmental vulnerability, adolescents are in particular danger of adverse reactions to prolonged stays in isolation.

---

[6]Noted developmental psychologist Lawrence Steinberg, details adolescents' growing capacity for executive functioning as their brains mature. Age of Opportunity: Lessons from the New Science of Adolescents. Houghton, Miffin, Harcourt, 2014).

[7] How Trauma Affects Child Brain Development – N.C. Division of Social Services. Vol. 17, No.2, 2012; See, e.g.: Tottenham, N., Galvan, A. (2016) Stress and the adolescent brain. Amygdala prefrontal cortex circuitry and ventral striatum as developmental targets. Neuroscience and Bio-behavioral Reviews 70:217-227.

7

9.     Juveniles with intellectual and mental health disabilities are especially vulnerable to a substantial risk of serious harm from solitary confinement because they are more likely than persons in the general population to have diagnosed mental illnesses, learning disabilities, and a high incidence of trauma. Research shows that over 60% of the youth in correctional settings have an underlying major mental illness. These include Posttraumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and various forms of Bi-Polar mood disorders. Youth in solitary confinement have an even higher incidence of mental disorders than those in the general population.

10.    Juveniles experience time differently - a day for a child feels longer than a day to an adult.[8] Whittmann et.al. conducted research investigating this perception difference, examining 499 subjects aged 14 to 94 years old. Their results generally support the widespread perception that the process of experiencing passage of time speeds up with age. In addition, juveniles have a greater need for social stimulation.

11.    Across all developmental spheres, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. [9]

12.    The incidence of trauma among incarcerated youth is also significant, with some studies reporting the number to be as high as 50 – 90%.[10] There is a clear medical consensus that, for those juveniles with mental illness, the risk of harm posed by solitary confinement is especially great. People with mental illnesses already have cognitive defects in their brain structure or biochemistry. They already have weakened

---

[8] Age effects in perception of time. Psychol Rep. 2005 Dec;97(3):921-35.Wittmann M, Lehnhoff S.

[9] See. e.g. Bremner,J. (2006) Traumatic Stress: effects on the brain. Dialogues in Clinical Neuroscience: Vol. 8, No. 4, 445-461.

[10] Ford, J., et.al, Trauma Among Youth in the Juvenile Justice System: Critical Issues and New Directions, National Center for Mental Health and Juvenile Justice, 2007.

Case 5:17-cv-00097-EKD-JCH   Document 34-8   Filed 02/28/18   Page 9 of 31   Pageid#: 309

defense mechanisms, are at a higher risk for mental health abnormality and are more susceptible to significant trauma from lack of environmental and social stimuli. Therefore, the trauma that can occur in juveniles with pre-existing mental illnesses will be more significant than the already significant and long-lasting effects on juveniles without a mental health condition when exposed to isolation.

13. Medical professionals, including organizations like the American Medical Association, agree that juveniles with mental illnesses should not be placed in solitary confinement for longer than one hour without a comprehensive evaluation from a physician. Solitary confinement should never be used to punish people with mental illnesses.

14. Youth exposed to traumatic or stressful events exhibit a wide range of symptoms. They present with not just internalizing problems, such as depression or anxiety, but also externalizing problems like aggression, conduct problems, and oppositional or defiant behavior. These are the very behaviors that result in institutional infractions that lead to placements in solitary confinement. This in turn causes more trauma, and can lead to more negative behavior, resulting in infractions, prolonging a youth's time spent in solitary.

## I.      SHENANDOAH VALLEY JUVENILE CENTER'S HOSTILE ENVIRONMENT

In addition to the trauma youth experience consequent to their placement in solitary confinement, the hostile environment created by the correctional officers is also traumatizing. National standards do not allow officers to "slam" youth against the wall, excessively shackle and restrain youth and use derogatory language in describing immigrant youth.

**Physical Abuse**

All youth reported that they had been beaten up by staff members. One youth spoke of having been placed naked in a restraint chair fully shackled and then beaten by staff members; the youth reports he was left naked in the restraint chair for two and a half days. All youth spoke of

9

being slammed against the wall or floor in staff members' attempts to "de-escalate" them and the situation. Clearly, these abusive actions further traumatized youth and were anything but calming interventions.

