# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

Harrisonburg Division

| | |
|---|---|
| JOHN DOE 1, *et al.*, by and through their next friend, NELSON LOPEZ, on behalf of themselves and all persons similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>SHENANDOAH VALLEY JUVENILE CENTER COMMISSION,<br><br>*Defendant.* | CIVIL ACTION<br><br>Case No.: 5:17-cv-00097-EKD<br><br>Honorable Elizabeth K. Dillon |

## AFFIDAVIT

**COMMONWEALTH OF VIRGINIA**
**COUNTY OF AUGUSTA:**

This day, Kelsey Wong, Program Director for Shenandoah Valley Juvenile Center Commission, appeared before the undersigned notary public and made oath to the following based on her personal knowledge:

1. I am employed as Program Director for Shenandoah Valley Juvenile Center Commission ("SVJC").

2. I am familiar with SVJC's policy and procedures governing the provision of services to minors, including unaccompanied alien children ("UAC") for the Office of Refugee Resettlement ("ORR").

3. SVJC provides housing, education, and other services pursuant to three different groups of minors:

    (a) SVJC provides secure housing, education, and other services for UAC in ORR custody who require a secure environment.

    (b) SVJC provides secure housing, education, and other services to juveniles from member jurisdictions who have been charged with a crime but have not yet had their cases adjudicated and juveniles who have been sentenced to detention.

(c) SVJC provides housing, education, and other services to juveniles who have been committed to the Community Placement Program ("CPP") by the Virginia Department of Juvenile Justice. The CPP is a separate transitionary release program that allows committed juveniles to be closer to their home communities and reside in smaller rehabilitative settings before being released.

4. The populations described in Sections 3(a) and 3(b) attend the same educational programming and are subject to the same rules and restrictions required for a secure environment.

5. Due to the nature of the CPP program, minors in that program are subject to different programming rules that include desks in their rooms as well as the use of iPods and video games on their unit during the week.

6. The education services provided by SVJC are subject to the requirements of and monitoring by the Virginia Department of Education. For instance, all meals served by SVJC are subject to the same requirements as those served at local high schools.

7. The secure housing services provided by SVJC are subject to the requirements of and monitoring by the Virginia Department of Juvenile Justice.

8. For UAC, all services provided by SVJC are also subject to the requirements of and monitoring by ORR.

9. An orientation program is administered to newly-admitted residents prior to being assigned to a housing unit or room that includes the behavior management program, the grievance procedure, and the disciplinary process.

10. Each resident undergoes a mental health screening upon intake to ascertain the resident's suicide risk level and the need for a mental health assessment.

11. Each resident undergoes a mental health assessment by a mental health clinician following the screening.

12. ORR approves an evaluation by a psychologist for UAC who present with mental health concerns and who are anticipated to remain in ORR custody for a significant period of time.

13. Each UAC approved by ORR for an evaluation is typically reevaluated on an annual basis subject to ORR approval.

14. UAC are provided with greater access to mental health treatment than juveniles in the local population due to ORR's heightened requirements. See ORR Policy Guide, Section 3.3 Care Provider Required Services.

15. Three licensed professional counselors are dedicated to serving a population of up to 34 UAC, whereas only one full-time counselor serves an average local population of 11 minors.

16. Each UAC meets with a clinician for one-on-one counseling at least once per week. Most UAC meet one-on-one with their clinician more than once per week.

17. Each UAC also attends two group counseling sessions per week with a clinician.

18. UAC have access to a psychiatrist through their mental health clinician. There is no limit on the number of appointments.

19. SVJC adheres to ORR's required ratio of one staff member for every six residents during waking hours. As such, each pod containing 10 rooms typically has two staff members present.

20. SVJC follows a behavior management policy that utilizes positive reinforcement to encourage good behavior by all residents, including UAC.

21. SVJC uses a system that awards points to UAC who fully participate in an activity and meet behavioral expectations.

22. UAC may earn either one point or zero points for each designated time period.

23. Points earned by a UAC may never be taken away.

24. A program and behavior log is maintained that includes a weekly record of the points earned by each UAC.

25. Points earned by a UAC may be used for a variety of privileges, including the SVJC shop, special visits, extra phone calls, movies, special events, and special meals.

26. Points are not required to obtain necessary items such as toothpaste and soap, which are already provided by SVJC. However, UAC may purchase name brand versions of many of those products by using points at the SVJC shop.

27. SVJC's regular school programming for UAC includes 45 minutes for physical education that is usually conducted in a full-size gym or outdoors in a courtyard.

