**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | |
|---|---|
| JOHN DOE 4, by and through his next friend, NELSON LOPEZ, on behalf of himself and all persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SHENANDOAH VALLEY JUVENILE CENTER COMMISSION, <br><br> Defendant. | Civil No. 5:17-cv-0097 <br> Judge Elizabeth K. Dillon <br><br> Jury Trial Demanded |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**INTRODUCTION**

1.    Plaintiff John Doe 4 ("Doe 4" or "Plaintiff") and members of the class he seeks to represent are Latino immigrant youths who are, or may in the future be, confined to the Shenandoah Valley Juvenile Center ("SVJC").   There are approximately 24 - 30 unaccompanied immigrant minors under detention in the facility at any given time.   Doe 4 and members of the class he seeks to represent are confined solely because they crossed the United States border seeking to escape violence in Mexico and Central America without proper authorization and the Office of Refugee Resettlement of the U.S. Department of Health and Human Services ("ORR") has determined to detain them.   Doe 4 and other similarly situated young people detained at SVJC are subjected to unconstitutional conditions that shock the conscience, including violence by staff, abusive and excessive use of seclusion and restraints, and the denial of necessary mental health care.   As a result of this treatment, Doe 4 and other youths have engaged in significant and often continuous self-harm, to which SVJC staff and

1

counselors have responded with callous indifference.  These violations reflect a disorganized, untrained, and understaffed facility that houses immigrant children in brutal, inhumane conditions.

2. This is a civil action pursuant to 42 U.S.C. § 1983 to vindicate the rights of immigrant youth detained at SVJC under the Fifth and Fourteenth Amendments to the United States Constitution.  Doe 4 represents a class of immigrant children who have suffered verbal and physical abuse by SVJC staff; received constitutionally inadequate mental health care; and been subjected to inappropriate confinement and seclusion while detained at SVJC.

3. On behalf of himself and all similarly situated immigrant children, Doe 4 seeks declaratory, preliminary, and permanent injunctive relief requiring that Defendant cease its unconstitutional policies and practices at SVJC and provide class members with the standard of care and conditions of confinement mandated by the United States Constitution.

4. These problems are not unique to SVJC, but are part of a growing and alarming national trend of punitive, racially discriminatory conditions of confinement and systematic indifference to the suffering of immigrant detainees, who often fare worse in civil detention than those serving criminal sentences.[1]

5. Immigrant detainees are regularly subjected to poor sanitation, substandard medical and mental health care, excessive use of solitary confinement, and other conditions that too often result in senseless, preventable suffering and in some cases, deaths.

---

[1] *See, e.g., Conditions of Confinement in Immigration Detention Facilities*, ACLU, June 27, 2007, https://www.aclu.org/sites/default/files/field_document/unsr_briefing_materials.pdf; *Systemic Indifference: Dangerous & Substandard Medical Care in US Immigration Detention*, HUMAN RIGHTS WATCH, May 8, 2017, https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention.

2

## PARTIES

### Plaintiff John Doe 4

6.    Doe 4 is a 17-year-old native and citizen of Honduras.

7.    Doe 4 left Honduras to escape a gang that threatened his life if he did not join the gang. In fear for his life and safety, he fled to Guatemala and then Mexico, and he entered the United States to seek protection as a refugee.

8.    Doe 4 arrived in the United States on or about May 15, 2017. He was apprehended by Immigration and Customs Enforcement ("ICE") officers at the Mexican border and, upon information and belief, was determined to be an Unaccompanied Alien Child ("UAC"). He was placed in a shelter in Tucson, Arizona for approximately one month.

9.    From Tucson, Doe 4 was transferred to a detention facility in New York, where he spent approximately 7-8 months.

10.    Doe 4 was subsequently transferred to SVJC on or about December 1, 2017. He was not initially informed of the reason for his transfer, but was later told that he was moved because he was considered a flight risk. Doe 4 has never attempted to escape from detention. He was also informed that he was moved because he did not respect staff at the prior facility.

11.    Doe 4 is currently detained at SVJC. On behalf of himself and all similarly situated immigrant children, he brings this action by and through Nelson Lopez, his next friend.

12.    Mr. Lopez has met with Doe 4, and Doe 4 consents to Mr. Lopez serving as his next friend.

13.    Nelson Lopez is an adult resident of Virginia. He brings this action for the benefit of Doe 4 and the class of immigrant detainees Doe 4 seeks to represent.

14.    Mr. Lopez is well-suited to serve in this role. He is currently self-employed and engaged as a community advocate at a Northern Virginia social justice organization that he co-founded.

3

He previously worked as a paralegal at an immigration legal services organization for approximately three years. In that capacity, Mr. Lopez frequently visited detained immigrant adults and children to educate them about their legal rights and assist them in navigating the immigration legal system.

15. Upon information and belief, the majority of the immigrant detainees in the class, most of whom have arrived from Mexico and Central America, have experienced psychological trauma before arriving at SVJC. They have been severely traumatized by violence they have experienced, witnessed or with which they have been threatened, in their home countries and during their journeys to the United States.

16. When ORR staff at other facilities are faced with behaviors of immigrant youth detainees which they perceive to be threatening or violent, they may arrange for the transfer of those immigrant youth to SVJC, because it is a "secure" facility. Those behaviors, however, are generally the direct result of untreated mental illness resulting from trauma experienced by the youth in, or during the process of fleeing from, their home countries.

