**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | |
|---|---|
| **JOHN DOE 4, by and through his**<br>**next friend, NELSON LOPEZ, on behalf of**<br>**himself and all persons similarly situated,** | |
| *Plaintiffs,* | **CIVIL ACTION** |
| **v.** | **Case No.: 5:17-cv-00097-EKD** |
| **SHENANDOAH VALLEY JUVENILE**<br>**CENTER COMMISSION**, | **Honorable Elizabeth K. Dillon** |
| *Defendant.* | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Shenandoah Valley Juvenile Center Commission, by counsel, files this Brief in Support of Defendant's Motion for Summary Judgment. As set forth below, summary judgment should be entered in favor of Defendant.

## INTRODUCTION

On July 11, 2018, Plaintiff John Doe 4 ("Doe 4") filed the Second Amended Complaint[1] in this action alleging violations of his constitutional rights by Defendant Shenandoah Valley Juvenile Center Commission. ECF Dkt. No. 68. Doe 4 is an unaccompanied alien child ("UAC") in the custody of the Office of Refugee Resettlement ("ORR") of the United States Department of Health and Human Services. Shenandoah Valley Juvenile Center Commission is a public body corporate comprised of members from seven jurisdictions which operate Shenandoah Valley Juvenile Center ("SVJC"). *Id.* at ¶ 19. SVJC provides secure education, housing and other services for Doe 4 and other UACs pursuant to a Cooperative Agreement with

---

[1] Prior to the Second Amended Complaint, the named plaintiffs in this matter consisted of John Does 1, 2, and 3. John Doe 1 affirmatively discontinued his participation in this case as class representative and as a class member. At or around the same time, John Does 2 and 3 requested and received orders of voluntary removal in their immigration proceedings which allowed them to return to their home countries.

1

ORR.  Doe 4 is the current class representative for a class certified by the Court on June 27, 2018.  ECF Dkt. Nos. 63 and 70.

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert that Defendant has violated the Fifth and Fourteenth Amendments based upon (i) excessive use of force and restraints; (ii) failure to provide adequate mental health treatment based upon deliberate indifference or, in the alternative, professional judgment; and (iii) discrimination on the basis of race and national origin.  ECF Dkt. No. 68, ¶¶ 123-165.  Plaintiffs seek declaratory relief for their claims along with a permanent injunction. ECF Dkt. No. 68. [2]  SVJC has moved for summary judgment on all claims asserted in the Second Amended Complaint.

## STATEMENT OF MATERIAL FACTS

I.     **SVJC's behavioral management program authorizes the use of restraints and room confinement only as a last resort and to the extent necessary for safety and security.**

A.     **Removal From Programming and Room Confinement**

SVJC's current behavioral management program was developed in early 2016 and implemented in August 2016.  Ex. A, Wong Depo. Tr. 92:13-15.  Under the prior approach, residents were subject to room confinement for a predetermined amount of time once their behavior crossed certain thresholds.  Ex. A at Tr. 107:14-108:20.  Under the current program, residents are placed in room confinement only when necessary to ensure safety.  Ex. B, Wong Aff. at ¶ 11.  Residents placed in room confinement must be reevaluated at least every four hours and returned back to normal programming as soon as safely possible.  Ex. A at Tr. 111:20-112:2; 119:12-19.  Administrative approval is required for room confinement of more than 24 hours. Ex. A at Tr. 120:3-9.  SVJC staff members perform a visual safety check through a glass window in the door every 15 minutes for UAC who are in room confinement.  Ex. B at ¶ 14.  A

---

[2] Plaintiffs' request in the Second Amended Complaint for a preliminary injunction was formally withdrawn pursuant to an Order entered by the Court on August 22, 2018.  *See* ECF Dkt. No. 82.

2

Significant Incident Report ("SIR") is required when UACs are removed from programming and placed in room confinement. Ex. B at ¶ 13.

As part of their mandatory training, SVJC members are required to undergo training on the nature of trauma, the effects of trauma on adolescent brain development, and how to work with individuals who have experienced trauma. Ex. C, Aleman Depo. Tr. 49:23-50:18. The trauma training is not only required for clinical staff, but also for floor staff and supervisors. Ex. D, Fields Depo. Tr. 51:12-54:17; Ex. E, Kahn Depo. Tr. 91:5-92:3. In addition, SVJC provides mandatory cultural competency training focused on UACs which describes cultural differences, the dangerous journey to the United States, and effects of past trauma. Ex. A at Tr. 28:23-29:20.

In his interrogatory answers and during his deposition, Doe 4 has described being placed in room confinement for a three-day period on one occasion while at SVJC. Ex. F, P.'s Resp. D.'s First Int. at 18; Ex. G, Doe 4 Depo. Tr. 80:5-13. Doe 4 was placed on a three-day modified programming schedule during the three-day period referenced in his testimony, which followed an assault on staff. Ex. H, Ropp Aff. at ¶ 20. During the modified schedule, Doe 4 attended educational programming for increasing portions of each day and was provided with the opportunity for recreation before returning to regular programming at the conclusion of the three-day period. *Id.*

In his interrogatory answers, Doe 4 describes being placed in room confinement on three occasions for time periods ranging from four to eight hours. Ex. F at 18. By contrast, Doe 4 testified during his deposition that he has been placed in his room for longer than one day, but he could not recall how many instances. Ex. G at Tr. 80:6-13. Doe 4 was placed in room confinement on one occasion on February 4, 2018, for 24 hours after he punched a staff member in the face multiple times and continued being disruptive after being placed in his room. Ex. H

3

at ¶ 18.  Aside from February 4, 2018, SVJC knows of no other instances in which Doe 4 has been subject to room confinement for a period of 24 hours or more.  Ex. H at ¶ 19.

**B.    Use of Force and Restraints**

SVJC staff members are trained in the use of restraints through a behavioral management program called "Handle With Care."  Ex. A at Tr. 30:19-20.  The Handle With Care program utilized by SVJC is approved by the Virginia Department of Juvenile Justice ("DJJ").  *Id*.  Under that approach, physical intervention by staff is allowed only as a last resort and only with the least amount of force that is reasonably necessary.  Ex. B-3 at 1.  Restraints may never be used as a physical punishment.  *Id*.  Except in emergencies, a primary restraint technique ("PRT") is used only after less restrictive measures, including verbal interventions, have failed to control behavior that poses a safety risk to the resident or others.  *Id*.  A resident placed in a mechanical restraint may not be left unsupervised or left in their room wearing the restraint.  Ex. B-4 at 3. All forms of restraint must be discontinued once the resident either demonstrates safe behavior or is placed in their room and they are unable to harm others.  *Id*.  When a restraint is utilized, SVJC prepares a report that includes the date and time of the incident, the identification of staff involved, the justification for the restraint, a description of less restrictive measures that were unsuccessfully attempted, a description of the restraint utilized, and the duration.  Ex. B-3 at 2.

