# **<u>EXHIBIT A</u>**

# JOHN DOE 4

*vs*

# SHENANDOAH VALLEY JUVENILE CENTER

Deposition of

*Kelsey Rebecca Wong*

*August 22, 2018*



*Statewide Coverage in Virginia*     *National and International Scheduling*

590 Neff Avenue, Suite 2000     1020 Ednam Center, Suite 002     205 34th Street, #1601
Harrisonburg, VA  22801     Charlottesville, VA  22903     Virginia Beach, VA  23452
(540) 801-0288     (434) 296-3111     (757) 227-4241

Deposition of Kelsey Rebecca Wong
August 22, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF VIRGINIA

 3                    HARRISONBURG DIVISION

 4     _____

 5     JOHN DOE 4, et al., by and through )

 6     their next friend, NELSON LOPEZ,   )

 7     on behalf of themselves and all    )

 8     persons similarly situated,        )

 9                      Plaintiffs,) CASE NO.

10     v.                              ) 5:17-cv-0097

11     SHENANDOAH VALLEY JUVENILE CENTER  )

12     COMMISSION,                        )

13                      Defendant.)

14     _____

15

16            Deposition of KELSEY REBECCA WONG

17                  Harrisonburg, Virginia

18              Wednesday, August 22, 2018

19                        9:30 a.m.

20                     Pages 1 - 225

21         Reported by:  Karen L. Hart, RMR-CRR

22

23

24

25
```

**COPY**

Page 2

1          Deposition of KELSEY REBECCA WONG held at

2    the offices of:

3

4              HART REPORTING AND VIDEOCONFERENCING, LLC

5              590 Neff Avenue, Suite 2000

6              Harrisonburg, VA  22801

7              (540) 801-0288

8

9

10

11

12

13          Pursuant to agreement, before Karen L.

14   Hart, Registered Merit Reporter, Certified Realtime

15   Reporter and Notary Public for the Commonwealth of

16   Virginia.

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4          HANNAH E. M. LIEBERMAN, ESQUIRE

 5          TIFFANY YANG, ESQUIRE

 6          WASHINGTON LAWYERS' COMMITTEE

 7          FOR CIVIL RIGHTS AND URBAN AFFAIRS

 8          11 Dupont Circle, NW, Suite 400

 9          Washington, DC  20036

10          (202) 319-1000 x130

11          Hannah_Lieberman@washlaw.org

12          Tiffany_Yang@washlaw.org

13

14                -- and --

15

16          THEODORE A. HOWARD, ESQUIRE

17          WILEY REIN, LLP

18          1776 K Street, NW

19          Washington, DC  20006

20          (202) 719-7120

21          thoward@wileyrein.com

22

23

24

25
```



Page 4

```
 1              A P P E A R A N C E S  (Cont'd)

 2

 3   ON BEHALF OF THE DEFENDANT:

 4        JASON A. BOTKINS, ESQUIRE

 5        LITTEN SIPE

 6        410 Neff Avenue

 7        Harrisonburg, VA  22801

 8        (540) 434-5353

 9        jason.botkins@littensipe.com

10

11             -- and --

12

13        MEREDITH M. HAYNES, ESQUIRE

14        WILLIAMS MULLEN

15        200 South 10th Street, Suite 1600

16        Richmond, VA  23219

17        (804) 420-6225

18        mhaynes@williamsmullen.com

19

20

21

22

23

24

25
```



Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 28

1      Q.    When do the resident supervisors receive

2   the training particularly with respect to providing

3   crisis management?

4      A.    When they're first hired, they have an

5   initial training, which I think is 80 hours, with the

6   training coordinator, and they go through all the

7   required trainings necessary before they do

8   on-the-job training which is 40 hours.  And then we

9   do annual trainings throughout the year which consist

10  of four hours per month.  Then we also offer external

11  trainings to staff when available.

