# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | |
|---|---|
| JOHN DOE 4, by and through his next friend, NELSON LOPEZ, on behalf of himself and all persons similarly situated, )<br><br>*Plaintiffs,*<br><br>v.<br><br>SHENANDOAH VALLEY JUVENILE CENTER COMMISSION,<br><br>*Defendant.* | Civil Action No. 5:17-cv-00097-EKD |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. PAUL DIVER

Defendant Shenandoah Valley Juvenile Center Commission ("SVJC"), by counsel, sets forth the following in support of its Motion to Exclude the Expert Testimony of Dr. Paul Diver.

## INTRODUCTION

On September 10, 2018, Plaintiff served his expert disclosures under Rule 26(a)(2). ***Exhibit 1**, Plaintiff's Fed. R. Civ. P. 26(a)(2)(A) Expert Witness Disclosures.* Those disclosures included the designation of statistical analysis and calculations set forth in a report by Paul G. Diver, Ph.D. ***Exhibit 2**, Expert Report of Dr. Paul Diver ("Diver Report").* Diver's Report avers that he was engaged "to systematically quantify the time spent in seclusion imposed against class members by employees of the [SVJC]." *Id.,* ¶ *3.* Dr. Diver was also asked to "quantify the use of force by employees of SVJC against class members." *Id.* Finally, Dr. Diver was asked "to analyze the time periods before and after SVJC changed its behavioral management program in August 2016 for both time spent in seclusion and use of force." *Id.*

Dr. Diver's analysis does not really include expert opinions, so much as mathematical calculations. The report includes various tabulations, charts and graphs regarding the number and duration of incidents in which UAC's at SVJC were subjected to seclusion and/or use of force. The only opinion asserted in his report is that "[o]f these incidents, there are a substantial number which exceeded AMA, JDAI, SVJC and expert attested acceptable standards in terms of duration of time in seclusion and use of force and with regard to class members who had exhibited self-injurious behavior." *Id., ¶ 39.*

Defendant deposed Dr. Diver on October 16, 2018. ***Exhibit 3***, *Transcript of Deposition of Paul Diver ("Diver Dep.").* Dr. Diver's testimony at deposition revealed a variety of fundamental flaws in his calculations and analysis. Based upon his deposition testimony and the information in his report (or lack thereof), the Court should exclude Dr. Diver from testifying at trial of this matter.

First, Dr. Diver's analysis is wholly irrelevant to the case before the Court. Though the certified class in this case is limited to current and future UAC's at SVJC (ECF Dkt. No. 63), Dr. Diver analyzed incidents involving seclusion and use of force at SVJC between June 2015 and May 2018. *Diver Report, ¶ 8.* The data examined by Dr. Diver relates solely to UAC's who resided at SVJC before the class was even certified, and the vast majority of the incidents included in his analysis relate to individuals who are not class members. That alone renders his testimony irrelevant, for the reasons set forth in Defendant's Motion for Protective Order. ECF Dkt. No.'s 92, 93.

Even within the timeframe Dr. Diver reviewed, he only analyzed data regarding a subset of the UAC's who have been placed at SVJC. Dr. Diver's analysis only includes those residents who engaged in behavior that resulted in some period of room confinement. His report ignores

any and all behavioral incidents that were handled by staff without having to resort to use of force or room confinement. Dr. Diver has no idea how many such incidents may have occurred during the timeframe he studied, nor does not know the total number of UAC's who were placed at SVJC during that period. In other words, Dr. Diver did not assess SVJC's treatment of all UAC's within any given timeframe. Rather, he only reviewed information relating to a subset of UAC's, and that subset does align in any respect with the class that has been certified in this case.

Dr. Diver's report is also irrelevant because it includes no analysis of the underlying reasons why force or room confinement was necessary in any given incident. For example, he conducted no analysis to determine how many incidents involving use of force arose out of a UAC's assault on a staff member or fellow resident of SVJC. Nor did he consider in any way the efforts undertaken by SVJC staff to resolve behavioral incidents without use of force or room confinement. In other words, Dr. Diver added up the number and duration of incidents involving room confinement and/or use of force, but without any qualitative context, such calculations are meaningless.

Second, Dr. Diver's analysis is based upon an inadequate factual foundation. His calculations were drawn exclusively from a spreadsheet that was prepared by unknown individuals working for Plaintiff's counsel. Dr. Diver could not say how the information in the spreadsheet was compiled or identify the source documents from which that data was drawn. He has no knowledge of the criteria applied by those who compiled the spreadsheet to determine whether and how to include certain incidents on the spreadsheet, and he himself did not cross-check the spreadsheet against any disciplinary reports, incident tracking reports, or other source documents produced in this case by SVJC. Ultimately, he has no idea where the numbers in the spreadsheet came from or whether they are accurate.