**Verbal Abuse**

The youth also spoke of the verbal harassment visited upon immigrant youth with remarks such as: "Hispanics, they don't know nothing, they just come to our country." The same youth said that staff "tell the kids they're stupid and make fun of them for not understanding English." The youth that reported this understood English enough to understand what the officers were saying.

Another youth spoke of being taunted by officers on a daily basis: "While I was at Shenandoah, staff members would make fun of me on a daily basis. They would call me names such as "pendejo" and "onion head," and do things like drop my clean towel on the dirty floor in front of me."

These overly punitive and degrading practices at SVJC lead to a culture within which youth cannot possibly be rehabilitated which is the mandate of juvenile correctional facilities. Shenandoah's strategies for managing youth's behaviors is entirely counter-productive. For over 70 years, behavioral psychological research has demonstrated that rewarding desired behavior is much more effective than punishing undesirable behavior. With a reward-centered paradigm, youth learn what *TO DO,* not just what *NOT TO DO.* As such, rewarded behaviors have a much greater likelihood of being repeated as opposed to behaviors which are not reinforced, which have a tendency to extinguish.

Research has shown that effective behavior management programs in juvenile justice systems are based on providing incentives for youths' production of desired behavior. Typically, the youth participates in identifying what rewards would be meaningful (e.g., extra phone call, later bed time, etc.). While the rewards jump-start the change process, as youths' behavior changes, so too does the reaction of others engaging with the youth. Over time, improved interactions

10

with others becomes its own reward. Through this process, youth come to incorporate the behavioral changes into their repertoire. Encouraging the development of more acceptable behaviors while detained has the greatest likelihood of their repetition in the community.

This is consistent with the Juvenile Detention Alternatives Initiative (JDAI) standard that requires "[t]he facility [to have] a system of positive behavior interventions and supports that provides a set of systemic and individualized strategies for achieving social and learning outcomes for youth while preventing problem behavior."[11]

## II.     ESSENTIAL COMPONENTS OF A MENTAL HEALTH PROGRAM IN JUVENILE FACILITIES

National standards promulgated by the National Commission on Correctional Health Care (NCCHC), the American Correctional Association (ACA) and the Juvenile Detention Alternative Initiative (JDAI) articulate the *essential* components of an adequately functioning mental health program in juvenile correctional facilities. As a general matter, there should be a sufficient number of mental health staff to perform the following functions:

1a. Intake Screening and Assessment – upon admission, all youth should receive a screening to determine if they are "eligible" for admission (e.g., they are not acutely psychotic or suffering a medical condition that cannot be treated at the facility).

1b. Admission screening should also determine if the youth is at risk of self-harm or has any other mental health condition requiring immediate intervention. When the screening detects possible mental health or substance use conditions, detainees should be referred for further evaluation, assessment and treatment by mental health professionals.[12]

---

[11] JDAI standard at D1 – Positive Behavior intervention and Supports
[12] E.g., NCCHC standard Y-E-05 Mental Health Screening and Evaluation.

11

2a. Suicide Prevention – All juvenile justice facilities should have and follow well-articulated policies and procedures for the management of youth who express suicidality or intent to harm themselves or engage in self-harming behaviors following admission. Typically, these procedures include placement of the youth on a suicide watch with either close (every 15 minutes) or constant observation.

In most facilities, anyone can place a youth on a suicide watch but only a mental health professional can lower or remove a youth from watch status.[13]

Several youths reported being placed in a restraint chair when they expressed intent on harming or killing themselves. Placing a youth in a restraint chair because he/she expresses suicidality is not consistent with national standards.