28. In addition, UAC are given one hour for recreation activity in the evening on school days.

29. UAC are provided three hours of structured leisure time and recreation time each day that there is no school, such as weekends and holidays.

30. Outdoor recreation is not available when the temperature is below 60 degrees or above 90 degrees, or when there is rain, snow, snow cover, or other conditions that threaten safety.

31. SVJC staff are required to conduct visual safety checks every 15 minutes while residents, including UAC, are in their rooms. Visual safety checks are required every five minutes if safety concerns are present.

32. The door for each UAC's room includes a window to allow SVJC to make visual safety checks as required.

33. About two-thirds of the door window is typically covered from the outside with a black material to provide UAC with as much privacy as possible without jeopardizing safety.

34. Any paper or other material used to block the remainder of the door window from the inside is removed by SVJC staff if a safety check cannot be performed.

35. For behavioral infractions, SVJC staff utilize a range of responses based upon the severity of the offense that range from verbal redirection to removal from daily school programming.

36. UAC may be removed from programming only when every possible alternative has been exhausted.

37. Residents, including UAC, who are removed from programming are placed in room confinement and reevaluated every four hours.

38. A disciplinary report describing the violation, listing any witnesses, and setting forth the sanction is required for every instance in which an earlier bedtime, removal from programming, or room confinement is imposed for a behavioral violation.

39. The resident is notified about the rule violation, provided with a copy of the disciplinary report, and given the opportunity to admit or deny the charge.

40. An administrative appeal process is available that includes the ability to call witnesses and present evidence and features two levels of review to be completed within 24 hours of the alleged violation.

41. Room confinement is subject to the following restrictions:

(a) SVJC staff are required to visually check the UAC every 15 minutes.

(b) SVJC staff are required to visually check the UAC every 5 minutes if the UAC is on suicide watch or other safety concerns are present.

(c) UAC are afforded at least one hour of physical exercise each calendar day unless the circumstances require an exception, which must be documented.

(d) Approval from SVJC's administrator or a designee is required before any UAC may be confined to his or her room for more than 24 hours.

(e) Approval and a written report to SVJC's director or designee is required if any resident, including any UAC, is confined to his or her room for more than 72 hours.

(f) A UAC may not be confined to his or her room for more than five consecutive days unless ordered by a medical provider.

42. A UAC's shirt and pants are removed only in instances where the UAC is using them to engage in self-harm. Both are returned once the UAC is behaving safely and the probability of further self-harm appears unlikely.

43. SVJC observes the following practices with respect to removing a mattress from a UAC's room:

(a) The mattress is removed only in instances where the UAC has destroyed it or is using it to engage in self-harm.

(b) The mattress is returned once the UAC is behaving safely and the probability of further self-harm appears unlikely.

(c) When a UAC destroys their mattress, a replacement mattress is provided after the UAC has calmed and is exhibiting safe behavior.

(d) A UAC may never be left in room overnight without a mattress.

44. SVJC adheres to a written policy governing the use force and restraints against residents, including UAC.

45. Any physical intervention that prevents a resident from moving any part of his or her body is considered a use of force and physical restraint.

46. SVJC staff are required to use the least amount of force that is reasonably necessary to eliminate the risk at issue or to maintain security and order.

47. Physical restraint is used only when a resident's behavior would likely result in harm to themselves or others.

48. Physical restraint is also used only as a last resort after less restrictive measures, including verbal intervention, have failed to control behavior that poses a safety risk to the resident or others.

49. Physical restraint is never used as a physical punishment.

50. A resident placed in a restraint may not be left alone or left in their room wearing the restraint.

51. Only SVJC staff who are trained in the proper and safe use of restraint may implement, monitor, or discontinue physical restraint.

52. Every instance where physical restraint is utilized is considered a significant incident that requires documentation of the following information in the resident's file:

   (a) Date and time of the incident.
   (b) Identification of staff involved.
   (c) Justification for the restraint.
   (d) Description of less restrictive measures that were unsuccessfully attempted.
   (e) Description of restraint utilized and duration.
   (f) Signatures from the person completing the report and the person reviewing the report.

53. SVJC utilizes an emergency restraint chair as the final step of a progressive response to residents who are physically combative, self-destructive, or potentially violent when all other interventions have proven inadequate.