17. As is the case with other SVJC detainees, Doe 4, upon information and belief, was not provided in his previous placements in ORR facilities the necessary services – including, but not limited to, appropriate mental health care – to allow him to live in a community setting, despite ORR's obligations under federal law to ensure that unaccompanied minors "be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

18. Doe 4's plight echoes the stories of the many immigrant youth who have been or are now

4

detained at SVJC.[2]  These children uniformly describe SVJC as a facility where immigrant youth languish without necessary mental health services, are regularly verbally and physically abused, harassed, and taunted by staff, and are subjected to harsh, disproportionate discipline for behavioral issues that are in many cases directly provoked by the abusive treatment they receive.  These conditions violate the constitutional rights of Doe 4 and all similarly situated immigrant children, all of whom are entitled, to the extent they are properly detained at all, to reasonably safe and sanitary conditions of confinement and protection from harm.

### Defendant Shenandoah Valley Juvenile Center Commission

19.  Defendant Shenandoah Valley Juvenile Center Commission ("Defendant" or "Commission") is a commission composed of members from seven jurisdictions in the Shenandoah Valley, including the Cities of Harrisonburg, Lexington, Staunton and Waynesboro, and the Counties of Rockingham, Augusta, and Rockbridge.  The Commission owns and operates SVJC, a secure residential detention facility in Staunton, Virginia, for use by each of the member jurisdictions.

20.  The Commission is a public body corporate pursuant to Va. Code § 16.1-315.

### <u>JURISDICTION AND VENUE</u>

21.  Plaintiff's causes of action arise under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

22.  Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331.

---

[2] Those prior detainees include John Does 1, 2 and 3, who served as named Plaintiffs in this lawsuit for a period of time and attested to the inhumane conditions at SVJC.  *See, e.g.,* Plaintiffs' (First) Amended Complaint, ECF Doc. 22; Exhibits 1-3 filed in support of Plaintiffs' Motion for Preliminary Injunction, ECF Docs. 34-1, 34-2, 34-3.

23. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

### General Conditions at SVJC

24. SVJC holds an approximate average daily population of 40 youth between the ages of 10 and 17 years. This includes both UACs and United States citizen youth who have been adjudicated as juvenile delinquents.

25. ORR, the division of the U.S. Department of Health and Human Services directly responsible for the care and custody of unaccompanied immigrant minors, has contracted with the Commission to house children whom ORR determines are UACs and require detention in secured conditions due to the risk of harm these UACs purportedly pose to themselves or others.

26. SVJC is currently one of only three secure facilities in the country that house detained UACs.

27. ORR's explanation for its decision to place a child in a secure facility must be made in writing and made available to the child. Its evaluations in this regard are to be revisited at regular intervals. Upon information and belief, ORR consistently fails to fulfill these obligations, and many of the members of the class that Plaintiff seeks to represent, including himself, have little to no understanding as to why they have been placed at SVJC.

28. SVJC is, both structurally and functionally, a prison. Children are not permitted to freely move about the facility and they are locked in their rooms for approximately 12-14 hours per day, including before and after meals; during staff breaks; and after 9:30 in the evening.

29. The children are fed substandard meals that contain too few calories and are often served cold or are accompanied by spoiled milk. They consistently remain hungry after meals

6

because they receive too little to eat.

30. Each child is assigned to a room with a mattress, a sink, and a toilet. There is no wall or divider enclosing the bathroom area, so the staff can see the children use the toilet through the window in the door to their room.

31. Some children have sought privacy by placing paper over this window to obscure the view from outside the room, but the staff have removed any such covering. One youth reported that, when he attempted to place paper over the window to his room for privacy, staff swarmed into his room with plastic shields and assaulted him. From the window, staff can and do regularly observe youth. Youth report being watched when they use the toilet.

32. Each room is in a "pod," which is a cluster of approximately ten rooms with a shared common area.

33. In the common area of each pod, there are metal tables and chairs that are bolted to the floors.

34. The immigrant children detained at SVJC are grossly under-stimulated. Although they receive a few hours of classroom instruction per day, much of it is either inaccessible, as the instruction is not consistently provided in the children's native language, is significantly below grade level and/or is repetitive. The facility does not meaningfully assess educational proficiency to determine the level of instruction that each resident should receive.

35. The children are given limited recreation time per day, which is either spent in a small gymnasium or, less frequently and only recently, in a small outdoor area that is fenced in with barbed wire. The children's remaining free time is spent locked in their pods, where the only activities they are regularly permitted are reading or playing cards with incomplete decks.

36. In the evening, the children are permitted to watch a limited amount of television, but the

7

staff members control the TV and the children are not allowed to touch it.

37. There is a point system in place to reward children for good behavior and punish them for bad behavior. The children are required to use points if they want to have access to personal hygiene items such as toothpaste and soap.

38. Points are taken away by SVJC staff from detained UACs for such purported "offenses" as asking the time of day; declining to read a book during the children's designated "free time"; giving their food to a friend; neglecting to raise their hand in class; moving the location of the TV in their pod to see it better; walking in the hallways with their hands down at their sides rather than behind their backs; and throwing a ball that hits the ceiling in the gym. If a child loses two points in a day, the child will be placed on "restriction," which amounts to solitary confinement in his room.