Pursuant to SVJC's express policy, any excessive use of force by an SVJC employee is grounds for immediate dismissal and the filing of a child abuse complaint with the Department of Social Services.  Ex. B-3 at 3.  Although such instances are rare, SVJC staff members who have engaged in excessive uses of force have been swiftly terminated in accordance with the policy.  *See* Ex. D at Tr. 103:5-105:7 (describing two instances of excessive force in eight years and terminations that followed); Ex. E at Tr. 152:25-155:1 (testifying that every instance of

4

excessive force he has observed resulted in termination, including a staff member who threw a punch while being assaulted by three residents at the same time); Ex. I, Mahiri Depo. Tr. 119:21-121:3 (describing instance in which trainee used excessive force and was terminated the following day); and Ex. J, McCormick Depo. Tr. 118:1-199:5 (describing instance in which staff member was terminated for throwing punches while being brutally assaulted).

Upon arrival at SVJC, residents, including Doe 4, are provided with information about what to do if they are mistreated along with information regarding a grievance procedure. Ex. G at Tr. 25:5-11 and 24:19-21. SVJC employees who have reason to suspect the abuse or neglect of any resident are required to report to Child Protective Services ("CPS"), DJJ, ORR, and, in some instances, local law enforcement. Ex. A at Tr. 214:24-215:19. Pursuant to Virginia Code § 63.2-1509, the same duty extends to teachers employed by Staunton City Schools who provide daily educational programming, doctors who provide medical services, and employees of the Community Services Board who maintain offices at SVJC. Ex. A at Tr. 97:9-15, 100:24-101:4.

In the course of discovery, Doe 4 has identified three specific instances in which he alleges to have been subjected to excessive force. In the earliest incident, Doe 4 claims that staff members fell on top of him, placed him in handcuffs, and forced him to stay in his room for an entire day while wearing the handcuffs and without a mattress. Ex. F at 4. Doe 4 does not recall whether he reported this incident to anyone. Ex. F at 6. SVJC has no knowledge or record of any report by Doe 4 of these allegations to anyone at SVJC. Ex. H at ¶ 10. Although Doe 4 has not provided a date for the incident, SVJC records indicate that the only incident in which Doe 4 has been placed in mechanical restraints of any kind occurred on February 4, 2018. Ex. H at ¶ 9.

As mentioned above, SVJC is required to prepare a report anytime any form of restraint is applied to a UAC. As set forth in a SIR[3] from February 4, 2018, Doe 4 became frustrated when he was informed that he would fail to earn a behavioral incentive point if he refused to trim his fingernails, which would create a safety issue. Ex. H-4 at 1. Doe 4 asked to speak with a supervisor. *Id.* An assistant shift supervisor responded and informed Doe 4 that he could earn the behavioral incentive point if he trimmed his fingernails. *Id.* Doe 4 refused, continued to argue with staff, and then punched a table and threatened to assault a staff member. *Id.* at 1-2. After refusing to take a time-out, Doe 4 punched a staff member in the face multiple times. *Id.* at 2; Ex. G at 65:10-13 and 85:14-86:2. Staff attempted unsuccessfully to get Doe 4 to release the staff member using a PRT for approximately three minutes. *Id.* Handcuffs were placed on Doe 4's wrists until he could be secured in his room. *Id.* Doe 4 was in handcuffs for approximately six minutes during the incident. *Id.* This is the only instance in which Doe 4 has been placed in mechanical restraints while at SVJC. Ex. G at 71:19-25, Ex. H at ¶ 11.

In the second incident, Doe 4 alleges having been pushed against the wall and floor, punched in the ribs and face, and having his hand struck. Ex. G at Tr. 50:23-51:14; Ex. F at 4. Doe 4 reported the incident to Andrew Mayles, who was Doe 4's mental health clinician at that time. Ex. G at Tr. 53:3-6; Ex. F at 6. Mr. Mayles reported Doe 4's allegations to CPS by letter. Ex. H-7. In addition, SVJC prepared a SIR report describing Doe 4's allegations and submitted the report to ORR. Ex. H-6. CPS did not reach a determination adverse to SVJC with respect to Doe 4's complaint. Ex. H-8. Although Doe 4 has not provided a date for the incident, the date of his report to Mr. Mayles corresponds with events that occurred on April 1, 2018. Ex. H-7.

---

[3] SVJC's SIR reports are not offered to contradict Doe 4's testimony, but to supplement testimony that rarely includes details of any substance. Indeed, Doe 4 has testified to a lack of memory of this and other incidents after becoming angry. Ex. G at Tr. 81:16-82:1; 86:8-14.

6

SVJC also prepared a SIR report describing actions by staff members during the April 1 incident as required by policy. Ex. H-5. After being disruptive during free time, Doe 4 refused requests by staff members that he go to his room for a time-out. *Id*. at 1. Doe 4 continued to refuse a time-out after additional staff arrived and spoke with him further. *Id*. Staff subsequently used a PRT hold to walk Doe 4 into his room. *Id*. at 1-2. While in his room, Doe 4 repeatedly tried to scratch, kick, and head-butt staff. *Id*. at 2. Doe 4 was in PRT holds for approximately five minutes until he was secured in his room. *Id*. Several staff members had scratches and red marks on their skin from being scratched or kicked. *Id*.

In the third incident, which Doe 4 believes occurred in mid-July, Doe 4 claims that staff members fell on top of him and grabbed him before placing him in his room and striking him with metal handcuffs. Ex. G at Tr. 111:5-113:5; Ex. F at 4. In his interrogatory answers, Doe 4 reports that the incident began with his request for a Sprite. Ex. F at 5. However, during his deposition, Doe 4 reported having requested deodorant spray before becoming angry and punching a staff member in the face. Ex. G at Tr. 111:5-112:6. Doe 4's reference to a request for deodorant aligns with a SIR report of July 12, 2018. Ex. H-9. As set forth in the report, Doe 4 refused to go to his room at bedtime despite several verbal requests by staff. *Id*. at 1. As staff approached, Doe 4 punched a staff member in the face. *Id*. Staff utilized a PRT hold for approximately three minutes to move Doe 4 into his room. *Id*. at 1-2. Doe 4 does not recall whether he reported his allegations of mistreatment to anyone. Ex. F at 6. SVJC has no knowledge or record of any such report by Doe 4 to anyone at SVJC. Ex. H at ¶ 15.

During his deposition, Doe 4 could not recall any other instances of being mistreated by staff at SVJC apart from the three incidents described above. Ex. G at Tr. 62:6-9. With respect to other UACs, Doe 4 described observing two instances in which he believes staff members

7

utilized excessive force in separating residents who were fighting with each other. Ex. F at 5. According to Doe 4, staff members fell on top of a resident in each instance while trying to break up the fight. *Id.* Doe 4 also alleges having heard staff members fall onto other UACs while in their rooms. *Id.* As part of the Handle With Care approach, SVJC staff members are trained to place residents in a neutral position on the floor when necessary to respond to behavior that poses an immediate threat to staff, the resident, or other residents. Ex. B at ¶ 19.

## II. UACs with mental health needs are evaluated by a psychologist, counseled individually on at least a weekly basis by a licensed professional counselor, and provided with regular treatment by a psychiatrist.