12     Q.    So that 80 hours of initial training

13  that's provided with the training coordinator, is

14  that for all new hires?

15     A.    All new hires.

16     Q.    And what does it consist of?

17     A.    Reading our policy, having all the initial

18  required training, such as first aid, CPR, emergency

19  precautions, OSHA, those kind of things, Handle With

20  Care, LGBTQ, and mandatory reporting, PREA, the ORR

21  program, cultural competency.  I can't remember them

22  all.  And then they do the 40 hours on the job.

23     Q.    What is covered in the cultural competency

24  training?

25     A.    Typically, because the UAC population

Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 29

1  usually comes from Central America, we talk about how

2  the kids come here, the differences in cultures,

3  things like that.

4      Q.    What do you cover in terms of how the kids

5  come here?

6      A.    Typically we talk about the journey that

7  they take from Central America.  Not all of our youth

8  are from Central America, but I would say the

9  majority of them are within the UAC population.  And

10  we talk about typically how dangerous it is and the

11  experiences that they encounter on the way.  We have

12  shown video clips, things like that.

13     Q.    Do you talk about trauma?

14     A.    Uh-huh.

15     Q.    And what do you talk about with respect to

16  trauma?

17     A.    Our lead clinician does -- talks about the

18  typical histories and past experiences of youth who

19  have been in our care and how they -- yeah, she talks

20  about their trauma, I guess, in the past.

21     Q.    Who is your lead clinician?

22     A.    Melissa Cook.

23     Q.    What is covered in the training with

24  respect to ORR?

25     A.    We go over what a UAC is, where they come



Page 30

1    from, the reasons why they come.  The push factors

2    mainly is kind of what we look at.  We talk about the

3    number of referrals that we've received from -- or

4    ORR has received from DHS throughout the years.  We

5    go through the legal authorities of ORR, the services

6    that are required.  We go through the

7    responsibilities of case managers and clinicians.  We

8    go over case plans, sponsor fraud, things like that

9    to be wary of.

10        Q.    I'm sorry?

11        A.    Sponsor fraud, to be wary of.

12        Q.    When you say you go over case plans, what

13   do you mean?

14        A.    We go over the possible cases of kids and

15   what they're working on or could be working on

16   depending on the child and the process and the length

17   of time it takes, things like that.

18        Q.    What is Handle With Care?

19        A.    It is the DJJ approved physical restraint

20   technique that we utilize.

21        Q.    And how long have you been utilizing the

22   Handle With Care approach?

23        A.    As long as I've worked there.  I'm not

24   sure when it began.

25        Q.    You then stated that you have 40 hours of



Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 46

1    developed case plans.  Is that one of the things that

2    case managers are expected to do?

3         A.    They're expected to work with a kid on

4    their case and try to move their case forward in

5    whatever capacity that we can and coordinate services

6    and document everything.

7         Q.    Are case managers assigned to specific

8    kids?

9         A.    Yes.

10        Q.    And how many kids would a case manager

11   typically have?

12        A.    Eight is the maximum.  It's a one-to-eight

13   ratio.

14        Q.    And are you at that one-to-eight ratio

15   point currently?

16        A.    Yes.

17        Q.    Do case managers speak Spanish?

18        A.    Yes.

19        Q.    All of them?

20        A.    Uh-huh.  Sorry.  Yes.

21        Q.    And what are the things that they might do

22   to move a case forward?

23        A.    Depends on the case plan, whether it's

24   referrals, working on the kid with good behavior,

25   working with a sponsor or family member to gather

Page 48

 1    and also the safety of the community.  Also, ideally,

 2    we're trying to step a kid down to lower levels of

 3    care, and that can impact acceptance at another

 4    program.  If a kid is continually having behavioral

 5    issues, they may not be approved for a step-down or

 6    the other programs may not accept them because of

 7    that.

 8          Q.    Do the case managers work with clinicians

 9    at all with respect to the kids?