Finally, Dr. Diver's testimony should be excluded because his analysis is wholly unreliable. Because the spreadsheet on which he relied was overinclusive and factually flawed, he included in his calculations of time spent in seclusion various incidents in which UAC's voluntarily remained in their rooms. He also counted overnight sleeping hours (when all UAC's are confined to their rooms) toward the duration of incidents of seclusion. His analysis also includes multiple incidents in which time in seclusion was double-counted. As a result, the calculations in Dr. Diver's report are significantly overstated, and many of the charts, tables and graphs in his report are inaccurate. When asked at deposition whether the numbers regarding time in seclusion were correct, Dr. Diver admitted that he "would need to spend more time with the data going through to confirm one way or the other." *Diver Dep. pp. 114:18-115:1.* As a result of these inherent flaws in his report and analysis, Dr. Diver's testimony is unreliable and inadmissible.

## STANDARDS GOVERNING ADMISSION OF EXPERT TESTIMONY

The admission of expert opinions into evidence is governed by Federal Rule of Evidence 702. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

4

Rule 702 reflects the long-standing principle that where an expert applies improper methodology, relies on incorrect facts and/or applies incorrect standards, the expert's opinion should be excluded. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591-93 (1993); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, *Daubert* acknowledges the Court's obligation "to ensure the reliability and relevance of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (emphasis added). The Court possesses "broad latitude" to take into account any "factors bearing on validity that the court finds to be useful," and the Court's exercise of its gatekeeping function will "depend upon the particular expert testimony and the facts of the case." *E.E.O.C. v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (*citations omitted*).

An expert's testimony must be relevant to the issues in the case. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.*

Expert opinions must also be based upon adequate facts, principles and methodologies. "[T]he trial court must probe the reliability and relevance of expert testimony any time such testimony's factual basis, data, principles, methods, or their application are sufficiently called into question." *E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015). Rule 702 requires that "the proffered expert opinion is based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphasis in original); *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.").

Statistical analysis is inadmissible when it contains "errors or mistakes" revealing "faulty methods and lack of investigation." *E.E.O.C. v. Freeman,* 778 F.3d at 470, *quoting Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 773 (7th Cir.2014); *see also Dart v. Kitchens Bros. Mfg. Co.,* 253 Fed.Appx. 395, 399 (5th Cir.2007) (noting that "basic mathematical errors and flaws in methodology" were appropriate reasons to exclude an expert). Exclusion of statistical evidence also has been deemed appropriate where an expert "relied on the plaintiffs' compilations of data, which gives rise to a 'common-sense skepticism' regarding the expert's evaluation, and did not seek to verify the information presented to him." *Munoz v. Orr,* 200 F.3d 291, 301-02 (5th Cir. 2000) (citations omitted).

Nor can any expert, especially a statistician, disregard relevant facts or data. Courts "have consistently excluded expert testimony that 'cherry-picks' relevant data," *EEOC v. Freeman*, 778 F.3d at 469 (collecting cases); *Lipitor,* 892 F.3d at 634 ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."); *Cady v. Ride-Away Handicap Equip. Corp.,* 702 F. App'x 120, 127 (4th Cir. 2017) (affirming district court's exclusion of expert testimony due to the expert's "various methodological flaws and omissions"). Thus, a statistical expert's review of data cannot be limited to only a subset of incidents or class members. *E.E.O.C. v. Freeman,* 778 F.3d at 468-69.

With regard to each of these issues, the party proffering the expert testimony bears the burden to prove that the testimony is admissible under Rule 702. *Higginbotham v. KCS Int'l, Inc.,* 85 F. App'x 911, 915 (4th Cir. 2004) (quoting *Daubert*) ("'[T]he proponent of the expert proffer bears the burden of establishing admissibility by a preponderance of proof.'").

6

## ARGUMENT

### 1. Dr. Diver's Analysis Is Irrelevant and Will Not Help the Trier of Fact.

On June 27, 2018, the Court certified this matter as a class action and defined the certified class to include:

> Latino unaccompanied alien children (UACs) who are currently detained or will be detained in the future at Shenandoah Valley Juvenile Center who either: (i) have been, are, or will be subject to the disciplinary policies and practices used by SVJC staff; or (ii) have needed, currently need, or will in the future need care and treatment for mental health problems while detained at SVJC.