3. Mental Health Services

 Youth are entitled to adequate medical and mental health care, to protection from harm including staff abuse, and to a facility in which the vulnerable can be protected: a safe, sanitary and humane environment. In order to provide this environment, certain measures should be implemented:

   a. All detainees should be screened upon admission by trained personnel for mental health and substance abuse problems.
   b. Treatment should be provided in an atmosphere of empathy and respect for the dignity of the person. It should be strength-based and recovery-oriented. A reasonable array of mental health interventions should be available (e.g., individual and group therapies, psychoeducational programs).
   c. Youth should have unimpeded access to care. This is accomplished by having a "kite" or sick call system where in every living unit has a sick call box into which youth can place their request to be seen by a mental health provider.
   d. Mental health providers make daily rounds ensuring they check in with all youth.

---

[13] E.g., NCCHC standard Y-G-05 Suicide Prevention Program

12

e. Mental health providers meet regularly with each other and with correctional staff to ensure everyone involved has knowledge of youths' needs and to coordinate intervention strategies going forward.

f. Treatment plans are developed for each youth (with or without a mental health disorder) which articulate what the youth and staff will work on/toward during the youth's residency. This is essential as it serves as the contract between the youth and staff.

## III.     Staff Training (See JDAI Training Standards at C)

At a minimum correctional staff should receive pre-deployment training on:

- Adolescent development/brain development.
- Signs and symptoms of youth with mental health disorder and the prevalence of these among incarcerated youth.
- Suicide prevention policy and protocols and their attendant responsibilities.
- The incidence of trauma among incarcerated youth and what staff can do minimize further traumatization.
- De-escalation strategies. Programs such as Safe Crisis Management have been shown to have great efficacy in calming youth and reducing confrontations between staff and youth. Their literature states: "Safe Crisis Management® 'SCM' is a comprehensive training program focused on preventing and managing crisis events and improving safety in agencies. Safe Crisis Management has a trauma-sensitive approach with emphasis on building positive relationships with individuals. Our program is designed to assist staff with responding to the needs of all individuals and particularly with the needs of the most challenging."[14][15]

## IV.     Grievance System

---

[14] See: JKM Training, Inc. Safe Crisis Management

[15] E.g., NCCHC Y-C-04 Training for Child Care Workers

13

National standards require an accessible and meaningful grievance process. For example, JDAI standard (at Rf1) reads, "The facility provides more than one way to report abuse, neglect, harassment, and retaliation by other youth or staff within the facility." Further, the standard (at Rf4) requires that, "Staff provide all youth with access to a grievance procedure that provides an opportunity for a fair consideration and resolution of complaints about any aspect of the facility, including medical and mental health services."

A fair and equitable grievance system is essential in any correctional facility so that those incarcerated within them feel they have recourse in the event they feel they are being mistreated. The declarations of the youth made it clear they felt abused and demeaned but that they did not have any meaningful recourse to address their complaints. One youth said, "It's easy for the guards to write incident reports - you did this, you did that, you disrespected me - but they never hear the kid's side of the story. My voice was never heard."

**FINAL CONCLUSIONS**

The SVJC is riddled with problems. The concerns of the immigrant children must be taken seriously. These already traumatized youth report being abused both physically and verbally while at SVJC. The practices employed by the SVJC create a hostile and punitive environment that runs counter to all national standards. While implementation of an adequate mental health program may take time, these practices must cease immediately.

It is imperative that the leadership at Shenandoah Valley Juvenile Center familiarize themselves with national standards and develop a plan for their implementation to avoid continuing practices that create lasting harm for vulnerable youth.

I submit this report on 2/27/2018.

*Andrea L. Weisman, Ph. D.*

Andrea Weisman, Ph.D.

# ANDREA WEISMAN
## Juvenile and Correctional Mental Health Consultant
## DOJ Certified PREA Auditor
### Phone: (202) 531-0488 Email: aweisman@aol.com

## Forensic Consultation

**June, 2017 – present**
**Corrections Information Council**
**Washington, DC**

CIC provides oversite of DC inmates in the FBOP. I am their mental health consultant. I have been involved in their assessment of mental health services for inmates at the ADX Florence Facility.

**August, 2016 – present**
**Equal Justice Initiative**
**Montgomery, AL**

This is a Miller re-sentencing case. A JLWOP case concerning a woman sentenced when she was 14.

**May, 2015 – June, 2016**
**Office of the State Public Defender**
**Kalispell, MT**

I was the mental health expert evaluating a young man charged with mitigated deliberate homicide.