54. The following restrictions apply in every instance where the chair is utilized:

   (a) The chair is used only for justifiable protection of the resident or others.
   (b) Like all other physical restraint, the chair is never applied as punishment.
   (c) Every use of the chair is documented.
   (d) Every use of the chair requires prior approval from SVJC administrative staff when possible or immediately upon using the chair in an emergency situation.
   (e) Only SVJC staff who are trained by the Department of Juvenile Justice in use of the chair may apply the restraints.
   (f) The use of the chair is avoided if at all possible for residents with self-injurious behavior.

(g) The resident must be removed from the chair as soon as the behavior of the resident indicates that it is safe to do so.

(h) While in the chair, SVJC staff ensure that the resident is reasonably comfortable and has access to water, meals, and the bathroom.

(i) No resident may be kept in the chair for more than two hours cumulatively in any 24-hour period.

(j) SVJC staff must maintain constant visual supervision while a resident is in the chair.

(k) SVJC staff are trained by a licensed nurse to monitor for any injuries resulting from the use of the chair.

55. SVJC utilizes a team approach in any physical intervention and avoids one-on-one scenarios whenever possible.

56. SVJC are directed to keep physical contact with residents of any kind to a minimum.

57. SVJC staff who use force in excess of what is necessary, including any force that is punitive or retaliatory, are subject to immediate dismissal and the filing of a child abuse complaint by SVJC with the Department of Social Services.

58. SVJC staff are trained and required to report any instance of physical assault or physical abuse of a resident to Child Protective Services.

59. SVJC staff receive training on the restraint policy, procedures, and techniques annually in a course of instruction approved by the Virginia Department of Juvenile Justice.

60. Employees of the Valley Community Service Board have offices within SVJC and regularly encounter and interact with residents and SVJC staff.

61. I was previously employed as a case manager for SVJC before being promoted to my current position.

62. I was the case manager for R.B. ("R.B.").

63. As his case manager, I supervised and oversaw all aspects of R.B.'s care and placement at SVJC.

64. I am a custodian of and have access to R.B.'s case file in the performance of my employment responsibilities.

65. All records referenced by and attached to this affidavit:

(a) Are true, accurate, and complete copies of records regularly maintained by SVJC as part of R.B.'s case file in the ordinary course of business;

(b) Are made at or near the time of the actions and events described therein;

(c) Are prepared using information provided by persons with knowledge of the actions and events described therein; and

(d) Are made and maintained as a regular practice by SVJC.

66. R.B. was transferred to SVJC due to his destructive and aggressive behavior (he assaulted others and started a fire) while residing at Sandy Pines Residential Treatment Center located in Florida.

67. During his assessment, R.B. disclosed that he began working with the Mexican Mafia Cartel when he was 14. He trafficked people and guns across the border.

68. R.B. reported that he shot a man in Mexico, which he later recanted.

69. R.B. had an extensive juvenile criminal record.

70. R.B. reported that he had received prior mental health treatment for ADHD and bipolar disorder, as well as at other placement centers. R.B. also reported seeing shadows in his room.

71. While at SVJC, R.B. received a psychological assessment and evaluation by Dr. Gustavo Rife on June 15, 2014.

72. R.B. was evaluated and treated on a regular basis by psychiatrist Timothy J. Kane, M.D., starting on June 25, 2014, for approximately five occasions while at SVJC.

73. R.B. was diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit hyperactivity disorder ("ADHD"). Dr. Kane noted that R.B. had PTSD related nightmares and hallucinations.

74. R.B. was prescribed Prozac, Minipress, Risperdal, and Adderall.

75. R.B. participated in weekly individual counseling sessions and bi-weekly group counseling sessions with a mental health clinician from June 13, 2014, until his discharge from SVJC on October 10, 2014.

76. R.B. participated in daily educational classes from June 13, 2014, until his discharge from SVJC on October 10, 2014.

77. R.B. participated in recreation and leisure activities for one hour of each day that was a school day and three hours on the weekends and holidays from June 13, 2014, until his discharge from SVJC on October 10, 2014.

78. A copy of a report from R.B.'s file is attached as Exhibit A-1 that may relate to R.B.'s allegations concerning room restriction. As stated in the report:

   (a) R.B. escaped from custody on October 1, 2014. While returning from a psychiatric appointment with Dr. Kane, R.B. cut his restraints and kicked open the back of the van while stopped at a traffic light.

   (b) Later that day, R.B. was apprehended by the police and returned to SVJC.

   (c) R.B. was restricted to his room and placed on an Intensive Watch.