**Race and National Origin Discrimination by SVJC Staff**

39. The majority of SVJC staff members are Caucasian and, despite the express requirements of SVJC's contract with ORR, do not speak Spanish.

40. SVJC staff routinely insult, taunt, and harass the immigrant youth detained at the facility based on their language, race, and/or national origin.

41. Doe 4 has had staff members insult him and has heard them insult other immigrant detainees. Staff have taunted Doe 4 by calling him "criminal", "pig", and "nothing more than an immigrant." They have told him that the only way for the immigrant children to leave SVJC is to be deported. He has heard staff say that the immigrant children are "living off of the government," that they have come to the United States to steal jobs, that they do not deserve to be in this country, and that they have no right to anything because of their immigration status and national origin.

42.	Youth report staff calling them "delinquents," "gangsters," and "defective." One child was called a "Mexican monkey"; another was told by a guard that "dark people bother me." Others have been called names such as "pendejo" (or "idiot" in Spanish) and "onion head".

43.	Youth who understand English have heard staff insult the immigrant children and call the children stupid for failing to understand the staff's English insults.  When these youth translate the insults into Spanish so the other children can understand what is being said about them, staff members become angry and take away points.

44.	Staff also have frequently refused to allow the immigrant children to watch Spanish-language programming on the communal television in their pods, making dismissive comments such as they "don't care" that the children are Latino and cannot understand an English television show.

45.	SVJC staff also exert their control in a way that is intended to demean and humiliate the children. Doe 4 and other detainees have reported being stripped of their clothes, including, at times, even their underwear, while restricted to their rooms in solitary confinement as a form of punishment.  There is no legitimate penological or detention-related justification for this kind of treatment.

46.	SVJC staff also subject the immigrant youth to disparate discipline, doling out harsher punishments to the immigrant youth than to local juvenile offenders, the majority of whom are Caucasian and were born in the U.S, who have engaged in the same or considerably worse behavior.

47.	On one occasion, an immigrant youth and a juvenile offender got into a fight after the juvenile offender had taunted the immigrant youth and told him that he "hate[d] Latinos".  When SVJC staff intervened to break up the fight, the immigrant youth was grabbed and thrown

9

forcefully to the ground, but the juvenile offender was merely held by the arms and pulled away. Thereafter, the immigrant youth was restrained, strapped to a chair, and hit several times by staff members while restrained. The immigrant youth was required to remain strapped to the chair, in his room, for four hours. This restraint served no security or penological purpose and was legally impermissible punishment.

48. Despite the fact that local detainees have been adjudicated as juvenile delinquents, while the immigrant youth residing at SVJC have not, the local juvenile offenders are also granted more privileges than the immigrant youth. Upon information and belief, the local offenders are granted more opportunities to go outdoors and more physical freedom to move about the facility; they are provided with computers in their classrooms and with markers and pencils for drawing; and they have regular access to MP3 players for listening to music and to Xboxes in their pods. The local juvenile offenders have better and more comfortable furniture in their pods. None of these benefits are afforded to the immigrant youth.

## Physical Abuse by SVJC Staff

49. In addition to being called racially-charged names, Plaintiff and other immigrant children are frequently called names, such as "gay" or "faggot", by SVJC staff, who appear outside of their rooms and taunt them until they receive a response.

50. For Plaintiff and other immigrant detainees, verbal abuse by staff triggers emotional responses connected to traumatic memories of past abuse that they have experienced and/or self-protective behaviors.

51. Relentless verbal abuse of the immigrant youth by SVJC staff frequently escalates into physical confrontations, as the frustrated children reach their breaking points and act out. *See, e.g., Santos v. Smith*, No. 5:17-cv-00020, 2017 U.S. Dist. LEXIS 83909, at *38 (W.D.

Case 5:17-cv-00097-EKD-JCH   Document 68   Filed 07/11/18   Page 10 of 31   Pageid#: 889

Va. June 1, 2017) (Dillon, J.) (noting, in ruling on a habeas petition brought by an immigrant youth detained at SVJC, that most of the petitioner's significant behavioral problems had arisen after he had been in custody for over a year and were "likely . . . attributable in part to his placement at SVJC.")

52. When immigrant youth lash out following the staff's taunting, SVJC staff regularly respond by physically assaulting the youth, applying an excessive amount of force that goes far beyond what is needed to establish or regain control.

53. Doe 4 has been subjected to physical assault by SVJC staff.

54. For example, when Doe 4 once attempted to calmly speak with a staff member about an issue, he was ordered to his room for a time out – ostensibly a short period of time for "cooling off" purposes. As he tried to approach his room, staff punched him, shoved him into the room, and tied his hands behind his back. A staff member then pinned him against the wall, twisted his wrist, and continued to hit him until several staff persons fell on top of him. When Doe 4 protested that he could not breathe, staff told him that it was "good" he could not breathe.

55. On other occasions, Doe 4 has been restrained by more than one staff member, put into a restraint hold, and removed from programming for actions deemed non-compliant but which were not accompanied by any physical act on his part. On such occasions, Doe 4 would be restricted to his room – in solitary confinement – for four to eighteen hours.