After arriving at SVJC, each UAC undergoes a mental health screening during intake to ascertain the need for a mental health assessment as required by Virginia Code § 16.1-248.2. Ex. A at Tr. 93:22-94:18. If the screening indicates such a need, a mental health assessment is performed by a mental health clinician following the screening. Ex. A at Tr. 95:7-13. SVJC requests approval from ORR for a psychological evaluation if a mental health concern or mental health need is identified during the assessment. Ex. A at Tr. 76:14-21. Any additional requests for treatment by a psychologist are submitted to ORR for its review and determination. Ex. A at Tr. 198:11-21; Ex. B at ¶ 18.

Each UAC is assigned a case manager and a mental health clinician shortly after intake. Ex. A at Tr. 48:10-12. All case managers and clinicians are bilingual in Spanish. Ex. A at Tr. 46:17-20 and 204:7-8. Each UAC meets with their clinician to receive one-on-one counseling at least once per week. Ex. B at ¶ 16. Most UAC meet one-on-one with their clinician for individual counseling more than once per week. *Id.* In addition, the clinicians coordinate two group counseling sessions each week. Ex. A at Tr. 221:2-18. UACs are also treated by a psychiatrist, Dr. Timothy Kane, every three to six weeks. Ex. A at Tr. 198:22-199:19. UACs

may schedule additional psychiatric appointments with Dr. Kane through their clinician without limitation. Ex. B at ¶ 17.

Shortly after arriving at SVJC, Doe 4 underwent a psychological evaluation performed by Dr. Joseph Gorin. Ex. H-1. The evaluation was impeded by Doe 4's lack of candor and inconsistencies during Dr. Gorin's clinical interview. *Id.* at 1-2. When confronted during the interview, Doe 4 acknowledged such inconsistencies and asked how the information had been obtained. *Id.* at 2. Dr. Gorin diagnosed Doe 4 with attention deficit hyperactivity disorder ("ADHD") and posttraumatic stress disorder ("PTSD"). *Id.* at 10. Dr. Gorin emphasized that the diagnoses were not confirmed by information provided by Doe 4 during the evaluation, but were based upon Doe 4's history as provided in a written clinical addendum. *Id.* Dr. Gorin recommended that Doe 4 be placed in a residential treatment center. *Id.*

While at SVJC, Doe 4 has met with Dr. Timothy Kane, a psychiatrist, about once every three to six weeks. Ex. G at Tr. 37:11-25; Ex. H-3. During each visit, Dr. Kane talks with Doe 4 about how Doe 4 has been doing since their last appointment, including any issues with sleeping, anger, anxiety, or other feelings. *Id.* at Tr. 38:7-18. More than 50 percent of each visit with Dr. Kane is dedicated to one-on-one counseling and coordination of care. *See, e.g.,* Ex. H-3 at 2-3. Doe 4 has never reported suicidal ideation or thoughts of self-harm to Dr. Kane. Ex. H-3.

Doe 4 meets with his mental health clinician for individual counseling for about an hour at least once each week. Ex. G at Tr. 34: 7-15 and 40:8-19. The two mental health clinicians who have served Doe 4 at SVJC each are licensed professional counselors with master's degrees who have completed at least 3,400 supervised clinical hours. Ex. H at ¶ 7; 18 Va. Admin. Code § 115-20-52. Doe 4's current clinician has a master's degree in clinical mental health. Ex. C at Tr. 12:22-24. Doe 4 has never reported suicidal ideation or thoughts of self-harm to either of his

9

clinicians at SVJC. Ex. H-2. Doe 4 has never attempted to harm himself while at SVJC aside from punching a wall on one occasion. Ex. G at Tr. 79:25-80:4. Doe 4 cannot recall why he punched the wall at SVJC, but acknowledges engaging in similar conduct during his prior placement at Children's Village. Ex. G at Tr. 44:9-10 and 19:20-20:8.

Doe 4 believes that he has gotten better dealing with his anger since arriving at SVJC. Ex. G at Tr. 81:25-82:9. Despite his improvement, Doe 4 also believes that he needs additional psychological treatment to deal with his anger and past. Ex. G at Tr. 41:14-19. Doe 4 alleges having made requests to his case manager and clinician to speak with a psychologist. Ex. F at 7; ECF Dkt. No. 69 at ¶ 98. SVJC has no knowledge or record of any such requests, which would be documented as a matter of policy. Ex. H at ¶ 17. Any additional treatment by a psychologist would require approval from ORR. Ex. A at Tr. 198:11-21; Ex. B at ¶ 18.

After receiving Dr. Gorin's recommendations, SVJC has submitted requests to transfer Doe 4 to a residential treatment facility on several occasions to several different facilities. Ex. H at ¶¶ 20-21. All transfer requests, including those for Doe 4, are subject to approval by ORR and acceptance by the receiving facility. Ex. B at ¶ 18. As mentioned above, Doe 4 acknowledges having punched staff members in the face while at SVJC. Ex. G at Tr. 112:5-6. In July 2018, Doe 4 tried to choke another UAC and refused to release him despite requests from staff members. *Id*. at Tr. 188:6-9 and 119:22-120:6. The available residential treatment facilities have declined to accept Doe 4 due to his aggressive and violent behavior against staff and other residents at SVJC. Ex. H at ¶¶ 20-21.

### III. SVJC provides services to three populations of youth without reference to race or national origin.

SVJC provides education, housing and other services to three populations of youth. Ex. B at ¶ 5. SVJC provides services to UAC who are classified by ORR as requiring placement in a

secure setting due to safety concerns. *Id*. at ¶ 5(a). Each UAC is reviewed every 30 days for eligibility for transfer or "step down" to a less secure setting. Ex. A at Tr. 69:20-70:25. SVJC provides similar secure services for youth from surrounding jurisdictions who have been charged with a crime but have not yet had their cases adjudicated. Ex. B at ¶ 5(b). UAC and predisposition youth attend the same educational programming and are subject to the same rules and restrictions. *Id*. at ¶ 6. As such, UACs and local predisposition youth at SVJC receive many of the same levels of services and resources. *Id*. Where there are differences, UACs typically receive greater services and resources due to the heightened requirements of SVJC's cooperative agreement with ORR. *Id*. For instance, SVJC provides UACs with mental health services which exceed those that are required for citizen youth detained at SVJC. *Id*.

SVJC provides education and housing services to a third group of youth through the Community Placement Program ("CPP") for DJJ. Ex. B at ¶ 5(c). The services provided to youth in the CPP program vary on a case-by-case basis depending upon the conditions imposed by the Court and DJJ. *Id*. at ¶ 7. As examples, some CPP youth undergo outside counseling and rehabilitation ordered by the Court or DJJ. *Id*. Others are approved by the Court and DJJ for ankle monitors that allow them to leave the secured area of the facility. *Id*. In some instances, CPP youth have already fulfilled educational requirements and utilize additional activities such as the use of iPods and video games while other youth attend educational programming. *Id*. at ¶ 8. The differences in programming between UAC/predisposition youth and youth in the CPP program are not based upon race, national origin, or any other form of discrimination. *Id*. at ¶ 9. To the contrary, Latino youth and undocumented immigrants have been members of all three populations served by SVJC. *Id*.