10          A.    Yes, they're paired.  So each kid is

11    assigned a case manager and clinician on intake or

12    when they're referred.

13          Q.    Is there an established method for

14    communication between the case manager and the

15    clinician with respect to individual kids?

16          A.    They work really closely together.

17    Most -- you have to kind of tag team the work.  A lot

18    of the documents are created in conjunction with one

19    another, in talking with the kid as well, safety

20    plans, family conferences, things like that.

21          Q.    What role, if any, does a case manager

22    have in determining the type of discipline a kid may

23    need to have?

24          A.    None.

25          Q.    So when a kid is subjected to a form of



Page 69

1   be?

2        A.    For example, if a kid had been mislabeled

3   gang but we're working on family reunification within

4   the safety plan, we'll probably look for programs

5   that work with gang-involved individuals because

6   sometimes that may help their approval for family

7   reunification even though it's been denied.  It can't

8   hurt.

9        Q.    So in cases where you conclude that a kid

10  does not need a secure setting and perhaps should be

11  stepped down, what are the steps you go through to

12  try to put that step-down process into place?

13       A.    We staff cases weekly with our case

14  coordinator.  Our FFS participates at least once a

15  month, but we elevate all our staffing notes and all

16  concerns or major issues through an e-mail weekly.

17  And then any other major concerns, we'll call our FFS

18  for guidance on -- you know, if we can do anything

19  sooner rather than later.

20       Q.    And who makes the decision about whether

21  step-down may or may not be appropriate in a given

22  case?

23       A.    ORR.

24       Q.    And who at SVJC is responsible for making

25  SVJC's recommendation with respect to step-down?



Page 70

1        A.     We don't necessarily make recommendations

2    all the time, initially just staffing the case and

3    providing eligibility or elevating a case about

4    concerns for placement.

5        Q.     What do you mean providing eligibility?

6        A.     If a kid has been -- typically a kid is

7    reviewed for step-down every 30 days, and other

8    programs won't accept a case unless they've

9    demonstrated 30 days of good behavior.  The process

10   continues to change because ORR continues to evolve.

11   So for certain cases now with gang involvement, if

12   they're only placed in secure for gang involvement,

13   which previously kids who disclosed gang involvement

14   weren't placed in a secure setting, they would be

15   placed in a staff secure setting, which was kind of

16   like a shelter placement but with higher levels of

17   supervision.  The ratio from staff to kid is smaller.

18   Then they would be evaluated there.  But the policy

19   changed that any kid who has gang involvement or gang

20   affiliation has to be in a secure setting, and the

21   policy has evolved to the point if a kid is only

22   placed in a secure setting for a gang involvement,

23   then they're evaluated within seven to ten days or

24   something and then that they can be -- the FFS will

25   review for step-down at the time.



Page 76

1    kids who have engaged in self-harming -- who have

2    histories of engaging in self-harming behaviors, and

3    a secure setting is the most restrictive setting

4    within the ORR network, so there's not as much access

5    to a lot of the items that kids may use for self

6    harm.

7        Q.    Are they put in a secure facility to --

8    for treatment purposes or for safety purposes?

9        A.    Safety.

10       Q.    To the extent that they might need or

11   benefit from treatment, is that something they can

12   get at SVJC, or do they have to be placed somewhere

13   else?

14       A.    Typically when they're referred to us, if

15   we've identified a mental health concern or a mental

16   health need, we will conduct or elevate and ask for a

17   psychological evaluation to be conducted, and we'll

18   refer them to that and then they'll -- depending on

19   that psychological evaluation, then we can move

20   forward with the case, and RTC within the network

21   won't accept a kid without a recommendation.

22       Q.    Who conducts the psych evaluation?

23       A.    We have two providers that we utilize.  We

24   used to have some other ones in the past, but they've

25   gone, moved on.  We typically use Dr. Gustavo Rife



1    necessary if we can't set the expectation upfront.

2    So they're posted throughout the facility based on

3    the area where the child is.