*ECF Dkt. No. 63.* The class is explicitly limited to current and future UAC residents at SVJC. Therefore, as set forth in Defendant's recently-filed Motion for Protective Order (ECF Dkt. No.'s 92, 93), information related to former UAC's who no longer reside at SVJC is irrelevant to the Plaintiff's claims regarding SVJC's treatment of the current class members.

However, Diver's Report notes that his analysis was based on data regarding "1172 behavioral incidents spanning June 2015 through May 2018 involving 131 class members." *Diver Report, ¶ 8.* After removing a number of duplicate entries and incidents where a resident's confinement was due to a medical necessity, Dr. Diver reported that his analysis included 972 incidents involving room confinement for 121 different individuals at SVJC. *Diver Dep. pp. 65:19-67:2.* This dataset is irrelevant to the current class claims in several ways.

### A. Dr. Diver's Analysis Looks at Former UAC's, and Not at Members of the Certified Class.

First, the 131 "class members" included in Dr. Diver's analysis are not actually members of the class that has been certified by the Court. In fact, Dr. Diver had no idea when any of the individuals included in his analysis arrived at SVJC, when they left, or how many of them currently reside there. *Diver Dep., pp. 32:9-33:17.* Only three of the 131 individuals included in the dataset

7

that Dr. Diver analyzed were residents at SVJC when the class was certified on June 27, 2018, and only two of them are current residents and class members. *Exhibit 4, Declaration of Kelsey Wong.* Because Dr. Diver's analysis relates almost entirely to individuals who are not class members, his analysis and testimony are irrelevant to the claims of the certified class.

### B. Dr. Diver's Analysis Is Based on an Irrelevant Timeframe.

Second, even under Plaintiff's view of the case and the scope of relevant discovery (in which information about former UAC's would be relevant), the timeframe reviewed by Dr. Diver of June 2015 through May 2018 is overly broad. In various discovery requests served in this action, Plaintiff defined the "relevant time period" for purposes of discovery in this case as limited to the period between "October 4, 2015 and May 1, 2018." *See, e.g., Defendant's Mem. In Supp. Of Mot. for Protective Order, ECF Dkt. No. 93, at Ex. 1, p. 3.* However, Dr. Diver's analysis includes incidents that occurred prior to this purportedly "relevant time period." Thus, Dr. Diver's analysis incorporates data that even the Plaintiff has deemed irrelevant for purposes of discovery.

### C. Dr. Diver's Analysis Only Examines A Subset of the UAC's and/or Behavioral Incidents That Occurred Within the Chosen Timeframe.

Finally, even if it were appropriate for Dr. Diver to review information dating from June 2015 through May 2018, the data that he relied upon is limited to a subset of the residents and behavioral incidents that occurred at SVJC during that period. Dr. Diver obtained his data from a spreadsheet that only included behavioral incidents which led to some period of room confinement. *Diver Dep. pp. 12:17-20.* He did not consider, and received no information regarding, behavioral incidents that did **not** lead to a resident spending time in room confinement. *Id., p.12:21-13:3.* He has no idea how many behavioral incidents may have occurred during the timeframe he reviewed that were handled or de-escalated by SVJC staff without resort to force or

room confinement.[1] *Id., p. 13:13-18.*  Thus, Dr. Diver conceded that his analysis related only to a

subset of the UAC's at SVJC:

> Q   Well, let me ask it this way:  Do you know how many residents
> were at Shenandoah during the three-year timeframe that you
> reviewed?
>
> A   How many total residents?
>
> Q   Correct.
>
> A   No.
>
> Q   Okay.  It could have been more than 131, correct?
>
> A   Correct.
>
> Q    And you don't have any idea how many more residents may
> have been there who never had a behavioral incident that resulted in
> room confinement, do you?
>
> A   Correct.
>
> Q   So the information that you were given relates to a subset of the
> residents at Shenandoah during that three-year period, that subset
> being the residents who had behavioral incidents that    resulted in
> room confinement, correct?
>
> A    That is my understanding.