**March, 2015 – present**
**Lee Hunt Law Office**
**Santa Fe, NM**

1

I am the mental health expert in a wrongful death suit of a youth in the Santa Fe County Juvenile Detention Facility.

**August, 2017 – September, 2017**
**Center for Children's Law and Policy**
**Washington, DC**

I served on a team of experts assessing four juvenile detention centers in Kentucky.

**August, 2017 – September, 2017**
**Center for Children's Law and Policy**
**Washington, Dc**

I was the mental health expert on a team of experts assessing the Long Creek Juvenile Detention Center in Portland Maine.

**September, 2015 – October, 2016**
**Law Offices of Victor Fleitis**
**Tupelo, MS**

I was the mental health expert in a case involving the intrusive and unnecessary strip search of a 12 year old girl.

**May, 2014 – June, 2016**
**U.S. Department of Justice v. Glen Mills School**

I was the mental health expert for DOJ investigating services for youth with mental health disabilities.

**July, 2014 – June, 2015**
**Center for Children's Law and Policy**
**Washington, DC**

2

I served as the mental health expert for the Center for Children's Law and Policy as part of a team brought in to assess the Rhode Island Training School's compliance with Juvenile Detention Alternative Initiative I standards.

**July, 2014**
**Georgetown Criminal Justice Law Clinic**
**Washington, DC**

I conducted a competency assessment of a 54 year old man with schizophrenia and MR charged with crack distribution.

**November, 2011 – December, 2015**
S.H. v. Reed
**Ohio Department of Youth Services**
**Columbus, Ohio**

I served as the mental health expert for the federally appointed Monitor in the class action lawsuit regarding conditions of confinement in three secure juvenile justice facilities in Ohio. Their use of isolation and programmatic restraint had been a central component of the litigation.

**February, 2012 – August, 2013**
Troy. D. v. Mickens, et. al.
**Juvenile Law Center**
**Philadelphia, PA**

I served as the expert mental health consultant regarding the use of extensive isolation and the development of an adequate mental health program.

**April, 2013**
**Center for Children's Law and Policy**
**Washington, DC**

3

I was the mental health expert on a team brought in to review the Cook County Temporary Juvenile Detention Facility in Chicago, Illinois on behalf the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative.

**May, 2013 – August, 2013**
 **State Office of the Public Defender**
Cheyenne, WY

I was the expert mental health consultant regarding the resentencing of a juvenile originally sentenced to life without parole.

**December, 2003 – September, 2004**
**Receiver, Riverview Psychiatric Center/Augusta Mental Health Institute**
Augusta, Maine

I served as an expert forensic consultant, working for the Receiver of Riverview Psychiatric Center (RPC), appointed by the federal court, regarding the structure and design of mental health services within the RPC (Maine's state mental hospital serving the forensic population) and the accessibility of acute care services for incarcerated populations in Maine jails and prisons. My consultation included the development of strategies for implementation of community-based services.

**July, 2003 – January, 2004**
**Dickstein, Shapiro, Morin & Olinsky LLP**
Washington, DC

I served as a mental health expert in a wrongful death lawsuit against the Virginia Department of Corrections. This case

4

involved the suicide of a 37-year-old man in one of the Sussex prisons in Virginia.

**January, 1998 – June, 2001**
**Institute on Crime, Justice and Corrections**
George Washington University
Washington, DC

I worked as a mental health expert for the Institute, which served as monitor of a Memorandum of Understanding between the US Department of Justice and the Georgia Department of Juvenile Justice regarding health care and conditions of confinement in the state's juvenile detention facilities and training schools for sentenced youth. Adequacy of mental health services in all the facilities was one of DOJ's principal concerns. I traveled throughout the state monitoring program capacity, speaking with youth and staff about practices and resources, and communicating back to the Institute, DOJ and the Georgia Commissioner on Juvenile Justice.

**November 1999**
**Human Rights Watch**
Baltimore City Jail
Baltimore, Md.

I was the mental health expert for HRW on a team brought in to investigate mental health services and conditions of confinement for juveniles in the Baltimore City Jail.