79. A copy of a report from R.B.'s file is attached as Exhibit A-2 that may relate to R.B.'s allegations concerning room restriction. As stated in the report:

   (a) On October 8, 2014, R.B began shifting in his seat, moving his legs, and touching his groin area several times while being interviewed by Program Manager Cristina Casado.

   (b) Sensing tension, Ms. Casado ended the interview and attempted to walk out of the office.

   (c) As she stood, R.B. grabbed her from behind, wrapping his hand around her mouth and pulling her into the office.

   (d) Ms. Casado was able to escape from his hold, open the door, and call for help.

   (e) At that point, R.B. calmly walked out of the office.

   (f) While being taken to his room, R.B. stated that "I got mad and hit her."

80. SVJC has no record of R.B. being involved in any fights with staff or other minors.

81. While at SVJC, R.B. reported suicidal ideation on September 18, 2014, September 26, 2014, and September 29, 2014.

82. R.B. was on intensive watch throughout his placement at SVJC.

83. On September 29, 2014, intensive watch protocols were followed to ensure R.B.'s safety and the clinician made an appointment for R.B. to see Dr. Kane on October 1, 2014.

84. Any use of the emergency restraint chair must be documented and approved by the SVJC's administration.

85. R.B. was never placed in the emergency restraint chair at any time while he resided at SVJC.

86. A spit mask was never placed upon R.B. at any time while he resided at SVJC.

87. R.B. had a child advocate to whom he spoke by telephone or email.

88. R.B. spoke with his *pro bono* immigration attorney, as well as a criminal defense attorney related to charges in Texas.

89. Neither R.B. nor his representatives raised the allegations described in his Declaration to SVJC at any time.

90. On October 10, 2014, R.B. was transferred from SVJC to Northern Virginia Juvenile Detention Center due to his escalating behavior and assault on Program Manager Cristina Casado.

Kelsey Wong

Subscribed and sworn before me this 19th day of March 2018 by Kelsey Wong
My commission expires 1/31/2020.
Notary Registration No. 7682465.

NOTARY PUBLIC



**EXHIBIT A-1**

## UAC Basic Information

**First Name:**

**Last Name:**

**AKA:**
**Status:** ADMITTED
**Date of Birth:**
**Alien No.:** 205814408
**Age:** 15
**Country of Birth:** Guatemala

**Gender:** M
**LOS:** 111
**Current Program:** Shenandoah Valley Juvenile Center
**Admitted Date:** 6/13/2014

## Significant Incident Report

| | |
|---|---|
| **Date of Incident:** | 10/1/2014 |
| **Incident Reported Date:** | 10/2/2014 |
| **Location Of Incident:** | On Transport |
| **Time of Incident:** | 04:10 PM |
| **Incident Reported Time:** | 09:35 AM |

**Incident Type:**

**Unauthorized Absence:**
- ☑ Runaway
- ☑ Unauthorized Attempt/Runaway Risk
- ☐ Unauthorized Absence of UAC (foster care)

**Abuse Allegation: Type of Abuse**
- ☐ Physical Abuse
- ☐ Sexual Abuse
- ☐ Verbal Abuse
- ☐ Child Neglect
- ☐ Other Abuse

**Abuse Allegation: Alleged Perpetrator** — Select Abuse Allegation Type --

**UAC Behavior:**
- ☐ Physical Aggression
- ☐ Inappropriate Sexual Behavior
- ☐ Possession/Use of Weapon
- ☐ Arrest and/or Incarceration of a UAC
- ☐ Incident Requiring Isolation
- ☐ Sexual Harm to other UAC
- ☐ Harm to Self
- ☐ Possession/Use of Drugs/Alcohol
- ☐ Sexual Assault
- ☐ Physical Harm to Other UAC
- ☐ Disruptive Behavior
- ☐ Restraint of UAC
- ☐ Harm to Staff
- ☐ Verbal Aggression
- ☐ Suicide Ideation/Gesture/Attempt

**Medical/Mental Health:**
- ☐ Death of UAC
- ☐ Mental Health Emergency
- ☐ Injury Requiring Medical Attention
- ☐ UAC Pregnant
- ☐ Childbirth
- ☐ Medication Issue

**Other:**
- ☐ Suspected Smuggling/Trafficking Concern
- ☐ Incident Involving Community Members
- ☐ Incident Involving Media
- ☐ Incident Involving Police