56. Other youth report use of force against them that is grossly disproportionate to the perceived offense. Youth have reported staff shoving them to the floor, hitting them while they were on the floor and, as in the case of Doe 4, piling on top of them. Youth subjected to such force also report significant bruising as a result.

11

57. Other youth have been restrained by multiple SVJC staff members at a time when the youth do nothing more than verbally insult them. In one such case, staff grabbed the youth's hands and put them behind his back so that he could not move, using enough force to leave bruises on his wrists, ribs, and shoulder.

58. Plaintiff and other children have also been assaulted by SVJC staff while they are restrained. Doe 4 has been hit by staff even while he was restrained inside his room.

59. Youth report being slammed, face first, into the wall, as staff respond to a verbal challenge. They report staff stabbing them with pens.

60. One immigrant detainee was physically assaulted because he failed to comply with a directive to leave his book in his room when he went to class. Although the child had not exhibited any physical aggression, three SVJC staff members reacted to his refusal by shoving him into his room, placing handcuffs on him, and forcing him to his knees. The staff members removed the mattress from his room and proceeded to push the youth, face down, on the concrete slab where the mattress had been. When they picked him back up, his face red from being pushed into the concrete, they locked him in his room for 8 hours.

61. Other youth have been assaulted by SVJC staff while they were restrained. For example, one youth was removed from class after he swore at a teacher, and staff members took him to his room. When the youth tried to resist, staff members put handcuffs on his wrists. After he was in handcuffs, staff members pushed his face into the wall.

62. Another child was punched by SVJC staff in the chin while his hands were tied behind his back, leaving a bruise. He struggled to break free, and staff members pushed him to the ground, causing him to lose consciousness.

63. As these incidents illustrate, SVJC staff regularly apply force to Plaintiff and other class

12

members for no legitimate penological or detention-related purpose, maliciously and sadistically for the very purpose of causing them harm.

64. The predicate for the application of force is often manufactured by SVJC staff, as they intentionally provoke the youth to an aggressive reaction in order to justify physically assaulting them, purportedly as punishment.

65. The degree of force used by SVJC staff is disproportionately severe in relation to any reasonably perceived threat. SVJC staff routinely hit and/or push children to the ground for minor acts of aggression, and they assault the children after they have been restrained, when any threat that the children may have posed has been eliminated.

66. As a result of such malicious and sadistic applications of force, Plaintiff and other immigrant youth have sustained significant injuries, both physical and psychological.

67. Upon information and belief, and based on the accounts of youth who are currently held or were recently held at SVJC, such physical abuse is routinely inflicted on class members.

### Confinement and Restraints

68. Defendant has a policy or practice of confining the immigrant detainees to their rooms for lengthy periods of time and/or using handcuffs and cloth shackles on their hands and feet to restrain them.

69. Defendant utilizes lengthy confinement and the application of restraints for punitive purposes.

70. Immigrant youth are confined to their rooms for minor behavioral infractions, including arguing over the television, not participating in class, complaining about a headache, or accidentally hitting another resident or the ceiling with the ball while playing soccer.

71. Confinement and restraints are also used when youth fight with one another, fight with staff,

or engage in self-harm.

72. The decision to use restraints on a child for "fighting" is often made arbitrarily, and children have been restrained merely for being present when a fight breaks out.

73. Moreover, the children are restrained long after any safety or security justification for doing so has expired.

74. On one occasion, Doe 4 had an altercation with a staff member. Multiple staff members grabbed his fingers, pulled them back painfully, and placed his knees on the ground before falling on top of him and throwing him to the ground. After placing his hands and feet in shackles, staff members grabbed him by the torso and put him in his cell. Doe 4 was kept in these restraints for an entire day inside his room, during which he was forced to lie face down on the floor with no mattress and with no other clothing but his boxers.

75. One youth was once forced to wear handcuffs on his wrists and shackles on his feet for approximately 10 days in a row after an altercation with a staff member. The staff member entered the youth's room without his consent and provoked an altercation with the child during which the staff member hit the youth and the youth bit the staff member. Thereafter, the staff member beat the youth, leaving him with bruises on his neck and arms. Subsequently, the youth was placed in the restraints.

76. Another youth was forced to wear handcuffs on his wrists and shackles on his feet several times while he has been restrained in his room.

77. During the time that a child is forced to wear the restraints, they are removed only while he sleeps or eats alone in his room.

78. Plaintiff and other children have suffered serious physical and emotional harm from Defendant's use of restraints. The restraints are very tight, often leaving bruises and cuts on

14

the children's wrists after they have been taken off. When the use of handcuffs on Doe 4 cut off his circulation, leaving bruises and hurting his wrists, he asked for medicine. Staff told him they would bring him medicine, but they never did.

79. Other children have complained about pain caused by excessively tight handcuffs and have shown injuries to SVJC staff and to ORR's on-site representatives, but no action to remedy the practice has been implemented.

80. Plaintiff and other children have also been confined to their rooms for 24 hours or more at a time. On some occasions the children are stripped of their clothes, including their underwear, during such lengthy periods of confinement.

81. Doe 4 was once confined to his room for three days following an altercation with a staff member. The first day of restriction, Doe 4 was kept in restraints and left in his boxer shorts. Late in the second day, staff removed the restraints and gave him a blanket. During these days in isolation, he was not provided adequate meals and remained very hungry. On the third day, when he was released from restriction, he was allowed to go to school, and his mattress, books and other belongings were returned to him.