11

Doe 4 alleges that American youth at SVJC receive better treatment than UACs because (a) American youth are allowed to be outdoors for more than one hour whereas UACs are permitted 30 minutes of outdoor recreation and 30 minutes of indoor recreation each day; (b) American youth have a greater number of iPods as compared to UACs; (c) American youth have greater access to computers; and (d) American youth have better seats. Ex. G at Tr. 74:14-77:10. Doe 4 has also testified that he believes SVJC staff are racists and alleges having heard comments that UACs "don't have a right to be in the United States, that we're gang members, and we come up here to take away their jobs." Ex. G at Tr. 55:24-56:1.

Doe 4 alleges being told that UACs would need to purchase a ball if they wanted to play soccer and observing a staff member throw away food and tell a resident to eat from the garbage. Ex. G at Tr. 57:12-25. Doe 4 cannot recall the names of the staff members and residents involved in these incidents or when they occurred. Ex. G at Tr. 57:12-58:8. Doe 4 testifies to having reported these incidents to four different individuals at SVJC, including a teacher. Ex. G at Tr. 59:2-60:7. SVJC has no knowledge or record of any such reports by Doe 4. Ex. H at ¶ 16. SVJC employees are expressly prohibited from discriminating against residents on the basis of race, color, national origin, and numerous other characteristics. Ex. B at ¶ 10, Ex. B-1.

## GOVERNING LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). When considering a motion for summary judgment, the Court views the facts and the inferences drawn from the facts in the light most favorable to the non-moving party. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

12

summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Furthermore, "[w]hen a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings." *Ballance v. Young*, 130 F. Supp. 2d 762, 765 (W.D. Va. 2000).

## ARGUMENT

### DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS ASSERTED IN THE SECOND AMENDED COMPLAINT

**I.     PLAINTIFFS MUST ESTABLISH A POLICY, CUSTOM, OR PRACTICE AS A PREREQUISITE TO ANY RELIEF AGAINST SVJC.**

The Second Amended Complaint seeks relief solely against SVJC pursuant to 42 U.S.C. § 1983. ECF Dkt. No. 68. SVJC, like all other local governmental units, is not subject to liability under 42 U.S.C. § 1983 for all constitutional misconduct by its employees or agents. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 568, 694 (1978). Instead, liability arises only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edict or acts may fairly be said to represent official policy, inflicts the injury." *Id*.

Within the context of § 1983, the reference to "policy" implies "a course of action consciously chosen from various alternatives" as contrasted with "episodic exercises of discretion." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987). Accordingly, policy is found primarily within regulations, ordinances, and other similar measures approved by policymakers which directly authorize constitutional violations. *Id*. By comparison, liability for a custom arises from practices which are sufficiently demonstrated to be persistent, widespread, and settled despite lacking formal approval from policymakers. *Monell*, 436 U.S. at 691. Such practices are attributable to a governmental unit "when the duration and frequency of the

13

practices warrants a finding of either actual or constructive knowledge" by the governing body. *Spell*, 824 F.2d at 1387.

Plaintiffs must establish four elements to prevail upon their claims. Plaintiffs must first prove the elements of the underlying constitutional deprivation. *See, e.g., City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("[I]f the [employee] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."). Second, Plaintiffs must show the existence of a governmental policy or custom. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Third, Plaintiffs must demonstrate a "direct causal link between the policy or custom and the injury alleged." *Id.* Finally, Plaintiffs must show that the policy was enacted with deliberate indifference. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (*citing Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). As set forth below, Plaintiffs have failed to establish the requisite elements to render SVJC liable for their claims.

## II. SVJC DOES NOT AUTHORIZE OR PERMIT EXCESSIVE USES OF FORCE, RESTRAINTS, OR ROOM CONFINEMENT PURSUANT TO ANY POLICY, CUSTOM OR PRACTICE.

### A. SVJC's policies prohibit the excessive uses of force, restraints, and room confinement alleged by Doe 4.

Doe 4's allegations regarding excessive use of force are expressly prohibited by SVJC policies regarding the use of physical and mechanical restraints. As set forth in SVJC's policies, physical intervention by staff is permitted only as a last resort once less restrictive measures have failed to control behavior that poses a safety risk. Ex. B-3 at 1. Further, staff members are required to use the least amount of force reasonably necessary to eliminate the safety risk and maintain security. *Id.* Doe 4 has described three instances in which he alleged having been subjected to excessive uses of force by SVJC staff members. Doe 4's allegations of being

14

punched, struck with handcuffs, and being left in handcuffs in his room for an entire day are directly at odds with SVJC's policies. In addition, in the single instance where Doe 4 reported his allegations, SVJC responded consistently with its written policy by reporting the allegations to CPS and ORR. *See* Ex. H-6 and H-7.

SVJC's behavioral management policy, including policies governing the use of force, restraints, and room confinement, are not facially unconstitutional and conform to all applicable requirements promulgated by DJJ. *See* 6 Va. Admin. Code §§ 35-101-1070, 1090, 1100, and 1130. Notably, Plaintiffs' expert, Dr. Andrea Weisman,[4] has testified that SVJC's behavioral management policy is not deficient in any way. Ex. K, Weisman Depo. Tr. 92:12-20. Accordingly, Plaintiffs are required to establish a custom or practice to render SVJC liable for their claims.

**B.     Plaintiffs have failed to establish a custom or practice under 42 U.S.C. § 1983.**

To establish a custom or practice under 42 U.S.C. § 1983, Plaintiffs "must point to a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Johnson v. Holmes*, 2017 U.S. Dist. LEXIS 173743, *23 (W.D. Va. 2017) (*citing Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014))(internal quotations and citations omitted). In other words, "there must be numerous particular instances of unconstitutional conduct in order to establish a custom or practice[.]" *Smith v. Ray*, 409 F. App'x 641, 650 (4th Cir. 2011). *See also Wilson v. Cook Cnty.*, 742 F. 3d 775, 780 (2014) (failure by a local government to terminate an employee after three incidents of sexual misconduct did not arise to a custom or practice). Once a custom or practice

---

[4] SVJC expressly reserves all arguments and bases for excluding testimony from Dr. Weisman set forth in its Motion to Exclude and the materials filed in support thereof.

is shown, Plaintiffs must also prove the custom or policy was "the moving force of the constitutional violation[.]"  *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984).

Doe 4 has failed to show that SVJC had actual or constructive knowledge of a custom or practice of using excessive force.  Doe 4 has not shown any instance in which SVJC failed to respond appropriately under its policies to a report of excessive use of force.  Based upon his own testimony, Doe 4 recalls reporting only one of the instances in which he alleges being subjected to excessive force.  Ex. G at Tr. 53:3-6; Ex. F at 6.  Doe 4 does not know whether he reported the other two alleged instances of excessive force and SVJC has no knowledge or record of any such reports.  Ex. F at 6-7; Ex. H at ¶¶ 10, 15.  In addition, Plaintiffs have failed to present testimony from any other class member to corroborate Doe 4's allegations.