4         Q.    So what were the rules previously that you

5    couldn't do?

6         A.    There is a list of them on the previous

7    resident orientation handbook.   I can't remember all

8    of them.

9         Q.    Can you give me some examples?

10        A.    It's been a long time since I've seen

11   them.

12        Q.    When did this change take place?

13        A.    We implemented the new behavioral

14   management program in August of 2016.   We started

15   redeveloping it in February of 2016.

16        Q.    So is it still the case that, for example,

17   kids must walk through the hallways with their hands

18   behind their back?

19        A.    Uh-huh, yes.   Sorry.

20        Q.    And what's the reason for that rule?

21        A.    I think it's to maintain order in the

22   hallways, to make sure that items on the wall -- just

23   to maintain order in the hallways, I guess.

24        Q.    What about the no talking at meals?

25        A.    I think that is mainly a logistic reason,



Deposition of Kelsey Rebecca Wong
August 22, 2018

1    just to -- for meals to go, to limit issues during

2    meal times.

3        Q.    What are the consequences if a kid

4    violates a rule of that nature?

5        A.    Typically, they're just verbally

6    redirected.

7        Q.    Is that what you would expect, that

8    violation of a rule of that magnitude would warrant a

9    verbal redirection only?

10       A.    Yes, I'd expect.

11       Q.    Are the residents given those rules beyond

12   ones that are posted?  Are they given those rules in

13   writing?

14       A.    The general rules are listed in the

15   resident orientation handbook, but they're also on

16   all the units for them to see it in writing.

17

18              (Wong Deposition Exhibit No. 13 was marked

19   for identification and attached to the transcript.)

20

21   BY MS. LIEBERMAN:

22       Q.    Ms. Wong, you have before you a document

23   that's been marked as Wong Exhibit 13.  Can you tell

24   me what it is?

25       A.    It's the mental health interview protocol

Page 94

1    document.

2          Q.    Is this a document that is currently in

3    use?

4          A.    Yes, at intake.

5          Q.    And how does it work?

6          A.    At intake it's part of one of the forms

7    that or assessments that are completed with the

8    youth.

9          Q.    And is it -- are these essentially

10   sequential interview questions?

11         A.    Yes.

12         Q.    Who asks them?

13         A.    The person conducting the intake,

14   typically the shift supervisor or the translator if

15   the translator is present.

16         Q.    So not a mental health professional?

17         A.    No, just at intake to identify any concern

18   prior to placement.

19         Q.    Has the approach to getting this

20   information been vetted by any of the clinicians?

21         A.    I'm not quite sure where the mental health

22   interview protocol form came from.  I'm not sure if

23   it's a DJJ form or something like that to make sure

24   when the kid is initially placed, most -- you know,

25   the kids are FAST placement or they're coming from a

Page 95

1    locality you don't really know their past

2    information, so it's to make sure if there's any

3    issues that need to be addressed they will be

4    addressed.

5        Q.    Do you expect that youth will be

6    forthcoming in their responses to these questions?

7        A.    Maybe not at intake, but the clinicians

8    always do follow-up to this, and I forget if they do

9    it within a week or 30 days afterwards.  There's a

10   timeframe.  I can't remember.

11       Q.    And the clinicians do a follow-up with

12   every single new resident?

13       A.    New intake, yeah.

14       Q.    Do they use a particular instrument in

15   their follow-up?

16       A.    I'd say it's conducted -- the follow-up

17   and this form are done in the JCS system as an

18   assessment tool.

19       Q.    So there's a structured document, if you

20   will, that the clinicians use to do their follow-up?

21       A.    Yes, I believe so, through the JSC.  They

22   do a follow-up form from this.

23       Q.    And then it's entered into the JCS system?

24       A.    Yes.

25       Q.    You mentioned the MAYSI scoring tool?



Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 97

1  youth, and if they have any scars or tattoos or like

2  that on their body that can be documented, yeah.