*Id., pp. 35:9-36:6.*

Therefore, regardless of the appropriate timeframe for his analysis, Dr. Diver did not

consider all of the UAC's who have resided at SVJC and been "subject to the disciplinary policies

---

[1] Dr. Diver was provided with a "Behavioral Incident Tracking" worksheet that was compiled by SVJC staff and produced in discovery in this matter.  However, he testified that he did not use the information in the SVJC worksheet at all in performing his analysis in this case. *Diver Dep. pp. 41:3-42:12.*  According to the "Behavioral Incident Tracking" document prepared by SVJC, there were at least 1817 behavioral incidents at SVJC between June 2015 and March (not May) of 2018.  *Wong Dec., ¶ 9; see also, **Exhibit 5**, Behavioral Incident Tracking Worksheet.*  This illustrates the limited scope of Dr. Diver's dataset regarding behavioral incidents in the timeframe he reviewed.

9

and practices used by SVJC staff." *Order Certifying Class, ECF Dkt. No. 63.* He looked only at a select group of individuals; namely, those UAC's whose behavior at SVJC necessitated the use of force or room confinement. He did not examine any data regarding the rest of the UAC's at SVJC during the time period he reviewed.

In fact, SVJC housed a total of 257 UAC's between June 1, 2015 and May 1, 2018, the period covered by Dr. Diver's work. *Wong Dec., ¶ 4.* Thus, Dr. Diver's analysis considered the behavioral incidents and associated staff treatment of **less than half** of the UAC's during the period of his review.[2] It is axiomatic that one cannot get a reliable sense of the frequency with which force is used at SVJC by only looking at those instances in which force was used. Nor can one readily appreciate how often residents are placed in room confinement by only looking at those residents who have been confined.

This is precisely the type of "cherry-picking" of data that the 4th Circuit has rejected as unreliable because it "produces a misleadingly favorable result by looking only to 'good' outcomes." *E.E.O.C. v. Freeman,* 778 F.3d at 469-70 (Agee, J., concurring). The omission of relevant data is particularly problematic in statistical analyses involving class actions. In such cases, statistical evidence must be tied to the actual class and relevant time period at issue. *Id., citing Lilly v. Harris-Teeter Supermarket,* 720 F.3d 326 (4th Cir. 1983); *EEOC v. Am. Nat'l Bank,* 652 F.2d 1176 (4th Cir. 1981). Thus, courts have rejected statistical expert analysis that only examined a limited subset of the relevant data "to draw conclusions about a much broader class." *Id., citing Lilly,* 720 F.3d at 337.

---

[2] The Spreadsheet includes 131 different individuals, but after removing incidents of medical confinement, Dr. Diver's analysis reviewed 972 incidents involving 121 UAC's. *Diver Dep. pp. 65:19-67:2.*

Dr. Diver's calculations seek to apply conclusions regarding the use of force and room confinement against a subset of UAC's over a three-year period to all of the UAC's placed at SVJC during that timeframe. Because his analysis omits any consideration of the incidents that did not lead to room confinement and/or the UAC's who were not subject to such measures, his analysis is irrelevant and inadmissible.

## 2. Dr. Diver's Analysis Is Based on an Inadequate Factual Foundation.

### A. Dr. Diver Cannot Identify the Factual Bases for His Analysis.

Though Dr. Diver's Report identifies a vast body of documents and information as items he relied upon (*Diver Report, ¶ 4, Appx. B*), Dr. Diver testified that he relied exclusively upon a spreadsheet that he received from Plaintiff's counsel regarding behavioral incidents at SVJC. *Diver Report, ¶¶ 8-9; Diver Dep. p. 28:1-15.* In separate columns, the spreadsheet includes separate entries for each purported behavioral incident that resulted in a UAC spending time in seclusion, and each entry includes the name of the resident, the date of the incident, a brief description of the incident, whether restraints were used, the date and time a resident was placed in seclusion and released from seclusion, as well as a count of the time spent in seclusion for each entry. *Exhibit 6, Spreadsheet of Behavioral Incidents* ("Spreadsheet").

Dr. Diver testified that he did not actually review any of the source data from which the Spreadsheet was compiled, and he simply accepted the information on the Spreadsheet at face value:

> Q.     And you personally did not do anything to look behind the data in the spreadsheet, correct?
>
> A.     For the purposes of the analysis, no.
>
> Q.     So the accuracy of your analysis depends upon the accuracy of the spreadsheet, correct?

A.    Correct.

*Diver Dep. pp. 40:18-41:2.*  In essence, Dr. Diver just took the numbers and incidents in the Spreadsheet and added them up.  He did no independent analysis to verify the accuracy of entries in the Spreadsheet; he just did the math.