**March, 1999 – June, 2001**
**Physicians for Human Rights**
Washington, DC

As a mental health expert for PHR, I provided training for medical students and physicians on how to inspect juvenile facilities.

5

**February 1999**
**Amnesty International**
Norway

I served as a mental health expert for AI as part of a team that toured Norway to discuss the American Juvenile Justice system with public officials and other policymakers, attorneys, law students, and other advocates.

**September, 1994 – December, 1994**
**National Coalition for Mental and Substance Abuse Health Care in the Criminal Justice System**
Washington, DC

This was a national advocacy organization funded by SAMHSA promoting mental health services for juveniles/adults in the juvenile/criminal justice system. I served as Senior Policy Analyst and helped to coordinate state policy planning meetings.


## Full-time Employment

**May, 2007 – August, 2011**
**Chief, Health Services Administration**
Department of Youth Rehabilitation Services
Washington, DC

I was responsible for the oversight of all medical and behavioral health programs and services for youth detained in or committed to DYRS facilities or in the community. The Agency has been under court order (*Jerry M.*) since 1987, in large part due to the inadequacy of medical and mental health services. Among my responsibilities was the development of a consent decree work plan with the court's Special Arbiter and plaintiffs' attorneys that would

6

allow DYRS to bring medical and behavioral health services up to national standards and move toward exiting *Jerry M.*

My responsibilities included oversight of the *Jerry M.* work plan, including the development of new policies, procedures, protocols, services, programs and staffing requirements and patterns of deployment for both medical and behavioral health programs. During my tenure, both medical and behavioral health services came into substantial compliance with the work plan. In addition, I oversaw the development of specialized programs, including programs introducing trauma informed care, the use of bio-feedback to address youths' trauma issues, a fatherhood program (Baby Elmo), gender specific programming, including family planning, implementation of an evidence-based substance abuse program, Lesbian-Gay-Bisexual-Transgender-Questioning programming and sensitivity training, the development of an extensive continuous quality improvement program for the Health Services Administration and access to an array of evidence-based programs and services, including Multisystemic Therapy, Functional Family Therapy, and Multidimensional Treatment Foster Care.

I have also been responsible for the development of significant interagency collaborative opportunities with the District's Departments of Education, Child and Family Services, Mental Health, Health, Health Care Financing, the Addiction Prevention and Recovery Administration, and Court Social Services. I have also had significant responsibility for working with the District's judges and court system.

**December, 2004 – April, 2007**
**Director, Division of Behavioral Health Services**
Maryland Department of Juvenile Services
Baltimore, MD.

7

Case 5:17-cv-00097-EKD-JCH   Document 34-8   Filed 02/28/18   Page 22 of 31   Pageid#: 322

I was responsible for the development, implementation and oversight of a continuum of behavioral health services (i.e., mental health and substance abuse) for youth in the 15 Department of Juvenile Services (DJS) facilities, both detention and commitment. DJS was under agreements with the U.S. Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA) in three facilities (Baltimore City Juvenile Justice Center, Cheltenham Youth Facility and Charles H. Hickey School). During my tenure, we came into partial or substantial compliance on most CRIPA-related indicators.

I was responsible for the collaboration and coordination of behavioral health services with Maryland sister agencies, including the Department of Health and Mental Hygiene (DHMH), Maryland State Department of Education (MSDE), Department of Social Services (DSS), Department of Health and various community mental health and advocacy organizations.

I was a co-founder of the Community and Family Resource Center in the Baltimore City Juvenile Justice Center, which provided information, short-term mental health counseling and linkage to an array of community-based services for families of youth in the juvenile justice system.


**September, 2002 – June, 2004**
**Director, Alternative Pathways**
Department of Mental Health
Washington, DC

Alternative Pathways (AP) was a locally- and federally-funded initiative to divert youth with mental health and/or substance abuse disorders from the juvenile justice system. I became the director of this initiative after I secured the funding from the federal Office of

8

I was responsible for the development, implementation and oversight of a continuum of behavioral health services (i.e., mental health and substance abuse) for youth in the 15 Department of Juvenile Services (DJS) facilities, both detention and commitment. DJS was under agreements with the U.S. Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA) in three facilities (Baltimore City Juvenile Justice Center, Cheltenham Youth Facility and Charles H. Hickey School). During my tenure, we came into partial or substantial compliance on most CRIPA-related indicators.