**Synopsis of Incident:** On 10/01/14, UAC _____ had a psychiatric appointment for medication management with Dr. Timothy Kane. Upon return from the appointment, the transport van was stopped at a red light at approximately 4:10PM. While stopped at the light, UAC _____ cut the soft

|  |  |
|---|---|
| | restraints with medical scissors from the first aid kit in the back of the van. Once released from the soft restraints, UAC _____ kicked the back window out of the van and ran south down the street. At approximately 4:59PM, UAC _____ was arrested by the Staunton Police Department and transported back to the Shenandoah Valley Juvenile Center without further incident. |
| **Witnesses:** | Mr. Simmons, Transportation Officer Mr. Deola, Transportation Officer |
| **Staff Response and Intervention:** | As soon as UAC _____ absconded, the transportation officers called the SVJC Program Manager and the Augusta County Sheriff's Office to report the run away. Once the police was notified, the transportation officers informed the Shift Supervisors and the ORR/DCS team at SVJC. Lead Case Manager, Kelsey Wong, informed FFS Supervisor, David Fink, and Deportation Officer, Jim Schubert, of UAC _____ absence. Additionally, Lead Case Manager, Kelsey Wong, informed UAC's Child Advocate, Shalyn Fluharty, of the incident. Upon UAC _____ return to SVJC, Case Manager and Clinician met with the minor. |
| **Resolution and Follow-up:** | In accordance with the Shenandoah Valley Juvenile Center's behavioral management policy, UAC _____ will be restricted to his room for losing all of his behavioral levels for absconding and destruction of property. UAC's Clinician, Andrew Mayles, will continue to follow up with UAC and his mental health status. UAC will remain on Intensive Watch. |
| **Recommendations:** | It is recommended that UAC continue to receive case management, mental health, legal and medical services. |
| **Actual or Expected Media Interest:** | No actual or expected media interest. |

**Persons/Agency or Relationship to UAC**

| Contact Name | Agency | Phone No. | Date | Time |
|---|---|---|---|---|
| DUCS Hotline | sirhotline@acf.hhs.gov | | 10/2/2014 | 09:35 AM |
| David Fink | FFS Supervisor | 2025073294 | 10/2/2014 | 09:35 AM |
| Jim Schenkenberg | Project Officer | 2024011196 | 10/2/2014 | 09:35 AM |
| Mark Bennett | Contract Field Specialist | 2022605738 | 10/2/2014 | 09:35 AM |
| Patricia Melendres | Case Coordinator | 7035876557 | 10/2/2014 | 09:35 AM |

**DHS/ICE Office with Jurisdiction over Minor Involved**

| | |
|---|---|
| Name: | Paul Trump |
| Title: | DHS/JC |
| Contact Number: | 7035689665 |

**Person Filing Report**

| | |
|---|---|
| Name: | Kelsey Wong |
| Title: | Case Manager |
| Contact Number: | 5408860729 |

**Contact for Follow-up**

| | |
|---|---|
| Name: | Kelsey Wong |
| Title: | Case Manager |
| Contact Number: | 5408860729 |

**Approving Supervisor**

| | |
|---|---|
| Name: | Cristina Casado |
| Title: | ORR/DCS Program Manager |
| Contact Number: | 5408860729 |

**User Notes:**

SIR Addendum Notes:



## UAC Basic Information

**First Name:**

**Last Name:**

**AKA:**
**Status:** ADMITTED
**Date of Birth:**
**Alien No.:** 205814408
**Age:** 15
**Country of Birth:** Guatemala

**Gender:** M
**LOS:** 117
**Current Program:** Shenandoah Valley Juvenile Center
**Admitted Date:** 6/13/2014

## Significant Incident Report

| | | | |
|---|---|---|---|
| **Date of Incident:** | 10/8/2014 | **Time of Incident:** | 04:20 PM |
| **Incident Reported Date:** | 10/8/2014 | **Incident Reported Time:** | 06:15 PM |
| **Location Of Incident:** | Case Manager's Office | | |

**Incident Type:**

**Unauthorized Absence:**
- ☐ Runaway
- ☐ Unauthorized Attempt/Runaway Risk
- ☐ Unauthorized Absence of UAC (foster care)

**Abuse Allegation: Type of Abuse**
- ☐ Physical Abuse
- ☐ Sexual Abuse
- ☐ Verbal Abuse
- ☐ Child Neglect
- ☐ Other Abuse