82. On another occasion, Doe 4 was placed in restriction for the entire day because he took a notebook from his classroom to his pod to draw, without first obtaining his teacher's permission. Staff told him that he was placed in restriction because he took the book without permission and had been disrespectful in discussing the incident.

83. Youth have also reported that at times, staff will escalate interactions and provoke an immigrant child before subsequently punishing the child, including placing the child in isolation. Once, when Doe 4 asked to play with the x-box in his pod, staff said no. When Doe 4 calmly asked why he could not play, staff threatened — and subsequently continued

15

to threaten — a time-out rather than answering his question. During this encounter, other staff members were called into the pod. Doe 4 became frustrated and said a bad word, which resulted in his being placed in restriction. On multiple occasions, he has been put in solitary confinement for merely saying angry words without any physical escalation, or for simply asking why points were taken from him.

84. On other occasions, when youth ask SVJC staff to be separated from other youth that are insulting them or attempting to provoke violence or anger, staff will ignore these requests and allow situations to escalate before punishing the provoked youth.

85. Doe 4 has been forced to wear a scratchy and suffocating thick green blanket that covers the entire body for three weeks whenever he was in his cell, including the time when he went to sleep. It is very thick and makes the wearer sweat. Staff told him he had to wear the green blanket because he didn't listen and didn't go to school.

86. When Doe 4 was told he had to wear the blanket, staff came and checked on him every 15 minutes to see that he had the blanket over him. They said that they would take everything he had away from him if he did not keep the blanket on.

87. During the period of time in which he was forced to wear the blanket while in his cell, Doe 4's mattress was also taken away. When he complained to his case worker, he was told that they did not have another mattress and he would have to wait until another youth left and a mattress became available.

88. Doe 4 has also been forced to wear a special suit for one or two days when confined to his room. The pants and shirt of the suit are connected and underwear is worn under the suit. He is not sure why he had to wear the suit, but it may have been because of a time when he was angry, hit the wall, and hurt his arm.

16

89. Upon information and belief, the blanket and the suit are used for children who have engaged in self-harm. However, youth have also reported that the green blanket is forced on them when they misbehave, such as if they are deemed to have demonstrated "disrespect" towards a teacher or hit the door of their room in frustration.

90. Other youth have been subjected to solitary confinement for more than a day. When placed in solitary confinement, staff take away the youth's mattress, blanket, and clothes.

91. Immigrant youth at SVJC have also have been strapped to a restraint chair as a form of punishment. While the youth are in the chair, their arms, legs, and torso are strapped down, and a mask is sometimes placed over their head. The children are sometimes strapped to the chair wearing nothing but their underwear, and in some instances have been subjected to urinating on themselves when staff refused their pleas to be unbound so they could use the restroom. Youth have been strapped to the chair for several hours at a time.

92. Although Doe 4 has not been placed in the restraint chair during his detention at SVJC, he and other immigrant youth have been threatened with punishment in the chair if they misbehave or do not listen to staff members.

93. There is no legitimate penological or detention-related justification for using confinement or restraints in the described manner, as these measures are used long after control of the subject child has been secured and there is no threat of any further physical altercation. Defendant's conduct is motivated by a desire to harass or humiliate the detained children in its care or to provoke a response that justifies the use of even further force by staff.

### Inadequate Mental Health Care

94. Defendant fails to provide minimally adequate mental health services for the immigrant detainees in its custody and is deliberately indifferent to their serious psychological and/or

medical needs.

95. Defendant has a policy or practice of denying Plaintiff and class members access to appropriate mental health treatment and counseling with licensed mental health professionals, in violation of well-established professional standards.

96. SVJC staff members are unable to recognize and properly react to the obvious needs of youth with known, demonstrable, serious mental health disorders and instead further taunt and harass the children when they exhibit signs of distress.

97. Youth who arrive at SVJC with diagnosed mental health conditions do not receive adequate or appropriate follow up care or treatment following their arrival at the facility. Their mental health treatment consists of meeting with a licensed professional counselor and taking prescribed medications.

98. In his meetings with his counselor, Doe 4 regularly asks to meet with a psychologist. He has explained that he wants to talk to a psychologist to help him deal with his anger and frustration. Despite his repeated requests, he has met with a psychologist only once during his six months at SVJC.

99. Staff have often refused Doe 4 access to his counselor outside of their routine schedule. For example, after Doe 4 was placed in restriction when he took a notebook to his pod to draw without first obtaining his teacher's explicit permission, see *supra* at ¶ 82, he was allowed to go to the gym. He sat in a chair and asked to speak with his counselor to talk through his anger about the situation. The staff member refused and demanded that Doe 4 leave his seat. When Doe 4 again asked to speak to his counselor, the staff member called other staff for assistance and ordered them to return Doe 4 to his cell. The staff members grabbed him by his hands and arms, and he asked them to not touch him. The staff ignored him, grabbed his

18

hands and arms, put him in his cell, and took away all his belongings.  He was then placed in solitary confinement for approximately seven to eight hours.

100. Youth at SVJC frequently engage in self-harm.  Self-harm includes cutting arms, wrists or other places on the body with objects, such as pieces of plastic or glass.  It may include banging the head against the wall or floor.  Youth, including a former Plaintiff in this action, have attempted suicide or expressed suicidal ideation while detained at SVJC.

101. Youth who engage in self-harm report that they started the self-harming conduct after being placed in SVJC or ORR custody.

102. Doe 4 has engaged in self-harm at SVJC.  He began scratching and cutting himself after he arrived at SVJC.  He has hit his head against the wall, and on one occasion he hit his arm against the wall and broke it, requiring a cast.

103. The only response from staff to Doe 4's self-harm was to tell him not to do it again and to warn him that further attempts at self-harm would result in the loss of privileges.  No one discussed with him why he did it. He did not talk to a psychologist after incidents of self-harm.

104. Doe 4 is aware that other youth engage in self harm.  Some youth try to drink shampoo.  Another youth recently was hitting his head against the wall of his room, resulting in bleeding, before he was subdued by staff.  The youth are given bandaids for self-inflicted cuts.

105. Doe 4 engaged in cutting to deal with feelings of anger and frustration.  Upon information and belief, these are symptoms of past trauma and untreated mental health conditions, which are exacerbated by the conditions in the facility and the lack of meaningful treatment to which he and other youth are subjected by staff.

106. The self-harming behavior of Doe 4 and other detained youth is a manifestation of serious, untreated mental health need.

107. SVJC staff are aware that immigrant youth engage in cutting and other self-harming behaviors. Doe 4 has reported his incidents of self-harm to his counselor on multiple occasions. Other youth have made similar reports.

108. SVJC staff are deliberately indifferent to the children's serious mental health needs, as they are aware of the harm that Doe 4 and others are causing themselves by cutting and other behaviors, and they disregard the excessive risk of future harm – namely, serious injury and possibly death – to the children's health and safety if they do not receive appropriate treatment for these needs.

109. SVJC staff have told youth and other staff on multiple occasions that they "don't care" that the youth are cutting themselves. Other youth have similarly been told, "Kill yourself already," by SVJC staff when they have learned that the youth have engaged in cutting.

110. Rather than treat the underlying causes of this behavior, SVJC staff have punished youth for engaging in self-harm. Engaging in self harm is considered a "bad behavior" which is punishable by segregation and confinement and/or use of restraints.

111. SVJC staff have responded to suicide attempts by removing the youth's clothes, placing the youth on restriction for one or more days, and allowing them to leave their room only for classes.

112. Youth have also been strapped to the restraint chair as punishment for self-harm.

113. Upon information and belief, youth who attempted suicide received no treatment beyond that accorded to any other detainee – i,e., periodic visits with counselors who admonish the youth to "behave."

114. Isolating, punishing, and failing to provide clearly-needed mental health treatment to children who are or may be suicidal is extremely damaging to their well-being, and violates well-established professional standards.

115. Plaintiffs have been and continue to be harmed by the lack of appropriate, trauma-informed mental health treatment.

## CLASS ACTION ALLEGATIONS

116.  John Doe 4 brings this suit on his own behalf and on behalf of all UACs who are, or will in the future be, detained at SVJC.

117. The class is so numerous that joinder of all members is impractical.  SVJC has the capacity to house 63 youth at one time and approximately 24-30 immigrant youth are detained there currently.  Further, because children remain at SVJC for varying lengths of time, and the population changes frequently and unpredictably, the class also includes former SVJC residents who may return there in the future as well as future members whose names are not known at this time.  Fed. R. Civ. P. 23(a)(1).

118. There are questions of law and fact common to all class members, including but not limited to the Defendant's failure to protect class members from harm; the Defendant's failure to provide class members with constitutionally adequate mental health care; the Defendant's policy and practice of subjecting class members to inappropriate restraint and prolonged periods of seclusion; and the Defendant's failure to otherwise provide class members with constitutionally safe and humane conditions of confinement.  Fed. R. Civ. P. 23(a)(3).

119. Because the Defendant's policies, practices, and procedures challenged in this Second Amended Complaint apply with equal force to the named Plaintiff and the other members of the class, the claims of the named Plaintiff are typical of the class in general.  Fed. R. Civ. P.

23(a)(3).

120. The named Plaintiff will fairly and adequately represent the interests of the class. He possesses a strong personal interest in the subject matter of the lawsuit and is represented by experienced counsel with expertise in class action and civil rights litigation in the federal courts. Counsel has the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action. Fed. R. Civ. P. 23(a)(4).

121. The Defendant has acted or failed to act on grounds generally applicable to the class in that Defendant's policies and practices in violation of the Plaintiff's constitutional rights have affected all class members. Accordingly, preliminary as well as final injunctive and declaratory relief is appropriate to the class as a whole. Fed. R. Civ. P. 23(b)(2).

## NECESSITY FOR INJUNCTIVE RELIEF

122. The Defendant has acted and continues to act in violation of the law as described above. The named Plaintiff and the class he seeks to represent do not have an adequate remedy at law. As a result of the policies, practices, acts, and omissions of the Defendant, the named Plaintiff, and the class he seeks to represent, have suffered serious, imminent, and irreparable physical, mental, and emotional injuries.

## COUNT I
### Violations of the Fifth and Fourteenth Amendments
### (42 U.S.C. § 1983 – Excessive Use of Force)

123. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 as if fully set forth herein.

124. The Due Process Clause of the Fifth Amendment requires that civil detainees be protected from harm and kept physically safe and secure. This right is enforced against the States through the Fourteenth Amendment.

22

125. This Fifth Amendment right includes the right to be free from excessive use of force by staff.

126. As described above, Defendant subjected Plaintiff to unnecessary and excessive force when Plaintiff was punched, hit, shoved, and otherwise physically assaulted by SVJC staff.

127. Any perceived need for the application of force in each such instance in which it was applied, if warranted at all, dissipated at the moment control was achieved and the youth involved was controlled or restrained. Indeed, Plaintiff Doe 4 was repeatedly subjected to force when he had not engaged in physically threatening behavior toward staff that warranted the use of any force, much less restraint by multiple staff members.

128. Despite the fact that Defendant achieved control, Defendant would routinely take further punitive action against the offending youth by, among other things, strapping them to a chair for hours at a time; confining them to their rooms for hours or even days, sometimes without clothing; or forcing them to wear handcuffs and shackles on their hands and feet for up to 10 days at a time.

129. Defendant wantonly engaged in this injurious conduct by applying force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or restore discipline, particularly in light of the minimal severity of the youths' perceived infractions and, in many cases, their extensive and detailed record of mental health diagnoses.

130. Defendant's excessive use of force causes physical pain and suffering, mental anguish, emotional distress, the deterioration of Plaintiff's and other youths' mental health and an undue risk of serious injury and/or premature death.

131. Defendant's refusal to protect children from harm, and to otherwise keep them physically safe and secure and free from unconstitutional practices like excessive use of restraints and prolonged confinement, violates the constitutional rights of the Plaintiff and class members

23

under the Fifth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

132. Defendant's policies, practices, acts and/or omissions have placed or will place Doe 4 and the members of the class he seeks to represent at an unreasonable risk of suffering new or worsening serious illnesses, injuries, and harm.

133. Unless restrained by this Court, Defendant will continue to engage in the acts and omissions set forth herein that deprive immigrant detainees confined at SVJC of rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and will cause irreparable harm to these youth.

## COUNT II
### Violations of the Fifth and Fourteenth Amendments
### (42 U.S.C. § 1983 – Failure to Provide Adequate Mental Health Services)

134. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 as if fully set forth herein.

135. The Due Process Clause of the Fifth Amendment requires that all individuals who are detained by the State be afforded adequate medical care, including mental health care, during their detention. This right is enforced against the States through the Fourteenth Amendment.

136. As described above, Defendant failed to provide necessary care and treatment for detainees' known and well-documented mental health conditions.

137. In particular, Defendant denied Plaintiff and other detainees the necessary medical and psychological care required to treat individuals who are psychologically traumatized and/or have engaged in self-mutilation.

138. Defendant engaged in this injurious conduct with deliberate indifference to Plaintiff's and other detainees' serious psychological and/or medical needs, placing these youth in

24

substantial risk of serious harm.

139. Defendant's deliberate indifference to Plaintiff's and other detainees' serious mental health needs has caused, and continues to cause, Doe 4 and other youth physical pain and suffering, mental anguish, emotional distress, the deterioration of their mental health, an undue risk of serious injury and/or premature death.

140. Defendant's policies, practices, acts and/or omissions constitute and reflect deliberate indifference to the serious mental health needs of the immigrant youth residing at SVJC and violate the Fifth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

141. Defendant's policies, practices, acts and/or omissions have placed or will place Doe 4 and the members of the class he seeks to represent at an unreasonable risk of suffering new or worsening serious mental illnesses, injuries, and harm.

142. Unless restrained by this Court, Defendant will continue to engage in the acts and omissions set forth herein that deprive immigrant detainees confined at SVJC of rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and will cause irreparable harm to these youth.

## COUNT II (IN THE ALTERNATIVE)
### Violations of the Fifth and Fourteenth Amendments
### (42 U.S.C. § 1983 – Failure to Provide Adequate Mental Health Services)

143. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 as if fully set forth herein.

144. The Due Process Clause of the Fifth Amendment requires that all individuals who are detained by the State be afforded adequate medical care, including mental health care, during their detention. This right is enforced against the States through the Fourteenth Amendment.

25

145. As described above, Defendant failed to provide necessary care and treatment for Plaintiff's and other detainees' known and well-documented mental health conditions.

146. In particular, Defendant denied Plaintiff and other detainees the necessary medical and psychological care required to treat individuals who are psychologically traumatized and/or have engaged in self-mutilation.

147. By failing to provide Plaintiff and other detainees with appropriate mental health care and treatment, Defendant has failed to exercise appropriate professional judgment, and/or exercised decision-making that is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the Defendant has not actually based its decision-making on such a judgment.

148. Defendant's failure to adequately treat Plaintiff's and other detainees' mental health needs has caused, and continues to cause, physical pain and suffering, mental anguish, emotional distress, the deterioration of their mental health, an undue risk of serious injury and/or premature death.

149. Defendant's policies, practices, acts and/or omissions constitute a failure to exercise professional judgment and/or a substantial departure from accepted professional judgment, practice, or standards as to the appropriate treatment of the mental health needs of the immigrant youth residing at SVJC and violate the Fifth and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

150. Defendant's policies, practices, acts and/or omissions have placed or will place Plaintiff Doe 4 and the members of the class he seeks to represent at an unreasonable risk of suffering new or worsening serious mental health illnesses, injuries, and harm.

151. Unless restrained by this Court, Defendant will continue to engage in the acts and omissions

26

set forth herein that deprive immigrant detainees confined at SVJC of rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and will cause irreparable harm to these youth.

**COUNT III**
**Violations of the Fifth and Fourteenth Amendments**
**(42 U.S.C. § 1983 – Discrimination on the Basis of Race)**

152. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 as if fully set forth herein.

153. Plaintiff and the members of the class enjoy a Fourteenth Amendment right to due process under the laws, including the right to be free from discrimination on the basis of their race.

154. Plaintiff and the members of class he seeks to represent, who are Latino, have been treated differently than Caucasian youth detained at the facility with whom they are otherwise similarly situated.

155. Defendant's actions towards Plaintiff and other immigrant youth indicate that such unequal treatment is the result of intentional or purposeful discrimination.

156. There is no legitimate penological or detention-related interest or rational basis for subjecting Plaintiff and other immigrant youth to unequal treatment on the basis of their race.

157. Due to Defendant's arbitrary and irrational discrimination against Plaintiff and class members on the basis of their race, the Defendant has denied Plaintiff and other similarly situated youth their right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.

158. Unless restrained by this Court, Defendant will continue to engage in the acts and omissions set forth herein that deprive immigrant detainees confined at SVJC of rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and

27

will cause irreparable harm to these youth.

## COUNT IV
**Violations of the Fifth and Fourteenth Amendments**
**(42 U.S.C. § 1983 – Discrimination on the Basis of National Origin)**

159. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 as if fully set forth herein.

160. Plaintiff and members of the class enjoy a Fourteenth Amendment right to due process under the laws, including the right to be free from discrimination on the basis of their national origin.

161. Plaintiff and members of the class, who are citizens of Mexico and Central America, have been treated differently than United States citizen youth detained at the facility with whom they are otherwise similarly situated.

162. Defendant's actions towards Plaintiff and other immigrant youth indicate that such unequal treatment is the result of intentional or purposeful discrimination.

163. There is no legitimate penological or detention-related interest or rational basis for subjecting Plaintiff and other immigrant youth to unequal treatment on the basis of their national origin.

164. Due to Defendant's arbitrary and irrational discrimination against Plaintiff and class members on the basis of their national origin, the Defendant has denied Plaintiff and others similarly situated their right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983.

165. Unless restrained by this Court, Defendant will continue to engage in the acts and omissions set forth herein that deprive immigrant detainees confined at SVJC of rights, privileges, or immunities secured or protected by the Constitution of the United States and federal law, and will cause irreparable harm to these youth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe 4, on his own behalf and on behalf of the class he seeks to

represent, respectfully requests that the Court:

    a.  Declare that the acts and omissions of the Defendant as alleged in this Second

        Amended Complaint violate the Constitution and laws of the United States;

    b.  Enter a preliminary and permanent injunction requiring the Defendant, its agents,

        employees and all persons acting in concert with or on behalf of the Defendant to

        cease their unconstitutional and unlawful practices;

    c.  Allow, upon appropriate motion, the substitution of Doe 4 in place of John Does 1, 2

        and 3 as representative of the Class certified by this Court pursuant to Fed.R.Civ.P.

        23(a) and 23(b)(2);

    d.  Designate undersigned counsel as attorneys for the certified class;

    e.  Award to the Plaintiff and class members reasonable costs and attorney's fees; and

    f.  Grant the Plaintiff and all members of the class all such other further relief as the

        Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury for all claims which may be so tried.


Dated: July 11, 2018              Respectfully submitted,

                                      By: /s/ Hannah M. Lieberman
                                      Hannah Lieberman (admitted *pro hac vice*)
                                      Tiffany Yang (admitted *pro hac vice*)
                                      WASHINGTON LAWYERS'
                                      COMMITTEE FOR CIVIL RIGHTS AND
                                      URBAN AFFAIRS
                                      11 Dupont Circle, NW, Suite 400
                                      Washington, D.C. 20036
                                      (202) 319-1000 (telephone)

(202) 319-1010 (facsimile)
hannah_lieberman@washlaw.org
tiffany_yang@washlaw.org

Theodore A. Howard (admitted *pro hac vice*)
Bradley C. Tobias (VSB No. 88046)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006
(202) 719-7120 (telephone)
thoward@wileyrein.com
btobias@wileyrein.com

*Attorneys for Plaintiff John Doe 4*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2018, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system which will then send a notification

of such filing (NEF) to the following counsel of record:

Jason A. Botkins
Melisa G. Michelsen
LITTEN & SIPE, LLP
410 Neff Avenue
Harrisonburg, VA 22801
(540) 434-5353 (telephone)
(540) 434-6069 (facsimile)
jason.botkins@littensipe.com
melisa.michelsen@littensipe.com

By: /s/ Hannah M. Lieberman
Hannah Lieberman
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, NW, Suite 400
Washington, D.C. 20036
(202) 319-1000 (telephone)
(202) 319-1010 (facsimile)
hannah_lieberman@washlaw.org