SVJC has not shown indifference in those rare situations in which staff have utilized too much force.  Without fail, SVJC reports complaints from UACs of excessive force to CPS pursuant to its duties as a mandatory reporter and without consideration to whether such reports are meritorious.  SVJC has fired staff found to have used excessive force.  *See* Ex. D at Tr. 103:5-105:7; Ex. E at Tr. 152:25-155:1; Ex. I at Tr. 119:21-121:3; Ex. J at 118:1-199:5.  SVJC even terminated a staff member who threw punches in self-defense while being subjected to a three-on-one assault.  Ex. E at Tr. 152:25-155:1 (testimony by former shift supervisor/current deputy director that termination under such circumstances was not excessive because "you have to understand, you throw a punch, you're not going to work with children anymore.").

To the extent that Plaintiffs allege that constitutional violations are caused by an unwritten policy, such as tacit approval by SVJC's administration, Plaintiffs must separately prove the existence of the unwritten policy and its origin.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) ("[C]onsiderably more proof than the single incident will be necessary in every

case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation"). The existence of an unwritten policy requires a heightened showing of proof with respect to unconstitutional conduct and SVJC's awareness of such conduct. *Greensboro Professional Fire Fighters Ass'n v. Greensboro*, 64 F. 3d 962, 967 (4th Cir. 1995) ("[A]ppellants would have to show that the practice was so widespread and permanent that, even though the City's written policy was one of union neutrality, the City in fact pursued a policy of opposing union activity"). Plaintiffs have failed to present sufficient facts to establish an unwritten policy or awareness of such a policy by SVJC.

Even assuming *arguendo* that sufficient facts are presented to support a policy, practice, or custom at SVJC that is deliberately indifferent to unconstitutional conduct by staff, Plaintiffs must also show that such policy is the "moving force" behind the actual behavior that has harmed them. *Milligan*, 743 F.2d at 230-31. To satisfy the moving force test, Plaintiffs must show that employees acting in violation of the Constitution did so in reliance on SVJC's policies. *Id* at 231. Plaintiffs have failed to present sufficient facts to demonstrate a pattern of unconstitutional behavior among SVJC staff that is caused by SVJC's policies. Indeed, SVJC expressly prohibits excessive use of force, actively reports and investigates complaints of excessive force, and swiftly terminates staff found to have violated its policies.

Doe 4 only remembers reporting one instance of excessive force to SVJC. Ex. G at Tr. 53:3-6. This aspect of Doe 4's testimony aligns with SVJC's records, which show no other report by Doe 4 of excessive force. Ex. H at ¶¶ 10, 15. The mere fact that a complaint was made to SVJC does not demonstrate a custom of deliberate indifference to excessive use of force. Plaintiffs must present facts sufficient to show that staff should have been disciplined for a particular use of force and that such discipline was not undertaken. *Johnson*, 2017 U.S. Dist.

17

173743 at *26-27 ("The mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force.") (*quoting Mettler v. Whiteledge*, 165 F.3d 1197, 1205 (8th Cir. 1999)).

To prevail on a claim for use of excessive force, Plaintiffs must not only show a custom or practice regarding the use of force, but that such force was not objectively reasonable under the circumstances. *Kingsley v. Hendrickson,* 135 U.S. 2466, 2473 (2015). Plaintiffs cannot carry this burden. Indeed, given Doe 4's memory lapses and the absence of corroborating witnesses, Plaintiffs cannot carry their threshold burden of showing that the force used in the incidents was objectively unreasonable given the factual record established by SVJC. *See* Ex. G at Tr. 81:16-82:1; 86:8-14; Ex. H-4, H-6, and H-9. Outside of Doe 4's unfounded allegations, Plaintiffs have offered no evidence regarding the use of force against other class members.

Plaintiffs have also failed to identify any evidence that the use of force was objectively unreasonable on a systemic level. The expert opinions disclosed by Plaintiffs for statistician Paul G. Diver are an inadequate and impermissible substitute for such evidence.[1] Dr. Diver's statistical analysis merely counts the number of incidents involving the use of force, restraints, or room confinement and calculates their duration, but includes no analysis as to why such measures were utilized in any particular instance. Ex. L, Diver Depo. Tr. 24:9-25:17. Thus, Dr. Diver's calculations shed no light on whether the use of force against class members at SVJC is excessive or unreasonable. Moreover, Dr. Diver's analysis includes time spent by UACs in their rooms voluntarily and during sleeping hours as time spent in room confinement. Ex. L at Tr. 74:19-76:21 and 92:7-13. Dr. Diver's analysis also includes significant instances of duplication.

---

[1] SVJC expressly reserves all arguments and bases for excluding testimony from Dr. Diver set forth in its Motion to Exclude and the materials filed in support thereof.

Ex. L at Tr. 97:13-100:6. Therefore, Plaintiffs' statistical data from Dr. Diver is too inherently unreliable to have any evidentiary value in the content of Plaintiffs' claims.

Plaintiffs have failed to allege or present facts that demonstrate that SVJC is deliberately indifferent to the excessive use of force by staff. SVJC adheres to strict policies regarding the use of force, trains staff appropriately in accordance with state law, unconditionally reports complaints of excessive force, and swiftly terminates staff members found to have used excessive force.

## III. SVJC'S PROVISION OF MENTAL HEALTH CARE EXCEEDS ALL CONSTITUTIONAL STANDARDS.

### A. The deliberate indifference standard applies to Plaintiffs' claims of inadequate mental health care.

Plaintiffs' claims of inadequate mental health care are governed by the deliberate indifference standard, which has been repeatedly applied to civil detainees, including immigrant detainees, held in a correctional facility for non-rehabilitative purposes.[5] *See, e.g., Newbrough v. Piedmont Regional Jail Authority*, 822 F. Supp. 2d 558 (E.D. Va. 2011); *Adekoya v. Herron*, 2013 U.S. Dist. LEXIS 164575 (W.D. N.Y. 2013); *Adegbuji v. Middlesex Cty.*, 2006 U.S. Dist. LEXIS 70527 (D. N.J. 2006); *Souleman v. Chronister*, 2012 U.S. Dist. LEXIS 81079 (M.D. Pa. 2012); *Lijadu v. INS*, 2007 U.S. Dist. LEXIS 23162 (W.D. La. 2007); *Asturias v. Smith*, 2016 U.S. Dist. LEXIS 109251 (N.D. Ala. 2016); *Lizama v. Hendricks*, 2014 U.S. Dist. LEXIS 22955 (D. N.J. 2014); *Baptiste v. Essex Cty.*, 2013 U.S. Dist. LEXIS 175154 (D. N.J. 2005); *Carlos v. York Cty.*, 2017 U.S. Dist. LEXIS 143136 (M.D. Pa. 2017); *Crosby v. Georgakopoulos*, 2005 U.S. Dist. LEXIS 32238 (D. N.J. 2005); *Ramos v. Winiewicz*, 2012 U.S. Dist. LEXIS 43101 (W.D. N.Y. 2012); *Harvey v. Chertoff*, 263 Fed. Appx. 188 (3rd Cir. 2008); *and Zikianda v.*

---

[5] In some instances, a treatment program, such as a treatment program for civilly-committed violent sexual offenders, may be housed within a correctional facility. The professional judgment standard applies to such a setting. *Matherly v. Andrews*, 859 F.3d 264, 270 (4th Cir. 2017).

*County of Albany*, 2015 U.S. Dist. LEXIS 122363 (N.D. N.Y. 2015). The rationale underlying these cases is generally that "immigration detainees are more similarly situated to pretrial detainees than to involuntarily committed patients[.]" *Newbrough*, 822 F. Supp. 2d. at 575. In reaching that conclusion, courts examine the purpose of the confinement, the nature of the confining facility, and the duration of confinement. *Id.*

By contrast, the professional judgment standard advocated by Plaintiffs is generally applied to governmental actors with a treatment or rehabilitation objective. *See* ECF Dkt. No. 34 at 29. For instance, in *Youngberg v. Romeo,* the professional judgment standard was applied to a plaintiff who was involuntarily committed to the Pennhurst State School and Hospital. 457 U.S. 307, 322 (1982). *See also Alexander v. Boyd*, 876 F.Supp 773, 797 (D. S.C. 1995) (applying professional judgment standard to South Carolina juvenile training schools because their purpose was "treatment or rehabilitation"); *Christian v. Magill*, 2018 U.S. App. LEXIS 3018 (4th Cir. 2018) (applying professional judgment standard to sexual violent predator treatment program), *Matherly v. Andrews*, 859 F.3d 264, 270 (4th Cir. 2017) (applying professional judgment standard to the Federal Bureau of Prison's Commitment and Treatment Program), *Farabee v. Clarice*, 2018 U.S. Dist. LEXIS 6204 (W.D. Va. 2018) (applying professional judgment standard to conduct by doctor at correctional treatment center).

The basis upon which UAC, including Doe 4, are confined at SVJC is a determination by ORR that they pose a safety risk in a less secure setting. Ex. B-1 at 1-2. SVJC provides secure placement for UAC "until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged by the Department of Homeland Security." *Id.* As such, SVJC does not serve an express rehabilitative or treatment function with respect to UAC. SVJC is a secure detention

20

facility rather than a residential treatment center or psychiatric hospital. Thus, the deliberate indifference standard applies to Plaintiffs' claims of inadequate mental health care.

**B.    SVJC's provision of mental health care exceeds minimum constitutional requirements.**

Under the deliberate indifference standard, Doe 4 must show that SVJC knew of and disregarded an excessive health risk. The test consists of an objective and a subjective component. The objective component requires a showing of a sufficiently serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective component consists of two prongs: (1) whether the defendant was aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and (2) whether the defendant actually drew the inference and omitted to remedy the condition. *Id.* Doe 4's testimony and treatment records fail to satisfy either component of the deliberate indifference standard.

Doe 4's primary allegation is that he has requested and been denied additional opportunities to speak with a psychologist rather than a psychiatrist or licensed professional counselor. Doe 4 Tr. 41:14-19; Ex. F at 7; ECF Dkt. No. 69 at ¶ 98. However, Doe 4 has no constitutional entitlement to "the exact mental health treatment, diagnosis, and placement that he might desire." *Price v. Dixon*, 961 F. Supp. 894, 899 (E.D. N.C. 1997) (*citing Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Instead, "the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). *See also Joyce v. Dotson*, 2018 LEXIS 64895, *4 (W.D. Va. 2018) (characterizing defendant's refusal to place plaintiff in a residential treatment facility as "simply not actionable under 42 U.S.C. § 1983.").

Doe 4's allegations are similar to those dismissed on summary judgment in *Davis v. Clear*, 2016 U.S. Dist. LEXIS 112400 (W.D. Va. 2016).[6]  In the *Davis* case, the plaintiff alleged inadequate mental health treatment based upon the defendant's failure to grant requests for additional access to a psychiatrist.  *Id*. at *5-8.  Like Doe 4, the plaintiff had been provided with counseling services by a licensed professional counselor.  *Id*. at *14-15; Ex. B at ¶ 16.  Also like Doe 4, the plaintiff had consistently denied suicidal ideation and had not reported facts which would constitute a medical emergency requiring additional treatment.  *Id*. at *15; Ex. H-2; Ex. H-3.  The Court dismissed the claim on summary judgment.  *Id*. at *16-17.  Accordingly, Doe 4's alleged requests to see a psychologist rather than a psychiatrist or licensed professional counselor for anger issues are not constitutionally significant.

Doe 4 has failed to show that he is subject to a substantial risk of serious harm from not being provided with on-demand access to a psychologist.  Doe 4 has been diagnosed with and prescribed medication for ADHD and PTSD.  Ex. H-1 at 10.  *Compare with Adams v. Compton*, 2005 U.S. Dist. LEXIS 17432, *30 (W.D. Va. 2005) (characterizing "risk of serious harm" as involving "usually loss of life or permanent disability; a condition for which lack of treatment perpetuates severe pain[.]")  According to his own testimony, Doe 4 has never attempted to harm himself while at SVJC except for a single incident in which he punched a wall in anger.  Ex. G at Tr. 79:25-80:4.  Doe 4's testimony on this subject is consistent with his treatment records.  Ex. H-2; Ex. H-3.  Doe 4 has not reported suicidal ideation or thoughts of self-harm to his mental health clinician or psychiatrist.[7]

---

[6] The claim of inadequate health care in the *Davis* case was alleged under the Eighth Amendment rather than the Fourteenth Amendment of the United States Constitution.  However, there is no meaningful difference in the application of the deliberate indifference standard.  *See, e.g., Patten v. Nichols*, 274 F.3d 828 (2001)(applying deliberate indifference standard in a Fourteenth Amendment context).

[7] *See* psychiatric treatment records of 12/27/17, 01/17/18, 02/07/18, 02/28/18, 03/30/18, 04/11/18, 05/02/18, 05/23/18, 06/13/18, 07/05/18, 08/15/18, and 09/05/18, and clinician progress notes of 12/05/17, 01/05/18, 03/28/18, 06/27/18, 07/10/18, 07/18/18, and 07/24/18, Exhibits H-3 and H-2, respectively.

22

At most, Doe 4's claims of inadequate mental health care reflect a disagreement regarding treatment approach that is not cognizable under 42 U.S.C. § 1983. *See, e.g., Wright*, 766 F.2d at 849. Doe 4 meets with his mental health clinician for individual counseling for about an hour at least once each week. Ex. G at Tr. 34: 7-15 and 40:8-19. Doe 4 reports having met with the first of his clinicians "whenever I needed him." Ex. G at Tr. 34:7-9. In addition, Doe 4 has met with Dr. Timothy Kane, a psychiatrist, about once every six weeks. Ex. G at Tr. 40:8-19. Doe 4's medical records reflect more frequent treatment by Dr. Kane. Ex. H-2 and H-3. During each visit, Dr. Kane talks with Doe 4 about how Doe 4 has been doing since their last appointment, including any issues with sleeping, anger, anxiety, or other feelings. Ex. G at Tr. 38:7-18. Doe 4 can schedule additional appointments with Dr. Kane and there is no limit on the number of appointments. Ex. B at ¶ 17. SVJC has granted every request by Doe 4 for additional appointments with Dr. Kane. Ex. H at ¶ 8. Doe 4's testimony falls far short of a "policy or practice" by Defendant of denying access to "mental health treatment and counseling with licensed mental health care professionals[.]" ECF Dkt. No. 68, ¶ 95.

Doe 4's lack of cooperation and consistency with mental health care professionals has impacted his care at SVJC. As mentioned above, Doe 4's lack of cooperation impeded a psychological evaluation conducted by Dr. Gorin shortly after Doe 4's arrival at SVJC. Ex. H-1 at 1-2. As a result, Dr. Gorin was forced to rely upon a written clinical addendum to formulate diagnoses rather than information provided by Doe 4 during the evaluation. Ex. H-1 at 10. At times, Doe 4 has also provided contradictory information to his mental health clinician that suggested it was "either fictional or great imagination." Ex. H-2 at 1. Doe 4 may not attack his care at SVJC as deficient to the extent he has withheld information from mental health professionals. Similarly, diagnoses and opinions offered by third-parties using such information

23

do not render Doe 4's care at SVJC constitutionally inadequate. *See, e.g.,* Ex. M, Lewis Depo. Tr. 180:22-181:8 (referencing trauma disclosed by Doe 4 during his evaluation that Doe 4 did not share with SVJC).

Even under the professional judgment standard, assessments by a qualified professional are "presumptively valid" and are subject to constitutional scrutiny only if they represent "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 322-323. Thus, the professional judgment standard sets a minimum constitutional threshold as opposed to judicially-sanctioned debate concerning the best available healthcare. *See Alexander S.,* 876 F. Supp. at 798 (under the professional judgment standard, the Court must "identify minimally acceptable standards for treatment[.]"). *See also Reno v. Flores*, 507 U.S. 292, 304 (1993) (finding no constitutional requirement to provide "the best healthcare available" to alien juveniles held in federal custody pending deportation hearings) *and Youngberg*, 457 U.S. at 321 ("the Constitution only requires that the courts make certain that professional judgment in fact was exercised."). Professional judgment "does not mean some standard employed by a reasonable expert or a majority of experts in the community ... but rather that the choice in question was not a sham or otherwise illegitimate." *Patten v. Nichols*, 274 F.3d 829, 845 (4th Cir. 2001).

Expert opinions disclosed by Plaintiffs for Dr. Gregory Lewis, a psychologist, improperly equate the professional judgment standard with negligence.[8] Ex. M at Tr. 186:15-187:8. *Compare with Patten*, 274 F.3d at 834 ("it is equally clear that negligence alone does not amount to a constitutional violation") (*citing Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

---

[8] SVJC expressly reserves all arguments and bases for excluding testimony from Dr. Lewis set forth in its Motion to Exclude and the materials filed in support thereof.

24

Indeed, even Dr. Lewis acknowledges that Doe 4's mental health clinicians have made appropriate efforts to respond to him, but believes "they didn't go far enough." Ex. M at Tr. 176:11-15. *Compare with Patten*, 274 F.3d at 845 (finding evidence that "there was more that could have been done" by defendant did not survive summary judgment). As set forth above, Doe 4 has received appropriate and regular mental health treatment while at SVJC.

**C.      Plaintiffs have failed to establish a policy, custom or practice of denying adequate mental health care.**

As set forth above, Plaintiffs have failed to present sufficient facts to establish a claim for inadequate mental health care under either the deliberate indifference or professional judgment standards. Therefore, by definition, SVJC can have no liability under 42 U.S.C. § 1983. *See City of L.A.*, 475 U.S. at 799. However, even to the extent this fatal deficiency is overlooked, Plaintiffs have failed to establish the remaining elements necessary to impose such liability upon SVJC, namely a policy or custom, a causal link between the policy or custom and the alleged injury, and deliberate indifference in enacting the policy. *See Bryson*, 627 F.3d at 788; *and Schneider*, 717 F.3d at 769.

**D.      The relief available for Plaintiffs' claims of inadequate mental health treatment is limited by Plaintiffs' failure to join ORR as a party to this case.**

The relief available for Plaintiffs' claim of inadequate mental health treatment is restricted by SVJC's limited legal role in providing secure detention services to Plaintiffs and other UAC. ORR is the legal custodian of Doe 4 and all other UAC housed at SVJC. Ex. B at ¶ 18. SVJC is required to obtain authorization from ORR for most forms of medical treatment, including psychological evaluations, vision exams, and vaccinations. *Id*. As custodian, ORR is also the final arbiter for treatment and placement decisions for each UAC. *Id*. Therefore, any relief awarded upon Plaintiffs' claims for mental health treatment must be tailored in a way that

25

does not change or impede ORR's legal rights and obligations as UAC custodian. *See Sanchez v. R. G. L.*, 761 F.3d 495, 507 (5th Cir. 2017)(requiring that ORR be joined as party to avoid requiring ORR contractor to choose between "disobeying a court order or breaking contractual and legal obligations" to ORR). As set forth above, Plaintiffs' claims for inadequate mental health care merit no such relief.

## IV. SVJC DOES NOT DISCRIMINATE AGAINST YOUTH ON THE BASIS OF RACE OR NATIONAL ORIGIN.

Plaintiffs allege that they have been denied their right to equal protection guaranteed by the Fourteenth Amendment. ECF Dkt. No. 68, Counts III and IV, ¶¶ 157, 164. To state an equal protection claim, Plaintiffs must establish "(1) plaintiff and a similarly situated comparator inmate were treated differently, and (2) that the different treatment was the result of intentional discrimination." *Douglas v. Johnson*, 2013 U.S. Dist. LEXIS 37003, *15 (W.D. Va. 2013) (internal citations omitted). In addition, for SVJC to be liable for alleged discrimination under 42 U.S.C. § 1983, Plaintiffs must allege and prove that such discrimination results from SVJC's policies or customs. *Monell*, 436 U.S. at 694.

### A. Plaintiffs have failed to allege or show that they are treated differently from similarly situated youth at SVJC.

The differences alleged by Doe 4 regarding other youth at SVJC are not based upon race or origin. Instead, they are based upon differing requirements for a separate population of youth who are in the CPP Program. The CPP program is a transitionary release program for youths who are subject to individual requirements imposed by the Court and DJJ. Ex. B at ¶¶ 5, 7. Youths in the CPP program have been transferred to SVJC to be closer to their home communities prior to being released. Ex. B at ¶ 5. Race and national origin have no bearing upon a youth's placement in the CPP program, which is determined by DJJ. Ex. B at ¶ 9.

In addition to the UAC and CPP programs, SVJC serves local youth who have (i) been charged with a crime but have not yet had their cases adjudicated, or (ii) who have been sentenced to detention (collectively, "Local Youth"). Ex. B at ¶ 5. Local Youth are subject to the same rules and restrictions as UACs and are treated similarly except in instances where UACs receive greater services, such as access to mental health treatment. Ex. B at ¶ 6. Local Youth and UACs receive the same access to iPods, computers, recreation time, and the like. Notably, both the CPP and Local Youth populations at SVJC have included youth who are Latino and youth who are undocumented immigrants. Ex. B at ¶ 9.

Plaintiffs' claims that they are discriminated against because "American"[9] youth receive a greater number of iPods, greater access to computers, or have greater access to the outdoors reflect differences between the UAC and CPP populations, which are not similarly situated. In a penal context, courts have repeatedly recognized that persons are often treated differently as a result of different programs or individual characteristics. *See Douglas*, 2013 U.S. Dist. LEXIS 37003 at *14-15 (allegations of different access to television, clothes, food, and different security measures in separate wings of a prison do not state an equal protection claim); *and Johnson v. Jabe*, 2010 U.S. Dist. LEXIS 103483 (W.D. Va. 2010). As set forth above, the differences alleged by Doe 4 regarding other youth at SVJC are based upon differing requirements for a separate population of youth rather than race, national origin, or any other form of discrimination.

---

[9] John Doe 4 testified that other youth are treated differently because "they're American." Ex. G at Tr. 74:14-18. Being American is an alienage status, not a race or national origin. Plaintiffs have not alleged discrimination on the basis of alienage. *See generally* ECF Dkt. No. 68.

**B.**   **Plaintiffs have failed to establish a custom or policy under which SVJC is liable for their allegations of discrimination.**

Apart from differences between UACs and youth in the CPP program, which are not similarly situated, Doe 4 further alleges that SVJC staff members have made racist comments, a staff member told a UAC that he would need to purchase a ball to play soccer, and that another staff member told a UAC to eat food from the trash.  Ex. G at Tr. 57:12-25.  SVJC is not aware of any reports by Doe 4 regarding such discriminatory comments or practices.  Ex. H at ¶ 16. Any such reports would be documented, investigated, and subject to appropriate disciplinary action as a matter of policy.  *Id.*

Although Plaintiffs generally allege that SVJC has "unconstitutional policies and practices",[10] SVJC's policies unequivocally prohibit discrimination on the basis of race and national origin.  Ex. B at ¶ 10; Ex. B-2.  In addition to prohibiting discrimination, SVJC proactively trains staff with respect to cultural competency and cultural differences.  Ex. B at Tr. 28:23-29:20.  Plaintiffs' conclusory allegation that SVJC's policies are unconstitutional is insufficient to state – much less prove – a claim for discrimination.  *Douglas*, 2013 U.S. Dist. LEXIS 37003 at *15 (*citing United Black Firefighters v. Hirst*, 604 F.2d 844 (4th Cir. 1979)).

Although SVJC denies that staff members have made such remarks, racist comments alone do not amount to a constitutional violation without accompanying conduct that deprives a person of established rights.  *See, e.g. Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) ("Where the conduct at issue consists solely of speech, there is no equal protection violation.") (internal citations omitted); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution."); *and Matthew v. Beard*, 2013 U.S. Dist. LEXIS 42844, *16 (W.D. Pa. 2013)

---

[10] ECF Dkt. No 68 at ¶ 3.

("Religious and racially discriminatory statements, racial slurs and epithets, without more, also do not establish liability under § 1983") (internal citations omitted). As set forth above, any difference in services between UAC and CPP populations is not based upon race or national origin. Therefore, Doe 4's allegations of racist comments are not sufficient to state a constitutional violation.

Plaintiffs' allegations are insufficient to establish that SVJC engages in intentional discrimination that deprives them of any established right. In addition, Plaintiffs have failed to allege or prove that any of the alleged comments and behavior by staff accords with a policy or custom that would render SVJC liable under 42 U.S.C. § 1983. Accordingly, Plaintiffs' cannot prevail upon claims against SVJC for discrimination on the basis of race and national origin.

## CONCLUSION

Plaintiff John Doe 4 has failed to relate three instances of alleged excessive force, only one of which he reported, to a policy, custom or practice of SVJC. SVJC provided Doe 4's sole complaint of excessive force to CPS in accordance with policy. Doe 4 has received constitutionally adequate treatment for ADHD and PTSD which has included an evaluation by a psychologist, individual weekly counseling by a licensed professional counselor, and unfettered access to a psychiatrist. Doe 4's allegations that American youth at SVJC are afforded better treatment and services reflect differences between separate youth populations that are not similarly situated rather than discrimination on the basis of race or national origin. Accordingly, Plaintiffs have failed to present facts upon which relief can be awarded against SVJC under 42 U.S.C. § 1983. For the reasons set forth herein, Defendant's Motion for Summary Judgment should be granted.

29

Respectfully submitted,
**SHENANDOAH VALLEY JUVENILE**
**CENTER COMMISSION**
*By Counsel*

By: /s/ Jason A. Botkins

| | |
|---|---|
| Jason A. Botkins (VSB No. 70823) | Harold E. Johnson (VSB No. 65591) |
| Melisa G. Michelsen (VSB No. 40001) | Meredith M. Haynes (VSB No. 80163) |
| Litten & Sipe, LLP | Williams Mullen |
| 410 Neff Avenue | 200 South 10th Street |
| Harrisonburg, Virginia 22801-3434 | Richmond, Virginia 23219 |
| Telephone: (540) 434-5353 | Telephone: (804) 420-6000 |
| Facsimile: (540) 434-6069 | Facsimile: (804) 420-6507 |
| Email: jason.botkins@littensipe.com | Email:hjohnson@williamsmullen.com |
| Email: melisa.michelsen@littensipe.com | Email:mhaynes@williamsmullen.com |

*Counsel for Defendant Shenandoah Valley Juvenile Center Commission*

## CERTIFICATE

I certify that on the 22nd day of October, 2018, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

| | |
|---|---|
| Hannah M. Lieberman (*pro hac vice*) | Theodore A. Howard (*pro hac vice*) |
| Tiffany Yang (*pro hac vice*) | Bradley C. Tobias (VSB No. 88046) |
| Mirela Missova (*pro hac vice*) | J. Ryan Frazee (*pro hac vice*) |
| | |
| Washington Lawyers Committee | Wiley Rein LLP |
| for Civil Rights and Urban Affairs | 1776 K Street, NW |
| 11 Dupont Circle, NW, Suite 400 | Washington, D.C. 20006 |
| Washington, D.C. 20036 | Telephone: (202) 719-7120 |
| Telephone: (202) 319-1000 | Facsimile: (202) 719-7049 |
| Facsimile: (202) 319-1010 | thoward@wileyrein.com |
| hannah_lieberman@washlaw.org | btobias@wileyrein.com |
| tiffany_yang@washlaw.org | jfrazee@wileyrein.com |
| mirela_missova@washlaw.org | |

*Attorneys for Plaintiff John Doe 4*

/s/ Jason A. Botkins
*Counsel for Shenandoah Valley*
*Juvenile Center Commission*