3      Q.    What about their educational levels?  Is

4  that explored?

5      A.    That's asked as part of the biographical

6  data.

7      Q.    Is there any testing of their educational

8  level?

9      A.    The education department -- so our

10 education department is provided through Staunton

11 City Schools, and they do educational testing for the

12 youth.  For our kids, they do it within 72 hours of

13 the intake unless they're on some kind of break for

14 holidays or something like that, that they do an

15 educational assessment for placement.

16     Q.    Do they do the educational assessment in

17 Spanish?

18     A.    English and Spanish, depending on the

19 kid's level.

20     Q.    And what do they do with the assessment

21 once it's completed?

22     A.    They use it to identify what type of

23 education they need to be placed in or where they

24 need to go, depending on their education level or

25 what can be provided.  If they're in a certain math

Case 5:17-cv-00097-EKD-JCH    Document 100-1    Filed 10/22/18    Page 20 of 33    Pageid#:
1264
Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 100

1   perfect English, had been accultured to the United

2   States, had been in school for a long time and they

3   were working on their GED.  And then for a while, we

4   had a lot of kids straight from the border who had

5   very low educational skills, and now we're getting --

6   we've had a little bit of a mix of it in the past few

7   years.

8        Q.    And so kids are assigned to different

9   classrooms based on their level of educational

10  attainment?

11       A.    However, the school department puts where

12  they want the kids and how they want to program them

13  for that day.

14       Q.    So does any of the SVJC staff actually

15  oversee the delivery of educational services?

16       A.    No, they provide more -- like they'll sit

17  in the classrooms to, you know, be a support there,

18  and they'll also be in the hallways.  If a kid needs

19  to cool down, they'll come out with the kid if they

20  need to cool down in the hallway to return to class,

21  or if the kid is frustrated and wants to go to their

22  room for a time-out, then they'll escort them to

23  their room for a time-out, things like that.

24       Q.    But institutionally, you don't -- or

25  institutionally, do you do any monitoring of whether



Page 101

1    the educational services provided at the facility are

2    appropriately tailored to the kids' needs and levels?

3         A.    They're supervised through Staunton City

4    Schools, the public school system.

5              MS. LIEBERMAN:   Okay.   Why don't we stop.

6    Why don't we take a lunch break.

7

8              (Recess, 12:22 p.m. to 1:33 p.m.)

9

10   BY MS. LIEBERMAN:

11        Q.    What is a case plan?

12        A.    A case plan is -- I'm trying to think of

13   how to describe it.   What the kid is working on to

14   either stay in the United States or to return to home

15   country.

16        Q.    And is it a document or something else?

17        A.    It's typically the primary goal of the

18   minor, the primary and concurrent goal of what

19   they're working on.

20        Q.    Is that goal embodied in a document?

21        A.    It's typically embodied in the UAC

22   assessment or case review.

23        Q.    And what is the case review?

24        A.    The case review is an assessment completed

25   that compiles all the minor's information into a

Page 107

1    that the old policy had.  Turn to page 6 of the

2    policy.

3         A.    Okay.

4         Q.    And in particular look at number E, and it

5    talks about types of disciplinary measures to be

6    applied progressively by staff to resolve resident's

7    violations.

8         A.    Yes.

9         Q.    And then it lists, in sequence, verbal

10   reprimand, time out, level loss, room isolation of

11   less than 24 hours and room isolation exceeding 24

12   hours.

13        A.    Correct.

14        Q.    Was this an approach that basically used

15   removing kids from programming as a disciplinary

16   measure rather than a safety measure?

17        A.    I would say so.

18        Q.    So there was a punitive aspect to the

19   various interventions that are listed here?

20        A.    I don't know if it would be considered

21   punitive.  But I would say that I think it was more

22   about -- still about maintaining safety, but I think

23   it was just handled in a different way.

24        Q.    In what respect?

25        A.    In this program, if a child continued to

Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 108

1    act out, had continued behavioral issues, then he

2    would lose his behavioral level up until the point of

3    having room time for a prescribed amount of time.

4        Q.    So I think I heard you say two things.

5    One, that it contemplated the loss of levels?

6        A.    Correct.

7        Q.    And was there any formula for how that

8    loss could happen, or was it discretionary?

9        A.    It was based on behavioral -- there was a

10   list, I believe, of things where they may lose their

11   level.

12       Q.    And the --

13       A.    Which would be in the resident orientation

14   handbook from previously.

15       Q.    So was it the case that a certain kind of

16   infraction would then trigger a specific loss?

17       A.    Yes.

18       Q.    And is that something that you changed in

19   2016?

20       A.    Yes.

21       Q.    So take a look at page 7, H, where it

22   says, "Once initiated, disciplinary levels are

23   influenced by the resident's attitude and actions,"

24   and certain actions may result in more stringent

25   disciplinary measures being taken.  Do you see where

Deposition of Kelsey Rebecca Wong
August 22, 2018

1      Q.     As a disciplinary response?

2      A.     Yes.

3      Q.     And there are two kinds, short term and

4   indefinite.   Short term is defined as less than eight

5   hours.

6      A.     I think it's up to 24 hours.   It says less

7   than eight hours but could be up to 24 hours.

8      Q.     Right.   Yes.   Thank you.

9             Is that still the facility's concept of

10   short-term isolation?

11      A.     We don't have a term for short-term

12   isolation in the new behavioral management program.

13      Q.     Is -- do you have -- well, we'll get to

14   that in a minute.

15             The second is indefinite, duration of more

16   than 24 hours but not to exceed 72.   Is that

17   something that the facility still uses?

18      A.     We don't have anything with that term for

19   indefinite.

20      Q.     And why did the facility decide to stop

21   using a short-term and indefinite duration policy?

22      A.     This is about the prescribed room time for

23   a specific violation, and we wanted to move away from

24   that because our idea is that kids will be more

25   successful if they're in programming and returning

Deposition of Kelsey Rebecca Wong
August 22, 2018

1   them to programming as soon as possible once they're

2   calm.

3        Q.     And in the old policy, it was a set time

4   period they had to satisfy?

5        A.     Yes.

6        Q.     If you turn with me to the following page

7   13, there should be some unnumbered pages with grids.

8   Do you see those?

9        A.     Yes.

10        Q.     What are those?

11        A.     This is a list of disciplinary measures

12   used for violation of rules.

13        Q.     And were these guidelines for staff?

14        A.     Yes.

15        Q.     And what were they intended to do?

16        A.     To provide kind of a crosswalk of measures

17   that can be used for offenses.

18        Q.     It says which level of disciplinary

19   measures will be used for a violation at the top.

20        A.     Yes.

21        Q.     Does that mean that staff were required to

22   follow the designations in this grid?

23        A.     They can follow any of the Xs.

24        Q.     Or must they follow the Xs?

25        A.     They should be following the Xs or

1    away that they've earned?

2         A.    No.  I think sometimes it's a verbiage

3    issue of kids feeling that things are taken away when

4    really they -- the expectation or responsibility of

5    them earning their points, they know the

6    expectations, and the goal is for them to earn it

7    within that respected period.

8         Q.    So I'm sorry.  I may have interrupted you

9    when you were walking through the ways in which this

10   policy was a change from the prior policy.  Were

11   there other things that you wanted to flag?

12        A.    I think we talked about the reinforcers.

13   I think that's it.  I guess removal from programming.

14   Previously, the verbiage for removal from programming

15   was called restricted, and now we call it removal.

16   And it can only be less than 24 hours for any

17   incident, and it's reviewed every four hours and

18   hopefully sooner for them to be reintegrated into

19   programming if it is safe to do so.

20        Q.    So it can only be less than 24 hours for

21   any incident?

22        A.    Uh-huh.  Previously, in the old policy, it

23   could be up to 24 hours for the incidents in the

24   diagram or from 24 to 72 hours.  No kid is removed

25   for more than 24 hours at a time in this new program.



Page 120

```
 1        Q.     Irrespective of the offense?

 2        A.     Correct.

 3        Q.     If a kid were removed for more than 24

 4   hours, now that this new policy is in effect, would

 5   that constitute a violation of rules by staff?

 6        A.     I think it -- in the policy, if I'm not

 7   wrong, it would have to have the executive director

 8   or deputy director approval if the kid was in their

 9   room for more than 24 hours.

10        Q.     And that approval would have to come when?

11        A.     When it's -- if it's coming up on the

12   24-hour period, it would have to have approval.

13        Q.     So it's not a retroactive blessing?

14        A.     No.   It would have to be beforehand.   And

15   then there would have to be a plan in place on how to

16   get the kid back into programming.

17        Q.     And would that trigger any red flags for

18   further involvement with the kid or examination of

19   the circumstances?

20        A.     All of the -- all of -- any kind of

21   disciplinary incident would be reviewed by multiple

22   people, so it wouldn't just have one person's eyes

23   looking at it.

24        Q.     Is that true of any incident or those that

25   exceed 24-hour isolation?
```



Page 198

1      A.      One of the psychologists that we have

2   available to --

3      Q.      Whom you mentioned before, Dr. Rife or

4   Dr. Gorin?

5      A.      Uh-huh, those are our current ones we

6   utilize.

7      Q.      So could any youth who wants to see a

8   psychologist see either Dr. Rife or Dr. Gorin, or is

9   it just a limited subset of kids who see them?

10      A.      Only UAC see them.

11      Q.      And if a UAC asks to see a psychologist,

12   would they be able to see one of the two of them?

13      A.      If approved by ORR.

14      Q.      And what information, if any, does ORR get

15   about their circumstances?

16      A.      They receive all the information.  All of

17   it is documented.

18      Q.      It goes to that portal?

19      A.      Yeah, and all the information is staffed

20   weekly and information is provided on a weekly basis

21   to them.

22      Q.      What does Dr. Kane do?

23      A.      He's a psychiatrist and he provides

24   medication management for the youth.

25      Q.      So he makes sure their meds are

Case 5:17-cv-00097-EKD-JCH   Document 100-1   Filed 10/22/18   Page 29 of 33   Pageid#:
1293
Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 199

 1    appropriate?

 2         A.    Uh-huh.

 3         Q.    Does he provide any kind of therapy?

 4         A.    I don't know if you consider -- I'm not

 5    sure if medication management is considered therapy.

 6         Q.    Or any treatment beyond medication

 7    management?

 8         A.    Not to my knowledge.

 9         Q.    And how often does he see kids?

10         A.    He comes about every three weeks to the

11    facility.

12         Q.    Does he see just the ORR kids?

13         A.    Yes.

14         Q.    Does he see all of them when he comes?

15         A.    He has a list that he sees based on --

16    when he first meets them, he may want to see them six

17    weeks out or in the next three weeks depending on

18    whatever he thinks is appropriate.

19         Q.    We were talking about ORR needs to approve

20    a kid seeing a psychologist.  Who requests -- who

21    makes the request to ORR to see the psychologist?

22         A.    We staff the case with the case

23    coordinator, and we elevate it to our FFS for

24    approval.

25         Q.    Is the case coordinator different than the

Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 204

1   supervision if there are concerns for them.

2        Q.   What else is in the ISR?  Is there a

3   mattress in the ISR?

4        A.   Yeah, it's just a normal room.  It just

5   has a lower bed bunk, and it just has two cameras in

6   it.

7        Q.   Do the clinicians speak Spanish?

8        A.   The ORR clinicians do.

9        Q.   Do the medical staff speak Spanish?

10       A.   No.  Our medical director has a working

11   medical Spanish, but he -- we always have a

12   translator present.

13       Q.   And is that a staff person or a

14   translator?

15       A.   Usually a case manager.  The back-up

16   medical director that we have, when he's unable, is

17   bilingual.

18       Q.   And who's that?

19       A.   Dr. Katie Lopez.

20       Q.   So we were talking about the mod program.

21   How does the mod program, as it now exists, how is

22   it -- how does it relate to what I understand is the

23   expectation that a UC may not be confined for more

24   than 24 hours?  Doesn't the mod program lead in to

25   confinement in excess of 24 hours?



Page 214

 1    management provides an update on the kid, and then

 2    the clinician provides an update on the child.

 3         Q.    Who is typically in attendance at those

 4    meetings?

 5         A.    All the case managers and clinicians,

 6    Patty, Patricia Melendres -- we call her Patty -- and

 7    I attend when I'm available.

 8         Q.    And the FFS, what is that?

 9         A.    FFS, federal field specialist, and that's

10    the ORR field staff that's assigned to our program.

11         Q.    And what do they do?

12         A.    They are the point of contact with ORR for

13    our facility, and they provide decisions on

14    step-downs, reunifications.  They provide additional

15    guidance when necessary.

16         Q.    What kinds of things would require

17    additional guidance?

18         A.    Say you have a case where reunification

19    has previously been denied, but they want to repursue

20    reunification, if we can proceed, if we -- ideas on

21    placement options or if there are concerns with just

22    general guidance about the case if it's abnormal or

23    different than the normal case, I guess.

24         Q.    There are occasions on which the facility

25    reports allegations of abuse or neglect to Child



Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 215

1    Protective Services?

2        A.    Yes.

3        Q.    Under what circumstances would the

4    facility do that?

5        A.    Everyone at the facility is a mandated

6    reporter, so any allegations of abuse or neglect must

7    be reported, not just to CPS, but to state licensing

8    and to ORR and, depending on the circumstances, local

9    law enforcement.

10       Q.    What is the process for providing that

11   notification?

12       A.    If CPS -- if a report is going to be made

13   to CPS, then they will notify administration to

14   report it to state licensing, and then if it's a UAC

15   or UC, then it would be reported to ORR through a

16   significant incident report.

17       Q.    So if it involves a UC, it would not be

18   reported to local law enforcement?

19       A.    Depending on the situation, yeah.

20       Q.    Under what circumstances would something

21   be reported to local law enforcement?

22       A.    It depends on the allegation.  There is

23   certain PREA requirements that require you to refer

24   to local law enforcement.  If there's like a

25   PREA-related offense, even ORR, it has to be reported



Deposition of Kelsey Rebecca Wong
August 22, 2018

Page 221

1      A.     We still have a position open.

2      Q.     This noted that the UCs did not seem to

3   understand that they had possibly been participating

4   in group counseling.  How does the group counseling

5   work?

6      A.     I think it's because it wasn't necessarily

7   called group when they would do it.  I think that's

8   mainly the reason why it was happening.

9      Q.     How was it conducted?

10     A.     It was conducted by the clinicians twice a

11  week.

12     Q.     And what does the clinician do?

13     A.     They do psychoeducation, whatever is

14  going -- you know, if there's a major issue going on

15  with the kids.  Maybe it's a morning group exercise

16  with the kids to start their day off and set an

17  intention for the beginning of the week if it starts

18  on Monday.  It can vary.

19     Q.     So is it a discussion opportunity?  Is it

20  a -- do they play games that have some pedagogic

21  value?  What's the dynamic?

22     A.     It could be a discussion or it could be

23  like a morning stress exercise, and they have a word

24  of the day or a quote of the day they're going to

25  focus on or it could be an opportunity to discuss how

Hart
www.hartreporting.com                    Toll Free
scheduling@hartreporting.com        (877) 907-4278