Dr. Diver conceded at deposition that he had no insight into how the Spreadsheet was prepared.  *Diver Dep. pp. 38:13-40:17.*  He does not know (i) who compiled the Spreadsheet; (ii) how many people were involved in that effort; (iii) what their qualifications for performing such work might be; (iv) what records they relied upon to compile the data in the Spreadsheet; or (v) what criteria they used in deciding what information to include in the Spreadsheet.  *Id.*  Thus, for example, Dr. Diver was unable to say whether the incidents of "seclusion" identified in the Spreadsheet included incidents where a resident voluntarily chose to remain in his room instead of going to school, recreation or other programming at SVJC.  *Id, pp. 48:12-49:6.*  In short, Dr. Diver has no idea how the data on which he relied was compiled, and he cannot vouch for its accuracy or validity.

It is the proponent's burden to establish that expert opinions are based on reliable data (*Higginbotham*, 85 F. App'x at 915), and Dr. Diver is thoroughly unable to make such a showing with regard to the Spreadsheet on which he relied.  Moreover, additional scrutiny of the factual underpinnings for an expert's analysis is appropriate where the expert was simply "spoonfed" information from a party's counsel.  *Munoz v. Orr,* 200 F.3d 291, 301-02 (5th Cir. 2000) (citations omitted) (noting that an expert's "reli[ance] on the plaintiffs' compilations of data…gives rise to a 'common-sense skepticism' regarding the expert's evaluation," especially where the expert "did not seek to verify the information presented to him.")

Dr. Diver simply took at face value, without any validation or cross-checking of source data on his part, a compilation of information prepared by unknown individuals in the employ of Plaintiff's counsel. Dr. Diver has no idea how the information in the Spreadsheet was compiled or selected for inclusion. He cannot identify the factual basis underlying his own analysis, nor can he verify its accuracy or reliability. Thus, his analysis is inadmissible.

### B. Dr. Diver's Analysis Fails to Consider Important Data or Variables Regarding the Incidents in the Spreadsheet.

Even if Dr. Diver could establish an adequate factual foundation for his analysis (i.e. by verifying the process by which the Spreadsheet was compiled and the accuracy of the information therein), his analysis is also unreliable because of the information it fails to consider.

As set forth above, Dr. Diver only reviewed information regarding a subset of the UAC's at SVJC during a given period. He concluded that there were 972 incidents between June 2015 and May 2018 in which UAC's were placed in room confinement. He did not analyze the other roughly 850 incidents that are identified in the Behavioral Incident Tracking computation prepared by SVJC. *Wong Dec., ¶ 9.* As a result, his analysis failed to consider a large portion of the behavioral incidents involving UAC's at the facility.

It is also problematic that Dr. Diver did not account for any relevant variables that might justify the use of confinement or force at SVJC. He added up the amount of time certain UAC's spent in room confinement or restraints, but Dr. Diver did not evaluate any data regarding the reasons why such measures were employed, nor did he consider data explaining the duration of such room confinement or restraints. For example, Dr. Diver could not say how many behavioral incidents at SVJC were handled or de-escalated without any use of force or room confinement. *Diver Dep. p. 13:13-18.* Nor did he analyze the reasons why force or confinement were used or categorize the behaviors that led to use of force or confinement. *Diver Dep. pp. 24:16-25:17;*

*155:11-156:11.* Thus, for example, Dr. Diver could not say how many incidents of those he actually included in his analysis arose out of a UAC assaulting a staff member or another resident at SVJC. *Id.* Nor did Dr. Diver consider any information regarding the reasons why a UAC was kept in restraints or room confinement for any given duration of time. *Id.*

As a result, Dr. Diver's analysis omits any consideration of the factual record regarding the reasons why the incidents he reviewed resulted in use of force or room confinement for a given duration. Without some examination of the reasons why force or confinement were used and/or continued for longer periods of time, one cannot begin to say whether such use of restraints or confinement was justified, appropriate or objectively unreasonable. Dr. Diver's report only tells part of the story, and the probative value of his report is undermined by the lack of any causal analysis of SVJC's use of force and confinement.

### 3. Dr. Diver's Analysis Is Fundamentally Flawed and Unreliable.

Dr. Diver's analysis is also unreliable and inadmissible because it includes various significant flaws in methodology leading to erroneous calculations. Ultimately, his analysis grossly overstates the number of incidents and time spent in confinement for various individuals in the group he assessed.

### A. The Analysis Includes Incidents in Which a Resident Refused to Leave his Room.

First, because he simply relied on the data in the Spreadsheet prepared by Plaintiff's counsel, Dr. Diver did not delineate between incidents in which a UAC was placed in room confinement by SVJC staff and those incidents in which the resident was free to leave his room but refused to do so. Dr. Diver conceded that he did not exclude entries on the Spreadsheet that indicated a UAC remained in his room voluntarily:

> Q    When you did your analysis, you did not take into account whether a resident refused to leave his room at any point, correct?
>
> A    Correct.
>
> Q    You included that as an incident of seclusion and you included the time spent in those specific incidents as time in seclusion for purposes of your report, didn't you?
>
> A    Correct.
>
> Q    And as we sit here today, you're not able to say how many of those incidents there were where a resident refused to leave his room, are you?
>
> A    Specifically, no.
>
> Q    And you're not able to say how much time spent in seclusion by any given resident was attributable to that resident refusing to leave his room, are you?
>
> A    Under that definition specifically, no.

*Diver Dep. pp. 87:11-88:7; see also, Id. pp. 56:22-57:4, 74:19-75:6.* Though he was not able to say how many of the incidents he reviewed involved a resident refusing to participate in programming or leave his room, Dr. Diver conceded that there were seven entries (out of 32) on the first page of the Spreadsheet alone which indicated that the resident had voluntarily chosen to stay in his room instead of engaging in programming. *Id. pp. 76:16-78:2; Spreadsheet, at lines 2, 4, 16, 21-23, 27.[3]* On the face of the Spreadsheet itself, it appears there are at least 82 entries that involved a resident refusing to leave his room. *Wong Dec., ¶ 7.*

---

[3] At deposition, Dr. Diver was also presented with an example in which SVJC's administrative records reported that a resident was "not ready to leave his room" after being placed in room confinement. *Diver Dep. pp. 80:14-85:4.* However, this notation was not included in the Spreadsheet provided to Dr. Diver. *Id.* This example illustrates that the Spreadsheet alone may not identify all instances in which a resident chose to remain in his room voluntarily after initially being placed in confinement by SVJC. Dr. Diver did not review any administrative reports to assess whether any portion of a resident's time in seclusion was self-imposed. *Id.*

15

As a result, Dr. Diver's analysis, both in its counts of incidents involving seclusion and of hours spent in seclusion, includes a significant number of incidents in which a UAC was not confined to his room by SVJC staff, but voluntarily chose to remain in his room. Including such voluntary incidents in his analysis obviously skews the data and exaggerates the use of room confinement or seclusion as a disciplinary or safety tool at SVJC. This, alone, renders his analysis inherently flawed and deeply unreliable.

### B. The Analysis Includes Sleeping Hours When All Residents' of SVJC are Confined to Their Rooms.

Dr. Diver's calculations of time spent in seclusion are also inflated by virtue of the fact that he did not account for the overnight hours in which all residents are confined to their rooms. Dr. Diver conceded that each resident has his own individual room at SVJC, and he understands that all residents are placed in their rooms at night. *Diver Dep. pp. 88:13-89:12.* However, he does not have any idea the specific time when residents are confined to their rooms each night or when they are released from their rooms in the morning, nor does he know the total time each resident spends in his room during the overnight hours. *Id., p. 90:3-7.* Yet, the totals of time spent in seclusion contained in Dr. Diver's analysis included numerous instances in which a resident was only kept in room confinement because it was already past bedtime. *Id., p. 92:7-20* (noting that his analysis "does not account for the sleeping hours.").

Once again, a specific example from the Spreadsheet illustrates the inflation caused by Dr. Diver's inclusion of "sleeping hours" in his counts of time in seclusion. The second incident listed on the Spreadsheet relates to an individual (initials A.P.R.) [4] who was placed in room confinement on December 7, 2017 at 7:25 pm and released back into programming on December 8,

---

[4] For the reasons set forth in the Protective Order entered in this case that the Court's Order to Seal the exhibits to Defendant's Motions to Exclude Experts, individual UAC's are referred to only by their initials, and not be their full names.

2017 at 8:00 am. *Diver Dep. pp. 90:8-91:15; Spreadsheet, line 3.* Even though the majority of this time involved the overnight "sleeping hours," and even though the individual was released alongside the rest of his peers the following morning, Dr. Diver counted this incident as involving 12 hours and 35 minutes of seclusion. *Id.* This is but one example of many in which Dr. Diver deemed residents to be "in seclusion" when they were simply sleeping in their rooms in the overnight hours, just like all of the other residents.

Notably, Dr. Diver explained that he could develop a methodology to back out the sleeping hours from one's analysis, but he did not apply that methodology in preparing his report. *Diver Dep. pp. 92:21-93:18.* Instead, he simply accepted at face value the counts of time in seclusion that were listed on the Spreadsheet and ignored the fact that a substantial portion of those hours were time when all residents were asleep in their rooms. This, too, is an inherent flaw that renders Dr. Diver's analysis overstated and unreliable.

### C. Dr. Diver's Analysis Includes Numerous Instances of Double-Counting.

In his Report, Dr. Diver noted that he removed from the Spreadsheet those entries that appeared to be duplicative. *Diver Report, p. 4, fn. 7.* He testified that his goal was to avoid double-counting incidents and hours spent in seclusion. *Diver Dep. pp. 93:19-94:2; 150:11-151:4.* Dr. Diver acknowledged at deposition that failing to remove duplicative entries "would render certain counts higher than they would otherwise be." *Id.* Thus, Dr. Diver set up his computer software to screen for duplicative entries on the Spreadsheet. *Id. pp. 172:13-173:4.* However, he apparently did not conduct any additional review to ensure that all examples of duplicates were removed from his analysis.

At deposition, Dr. Diver was confronted with two examples of substantial double-counting in the Spreadsheet that affected Dr. Diver's analysis. *Id. pp. 94:3-110:12.* Dr. Diver's Report

identifies a resident with the initials D.N. as having experienced 37 incidents in seclusion with a total time in seclusion of 1630 hours. *Diver Report., p. 9, Table 3.* Dr. Diver's Report suggests that this individual had a much higher total for time in seclusion that all but one of the other UAC's included in Dr. Diver's analysis. *Id.* However, a number of the entries on the Spreadsheet involving D.N. were doubled, tripled and even quadrupled. *Spreadsheet, at lines 217-220; 221-222; 227-233; 234-236; 237-239; 240-243; 244-246.* For example, the Spreadsheet includes entries with the data below regarding time in seclusion:

| Line | Begin date | Begin Time | End Date | End Time | Time of Seclusion |
|------|-----------|-----------|----------|----------|-------------------|
| 234 | 1/7/2017 | 19:45 | 1/10/2017 | 18:00 | 70:15 |
| 235 | 1/8/2017 | 19:45 | 1/10/2017 | 18:00 | 46:15 |
| 236 | 1/9/2017 | 18:30 | 1/10/2017 | 18:00 | 23:30 |

*Spreadsheet, at lines 234-236.* As established by the overlapping date range, the latter two entries (lines 235 and 236) are duplicative of the entry in line 234. *Id.* However, Dr. Diver included them as separate incidents in his analysis:

> Q   And so for lines 234 through 236 you have a single incident that resulted in room confinement spanning almost three days, 70 hours and 15 minutes, but under your analysis it's treated as three incidents totaling what?  140 hours of time, correct?
>
> A   You might say roughly.

*Diver Dep. pp. 104:19-105:3.* Ultimately, after reviewing a host of other examples of double-counting D.N.'s incidents and time in seclusion, Dr. Diver admitted that the numbers in his Report were inaccurate:

> Q   But all of the other incidents that we discussed for [D.N.] which involved double or triple counting remained part of your analysis, didn't they?

18

A   It seems likely that they would, yes.

Q   I mean, on Table 3 where you list 37 incidents for 1630 hours, that includes double counting a number of the incidents that are listed in the spreadsheet at Exhibit 2, doesn't it?

A   It seems likely, yes.

*Diver Dep. p 110:3-12.*[5]

The second example of double-counting involved an individual with the initials K.A. *Diver Dep. pp. 115:15-122:7.* Dr. Diver conceded that "it seems likely" that the several incidents and counts of time in seclusion for K.A. listed in Diver's Report were inflated by double-counting. *Id.; see also, Spreadsheet, lines 912-913, 914-916.*

Ultimately, when asked whether the numbers regarding time in seclusion in his report were accurate, Dr. Diver testified the he "would need to spend more time with the data to make a declaration one way or the other." *Id., pp. 114:11-115:1.* Dr. Diver could not attest to the counts of incidents in his Report, noting instead than any adjustments that might be made would alter those counts. *Diver Dep. pp. 143:22-144:6* ("Q. Do you know whether there were 849 incidents in which residents of Shenandoah were confined to their rooms for more than four hours? A. Again, if you are asking if an adjustment needs to be made, that would change the 849. If an adjustment is made off of the 849, it would be a different number.") He also acknowledged that the defects associated with double-counting the incidents of seclusion would affect various tables and graphs

---

[5] Though Dr. Diver professed to need more time with the data to determine the precise impact of the double-counting of D.N.'s time in seclusion, he was presented with information at deposition which demonstrates that, after removing the duplicative entries on the Spreadsheet, D.N. had a total of 21 incidents involving time in seclusion for a total of 972 hours. *Diver Dep. pp. 111:3-113:11.* This calculation does not account for the sleeping hours and/or any instances in which D.N. refused to leave his room. On its face, therefore, Diver's Report overstates D.N.'s incidents and hours spent in seclusion by roughly 40%.

throughout his report. *Diver Dep. pp. 128:4-130:1; 145:1-5; 147:11-149:5* (regarding impact of double-counting on Tables 2, 10 and 11, as well as Figures 1, 6 and 11 of the Diver Report).

Ultimately, Dr. Diver is unable to state whether any of the numbers, calculations, charts and graphs in his report that relate to time in seclusion are accurate. By definition, therefore, Dr. Diver cannot testify to a reasonable degree of certainty that his analysis is accurate, reliable or grounded in fact. As such, his testimony is inadmissible and should be excluded. *Bambarger v. Ameristep, Inc.*, No. 7:12CV280, 2013 WL 6222540, at *2 (W.D. Va. Nov. 29, 2013) ("Virginia courts require experts to state their opinions to a reasonable degree of certainty or probability.").

Dr. Diver's Report is rife with errors and dramatically inflates both the number of incidents involving seclusion and the amount of time spent by UAC's in seclusion. His analysis equates a resident refusing to leave his room with an incident of confinement by staff, does not account for those hours in which all residents are confined to their rooms at night, and double, triple or even quadruple counts various incidents and time spent in seclusion for at least some of the UAC's at SVJC in the timeframe he reviewed. These flaws render his report completely unreliable and inadmissible.

## CONCLUSION

Dr. Diver's analysis is irrelevant because it covers an irrelevant time period and includes mostly non-class members who constitute a mere subset of the UAC's at SVJC. His analysis is not helpful to the trier of fact because it includes no causal analysis or consideration of the reasons why force or confinement were used against any class members. Diver's proffered testimony also lacks an adequate factual foundation, as he has no idea where the data on which he exclusively relied came from or how that data was compiled. Finally, his report and analysis are inflated by various methodological flaws.

20

WHEREFORE, the Defendant respectfully requests that the Court grant its Motion to Exclude Dr. Diver's expert testimony.

**Respectfully submitted,**
**SHENANDOAH VALLEY JUVENILE**
**CENTER COMMISSION**
*By Counsel*

**LITTEN & SIPE L.L.P., and**
**WILLIAMS MULLEN**
By: /S/ Harold E. Johnson

Jason A. Botkins
Melisa G. Michelsen
Virginia State Bar No. 70823
Virginia State Bar No. 40001
410 Neff Avenue
Harrisonburg, Virginia 22801-3434
Telephone: (540) 434-5353
Facsimile: (540) 434-6069
Email: jason.botkins@littensipe.com
Email: melisa.michelsen@littensipe.com
Harold E. Johnson (VSB No. 65591)
Meredith M. Haynes (VSB No. 80163)
Williams Mullen
200 South 10th Street
Richmond, Virginia 23219
Telephone (804) 420-6000
Facsimile: (804) 420-6507
Email: hjohnson@williamsmullen.com
Email: mhaynes@williamsmullen.com

*Counsel for Defendant Shenandoah Valley Juvenile Center Commission*

# CERTIFICATE

I certify that on the 22nd day of October, 2018, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Hannah M. Lieberman (*pro hac vice*)
Tiffany Yang (*pro hac vice*)
Mirela Missova (*pro hac vice*)

Washington Lawyers Committee
for Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C. 20036
Telephone: (202) 319-1000
Facsimile: (202) 319-1010
hannah_lieberman@washlaw.org
tiffany_yang@washlaw.org
mirela_missova@washlaw.org

*Attorneys for Plaintiff John Doe 4*

Theodore A. Howard (*pro hac vice*)
Bradley C. Tobias (VSB No. 88046)
J. Ryan Frazee (*pro hac vice*)

Wiley Rein LLP
1776 K Street, NW
Washington, D.C. 20006
Telephone: (202) 719-7120
Facsimile: (202) 719-7049
thoward@wileyrein.com
btobias@wileyrein.com
jfrazee@wileyrein.com

/s/ Harold E. Johnson
*Counsel for Shenandoah Valley*
*Juvenile Center Commission*

37161344_1