I was responsible for the collaboration and coordination of behavioral health services with Maryland sister agencies, including the Department of Health and Mental Hygiene (DHMH), Maryland State Department of Education (MSDE), Department of Social Services (DSS), Department of Health and various community mental health and advocacy organizations.

I was a co-founder of the Community and Family Resource Center in the Baltimore City Juvenile Justice Center, which provided information, short-term mental health counseling and linkage to an array of community-based services for families of youth in the juvenile justice system.


**September, 2002 – June, 2004**
**Director, Alternative Pathways**
Department of Mental Health
Washington, DC

Alternative Pathways (AP) was a locally- and federally-funded initiative to divert youth with mental health and/or substance abuse disorders from the juvenile justice system. I became the director of this initiative after I secured the funding from the federal Office of

I was responsible for the development, implementation and oversight of a continuum of behavioral health services (i.e., mental health and substance abuse) for youth in the 15 Department of Juvenile Services (DJS) facilities, both detention and commitment. DJS was under agreements with the U.S. Department of Justice under the Civil Rights of Institutionalized Persons Act (CRIPA) in three facilities (Baltimore City Juvenile Justice Center, Cheltenham Youth Facility and Charles H. Hickey School). During my tenure, we came into partial or substantial compliance on most CRIPA-related indicators.

I was responsible for the collaboration and coordination of behavioral health services with Maryland sister agencies, including the Department of Health and Mental Hygiene (DHMH), Maryland State Department of Education (MSDE), Department of Social Services (DSS), Department of Health and various community mental health and advocacy organizations.

I was a co-founder of the Community and Family Resource Center in the Baltimore City Juvenile Justice Center, which provided information, short-term mental health counseling and linkage to an array of community-based services for families of youth in the juvenile justice system.


**September, 2002 – June, 2004**
**Director, Alternative Pathways**
Department of Mental Health
Washington, DC

Alternative Pathways (AP) was a locally- and federally-funded initiative to divert youth with mental health and/or substance abuse disorders from the juvenile justice system. I became the director of this initiative after I secured the funding from the federal Office of

8

Juvenile Justice and Delinquency Prevention for $1,600,000 for the Department of Mental Health to take the lead for the District.

AP spearheaded interagency collaboration among all the District agencies that touch youth involved in the juvenile justice system, including the Family Court, the Metropolitan Police Department, Court Social Services, Public Defender Services, Department of Mental Health, Youth Services Administration, the Deputy Mayor for Children, Youth and Elders and various community stakeholders.

As chair of the mayorally appointed committee, known as the Front-End Assessment Team (FEAT), I was responsible for leading the effort and for bringing together those who could conceptualize the infrastructure and resources that would be needed. I developed the RFPs for vendors and was responsible for the development of all budgets and accounting to the District and federal agency. I was also responsible for all quarterly and annual reports.

In FY 2003, Alternative Pathways launched Youth Empowerment Services (YES), with the goal of screening chronic truants and all apprehended youth for co-occurring disorders so that linkage to necessary services and supports could be established.

Alternative Pathways was also asked to apportion a percentage of its funds for "deep-end" youth, defined as those residing on the Oak Hill Youth Center campus, or in out-of-District residential settings. I was responsible for developing the budget criteria, and protocol for identifying youth with mental health needs who required resources not available in their current placements. Dozens of youth were identified and, with Medicaid and AP funds, were transitioned into the community to receive the services they required. Th  blending of funds from these sour e  made it

9

possible to focus on community-based plans that were a mix of traditional and non-traditional services and supports.

In addition, AP provided the funds to support the validation of Court Social Services' Risk Assessment Instrument (RAI) used in screening youth for detention. As part of AP's strategic plan for addressing the front-end, it was essential that the District used an objective and validated RAI. I budgeted funds in the AP grant to accommodate this expenditure and developed a contract between AP and the National Council on Crime and Delinquency. Progress and monitoring was provided by the FEAT.

**February, 2001 – September, 2002**
**Director, Mental Health Services, Oak Hill Youth Center**
Department of Mental Health
Washington, DC

As noted previously, the Youth Services Administration (YSA), which was the predecessor of the Department of Youth Rehabilitation Services, had been under court order (*Jerry M.*) since 1987. During my tenure the daily census on the OHYC campus averaged 175, with up to 20 daily admissions. The population included a co-mingled mix of detained and committed youth. Working for the Department of Mental Health, I was responsible for the administrative and clinical oversight of mental health services and supports at the facility. I worked to develop interagency agreements between DMH and YSA, and other District agencies providing direct service to the population (e.g., Department of Education, Court Social Services and various group and shelter home providers). With supervisory responsibility for 15 mental health professionals, I developed a comprehensive mental health program that included: suicide screening, comprehensive psychiatric and psychological assessments, medication management crisis management, acute care services

10

and protocols for hospital transfers, and brief and on-going psychotherapy. I also established procedures for the linkage of youth to mental health services upon their release to the community.

In addition, I provided a number of trainings for OHYC juvenile corrections officers, including: "Mental Health 101," strategies for de-escalating youth, and suicide prevention.

### December, 1995 – July, 2000
### Director, Mental Health Services, Central Detention Facility (DC Jail)
Federal Receivership (*Campbell v. McGruder*) DC Jail
Washington, DC

In 1995, the DC Jail (Central Detention Facility, or CDF) was placed into receivership after nearly two decades of failing to come into compliance with consent decrees. The sentinel events leading to a receivership were the large number of completed suicides (9) that had occurred in the jail in the previous year. At that time, CDF provided services for all DC inmates, including sentenced inmates residing in the Virginia-based Lorton prison complex. Upon my appointment, I decentralized mental health services. This included training prison staff and developing protocols and procedures for delivery of mental health services throughout the DC Department of Corrections.

The CDF had a court-mandated ceiling of 1,767 (there were 1,700 on any given day and about 1,000 monthly admissions). I developed two residential treatment units, one serving those identified as acutely mentally ill, and a second, long-term stay unit that served as a step-down for those unable to be housed in the general population. All officers, detailed and relief, had to go through an 40-hour, full-week training in order to qualify to work on the "mental health units." In addition, I developed an outpatient

11

mental health program for inmates residing in the general population. I hired and supervised a professional staff of 13 licensed psychologists and social workers to accomplish this. Together we developed protocols, procedures and policies that conformed with, and in many instances, went beyond the National Commission on Correctional Health Care standards.

I developed, staffed and resourced numerous trainings for correctional officers
Including, the 40-hour mental health training, suicide prevention, stress management, and de-escalation strategies.

I also developed the funding necessary to launch two residential treatment units, (one for men, the other for women) for inmates with substance abuse histories or charges. Working with Pretrial Services, the Addiction, Prevention and Recovery Administration (APRA), and the Salvation Army, these jail-based units provided comprehensive mental health and substance abuse assessments and medical evaluations of detainees. I also began the process of establishing a recovery plan and effecting real linkages for detainees returning to the community.

My responsibilities included negotiating aftercare services and supports with the Department of Mental Health. In addition, I spearheaded an initiative to divert non-violent misdemeanants from the criminal justice system into mental health services and settings. As Chair of the DC Jail Diversion Task Force, I brought together the DC Superior Court, the Attorney General's Office, Public Defender Services, numerous community-based mental health advocacy groups and others to craft the District's diversion plan.

**January, 1995 – August, 1996**
**Director, DC Women's Jail Project**
Central Detention Facility (DC Jail)

12

Washington, DC

I developed the program and funds to establish the Women's Jail Project, which provided direct mental health services and advocacy for women in the DC Jail. I supervised four Howard University clinical psychology doctoral students who worked on site in the Jail. The project was supported by funds from the U.S. District Court for the District of Columbia, the Public Welfare Foundation, the Eugene and Agnes E. Meyer Foundation, and the Center for Mental Health Services/Substance Abuse and Mental Health Services Administration/HHS.

**Volunteer Work**

**April, 2010 – June, 2011**
**International Sports Federation (INAS)**

I was part of an international eligibility committee of psychologists that reviewed applications from intellectually disabled athletes from around the world who were applying to compete in the International Olympics.

**August, 1992 – September, 1994**
**Death Penalty Focus**
San Francisco, CA.

I volunteered for the Death Penalty Focus Group in San Francisco offering technical assistance in their development of media campaigns.

**September, 1993 – December, 1993**

1

**Pelican Bay Information Project**
San Francisco, CA

I volunteered for this grass-roots project whose mission was to monitor the Pelican Bay Prison trial and stay in communication with inmates in Pelican Bay's Special Housing Unit (SHU).

## Clinical Practice

- Director, Psychological Services Center, Clark University, Worcester, Ma. (1/91-6/91)
- Partner, Private Practice, Clinical Associates of Shrewsbury, Shrewsbury, Ma. (9/90-6/93)
- Treatment Team Coordinator, Westborough State Hospital, Westborough, Ma. (9/87-12/90)
- Sexual Abuse Specialist, Westborough State Hospital, Westborough, Ma. (9/88-12/90)
- Staff Psychologist, Psychiatry and the Law Program, Worcester Area Community Mental Health Center, Worcester, Ma. (9/83-6/87)

## Education

1988 Ph.D.  Clinical Psychology Clark University, Worcester, MA
1977 M.A.  Psychology        Clark University, Worcester, MA
1972  B.A.  Psychology        Clark University, Worcester, MA

## Honors and Awards

14

1987 Research Scholar Appointment, Clark University,
Worcester, Ma.
1972    Phi Beta Kappa, Clark University, Worcester, Ma.
1972 B.A. Cum Laude and with High Honors in Psychology,
Clark University, Worcester, Ma.

## Select Publications, Reports and Presentations

(2014) Hartford Courant Op-Ed: State Must Fnd Use of Restraints
On Juveniles.

(2014) Workshop presentation: Solitary Confinement and Isolation
of Youth: Successful Reforms and Next Steps. Coalition for
Juvenile Justice. With Amy Fettig, Senior Staff Counsel for the
ACl U and Mishi Faruque, National Juvenile Justice Policy
Strategist, ACLU.

(2007) Testimony on "Mental Health Issues among Youth in the
Juvenile Justice System" presented to the Congressional
Subcommittee on Healthy Families and Communities of the
Committee on Education and Labor.

(2003) "Remarks   Mental Health in Prison Groups," UDC David
A. Clarke School of Law Law Review, Vol. 7, Spring, Number 1,
pgs. 224-232.

(2002) "Trends in Mental Health and Juvenile Justice in the U.S."
XXVIIth International Congress on Law and Mental Health,
Amsterdam, the Netherlands.

(2000) "Mental Illness Behind Bars." In J. May and K. Pitts (Eds.)
*Building Violence: How America's Rush to Incarcerate Creates
More Violence.* Sage Publications, Ca.

(1999) "Central Detention Facility Safety Net Program." An interactive journaling series for use in a jail-based substance abuse program. Developed with Corrective Action Publications, a subsidiary of Serenity Support Services.

(1999) "Manufacture of Mental Illness in U.S. Prisons: Can Psychologists Respond?" With Craig Haney. Panel presented at the American Psychological Association meeting in Boston, Ma. The panel was part of a session entitled *Crisis in U.S. Prisons: Implications for a Culture of Peace.*

(1998) "Mental Health Outpatient Services in Correctional Settings." In M. Puisis, R. Shansky, and J. May (eds.) *Clinical Practice in Correctional Settings.* Mosby, Chicago, Ill.

Licensed in DC: license # PSY 1752
Licensed in MD: license # 04384 (inactive)

References upon request.

Case 5:17-cv-00097-EKD-JCH Document 34-8 Filed 02/28/18 Page 31 of 31 Pageid#: 331