**Abuse Allegation: Alleged Perpetrator** -- Select Abuse Allegation Type --

**UAC Behavior:**
- ☒ Physical Aggression
- ☒ Incident Requiring Isolation
- ☐ Sexual Assault
- ☐ Harm to Staff
- ☐ Inappropriate Sexual Behavior
- ☐ Sexual Harm to other UAC
- ☐ Physical Harm to Other UAC
- ☐ Verbal Aggression
- ☐ Possession/Use of Weapon
- ☐ Harm to Self
- ☒ Disruptive Behavior
- ☐ Suicide Ideation/Gesture/Attempt
- ☐ Arrest and/or Incarceration of a UAC
- ☐ Possession/Use of Drugs/Alcohol
- ☐ Restraint of UAC

**Medical/Mental Health:**
- ☐ Death of UAC
- ☐ Mental Health Emergency
- ☐ Injury Requiring Medical Attention
- ☐ UAC Pregnant
- ☐ Childbirth
- ☐ Medication Issue

**Other:**
- ☐ Suspected Smuggling/Trafficking Concern
- ☐ Incident Involving Community Members
- ☐ Incident Involving Media
- ☐ Incident Involving Police

**Synopsis of Incident:** On 10/08/14 at 4:20PM, UAC was interviewed by ORR/DCS Program Manager, Cristina Casado. During the interview, UAC reports, "I have nothing to lose," when describing his attempt to run away from SVJC Secure. During the interview, UAC

|  |  |
|---|---|
|  | remained calm, however, he began shifting in his seat, moving his legs and touching his groin area several times. As Ms. Casado could detect tension, she ended the interview quickly and attempted to walk out of the office. As she stood up, UAC grabbed her from behind, wrapping his hand around her mouth and pulling her towards the office. At this time, Ms. Casado was able to escape from his hold, push the office door open and yell for help. Once Ms. Casado yelled for help, UAC walked out of the office calmly. While being escorted to his room, UAC reported to the Shift Supervisor, "I got mad and hit her." UAC entered his room without further incident. |
| **Witnesses:** | Cristina Casado, ORR/DCS Program Manager Mr. Neilson, Shift Supervisor |
| **Staff Response and Intervention:** | On 10/08/14 at 4:20PM, ORR/DCS Program Manager, Cristina Casado, met with UAC . As Ms. Casado detected tension, she ended the interview quickly and attempted to walk out of the office. As she stood up, UAC grabbed her from behind, wrapping his hand around her mouth and pulling her towards the office. At this time, Ms. Casado was able to escape from his hold, push the office door open and yell for help. Shift Supervisor, Mr. Neilson, responded to the yelling promptly and escorted UAC to his room without further incident. |
| **Resolution and Follow-up:** | In accordance with the Shenandoah Valley Juvenile Center's behavioral management policy, UAC will be restricted to his room for losing all of his behavioral levels for disrespect to staff, threatening staff, and assaulting staff. |
| **Recommendations:** | Due to the minor's escalating behavior at SVJC, we are requesting a lateral transfer to another secure facility. Incident will be staffed with UAC's clinician, Andrew Mayles. It is recommended that UAC continue to receive case management, mental health, legal and medical services. |
| **Actual or Expected Media Interest:** | No actual or expected media interest. |

**Persons/Agency or Relationship to UAC**

| Contact Name | Agency | Phone No. | Date | Time |
|---|---|---|---|---|
| DUCS Hotline | sirhotline@acf.hhs.gov |  | 10/8/2014 | 06:15 PM |
| David Fink | FFS Supervisor | 2025073294 | 10/8/2014 | 06:15 PM |
| Mark Bennett | Contract Field Specialist | 2022605738 | 10/8/2014 | 06:15 PM |
| Jim Schenkenberg | Project Officer | 2024011196 | 10/8/2014 | 06:15 PM |
| Patricia Melendres | Case Coordinator | 7035876557 | 10/8/2014 | 06:15 PM |

**DHS/ICE Office with Jurisdiction over Minor Involved**

| | |
|---|---|
| **Name:** | Paul Trump |
| **Title:** | DHS/JC |
| **Contact Number:** | 7035686557 |

**Person Filing Report**

| | |
|---|---|
| **Name:** | Kelsey Wong |
| **Title:** | Case Manager |
| **Contact Number:** | 5408860729 |

**Contact for Follow-up**

| | |
|---|---|
| **Name:** | Kelsey Wong |
| **Title:** | Case Manager |
| **Contact Number:** | 5408860729 |

**Approving Supervisor**

| | |
|---|---|
| **Name:** | Cristina Casado |
| **Title:** | ORR/DCS Program Manager |
| **Contact Number:** | 5408860729 |

User Notes:
SIR Addendum Notes: