Gregory N. Lewis, Psy.D.
Licensed Clinical Psychologist
5636 N. Virginia Avenue
Chicago, IL 60659

September 11, 2018

Theodore A. Howard, Esq.
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006

Re: John Doe, et al. v. Shenandoah Valley Juvenile Center Commission

Dear Mr. Howard:

On November 10, 2017 we discussed my willingness to serve as an expert witness on the case referenced above and agreed that I would serve in that capacity. The following is a report addressing: 1) unaccompanied alien children and complex trauma, 2) my psychological evaluation of Plaintiffs John Doe 1 (who was a detainee at the Shenandoah Valley Juvenile Center for an extended period of time) and John Doe 4, the conditions under which they were detained, and the appropriateness of the treatment they received; 3) my review of the declarations and Shenandoah Valley Juvenile Center (SVJC) documents for Does 2 and 3 who were formerly detained at SVJC; 4) standards of care for treating UACs and other youth who are in detention; and 5) my opinions regarding the appropriateness of care offered to the plaintiffs at Shenandoah and how their experiences there impacted them.

**Executive Summary:**

Shenandoah Valley Juvenile Center (SVJC) staff do not demonstrate an understanding of the manifestations of trauma and stress in youth, do not utilize and therefore do not appear to be well trained in utilizing trauma-informed approaches that are the standard of care in all stages of the juvenile justice system. The predominant approach utilized to manage youth at SVJC is punishment and behavioral control through methods such as solitary confinement, physical restraint, strapping to a chair, and loss of behavioral levels. These approaches are not only ineffective, but have a profound negative impact on youth, can seriously impair their development and psychological well-being, and can cause or exacerbate mental health problems including panic attacks, suicidal and self-injurious behavior, psychotic symptoms, paranoia, and hopelessness. Because of their special vulnerabilities and needs as adolescents, the use of these approaches is a cruel and harmful practice when utilized and can have long-term deleterious consequences that are difficult to remediate. In summary, both the mental health care and the overall care provided at SVJC are deficient and fall well below professional standards of care in the juvenile justice system.

EXHIBIT
B
tabbies

1

**Qualifications/Background:**

1.    I am a licensed clinical psychologist. A copy of my current CV is attached at Appendix A. I received my doctorate in clinical psychology from the Illinois School of Professional Psychology in 1989. I became licensed in Illinois in 1990. As part of my professional training, I completed a one-year internship in clinical psychology and a one-year fellowship in adolescent health psychology at Cook County Hospital (now John H. Stroger, Jr. Hospital of Cook County).

2.    I was a Clinical Psychologist in the Department of Psychiatry at Stroger Hospital from September 1987 – July 2013. I worked with children, adolescents, and adults including those who had chronic medical illnesses and/or were traumatized or abused. I was Co-Director of the Adolescent & Young Adult Clinic and Coordinator of the Child & Adolescent Inpatient Consultation-Liaison Service that provided assessment and consultation to the pediatric, trauma, and ob-gyn units, as well as to the Child Protective Services team and the pediatric emergency room. During my time at Stroger, I evaluated many detainees from the Cook County Juvenile Temporary Detention Center and worked at the center for a period of four months when they were understaffed.

3.    In addition to working at Stroger Hospital, I was a Lecturer in the Department of Behavioral Sciences at Rush University Medical Center in Chicago from January 1998 - July 2013. I have had a private practice in Wheaton, Illinois since 1987, working primarily with adults providing individual, couples, and family therapy. Since 2013 I have also been the Clinical Director of The Counseling Center at the First Presbyterian Church of Evanston. In addition, I provide psychological services in a school-based health center in a Chicago area high school that is predominantly Latino.

4.    I have served on two medical missions with the Syrian American Medical Society providing psychological trauma services to Syrian refugees living in Jordan, primarily to those living at the Zaatari Refugee Camp.

5.    I was guest co-editor for a special issue of the *Journal of Child and Adolescent Trauma*: Resilience-Based Approaches to Trauma Intervention for Children and Adolescents (Volume 9, Issue 1, March 2016).

6.    I am a member in good standing of both the American Psychological Association and the Illinois Psychological Association.

7.    I have done numerous forensic psychological assessments in Special Immigrant Juvenile Status and asylum cases in the United States and have also done several forensic psychological assessments of immigrants involved in civil cases. I have completed the training by the Physicians for Human Rights Asylum Program on "Aiding Survivors of Torture & Other Human Rights Abuses: Physical and Psychological Documentation of Individuals Seeking Humanitarian

Protection in the U.S." I am familiar with the Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. I have received training in forensic psychological assessment and testimony, as well as forensic assessment of trauma and emotional injury, from the American Psychological Association. I have also received training in forensic report writing, comprehensive assessment of feigning in forensic contexts, and forensic assessments in immigration proceedings from the American Academy of Forensic Psychology. I have done trainings for Physicians for Human Rights, the Vera Institute of Justice, the Young Center for Immigrant Children's Rights, and the Loyola Center for the Human Rights of Children on the topic of forensic psychological evaluation of trauma in the context of asylum and immigration.

8. I have personally evaluated about 25 UACs since 2004 for reasons of asylum and Special Immigrant Juvenile Status. Most have been referred to me from the Young Center for Immigrant Children's Rights, but others have been referred from the National Immigrant Justice Center, the DePaul Asylum & Immigration Law Clinic, the Loyola Civitas ChildLaw Center, as well as various law firms. I have also done numerous evaluations on adults seeking asylum.

9. I was involved in a civil class action lawsuit brought by several women from Central America against the federal government and the Corrections Corporation of America after these women were sexually assaulted by a guard during transport. I did not testify, but did provide deposition testimony. This case was eventually settled (see Appendix C No. 1).

10. I, along with several others, submitted a brief to the United States Court of Appeals for the Fourth Circuit in support of an alien child who was detained by the Office of Refugee Resettlement (ORR) despite the availability of his mother to care for him in the United States (see Appendix C No. 2).

11. I am familiar with conditions of detention and mental health treatment for unaccompanied minors who reside in facilities similar to the Shenandoah Valley Juvenile Justice Center as a result of my work in doing Special Immigrant Juvenile Status and asylum evaluations, as well as my involvement in civil cases brought against other juvenile facilities.

12. I have evaluated UACs as part of two civil class action lawsuits against detention centers in the U.S. that did not provide appropriate care to UACs. I evaluated five youth as part of a civil case in 2009 brought against the Abraxas Hector Garza Center ("Abraxas"), Cornell Companies, the Office of Refugee Resettlement, U.S. Immigration and Customs Enforcement, the Texas Department of Family and Protective Services, and the city of San Antonio alleging that these youth were physically and emotionally abused while residing at Abraxas. I did not testify and did not provide deposition testimony. This case was eventually settled (see Appendix C No. 3). The Division of Unaccompanied

Children's Services (DUCS) terminated its contract with Abraxas for many reasons including inadequate services.[1] I evaluated six youth as part of a civil class action lawsuit brought against the federal government alleging that these youth were sexually, physically, and emotionally abused while residing at the Texas Sheltered Care Facility in Nixon, TX. I did not testify, but did provide deposition testimony. A settlement agreement was reached with the facility and its employees, but the case against the United States and its employees was lost. The case has been filed with the Inter-American Commission on Human Rights (see Appendix C No. 4). DUCS had been previously alerted to problems at Nixon by child advocates, but no action had been taken.[2]

13.     The boys that I evaluated for both of these lawsuits were all UACs from Central America. Most of them had experienced various forms of abuse, neglect, abandonment, and violence from their families and communities, and many had also been traumatized during their journey to the U.S. They came to the U.S. to get away from their abusive environments in the hopes of obtaining a better life.

14.     The youth who were at Abraxas reported physical and verbal abuse; inadequate medical care; confinement; denied access to attorneys; and abrupt transfers to other facilities with no explanation. The youth I evaluated for the Nixon litigation also reported significant abuse.

15.     It was my opinion that all but one of the youth I evaluated at both facilities had suffered substantial physical, mental, and emotional harm as a result of the abuse they experienced while in detention. Most had experienced prior traumas that were exacerbated due to the traumas they experienced in detention. Most were diagnosed with PTSD, depression, and/or anxiety.

16.     It was also my opinion that these youth had not been provided with a safe and humane environment in which to live and that they had not received adequate mental health care.

**Documents Reviewed:**

17.     See Appendix B.

**Unaccompanied Alien Children and Complex Trauma:**

18.     Children who come to the United States unaccompanied from other countries (unaccompanied alien child – "UAC") come for a variety of reasons including:

---

[1] *Halfway home: Unaccompanied children in immigration custody*. (2009). Women's Refugee Commission.
https://www.womensrefugeecommission.org/resources/document/196-halfway-home-unaccompanied-children-in-immigration-custody
[2] Ibid.

4

fleeing parental abuse and neglect; fleeing violence and unsafe conditions in their home country; fleeing persecution; to join parents or other relatives already living in the U.S.; and a desire for a better life in which they will have opportunities to work and go to school. Some children are also involuntarily trafficked into the U.S. as part of the worldwide labor and sex trafficking industry.[3] UAC's are vulnerable before, during, and after their journey to the U.S. because they do not have adult protection and are unable to properly care for themselves.[4]

19.     Most UACs have experienced abuse, neglect, and trauma within their home countries, but are then faced with the additional stresses of migrating to the U.S. often traveling through unsafe and dangerous countries over a period of weeks and months. During their journey - which may take them through multiple countries - UACs may undergo highly traumatic experiences including: going days without food, water, or shelter; being exposed to unsanitary conditions; getting sick or injured; being robbed or kidnapped; being beaten; being raped; watching others being tortured or murdered; having to survive in the jungle; and having to survive crossing through deserts and rivers. Once they arrive in the U.S., UACs may be further traumatized if apprehended by Immigration and Customs Enforcement and detained. In addition, they have to adjust to living in a country in which they often do not speak the language and are unfamiliar with the customs. All of these experiences contribute to UACs who are likely to have suffered extensive and multiple instances of abuse and trauma, often referred to as complex trauma, prior to any trauma they may experience if detained.

20.     Complex trauma occurs when a child has been exposed to multiple, chronic, and prolonged traumatic experiences that are often of an interpersonal nature (e.g., abuse from a caretaker).[5] When untreated, these lead to changes in the brain (i.e., prolonged activation of the body's stress response system) and result in a loss of core capacities for self-regulation and interpersonal relatedness.[6] Trauma-exposed children develop psychological symptoms including hypervigilance, over reactivity to perceived threats of danger, difficulties in calming themselves, and avoidance or dissociation – i.e., they try not to think about their traumatic experiences so as not to be overwhelmed by them and can

[3] Levinson, A. (2011). Unaccompanied immigrant children: A growing phenomenon with few easy solutions. Migration Policy Institute.
https://www.migrationpolicy.org/print/4328

[4] Young, W., & McKenna, M. (2010). The measure of a society: The treatment of unaccompanied refugee and immigrant children in the United States. *Harvard Civil Rights-Civil Liberties Law Review*, 45, 247-260. http://harvardcrcl.org/wp-content/uploads/2009/06/247-260.pdf

[5] Van der Kolk, B. (2005). Developmental trauma disorder. *Psychiatric Annals*, 35, 401-408.

[6] Cook, A. et al. (2005). Complex trauma in children and adolescents. *Psychiatric Annals*, 35, 390-398.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 5 of 51   Pageid#: 2519

become very distressed when these experiences come to mind.[7] Children who have been abused develop strategies and mechanisms to manage their anxiety and to cope with their abuse (e.g., fleeing the abuse, fighting back, or emotionally detaching from the abuse). This is what is typically referred to as the "fight" or "flight" response and gets activated when the child is in a situation or interacting with someone that triggers past memories of the abuse. The child is essentially doing his or her best to "survive-in-the-moment" in response to a threat or perceived threat that is overwhelming and for which they have limited abilities to soothe and regulate themselves.

21.     The responses of children who have experienced complex trauma are rooted in their past traumatic experiences (which may include parental abuse and neglect) that can be easily triggered in an environment - such as a detention center - where staff are not trained to see how their own actions and words can precipitate traumatic memories and, therefore, survival-in-the-moment responses on the part of detainees as a way of managing these traumatic memories. Once a child knows what it is like to feel danger and terror, it takes very little new threat to reignite it.[8] Children who have been abused develop strategies and mechanisms to manage their anxiety and to cope with their abuse (e.g., fleeing the abuse, fighting back, or emotionally detaching from the abuse), and these strategies become activated by the parts of the brain that control basic emotionality and survival-motivated behavior and prepare the body for emergency responses. Sensory information from the environment is transmitted very quickly and unconsciously so that the child has a chance to respond immediately to the danger or perceived danger. Analysis of details and the context of the situation are sacrificed for speed of transmission so that the child can survive.[9]

22.     Youth who experience complex trauma often do not meet criteria for Posttraumatic Stress Disorder (PTSD), but instead are given several diagnoses that reflect their various symptoms and behaviors (e.g., depression, conduct disorder, anxiety). This often leads to attempts to treat each of these particular diagnoses rather than seeing that all of these are part of a complex trauma presentation. It is not that these youth are not depressed or anxious or have behavioral problems, it is that these need to be viewed as manifestations of, and coping methods for dealing with, their past abuse and trauma.

---

[7] Dudley, R. (2015). Childhood trauma and its effects: Implications for police. *New Perspectives in Policing Bulletin*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice. NCJ 248686.

[8] Garbarino, J. (2008). *Children and the dark side of human experience*. New York: Springer.

[9] Saxe, G., Ellis, B., & Kaplow, J. (2007). *Collaborative treatment of traumatized children and teens: The trauma systems therapy approach*. New York: The Guilford Press.

23. Youth who have been abused will often unconsciously get drawn into, or draw others into, situations in which they can try to master their past abuse. For example, a youth who felt powerless and helpless when physically abused as a child might be drawn to, or draw others into, situations in which he/she could feel powerful and in control and, in this way, undo or master their previous victimization and abuse.

**Evaluation of Plaintiff John Doe 1:**

24. On August 10 and August 11, 2017 I evaluated Plaintiff John Doe 1 at the request of the Young Center for Immigrant Children's Rights. The evaluation was requested to provide an understanding of Doe 1's past trauma and detention history, the impact this had on him, and recommendations for future placement and treatment. The evaluation was conducted at the Legal Aid Justice Center in Charlottesville, VA over a period of 10 hours with the assistance of Mr. Jeff Divers, who served as my Spanish-English interpreter. Doe 1 was also administered several psychological tests and questionnaires (as adjuncts to the clinical interview) that assess for anxiety, depression, traumatic life events, behavioral problems, self-esteem, and cognitive functioning. At the time of the evaluation, Doe 1 was a UAC at the Shenandoah Valley Juvenile Center (SVJC).

25. Doe 1 is a 17-year-old Mexican youth. His childhood history in Mexico indicates that he had experienced abuse and neglect from his parents and struggled with depression. Doe 1's father drank a lot and would become violent. He physically abused Doe 1 (this was confirmed by the Young Center after conversations with Doe 1's mother) with objects such as shoes, belts, and cables and psychologically abused him by saying Doe 1 was not his child and by making other disparaging remarks. His mother was unable to adequately protect him from the father's abuse and appears to have been unable to provide Doe 1 with the nurturance and support he needed to process, understand, and cope effectively with his father's abuse. Doe 1 has no positive memories of his father.

26. Doe 1 would cry and feel scared and angry when his father abused him and would frequently run away from the house to escape the abuse. He would run and hang out on the streets or hide near the river and either his mother would come and get him or he would return home on his own after about half a day.

27. Doe 1 was frequently teased about his physical appearance when he was a child. He dropped out of school when he was 14 years old because he lost interest and was getting into fights.

28. Doe 1 came to the U.S. right after his 15th birthday because he felt unsafe and unhappy in Mexico due to the violence there and because he wanted the opportunity for a better life. He would eventually like to have a family and work in a car factory.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 7 of 51   Pageid#: 2521

29.    Doe 1 expressed fears of being killed by the drug cartels if returned to Mexico.

30.    I diagnosed Doe 1 with: 1) Child Physical Abuse, Confirmed; 2) Child Psychological Abuse, Suspected; 3) Major Depressive Disorder (MDD), Recurrent Episode, Moderate; 4) Persistent Depressive Disorder (Dysthymia); and 5) Conduct Disorder, Unspecified onset, Moderate.

31.    Results of the evaluation indicate that Doe 1 is a very depressed young man with serious doubts about his self-worth who has limited abilities to regulate his mood and behavior when upset. He desires to better control his temper and admits to feeling bad when he hurts someone. He experiences a high degree of behavioral and emotional maladjustment and does not easily trust others because he fears being taken advantage of. Doe 1 vacillates between feeling depressed and sad about where his life is at and that others do not like him vs. liking that others are afraid of him because it gives him a sense of feeling powerful and in control over them. He believes it is a sign of weakness to show that he is depressed. Results of the evaluation also suggested that Doe 1 has below average intellectual functioning.

32.    Doe 1 became highly distressed during the evaluation when asked to talk about his father. He had trouble discussing the abuse that he experienced with any detail and at times completely shut down emotionally. He reported forgetting and not wanting to remember things from his past – especially memories regarding his father. While detaching from these painful memories allows Doe 1 to not have to feel the emotional pain associated with these memories, it also serves to keep these hurtful memories buried inside him like an old wound that can be all too easily opened up in situations in which he is reminded of the abuse.

33.    Although Doe 1 did not meet criteria for Posttraumatic Stress Disorder (PTSD), it is my opinion that, from a complex trauma framework, his behavioral and emotional difficulties have most likely resulted from and been shaped by his early childhood abuse and neglect and have been exacerbated while he has been in detention. Complex trauma is not a diagnosis listed in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DMS-5), but is likely to be included in the next edition of the DSM. Viewing Doe 1's problems from a complex trauma perspective is critical in that it not only helps to explain his behaviors and moods, but also helps to understand both the type of treatment and environment that he will best respond to and how his experience at SVJC has exacerbated his pre-existing trauma. In other words, understanding that youth such as Doe 1 are traumatized can avoid creating additional harm and improve the diagnoses and facilitate matching them to trauma-informed services.

34.    It was my opinion that it would be detrimental for Doe 1 to be returned to Mexico and I recommended that he receive services in a trauma-focused

residential treatment facility. It was my belief that his depression and aggressive behaviors originated in his adversity and trauma and would likely not improve without proper trauma-focused treatment in a safe environment over an extended period of time. It was also my opinion that Doe 1 would probably never fully recover from the traumatic events that he experienced as a child (and while detained at SVJC) without proper trauma-informed treatment.

**Doe 1's Experiences in Detention at SVJC:**

35. Doe 1 reported feeling very depressed while in detention at SVJC. He felt "stuck" and "trapped" because he was not allowed to go outdoors much. At times he felt so depressed that he struggled to get out of bed in the morning and had thoughts that he would be better off dead.

36. Doe 1 experienced many forms of repeated and prolonged abuse and punishment while in SVJC detention including teasing and physical assault from staff, humiliation when being observed using the toilet, being confined to his room or restrained to a chair (sometimes with a mask put over his head) for long periods of time, and being forced to wear handcuffs and shackles. These actions on the part of staff replicated and exacerbated the abuse and teasing that he experienced as a child from his father and his peers, and further traumatized Doe 1. Several examples will be provided below.

37. Doe 1 tended to respond to his traumatic experiences in both internalizing and externalizing ways. At times he would internalize by withdrawing from others and engaging in self-injurious acts such as cutting himself with an object or hitting his head against the wall when upset. On several occasions, he talked about or made suicide attempts. He felt he was frequently blamed for things that were not his fault.

> "I feel all torn up inside, but I don't show this to people because it is a sign of weakness. I feel like there is something broken with me. When I feel bad, it comes up on me suddenly and I just want to be left alone and sit in the sun."

38. For example, on 07/10/16, Doe 1 refused to leave his room and engaged in self-injurious behavior (carving initials on his chest and banging his head against the wall). Subsequent discussion with his counselor on 07/11/16 suggested that Doe 1's self-destructive behavior was in response to being chronically bullied by one of his peers. The counselor seemed more concerned with why Doe 1 self-harmed and what the meaning was of the initials he carved on his chest than on understanding his experience of being bullied, the feelings that this triggered in him (e.g., fear, anger, shame, self-loathing), and more appropriate ways to manage these feelings.

39. At other times Doe 1 would get "really angry" and act out aggressively. He thought that others did not like him and would get upset and feel "bad" when

9

others insulted or pushed him, and would want to retaliate. He stated that his "adrenalin would kick in" when he felt insulted or abused and this would sometimes cause him to respond aggressively.

> *"I feel depressed and rejected and take it out on whoever is around. There is nothing I can do about my bad feelings, so I attack people because I can't tolerate my bad feelings."*

40.    For example, Doe 1 was involved in an incident during recreation time on 04/20/16 in which he was verbally redirected several times to not forcefully throw the ball. Doe 1 failed to obey and continued to throw the ball. He cursed at staff and a physical altercation ensued. This resulted in Doe 1 being physically restrained, confined to his room, and losing all of his behavioral levels or "points".[10] This altercation occurred only five days after Doe 1 had been transferred to SVJC and appears to have set the tone for further aggression from both Doe 1 and staff throughout his detainment. The progress note dated 04/20/16 said, "UC stated that this staff member spoke to him 'like my father' which caused him to react with physical aggression." This statement and the above incident are significant for several reasons. First, Doe 1 himself is providing his mental health counselor the link between his prior abuse and his current reaction, yet there was no attempt by the counselor to process this with Doe 1 despite their meeting for 60 minutes. Had this been recognized as a traumatic trigger for Doe 1, a different treatment approach could have been utilized which would have included working with Doe 1 to calm himself and express his anger in other ways and to work with the staff member to be aware of how his words triggered Doe 1 so as to be more aware of this in their future interactions. Second, things appear to have escalated after Doe 1 cursed at the staff member. A staff member asked Doe 1 if he had directed the curse words towards staff and a fight ensued. While it is understandable that the staff member likely felt disrespected, it appears that this staff member may have unnecessarily provoked Doe 1 through his words and actions. This would have been an opportunity to utilize de-escalation strategies to defuse the situation. However, there is no indication that this was done. Instead, "with no time left for less intrusive intervention, Doe 1 was placed in a physical restraint." Third, this incident exemplifies that the predominant approach utilized at SVJC is one of behavioral control and punishment. This incident very likely set the stage for Doe 1 to not feel safe at or understood by the staff at SVJC and to feel angry for being unjustly treated. Fourth, for many youth times of transition are often difficult to manage because of the ensuing anxiety. Doe 1 had recently

---

[10] Points are given to reinforce behaviors such as turning in schoolwork and taken away to punish behaviors such as fighting or cursing. The total number of points is used to determine the behavioral level of a detainee. The lower the behavioral level, the less privileges the detainee has. Unfortunately, staff may arbitrarily give or not give points based on their own attitude and mood at a particular time rather than relying on objective criteria and administering the point system consistently.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 10 of 51   Pageid#: 2524

transitioned from NOVA, a staff secure facility in Virginia, and may have been confused about the expectations at SVJC. He may have also been experiencing shame as a result of being sent to a more secure facility. However, there was no attempt on the part of his counselor to discuss Doe 1's feelings about the recent transition and the adjustments he was having to make.

41.     Four days later, on 04/24/16, Doe 1 again lost all of his behavioral levels and was restricted to his room for disruptive behavior and assault on staff. When meeting with his mental health counselor the following day, the "clinician emphasized to UC the significant consequences that can occur if he were to continue assaulting staff/peers while at the facility." Again, there was no effort to process with Doe 1 what his feelings and thoughts were during this incident and to help him learn more adaptive ways to cope; instead, the main intervention was to punish him and to emphasize his need to behave better.

42.     On 05/03/16, Doe 1 lost all of his behavioral levels and was confined to his room for stealing a pencil. On 05/04/16, he was put in restraints and confined to his room for assaulting a peer. In his therapy session on 05/05/16, his counselor "emphasized both the immediate and long-term consequences of his aggressive behavior at the facility/outside in the community." The only effort made to help Doe 1 process his behaviors was when the counselor tried to get him to discuss his "motives," which Doe 1 had difficulty doing. This is not an effective approach with impulsive youth, as they often do not know why they are behaving in certain ways. An effective approach would have been to ask him what he was thinking and feeling before he took the pencil and before he assaulted the peer, to link these thoughts and feelings to his subsequent behaviors, and to help Doe 1 understand how his behaviors were likely efforts to survive in the moment and to self-regulate emotions (such as depression, loneliness, fear, or anger) that were distressing him.

43.     In his session with his counselor on 08/01/16, Doe 1 attributed much of his acting out at the facility to "bad dreams" that upset him during the day. "UC stated that his dreams often include staff members and previous cartel members involved in violent acts." This was a clear indication that Doe 1 was carrying around a great deal of traumatic anxiety with him during the day and was an opening for the counselor to further process Doe 1's experiences of trauma, as well as to provide education for Doe 1 as to what trauma is, how it is carried in our bodies, and how to manage it. Instead, the counselor seemed to mostly focus on whether the content of the dreams was true and to reiterate the consequences that would occur if Doe 1 were to continue assaulting others.

44.     A psychological evaluation was completed by Gustavo Rife, Psy.D on 05/04/16 at the request of Mr. Evenor Aleman, Doe 1's mental health counselor at SVJC. The results of this evaluation and the recommendations appear to have contributed to the behavior control and punishment approach utilized at SVJC rather than a more trauma-focused approach. For example, Dr. Rife states,

"Testing also indicated that [Doe1] consistently approves of antisocial behavior and has a generalized predisposition to resolve problems of social and personal adjustment in ways that disregard social customs and rules." This statement sets up Doe 1 to be viewed as being predisposed to antisocial behavior vs. considering that his "antisocial behavior" may, instead, be behavior that has been learned in response to his past abuse and distrust of others and which can be easily triggered in situations in which he is treated (or perceives that he is being treated) unfairly and harshly.

45.     Dr. Rife also states, "There was also a history of physical abuse and possible exposure to other trauma, but there are no evident symptoms for PTSD at this time." While I agree with this statement, it does not go far enough in recognizing that youth with complex trauma often do not meet criteria for PTSD and often have several diagnoses (e.g., depression, conduct disorder, etc.) that become the focus of treatment rather than the underlying trauma and abuse that drives these moods and behaviors. Dr. Rife goes on to state, "...testing indicates that his interpersonal difficulties may be due more to social anxiety than a complete lack of regard for other people....he also had a very low score on his sense of relatedness suggesting great difficulties being in relationships." It is my opinion that this more accurately captures the trauma and anxiety that gets easily triggered in reactively aggressive ways when Doe 1 is around others. However, rather than focusing on ways to address his underlying anxiety and trauma, the approach taken at SVJC was largely to just control his aggression and self-injurious behavior. This was further reinforced by Dr. Rife's recommendation that "[Doe 1's] persistent anger, self-centeredness, lack of respect for authority and lack of concern about others put him at high risk for antisocial acting out which needs to be directly confronted and contained." Again, the emphasis here is on controlling antisocial behavior rather than considering that his acting out behaviors may be defensive reactions to protect himself from further victimization by those in his environment.

46.     In his summary of Doe 1, Dr. Rife states, "He does not appear to suffer from active symptoms of serious mental illness that significantly impairs his cognitive competence to make informed decisions although his cognitive abilities may be temporarily impaired when he is highly angered or upset. " It is my opinion that this statement minimizes the impact of Doe 1's depression and past abuse/trauma on his ability to function in the moment when his reaction to past trauma gets triggered. This would have been an opportunity to explain in the report that Doe 1's behaviors are often in reaction to his environment and to those around him and are an attempt to "survive" in the moment when there are reminders of his past abuse and traumas, rather than simply manifestations of disregard for others and delinquency.

47.     During the course of my evaluation of Doe 1, he was noticeably agitated and restless when discussing his experiences in detention. His legs were constantly shaking, he pulled apart the paper cup he was drinking from, and kept looking

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 12 of 51   Pageid#: 2526

down at his feet. He said that talking about these experiences reminded him of when he was growing up and would feel bad about himself because kids would tease and make fun of him. He also said that witnessing other boys being mistreated was upsetting to him because it reminded him of his father's abuse. He would sometimes try to defend the other boys and would then be punished for this by being put in restraints or confinement.

48.    Based on the information provided above, it is my opinion that Doe 1's traumatic childhood history of abuse, neglect, and teasing has been replicated while in detention. Individuals with this kind of history are extremely vulnerable to becoming emotionally and behaviorally dysregulated in situations where others are saying or doing things that are abusive or demeaning. Even such subtle interpersonal signals as a harsh look, a critical tone of voice, or a humiliating comment could be enough to trigger a traumatic reaction of "fight" or "flight" in someone like Doe 1. As described above, his usual responses vacillate between those that are internalized (i.e., fleeing or detaching) and those that are externalized (i.e., fighting). "Fleeing" is a survival behavior that he learned as a child to get away from his father's abuse and may partly explain his threats to run away from the detention center and being labeled a "flight risk." However, Doe 1 also reported numerous situations in which he felt insulted or humiliated by things staff said or did to him and would go into fight mode and become reactive and aggressive. Later, when staff would ask him why he responded the way he did, he would often not know why. He was simply surviving in the moment.

49.    Doe 1 has difficulties self-regulating his emotions (e.g., humiliation, fear, anger, self-loathing) and behaviors (e.g., aggressiveness), especially when faced with situations in which he does not feel safe. It is my opinion that it is highly likely that many of Doe 1's aggressive behaviors (both self and other directed) in detention were survival responses to situations in which he felt in danger (or felt another detainee was in danger), much as he felt with his dad. An environment in which people intentionally or unintentionally provoke an abused child and then focus on limiting, shaming, and punishing the child can lead to further acting out (because the child does not feel understood and feels angry and helpless) and to the child's being labeled as antisocial or delinquent rather than as a previously abused and traumatized child who is trying to survive in an environment that is triggering him and not understanding or supporting him in appropriate ways.

50.    The failure to respond to Doe 1 through a trauma-informed approach caused him to experience shockingly high and frequent periods of solitary confinement and restraint. The statistics provided by the Berkeley Research Group (BRG) shows that John Doe 1 experienced 75 incidents, for a total of 2,470 hours, in solitary confinement. As I explain in this Report, it is universally recognized that solitary confinement seriously harms juvenile detainees.

13

51.     According to the BRG data, Doe 1 also spent 232 minutes over the course of his SVJC detention in eighteen episodes of mechanical restraints. Despite his recurrent episodes of self-harm and other indicators of serious mental health issues, he was placed in the restraint chair eleven times, for a total of 767 minutes. Additionally, 31 incidents of being placed in a "PRT" (Primary Restraint Technique) caused him to be held immobilized, generally by more than one staff person, for 129 minutes.

52.     The repeated, often prolonged episodes of physical restraint and isolation to which Doe 1 was subjected at SVJC far exceed the bounds of any professional standards, shock the conscience and cannot be justified by concerns for his or others' safety.

53.     In my professional opinion, the abusive punishment Doe 1 experienced at SVJC exacerbated his prior trauma and caused him substantial, additional, long-term harm.

**Review of Documents Regarding Plaintiff Doe 2:**

54.     Doe 2 is a 16-year-old adolescent who was born in Reynosa, Mexico and brought to the U.S. at the age of 10 months. He had been living with his mother in the U.S. until immigration authorities picked him up in 2017 for not being documented. His mother struggled to control him.

55.     Doe 2 was originally placed at the BCFS Harlingen Shelter from 05/08/17 to 06/30/17 when he was stepped up to BCFS San Antonio due to behavioral concerns. He was at BCFS San Antonio from 06/30/17 to 09/30/17 when he was stepped up to SVJC Secure due to behavioral problems, including noncompliance, aggressive behavior, and being a flight risk. He accrued 16 SIRs (Serious Incident Reports) at BCFS San Antonio.

56.     Doe 2 was evaluated by several psychologists and psychiatrists and given a variety of diagnoses including Conduct Disorder, Major Depressive Disorder, Intermittent Explosive Disorder, Attention Deficit Hyperactivity Disorder (ADHD) , Generalized Anxiety Disorder, Insomnia, and Substance Abuse. Doe 2 was placed on medications and treatment at residential treatment center (RTC) was recommended. Prior to being transferred to SVJC, he was rejected by two RTC's due to behavioral problems.

57.     SVJC Case Management notes from 09/30/17 included a transfer summary from BCFS San Antonio stating, *"Currently, Clinician and* [Doe 2] *have been completing biweekly sessions in an effort to identify triggers and learn appropriate coping skills. However,* [Doe 2] *is not receptive to the information and claims he does not need help in these areas."*

58.     Doe 2 had trouble adjusting to SVJC and had several incidents in which he became disruptive during the months of October and November 2017. For example, on 10/10/17 (SVJC Disciplinary Report), Doe 2 began to yell in his room and kick/hit the door after returning from physical recreation. He was told that if his disruptive behavior continued that he would be removed from programming. He continued to hit/kick the door and was removed from programming. SVJC's Behavior Management Program 3.1-4.1 Subsection C requires progressive implementation of intervention starting with *"talking and active listening"* when residents are too agitated to utilize verbal coaching. "Removal from programming" is to be used as a last resort *"when there is no other alternative."* In this situation, the threat of removal from programming followed by the actual removal from programming were the first interventions tried, which clearly does not follow SVJC's policies. Also, in reviewing the SVJC documents, Doe 2's hitting and kicking of the door appeared to be more an expression of his frustration rather than an immediate threat to safety. Despite these above-mentioned concerns, the SVJC report states, *"Resident poses a threat to security; removal is warranted at this time."*

59.     On 12/12/17 (SVJC Disciplinary Report), Doe 2 was asked to leave class for disruptive behavior. While walking in the hallway, he began to curse and was then removed from programming. While it is clear that Doe 2 was in need of some type of intervention, the place to start would have been with "talking and active listening" progressively followed by other interventions (e.g., cool-down period, failure to earn points, time-outs) if not successful, as required by the SVJC Behavioral Management Program 3.1-4.1. This policy was not followed in this situation and removing Doe 2 from programming was not only an overreaction to a non-threatening situation, but one which could have been managed with less intrusive methods. Despite these concerns, the SVJC report states, *"Removal in accomplice* (sic) *with policy."*

60.     On 11/18/17, Doe 2 was placed in the restraint chair and put on room confinement. Prior to this he was upset about not having earned enough points to participate in the evening programming and after cleaning he refused to go to his room. Staff "redirected" him multiple times with no success and then placed him in a PRT and took him to his room where he became more agitated and aggressive to which staff responded with mechanical restraints and the restraint chair. Once kids become highly aggressive, it puts staff in the position to have to intervene. The question in this particular situation is whether this particular chain of events had to lead to the use of restraints with Doe 2 and eventually the restraint chair. Again, there is no indication in either the Disciplinary Report or the SIR that progressive interventions were tried that might have enabled Doe 2 to calm down before more intrusive measures were deemed necessary. Staff made use of "redirection", but there was no attempt at "talking and active listening" to try to calm Doe 2 and keep things from escalating. Use of a restraint chair is an extreme measure that should seldom, if ever, be necessary with youth. In this situation, it likely could have been prevented.

15

61.     On the day following the above incident, Doe 2 was kept on room isolation for almost the entire day despite the SVJC records indicating that he had woken up around 10:30am and appeared calm and then at 11:30am he asked about coming off of removal – to which he was told no. At 11:45am, Doe 2 became agitated after being told that he would stay removed. He continued to become further agitated banging on the door, cursing, and ripping up his clothes. He remained on room confinement until about 8:15pm that evening. SVJC's Behavior Management Program 3.1-4.3 Subsection B states that *"Removal of a resident from programming to their room or the intensive-watch supervision room will be used as a last resort, only after exhausting other less intrusive measures."* Subsection 1 under that further states that *"A resident will be temporarily removed from programming if the resident's behavior poses a substantial threat to self, others, or property. Removal from programming will not be used for punitive purposes, but rather to gain control of an acting-out resident and ensure the security and safety of the staff, facility and residents in the program."* Even though Doe 2 had been agitated and aggressive the prior night, he appeared calm during the early morning hours and did not present a threat to himself, others or property at that time according to SVJC records. It is not clear why he was not returned to programming in the morning. It was only after he was told that he would have to remain removed that he began to act out. Doe 2's subsequent acting out appears to have been used to justify his further removal from programming and to have simply been a punitive action. This is a clear example of SVJC staff's use of its policies to justify punitive actions towards Doe 2 which were substantially harmful to him in that he became further aggressive, hostile, and defiant.

62.     In late November 2017 Doe 2's behavior began to improve dramatically.

63.     SVJC Case Management notes from 12/28/17 stated, *"UC's* [Doe 2's] *last SIR was on 11/21/17 for threatening staff. At this time, UC is eligible for a step down to a less secure facility."* Doe 2 was evaluated on 11/15/17 by Dr. Joseph Gorin, a clinical psychologist, who made the following recommendation in his psychological report: *"The most concerning factors regarding* [Doe 2] *have to do with his history of aggression and substance use. These incidents seem to be more related to impulsivity, poor judgment, and poor emotion regulation than they are to a propensity toward violence.* [Doe 2] *generally presents with a moderate to high risk of getting into fights. However, with appropriate intervention geared towards his impulsivity, social abilities, and self-regulatory skills, his risk profile for violence would likely be low."* The SVJC Case Management notes from 12/28/17 went on to state, *"Given this recommendation, CM* [Case Manager] *and CL* [Clinician] *recommend a step down to an RTC placement to work on the skills necessary to mitigate the concerns of aggression and substance use."* This same recommendation had previously been made by another outside clinical psychologist, Dr. Alina Perez, in her report dated 06/20/17.

16

64.     This recommendation of an RTC was an essential theme throughout Doe 2's detention. It clearly addressed his need for additional mental health treatment that was recognized by several professionals working with him. This recommendation was not followed through on and set Doe 2 up for failure. When he resided at the BCFS facilities, his disruptive behavior was the reason given for his not going to an RTC. However, while at SVJC, his behavior improved dramatically and he still was not sent to an RTC. It is clear that Doe 2 was hoping to be stepped down to an RTC and that his mental health counselor was encouraging his "good behavior" so that this could happen. A Case Management note dated 12/08/17 included a "Mental Health Status/Clinical Update that stated, *"Despite his struggles with sudden anger, UC has been successful in asking for cool downs, time outs, and successful in calming down while meeting with his clinician. UC has not had any significant incidents since 11/21/17 and has been motivated to continue his good behavior, in order to eventually become eligible for a step down."* As of 12/08/17, Doe had accumulated 17 days without a SIR.

65.     Doe 2 was clearly of the impression that he would be eligible for a step down after 30 days of being "good." [see Doe 2 Declaration p. 2 paragraph 13]

66.     SVJC Case Management notes dated 01/04/18 again reiterated Doe 2's eligibility for a step down to a less secure facility. *"CM praised UC for his continued good behavior and encouraged UC to continue to maintain this behavior to remain eligible for a step down."* As of 01/04/18, Doe 2 had gone 44 days without getting a SIR.

67.     As of 01/10/18, Doe 2 had demonstrated "good behavior" (i.e., no SIR's) for 50 days. There is no indication in the records of any actions being taken to facilitate Doe 2's step down despite his dramatically improved behavior. His going 50 days without a SIR is especially remarkable given his previous behavioral difficulties and is all the more reason that his marked and consistent improvement should have been acted on more expeditiously by SVJC/ORR.

68.     On 01/10/18, Doe 2 received a SIR for demonstrating inappropriate and disrespectful behavior in class. The teacher redirected him several times and then asked him to leave for a time out. As Doe 2 left the classroom, he cursed the teacher and punched the door. As he went into his room he again began cursing and slammed his door. Once secured in his room, he was told he had been removed from programming for *"threatening and disruptive behavior."* He then became very upset and banged on his door, covered his window with toothpaste and toilet paper, ripped up his mattress, and was "tearful and inconsolable." Doe 2 admitted to staff that he had been disrespectful, but denied being threatening. He felt his removal was "unjust" and under "false pretenses" because he had only been told that he was being given a "time out." His mental health clinician came to talk with him. *"Clinician provided empathic support and validation in hopes of attenuating UC's current distress. Clinician was somewhat successful, as he was*

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 17 of 51   Pageid#: 2531

*able to speak more about his general disappointment about removal as he had 50 days with no behavioral issues."*

69.     There are several issues regarding the above incident. First, SVJC's Behavior Management Program 3.1-4.1 Subsection C describes the need for <u>progressive implementation</u> of interventions starting with "talking and active listening" when a resident is too agitated to respond to verbal coaching. There is no indication that either the teacher or the guards attempted this before moving on to "verbal redirection" and "time outs" and then ultimately to "removal from programming." Had more effort been put into talking to Doe 2 about what he was upset about, he might have been able to calm down. Second, although Doe 2 was disrespectful, there was no indication that he was threatening. His verbal actions (i.e., cursing) and his physical actions (i.e., punching the classroom door and slamming his room door shut), although certainly disruptive, were not inherently threatening. Staff, in their efforts to punish Doe 2 for his actions, removed him from programming even though he had been told that he was only being asked to take a "time out." Doe 2's emotional and behavioral reactions to this are clearly understandable since he felt he was being deceived. Third, SVJC's own Behavior Management Program 3.1-3.1 Subsection H states, *"Being consistent with the behavior expectations and ensuring appropriate responses are proportional to the resident's behavior supports the credibility of the rules and staff. Not being consistent undermines program fidelity."* And even more importantly, not responding appropriately and proportionally undermines the trust of the residents that the SVJC environment is safe and predictable, and that they will be treated fairly. This, in turn, leads them to become further demoralized, which often results in aggressive or self-injurious actions, as it did in this case with Doe 2. Fourth, there was a lot at stake for Doe 2. He had already gone 50 days without any serious behavioral problems and getting a SIR for removal from programming would seriously set back his chances of getting a step down. Following through with the originally planned "time out" in this situation would likely have served its purpose, not have further increased Doe 2's distress and agitation, and very likely not have led to a SIR.

70.     Underlying Doe 2's disruptive behavior in the classroom and on the unit in the incident described above was his frustration and anger at not having been stepped down despite having done his part to make this happen. Given Doe 2's history of behavioral difficulties at his previous facilities, the professional recommendations that he needed an RTC I (which SVJC staff endorsed), and his long period of "good" behavior at SVJC begs the question as to why more was not done to facilitate and advocate for Doe 2's step down to an RTC. Doe 2 was extremely distressed by both having received a SIR and not being sent to a less secure facility in response to his 30 days of appropriate behavior. On 01/11/18, the Case Management note stated, *"UC was visibly upset, telling his mother that he wanted to return to Mexico and that she did not understand what it was like to be locked up."* The fact that Doe 2 was now willing to consider being returned to Mexico – a country he was not familiar with and in which he had never really

lived – certainly underscores his extreme distress and disillusionment at being in detention at SVJC and the treatment he received there.

71.     Case Management notes from 01/23/18 stated that Doe 2's last behavioral SIR was on 01/10/18 (the incident described above) and that he was *"not eligible for step down at this time."* On 02/09/18, the notes stated that Doe 2 had again reached 30 days of "good behavior." Yet, on 02/15/18, the Case Manager told Doe 2 that she *"would not be bringing him to her office until he could display a pattern of positive behavior."* This clearly ignores Doe 2's remarkable efforts to demonstrate both 50 days, followed by another 30 days of "good behavior." To have expected Doe 2 to do anything more than what he had already demonstrated (especially when he was not rewarded for this by being stepped down) was inappropriate, insensitive, and punitive. Doe 2 was clearly hurt by this rejection as he refused to meet with her when she came on to the unit on 02/22/18 and told her he would like a new Case Manager. To add insult to injury in all of this, on 02/20/18 the *"FFS [Family Field Specialist] provided that she would like to see 60 days of good behavior before UC could be stepped down."* It is totally unacceptable to expect an emotionally vulnerable youth such as Doe 2 who is demoralized after having just gone through two extensive periods of "good behavior" without being rewarded (by being stepped down) to now be told that the bar is being raised even higher. This is simply another form of punishment. As Doe 2 stated in his Declaration, "I have been good for the past 44 days, and I haven't been removed from the program." (p. 5 paragraph 34)

72.     Doe 2's behavior deteriorated in February and March 2017. He received SIR's for wanting to fight a peer, for an unprovoked attack on a peer, for sexual acting out next to a teacher, for trying to punch a peer, and for refusing to give up contraband. On 02/24/18, he was removed from programming after becoming very upset when told that he would not be the first one allowed to take a shower. While in his room he threw milk against the window, made a mess with milk and toilet paper, covered the window with toilet paper, and banged on the door and started cursing. Doe 2 clearly overreacted to limits set by staff and was clearly out of control. The Progress Note from his clinician on 02/26/18 indicated that Doe 2 was experiencing *"boredom and frustration"* and had *"little to no motivation to maintain positive behavior."* What seems to have been missed in all of this is that Doe 2 was feeling out of control, angry, and demoralized about not having been stepped down despite long periods of good behavior, about being told that he now needed to demonstrate 60 days of good behavior, and that his Case Manager had refused to see him in her office until he demonstrated more *"positive behavior."* It is not surprising that he acted out of control given that he felt powerless and trapped (much like a rat in a maze with no way out) and that he was playing a game in which he could not possibly win because the rules of the game keep changing.

73.     It was soon after this that Doe 2 asked for voluntary departure rather than be deported. Case Management notes form 03/01/18 stated, *"UC requested to speak*

*with CM. UC expressed that he would like to pursue VD."* Notes from 05/02/18 stated, *"VD to Mexico granted."* It is my opinion that this was not only an unfortunate chain of events, but may have been avoidable. It appears that Doe 2 may have essentially given up after losing hope in both the immigration system and SVJC to help him. He was likely frustrated at how long his immigration case was taking. However, SVJC also failed Doe 2 by not providing an environment conducive to his maintaining his motivation to continue to behave well [to want to remain in the U.S. to seek possible asylum]. SVJC did not follow through on advocating for an RTC which would not only have been in Doe 2's *"best interests"*[11], but would also have met the requirements set forth in the Flores consent decr that unaccompanied minors be detained in the *"least restrictive setting."*[12]

74.     SVJC frequently used room isolation with Doe 2 not only as a means of control, but primarily as a means to punish him for what appears to be mostly behaviors that were considered disrespectful, but were not truly threatening. Solitary confinement is harmful to adolescents, especially when used as a form of punishment for "bad", but not necessarily dangerous behavior (see section below on "Use of Solitary Confinement and Seclusion in Youth). This was true for Doe 2 as he frequently demonstrated more aggressive and self-injurious behaviors when in confinement. SVJC's use of room confinement with Doe 2 did not follow its own Behavior Management Program, was substantially harmful to Doe 2's psychological functioning, and was well below expected professional standards for both mental health and detention.

75.     SVJC's use of the restraint chair with Doe 2 was inappropriate, unnecessary, and substantially harmful to him. It was justified based on his aggressive behavior, which was likely provoked by SVJC staff not following their own de-escalation strategies/policies in a consistent and progressive manner as required in the SVJC Behavior Management Program. The use of the chair in this manner with Doe 2 falls far below expected standards of both juvenile detention and mental health care. The use of restraint chairs with children is highly controversial. It is based on the unsubstantiated theory that the use of coercive controls with aggressive children will lead to their "internalizing" their aggressive impulses and ultimately to more socially acceptable behavior.[13]However, there has been no empirical research to prove this. While the use of the restraint chair may be necessary in some extreme circumstances

---

[11] A universally accepted principle established in the 1989 Convention on the Rights of the Child which encourages the "best interests" of the child to be considered in all matters pertaining to children (especially unaccompanied minors, refugees, and asylees) because of their special vulnerability as children.

[12] *Reno v. Flores*, 507 U.S. 292 (1993)

[13] Cotton, N. (1989). The developmental-clinical rationale for the use of seclusion in the psychiatric treatment of children. *American Journal of Orthopsychiatry*, 58, 442-450.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 20 of 51   Pageid#: 2534

(e.g., when a child is so out of control that they are in severe danger of hurting themselves or others), it should only be used when all other measures have been tried. Unfortunately, this is often not the case as the use of the restraint chair (and restraints in general) is often implemented for convenience, as a show of strength to coerce children to obey, or as a form of punishment and retaliation.[14]

76.  SVJC did not consistently follow its own policies and procedures which was harmful to Doe 2 in that it led him to further act out aggressively and to eventually become demoralized and depressed. All told, SVJC's actions were well below professional juvenile detention and mental health treatment standards and likely caused substantial emotional and mental harm to Doe 2.

**Review of Documents Regarding Plaintiff Doe 3:**

77.  Doe 3 is a 15-year-old youth born in Honduras who left Honduras and came to the U.S. in July 2017 due to fears of being killed by gangs. His parents died when he was young and his grandmother raised him. He dropped out of school after completing third grade.

78.  Doe 3 was apprehended by U.S. Custom and Border Protection and placed in a shelter. He was transferred to BCFS San Antonio Staff Secure on 07/28/17 and from there was stepped up to SVJC on 08/04/17 due to reports he previously made that he and some friends had thrown rocks at a gang member and killed him. Detention staff felt it best that he be placed in a more secure setting for the safety of others.

79.  Doe 3 later recanted his previous disclosures saying that he had originally said this in an effort to get deported more quickly. He maintained that he had never killed anyone before and that he had himself been a target of the gangs in Honduras.

80.  Doe 3 struggles to adjust to SVJC in the first few months after he arrived there and was clearly "testing the limits" as to what was acceptable behavior. He was written up numerous times for behaviors including being disrespectful, threatening staff, ripping up his clothes and books, refusing to attend school, punching another resident, and having contraband. Case Management notes from 10/24/17 stated that he had " displayed constant defiant behavior."

81.  For example, on 08/15/17, Doe 3 made a disrespectful remark to a female staff member and was told to stop. He became upset and commented that he "could beat all the staff" and was then escorted to his room and removed from programming. While there was clearly a need for some type of intervention with Doe 3, room confinement could very well have been avoided. There was no

---

[14] Kennedy, S. & Mohr, W. (2001). A prolegomenon on restraint of children: Implicating constitutional rights. *American Journal of Orthopsychiatry, 71*, 26-36.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 21 of 51   Pageid#: 2535

attempt at "talking and active listening" which might have quickly de-escalated the situation, nor was there any mention of other progressive interventions such as a "cool-down period" or a "time out" (all of which are required by the SVJC Behavior Management Program 3.1-4.1 Subsection C). Also, staff appeared to overreact to his statement that he "could beat all the staff" as a true threat vs. an immature, impulsive youth who was likely frustrated and showing bravado as an attempt to save face. Essentially, it appears that Doe 3 was put on room confinement unnecessarily despite not really being a threat to safety.

82.     On 08/28/17, Doe 3 was in his room after dinner and began banging on the door and was told to stop because the other residents were doing "enrichment" on the pod. Per the Disciplinary Report, he was upset that he *"couldn't come out of his room due to not having earned enough points during the day."* Doe 3 continued to bang on his door and then ripped up his clothes and books. He was then put on room confinement for *"destruction of property and disruptive behavior."* Again, SVJC staff did not follow the Behavior Management Program which would have started with "talking and active listening" to explore Doe 3's feelings more and to encourage more adaptive ways of coping. Had this been done initially, his behavior might not have escalated. This incident also raises the question of what happens to residents who do not have enough points to participate in special activities. It appears that Doe 3 was simply expected to just be in his room (i.e., room confinement) even though he had not officially been removed from programming. It is understandable that he would get upset at seeing other residents involved in activities while he apparently was given no other option than to remain in his room.

83.     On 10/05/17, Doe 3 had been disrespectful and threatening and was asked to take a time out in his room. After repeatedly being asked to go to his room, he was put in a PRT (which caused him and the staff to fall to the floor) and taken to his room for over nine hours. He was then removed from programming for about nine hours. Staff's actions of placing Doe 3 in a PRT rather than using "talking and active listening" (required by SVJC Behavior Management Program 3.1-4.1 Subsection C) likely provoked him – by creating an unnecessary power struggle – and led him to escalate. Spending time to talk with Doe 3 to discuss what he was upset about and why he was being defiant could have led to his feeling more understood by staff, which might then have de-escalated him and led him to eventually become calmer and more cooperative. At 12:09pm, after having been in his room for over six hours, staff talked to Doe 3 and *"explained to him to behave so we can get him out of his room."* It is not enough to tell a youth who has emotional and behavioral difficulties to just *"behave"* without reviewing with him alternative ways to cope with his frustration or to encourage him to ask for a cool-down period or a time-out if he is having trouble coping. Doe 3 remained on room confinement until 6pm that day. It is my opinion that this use of room confinement could have been avoided, or at least minimized.

22

84.     Doe 3 was evaluated by a licensed clinical psychologist, Dr. Gustavo Rife, on 11/21/17. Dr. Rife diagnosed Doe 3 with "Adjustment Disorder, Unspecified." He assessed Doe 3 as being an immature, needy adolescent who was highly attention-seeking. Although he found Doe 3 to be impulsive, he did not feel Doe 3 had "criminal attitudes" and rated him as being at *"Low Risk for future serious violence toward peers and/or people in the community."* [Rife report, p. 5] Dr. Rife further stated that Doe 3's abilities to self-regulate were impaired. *"He appears to have a low threshold for sensitivity, meaning he is easily triggered and has a moderately high intensity in his response when triggered. He also appears to be significantly impaired when he is upset and has a hard time maintaining emotional equilibrium."* [Rife report, p. 4] Dr. Rife recommended individual therapy to help Doe 3 to: 1) become less dependent and to learn better coping skills for dealing with his anxiety and 2) become less impulsive by learning to be more aware of interpersonal situations (e.g., peer taunting) that trigger his anger and learning interventions to help him cope in more adaptive ways with his anger.

85.     Although Dr. Rife's report generally seemed appropriate, in my estimation, it did not go far enough. For example, Dr. Rife did not do any kind of formal trauma assessment even though Doe 3 gave him specific information regarding the death of his mother when he was four years old, friends of his being killed by gangs, being threatened by gangs, and that he had traveled through Mexico to get to the U.S. – a journey that is perilous for many unaccompanied alien children. Doe 3's self-regulation difficulties and impulsivity may very well be trauma-based, yet this was not evaluated and, as a result, there were no recommendations to SVJC addressing this – recommendations which might have enabled staff to better understand Doe 3's immature and impulsive behaviors and to work more effectively with his self-regulation difficulties. This, in turn, might have decreased his need for room isolation (or at least decreased the amount of time he was in isolation) and for SVJC's use of restraints.

86.     Dr. Rife's report was received by SVJC on 01/25/18. The report clearly states that Doe 3 *"denied ever killing anybody or harming anyone, which is consistent with his referral documents in his current placement."* [Rife report, p. 2] And, as mentioned in paragraph 84 above, Doe 3 was not considered to have "criminal" attitudes and was felt to be at low risk for serious future violence towards his peers or others in the community.

87.     Doe 3's behavior improved dramatically after 11/04/17. Case Management notes from 12/11/17 stated that *"UC reached 30 days of good behavior on 12/04/17. On 12/16/17, CM and CL recommended a step down to a staff secure facility. Pending step down approval."*

88.     On 12/28/17, Doe 3 was informed that there was no viable family reunification options available for him. He was upset about this.

89.     Doe 3 expressed frustration to his Case Manager on 01/17/18 that there had been no updates regarding his step down. His Progress Note on 01/19/18 stated that he was *"beginning to question his length of stay at SVJC"* and that he *"may begin to decompensate if he feels no recognition in his good choices and behaviors."* In his own Declaration, Doe 3 states, *"I have been on good behavior for three months. I should have been stepped down after 30 days of good behavior. I am upset that I haven't been stepped down. I will talk to my case manager about that."* (p.4)

90.     Case Management notes from 01/23/18 stated, *"UC has reached 81 days of good behavior. At this time, CM and CL continue to recommend a step down to a staff secure facility."*

91.     Doe 3's long record of good behavior, along with Dr. Rife's report that he denied killing anyone and was not a high risk to act out violently towards others, should have been enough to advocate for and expedite Doe 3's step down to a less restrictive environment and would have enabled SVJC's compliance with the condition of the Flores consent decree requiring that unaccompanied minors be detained in the least restrictive setting. Because this did not happen, Doe 3's behavior needlessly deteriorated over the next several months and led to increased room isolation and restraints due to his aggressive acting out.

92.     Case Management notes fro 01/30/18 stated that *"CM and CL met with UC to discuss recent behavior and redirect UC for reacting poorly to an issue with a peer on the unit. CM advised UC that he needed to be respectful of others and learn how to behave in order to be stepped down."* At this point, Doe 3 had accumulated 88 days of good behavior and been extremely patient in awaiting his step down and yet he is being told he needs to learn how to behave due to some recent minor behavioral problems. In this meeting, there was no empathy expressed by the staff at the good work Doe 3 had done up to this point and at how patient he had been in waiting for a step down. There was also no documentation indicating that SVJC staff advocated for and tried to expedite his step down. His Progress Note on 01/31/18 stated, *"Clinician met with minor to review his attitude as he is showing signs of decompensating on a daily basis. Minor is demanding and loud."* Again, there is no empathy shown by the clinician with regards to Doe 3's frustration and disillusionment at not being recognized with a step down that he clearly earned. Doe 3's *"attitude"* problem has essentially been provoked by SVJC's not expediting his step down in timely manner and by the lack of empathy demonstrated by his clinician.

93.     Not surprisingly, after going 96 days with good behavior and no step down, Doe 3 obtained a SIR on 02/07/18 for having contraband (a straightened paper clip that was found in his folder). The concern was that he might use this clip to hurt himself or someone else. The Progress Note on 02/07/18 indicated that the counselor did review *"coping skills and decision making skills"* with Doe 3. However, there was no exploration with Doe 3 at a deeper level as to the

meaning and motivation for his having a paper clip in his possession, what his underlying feelings were, or any strategies for more adaptive ways of coping with his feelings. When he mentioned that he would hit someone if they *"crossed the line"* with him (i.e., provoked him), the counselor only told him that if he attacked someone that he might be charged. The primary focus was on his needing to behave bettor or suffer the potential consequences rather than appropriate coping strategies.

94.    The Progress Note dated 02/9/18 stated that *"Clinician spoke with minor in the hallway near his unit and expressed her frustrations with him...Clinician verbally confronted the minor with his behavior, his attitude, and his demands."* She went on to say that the *"Minor is very self-absorbed and has been behaving like a needy five year old who has a temper tantrum and meltdown when he does not get his way."* These above statements show a lack of understanding of the context in which Doe 3 had regressed – i.e., that he went 96 days without a SIR and then got frustrated and discourage because of the lack of follow through on a step down that he felt he deserved.    The clinician's own frustrations are beginning to spill out towards Doe 3. She does not seem to understand the larger issues that are playing out with Doe 3 – i.e., that his needy demands are likely an expression of his resentment that his long-term good behavior was not rewarded, that he is missing his grandmother (the only "mother" he really knew), and that he sees her (the counselor) as someone with the power to magically meet all of his underlying dependency needs to be taken care of.

95.    Over the next two months, Doe 3 continued to decompensate (as had been predicted by his counselor) and accrued several SIR's for assault on peers and for disrespectful and threatening behavior. He had become increasingly discouraged and disillusioned (about both not having been stepped down and about the slow progress in his immigration case) and expressed this to his counselor.

*"While drawing minor talked about his feelings of frustration, anger, and sadness that he had been asked to behave to leave* [step down]. *He feel* (sic) *like he behaved for so long and then watched all his friends leave. He is sad and angry."* (Progress Note 02/12/18)

*"Minor no longer has faith that his case will move forward and has given in to acting out his frustrations when the opportunity provides itself. Clinician reviewed expectations and consequences that will happen if minor continues to threaten people or harms anyone. Minor stated that he is aware of this but is just angry."* (Progress Note 02/15/18)

96.    In the 02/12/18 session, the counselor was appropriately empathic and assisted Doe 3 to express his feelings through drawing and verbal expression. However, in the 02/15/18 session, the focus was largely on behavioral

expectations and consequences rather than trying to understand Doe 3's anger and hopelessness about his immigration case.

97.     The Case Management note from 02/15/18 stated that *"CM told UC that she was tired of having the same conversation with the same negative response from UC and that UC was giving her no resources with which to fight his case."* Although the Case Manager was probably trying to motivate Doe 3 in this interaction, it was likely experienced by him as negative and critical. The fact is that Doe 3 had given her 96 days of good behavior with which to fight his case. In both this note and the note in paragraph 94 above, there is a negativity and frustration that is beginning to show on the part of SVJC staff that very well may have been experienced by Doe 3 as rejecting and unsupportive which, in turn, may have further contributed to his acting out over the subsequent two months. Sensitive youth, such as Doe 3, can be very adept at discerning when staff are feeling negative towards them and are quite vulnerable to internalizing these negative feelings and then acting them out towards themselves or others.

98.     The Case Management note dated 02/27/18 stated that *"CM noticed that UC was drawing a picture with clear gang ties. CM redirected UC for this behavior. CM reminded UC that maintaining good behavior was the key to being stepped down. UC reported that he did not care about his* behavior or losing points. UC reported that he would continue to misbehave." It seems that Doe 3 had essentially given up at this point and likely felt that he had nothing to lose since his long period of "good behavior" had not gotten him the step down to which he was entitled. He was also frustrated with the slow progress regarding his immigration case. Both of these issues contributed to his telling his Case Manager on 03/20/18 that he wanted to pursue voluntary departure.

99.     Overall, a review of Doe 3's documents suggests that he received both individual and group counseling, as well as medications, to help him cope. The group sessions addressed a variety of issues including anger management and conflict resolution, strategies for distress tolerance and self-regulation, and stress management strategies such as deep breathing. His individual counseling provided him space in which to identify and express his feelings and to learn coping strategies. The fact that Doe 3 was able to demonstrate good behavior for 96 days appears may be partly the result of the counseling he received. However, his individual sessions should have gone further in helping him to understand his motivations for acting out rather that focusing so much on his need to behave better and the consequences if he did not. There should also have been more of a focus on his past traumas and how these might have been getting triggered in the detention setting. Also, although Doe 3 was undoubtedly a difficult youth with whom to work, the Case Manager and Clinician both seemed to let their own frustrations get in the way of their interactions with him and were not consistently empathic regarding his frustration, anger, and disappointment about not getting a step down. In addition, neither of them grasped how devastating this was for Doe 3 and how greatly it impacted his behavior in the

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 26 of 51   Pageid#: 2540

last couple of months. Even though there were some positive aspects to the counseling services offered, nonetheless, they were limited and still fell short of mental health professional standards for juvenile detention settings.

100. The SVJC's management of Doe 3's aggression was inconsistent. There were situations in which staff responded appropriately and situations in which they did not follow SVJC's Behavior Management Program (which requires a progressive series of responses when a youth is acting out). In particular, SVJC staff frequently used redirection followed by room isolation in response to Doe 3's defiant and threatening behavior rather than trying to engage with and relate more to him when he was upset – i.e., by spending more time implementing *"talking and active listening."* There were also situations in which "cool-downs" and "time-outs" should have been more effectively used. The failure to try to engage Doe 3 more before utilizing room confinement led to Doe 3's being confined more often, and for longer periods, than was necessary. This was harmful to him in that it led him to become even more angry and destructive, at times, while in confinement. This, then, was used to justify and prolong his confinement and removal from programming.

101. SVJC's biggest failure with Doe 3, however, was not having advocated for and facilitated Doe 3's step down to a less restrictive setting after he had in good faith demonstrated 96 days of good behavior with no SIRS. This was a remarkable accomplishment for an immature, impulsive youth who should not have remained at SVJC for as long as he did. As can be seen by the dramatic increase in SIR's that he accrued after 02/07/18 and by the deterioration in his mood and behavior noted in the Case Management and Progress Notes after 02/07/18, this had a substantially negative and demoralizing impact on Doe 3 and may have partly contributed to his request for voluntary departure.

102. In summary, there were some positive aspects to the mental health treatment provided to Doe 3 and there were times when staff managed his aggressiveness appropriately. However, SVJC staff did not follow the Behavior Management Program consistently and by not doing so, provoked negative and aggressive reactions from Doe 3. There were no indications that the counseling staff made any attempts to work with the guards to more consistently follow the behavioral policies or to try to help them better understand and deal with Doe 3's aggressive behaviors. The Case Manager and Clinician's negative attitudes towards Doe 3 appeared to leak out inappropriately and were likely experienced by him as rejecting and punishing. Lastly, there were no indications that SVJC staff actively tried to advocate for and facilitate Doe 3's step down to a less secure facility; their failure to do so led him to decompensate. Despite some of the positive aspects to the care that Doe 3 received, his overall care fell below all professional standards for both detention and mental health in juvenile facilities and likely caused substantial harm to him.

27

**Evaluation of Plaintiff Doe 4:**

103.   On July 25 and July 26, 2018, I interviewed and administered several psychological questionnaires to Doe 4 for a total of 10.5 hours. The assessment was conducted at the Shenandoah Valley Juvenile Center (SVJC) in Staunton, Virginia with the assistance of Mr. Jeff Divers, who served as my Spanish-English interpreter. I received compensation of $300/hour for time spent doing the evaluation, evaluating the information obtained, reviewing documents, and writing this report.

104.   Prior to undertaking this assessment, it was understood that I would approach the assessment with no particular result in mind and that I would exercise independent professional judgment on all aspects of the evaluation.

105.   Prior to commencing the interviews, I explained to Doe 4 that confidentiality is limited in a forensic evaluation. I informed him that the purpose of the evaluation was to assess his psychological functioning and that I would be asking him about his childhood history, his travels to the United States, and how being detained had impacted him – especially with regards to his experiences at SVJC. He was informed that I would be providing a written report to his lawyers that would also be submitted to the court. Doe 4 was able to verbalize that he understood the purpose of the evaluation and the limitations of confidentiality.

106.   Doe 4 was born on 01/20/2001. He was raised in San Pedro Sula, but is not sure if he was born there. He is 17 years old. He was raised by his maternal grandparents and also lived with several aunts and a cousin. His mother abandoned him when he was young and he did not see her for 13 years. She attempted to reconcile with him when he got older, but he was not interested in reconciling with her. Doe 4's father was in prison in San Pedro Sula and had been involved in gangs. Doe 4 never met him or saw a picture of him and was told that he died as a result of a fire in the prison at which he was detained. Doe 4 thinks this was around 2005. Another prison in Comayagua was also burned down about a week later. Doe 4 reports that the rumor was that the President of Honduras had the prisons burned down in retaliation for the gangs kidnapping and killing his son.

107.   Doe 4 attended school until the sixth grade. He liked to learn and especially enjoyed history and math. He also enjoyed playing soccer at recess. He had some behavioral problems that mostly occurred at school. For example, he sometimes broke windows and shoved people around or threw a ball at people. When his grandparents found out about his misbehavior they would punish him by restricting his privileges – e.g., confining him to his room, not letting him watch TV, not giving him money, or not allowing him to play soccer. Sometimes he "got the belt" for doing more serious things like throwing a rock at a classmate or tearing up his schoolbooks. One time his grandfather punished him by making him hold up a log in the air for an extended period of time.

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 28 of 51   Pageid#: 2542

108.    Doe 4 began working at the age of seven to help his family out financially and to pay for food. He would get on busses as a street vendor selling peanuts, soft drinks, and popcorn balls. He also did a variety of other work including construction, loading large bags of coffee bags, and putting up signs and banners for a company. Doe 4 says he felt an obligation to work even though his family did not want him to.

109.    Doe 4 became sexually involved with an 18-year-old woman named Jessica Castillo that he met at a traveling fair when he was 12 or 13 years old. Jessica got pregnant which resulted in the birth of their daughter, Stephanie Nicole, who is currently four years old.  He has had no contact with his daughter or Jessica for two years.

110.    Doe 4 never belonged to a gang, but says they pursued him to try to get him to join and that this is one of the reasons he quit school. The gangs killed many of Doe 4's friends. [In discussing this, he became noticeably distressed and looked away from me.]

> *My friends were killed by the gangs when I was seven or eight years old. My friends were nine or ten years old, one was my age. I could see how some of them were killed when I got close to them. Some I saw get hacked with a machete. I don't like to talk about this. I say many friends get killed – more than ten friends. It's only by the grace of God that I was not killed. Some of the kids were taken away and killed. Some of the kids I saw get killed. It affected me very deeply. I could never understand why they would kill somebody simply because they refused to join something."*

111.    Doe 4 named several of his friends who were killed - "El Vaquero, Jose, Pedro, William, El Puma, and many more."

> *"Some of the kids were killed with rocks. Some were being beaten and had rocks thrown at them and some were being hacked and had rocks thrown at them. I tried to protect my friends. One time I grabbed a man from behind who had a gun and he kicked me and I was unconscious. Sometimes I would grab a long stick when someone was running around with a machete...when they were running around like psychopaths killing people."*

112.    Doe 4's witnessing the many murders of his friends and others greatly impacted him.

> *"These were the worst times in my life. I prefer being alone because I don't want the same things to happen to me that happened to my friends. I don't want them to kill me and I don't want them to hurt other people. These experiences have hardened me and being in this facility [Shenandoah] has hardened me. The things that I've seen have been extreme enough that other things I see don't surprise me and don't always sadden me."*

29

113.   Doe 4 was injured several times in his attempts to defend himself from gang violence. Some of these injuries occurred when he was eight or nine years old. He was hit many times with rocks, hacked with a machete [he showed me a machete scar below his left knee that required 16 stitches], and cut with a switchblade on his arm [he showed me two scars on his right forearm].

114.   Doe 4 felt that he and his family were in danger because of the gangs and this was a major reason for his leaving Honduras.

> *"They threatened me with killing my family. The way they kill people in my country is by bullets. I was worried about the safety of my parents, sisters, and girlfriend. They always stopped me on the street. I believe they were always watching us. I don't know for sure, but I assume that since the gangs know everything that there was an awareness that I was my father's son."*

115.   Doe 4 discussed a specific incident that led to his leaving Honduras.

> *"It's me and a friend of mine, Marcos, who came here because we were having problems in Honduras. They told me I had to go kill a family [Sanchez family] and that if I didn't they would kill my daughter. We agreed to their demands to kill the family, but we did not kill the family, but took the money and came here. They would kill us if we returned. Even here in the U.S., I don't feel safe. The gang [MS] is here too. It's not easy living the life I've lived. Going through what I've gone through has forced me to mature."*

116.   Doe 4 left Honduras because he was fearful of being killed by the gangs and came to the U.S. because of the opportunities he would have here. He would eventually like to bring his parents, daughter, and his daughter's mother to the U.S.

117.   Doe 4 came to the U.S. with his friend, Marcos. They traveled through Guatemala and Mexico. They walked, hitchhiked, and rode busses and freight trains through Honduras, Guatemala, and Mexico. They frequently ran out of money and food and would beg or work to get money. For example, Doe 4 cleaned car windshields, harvested grapes and asparagus, learned to weld, and worked at a tire shop. The journey took about one year during which he experienced several traumatic events such as witnessing people get thrown off trains when they did not give money to robbers.

> *"I saw a pregnant woman get thrown off the train and saw the train run over her and split her in half. I can't really explain this. I've seen worse. I saw friends' heads get split open with machetes and get gutted."*

118.   When Doe 4 and Marcos arrived in Caborca, Mexico they were robbed and assaulted.

> *Some Hondurans assaulted us...they took my clothes and everything I had and left us with boxer shorts. They beat us with sticks and we bled. Marcos and I ran in opposite directions to escape. One guy shot at me and hit me in the right foot. I've never seen Marcos since then. I got hospital attention in Caborca. It took three weeks to recover since I couldn't walk. I stayed in an immigration home."* [Doe 4 showed me scars from being cut behind his right ear that occurred during the above-described assault. He also reported having a bullet wound on his right foot.]

119.    Doe 4 continued to travel and arrived at Mexicali where he worked at a tire shop. The owner allowed him to stay overnight and, while there, some neighbors stole the owner's things and beat Doe 4. One of the men wanted to kill him, but another man said to leave him alone. As a result, the man aimed a gun at Doe 4 and kicked him.

120.    After the above-described assault, Doe 4 went to an immigration home and connected with an El Salvadoran and a Honduran. They crossed together into the U.S. Doe 4 was not able to say the exact date that he arrived in the U.S., but he believed it was the "fifteenth of some month."

121.    After being apprehended by immigration, Doe 4 was detained at Southwest Key Estrella in Arizona and then at Children's Village in New York.

122.    Doe 4 filed a complaint (while in detention in Southwest Key Estrella) alleging that U.S. Customs and Border Protection (CBP) officers slammed his head on the ground, almost knocking him out, while handcuffing him face down on the ground. He may have been tasered while this was happening. He experienced blurry vision and headaches after this incident. He was interviewed by two officers about this incident, but was transferred to Children's Village (CV) the next day and was never told the outcome of his complaint.

123.    While detained at CV a Catholic Charities Community Services Case Note indicated that possibilities were being explored for Doe 4 to be transferred to a residential treatment center due to his need for additional medical attention and apparent severe trauma.

> *7/27/17 CM* [Case Manager] *confirmed that minor has no FRP* [Family Reunification Program] *options and that a CBP* [Customs and Border Protection] *complaint was filed at previous shelter. There was an investigation and CM will see if he can share the report with us. He also informed that FFS* [Family Field Specialist] *is currently exploring the possibility of transferring minor to Mercy First for RTC* [Residential Treatment Care] *as minor needs additional medical attention as he seems to be experiencing severe trauma. The CM informed that they are going to do a psych evaluation and other exams to determine his needs and based on that assessment, they will look at his options..."* [CAIR records p. 116]

124.     A staff member physically assaulted Doe 4 at CV on 9/12/17. Doe 4 was sitting at a table asking for help when a male staff member kneed him in the chest unprovoked. An investigation was done by the New York Justice Center for the Protection of People with Special Needs that substantiated the abuse. The staff member was reprimanded and transferred to another staff secure facility.

125.     On 09/22/17 Doe 4 was given the wrong medications by the nurse at CV (Capitol Area Immigrant Rights - CAIR – Coalition Records p. 117). He informed the nurse that the medications were different than the ones he was usually given. He was told to take them anyway. Doe 4 went to his room and felt dizzy and sleepy which led to the doctor being called, who confirmed that Doe 4 was given the wrong medications. Doe 4 had trouble getting up the next morning and was threatened with a SIR (serious incident report) for not waking up as he was told. He appeared drowsy with slurred speech when interviewed by staff from Catholic Charities Community Services. He was eventually given a "behavioral report" instead of a SIR (CAIR records p. 118).

126.     On 10/06/17 the case manager at CV reported to the Catholic Charities staff that Doe 4 was "being considered for a 45 day transfer to Mercy First." [CAIR records p. 117]

127.     On 11/03/17 it was reported by the case manager at CV to the Catholic Charities worker that Doe 4 was "no longer being considered for transfer to Mercy First or any other RTC facility due to his improved behavior." [CAIR records p. 120]

128.     In December 2017 Doe 4 was transferred to SVJC because of behavioral problems and because he was deemed a flight risk.

129.     Doe 4 reports no major health problems or conditions.

130.     Doe 4 denies any formal psychiatric history when living in Honduras. However, he reports having had some behavioral problems while there.

131.     Doe 4 has been prescribed psychotropic medications for sleep, stress, and anger since being in detention. He thinks the medications have helped somewhat, but says he often wakes up "sweating and feeling angry."

132.     Doe 4 was alert during the interview and was oriented to person (who he was), place (where he was), time (the date), and the reason for the interview. He was dressed casually in jeans and t-shirt. He was cooperative throughout the interview and maintained good eye contact. His legs were sometimes shaking. His speech was within normal limits. He was estimated to be of average intelligence. His short- and long-term memories were largely intact, but he had some difficulties in remembering specific dates. He displayed fair insight and judgment. His overall mood was calm and euthymic (neither happy nor sad) throughout most of the

interview. However, he became anxious several times during the interview if he felt that SVJC staff were either listening in on or watching him from the cameras in the room [SVJC staff were asked about this and said the cameras were turned off]. He reported anxiety about the safety of his family, including his daughter, and about whether he would ever be able to leave SVJC. Doe 4 also became noticeably distressed when describing the murders of his friends growing up. His thought processes were coherent and logical and his thought content was appropriate to the interview. There were no signs of psychosis. He denied auditory or visual hallucinations and denied any delusions. He denied current suicidal or homicidal thoughts or plans, but admitted to having tried to injure himself in the past when angry and frustrated (e.g., hitting the wall while in detention and injuring his arm).

133. Doe 4 was given diagnoses of: 1) Posttraumatic Stress Disorder (PTSD), Chronic and 2) Adjustment Disorder with Mixed Disturbance of Emotions and Conduct based on the clinical interview, Doe 4's history, the questionnaires administered, and the collateral information sources reviewed. His chronic PTSD symptoms are highly consistent with his multiple traumatic experiences as a child in Honduras, the many traumas he experienced during his journey to the U.S., and his fears of being killed by the Mara Salvatrucha gang if returned to Honduras. These traumatic experiences have resulted in his frequent nightmares, trouble concentrating, and reliving bad memories and have left him feeling angry, distrustful, hypervigilant, and fearful of being murdered.

> *"I am angry at the world. I feel suspicious. I'm not trusting. I feel the world is dangerous. I'm getting more angry, but I'm trying to learn to calm down."*

134. Despite meeting criteria for PTSD, Doe 4's emotional and behavioral difficulties are best understood as "Complex Trauma" or "Complex PTSD" (which has not yet been recognized by the American Psychiatric Association, but has been included in the World Health Organization's International Classification of Diseases, ICD-11). What this essentially means is that children and youth - such as Doe 4 - that have experienced multiple and chronic traumas are at significantly increased risk to develop complex trauma which is characterized by problems in emotional self-regulation (of feelings such as anger, sadness, fear, guilt, and shame) and interpersonal relatedness (due to their mistrust and hypervigilance). This is frequently evidenced in their "survival-in-the-moment" responses which tend to be of a "fight" (i.e., aggressive responses directed towards themselves or others) or "flight" (i.e., avoidance, depression, withdrawal) nature. Doe 1 demonstrated all of these responses while detained at SVJC.

**Doe 4's Experiences in Detention at SVJC as Reported during this Assessment:**

135. Doe 4 was sent to SVJC in December of 2017. Initially, he did not know why he was sent there, but was later told that it was because he had been

33

disrespectful to staff and was a flight risk. He admitted to having been disrespectful, but says he never tried to escape.

136.     Doe 4 described his experiences at SVJC as "horrible."

> "They mistreat people here. They discriminate against you and hit you. They do things that infuriate me and no one deserves to be treated that way. When we ask for food, sometimes they throw it in the garbage and say, 'You get it from there.'"

137.     Doe 4 reported an incident in which he became aggressive and was assaulted by staff.

> "Last week I took a shower and asked for spray deodorant and they told me 'no' because shower time was over. I went to my cubby to get my solid deodorant and they said, 'no.' I said, 'Why are you trying to be so tough?' They said they were going to stick me in my room. I said, 'Who do you think you are to boss me around?' They sent several staff after me and I punched the first guy that came in. I stopped hitting him. One guy beat me with handcuffs after they dragged me to my room. This guy held my hand behind my back and hit me with his handcuffs because he thought I might continue to hit him."

138.     Doe 4 was asked why he got so upset about not getting deodorant and responded:

> "They're supposed to give you deodorant and they did not. They said, 'Why should I give it to you when I don't feel like it?' He had a really hateful face. These types of things have happened to many other kids. Sometimes they put on shields and helmets and come in your room and press down on you so you almost can't breathe. They define any behavior as violent or disrespectful and use this as an excuse. This has happened to me many times."

139.     Doe 4 has struggled to control his anger. At times he becomes aggressive towards others and at other times he turns his frustrations and anger back on himself in self-injurious ways.

> "It's hard for me to control my anger. I've been here a really long time. It could be because of the way they treat me. They deal with violence with violence and that doesn't help anybody. They're very hard on us. My stay here has not been nice because of the way they treat us."

> "When I get angry, I slam by fist against the wall. I used to hit the wall, but they told me I should hit the mattress instead. I ball up a t-shirt now and squeeze it. I have in the past tried to cut myself – a long time ago. But it also happened at Shenandoah. When I arrived here in December I tried it, but didn't like it."

34

*"When I get angry, I really want to be alone because I don't think clearly. Many things get me angry. I don't like when they treat others poorly; for example, when other kids are fighting and the guards don't intervene and when the guards beat the kids."*

*"I don't think anything when I get that angry. My mind is just blank. I'm trying to change that little by little. But his is hard to do on my own, but I'm trying to figure out how to do this. I put myself in my room and I've started drawing things like cars, hearts, angels, and houses. Sometimes I draw people that show up in my head. The last person I drew was the face of a boxer."*

140.   Doe 4 has been put on room confinement on many occasions that caused him to be restricted from school, sports, and his peers. He reports being confined three or four times for more than one day and confined for three or four days on one occasion. At times when confined he was put in a "green suit with a hood" that was very "thick" and made him sweat. The suit allows you to move your arms and feet, but there are no holes for your arms to come out. It is used to keep kids from hitting or biting anyone. Doe 1 was kept in the green suit for a full day on one occasion. He also sometimes was told he had to sleep with a "green cover."

*"This is like a heavy blanket that they put over you. They remove everything from your room and all your clothes except for your boxers. I spent three weeks in my room with this cover, but they gave me my clothes to go to school. I could walk around in my boxers, but had to put the cover on when they came in the room. I don't' know why they did this for so long. When they decide to do it, they just do it. I have no control over that."*

141.   Doe 4 reports that SVJC staff take away points that have already been earned, that they frequently overreact to situations with aggression and force, and that room confinement is frequently used when unnecessary - e.g., when they believe a resident has been "disrespectful." He finds the inconsistency and arbitrariness of SVJC staff's responses to be unfair, demoralizing and frustrating.

142.   Doe 4 reported that there were "some nice people" at SVJC who tried to help him and teach him how to calm down. However, for the most part, the counselors and guards just chastised him by saying things like "If you don't behave, you won't be coming to my office."

*"The focus is on what I did wrong rather than what to do differently...sometimes Evenor [counselor] does tell me "You should have done...' or "You need to calm down and go to your room' and when I say 'What do I do to calm down?' he says, 'That's another problem.'"*

143.   Doe 4 reports he was not offered any group counseling services to learn coping strategies to help with anxiety and anger management. He says that a

couple of times each week the staff had them do stretching and breathing for three to five minutes in the morning.

144.  Doe 4 has experienced frequent nightmares while at SVJC and often wakes up sweating. He relates his nightmares to the threats made by the gangs to kill him and his family and to the several assaults and traumas he experienced during his travels to the U.S.

145.  Doe 4 has also been discouraged and depressed while at SVJC.

> *"I feel disillusioned and angry. I feel sad. I think about not being able to get out of here and see my daughter and about not being able to get ahead."*

146.  Doe 4 has felt unsafe, belittled, and discriminated against at SVJC.

> *"From my point of view no one should be here. They discriminate and they use violence to deal the violence. They insult us and tell us we have no right to be in this country. They make fun of the way we speak when we try to speak English and say we are delayed or retarded. They use bad words like 'fuck you, pussy, and SOB.' When they get angry they say, 'You don't belong here. Why are you coming to take our jobs from us?'"*

147.  Doe 4 was asked what he would change about SVJC if he were in charge and he responded:

> *"The way they treat us, improve the food, be less strict, get us outside more to enjoy the sun, different types of games, change the color of the walls – everything is white, more comfortable chairs, and teach kids how to work, be organized, and manage their money."*

### Review of Doe 4's Declaration and SVJC Disciplinary Reports:

148.  Doe 4 believes SVJC staff arbitrarily take away points that have already been earned.

> *Due to Mr. Rey attempting to secure another resident in his room there was no time for other actions. Mr. Rey raised his arm and moved* [Doe 4's] *arm from the door* [Doe 4] *walked away as Mr. Rey informed him that this was unacceptable and that he had lost a point for his actions."* [12/21/17 Disciplinary Report]

149.  This recorded point loss clearly goes against the policies of SVJC's Behavior Management Program Section 3.1-4.1 subsection B.1.j. which states "Once earned, points are never taken away." This rule violation created frustration and demoralization in Doe 4 and undermined his trust in SVJC staff to treat him with

fairness and respect. For point systems to be effective, they must be administered fairly and consistently.

150. Doe 4 believes that SVJC staff create unnecessary power struggles that then escalate. For example, on 12/28/17 [Disciplinary Report] Doe 4 got upset during dinner and dumped all of his food and drink on his tray. He was asked to go to his room, but refused. He was then asked several more times and finally placed in a two-man PRT. Doe 4 struggled and tried to kick staff. He was then put on room confinement. He became upset and tied a shirt around his neck and was given a suicide blanket. There was no initial staff intervention in this situation to talk with and engage Doe 4 to find out what was going on with him, what he was feeling, why he was upset, or why he had dumped his food and refused to go to his room - all of which might have enabled him to calm himself down and cooperate. The only staff interventions attempted were verbal redirection (e.g., go to your room) followed by restraints and room confinement. Doe then made a suicide attempt while confined which possibly could have been avoided if staff had initially been more engaged with Doe 4. In fact, it is likely that just the act of having put Doe 4 on room confinement may have unnecessarily provoked his suicidal behavior. Again, SVJC's own Behavior Management Program requires that "talking and active listening will be used to address problem behaviors and motivate the resident to improve behavior" when a resident is too agitated to engage in verbal coaching [3.1-4.1 subsection C]. Only after talking and active listening are unsuccessful are "Verbal Redirection" and then other measures such as "Warnings, Verbal Reprimands, and Explanations, Cool-Down Period(s), Failure to Earn Points, Time-Outs, and Removal from Programming" to be *implemented progressively* in this order per SVJC's policy.

151. On 02/04/18 [Disciplinary Report] Doe 4's failure to trim his fingernails led to his failure to earn a point and to a subsequent argument/power struggle with staff. Doe 4 threatened to assault staff and punched a table. He eventually punched a staff member in the face and this led to a two-person PRT and mechanical restraints. After these were removed, he was put on room confinement. During this incident, there was no initial staff effort to talk with and engage Doe 4 about what was going on, what he was feeling, or why he was refusing to trim his nails which might have calmed him down and led him to cooperate. Again, SVJC staff did not progressively implement the required interventions prior to telling Doe 4 he had failed to earn points. This rush to punish Doe 4 (with failure to earn a point) rather than trying to verbally engage him led him to become angry and aggressive and to subsequent restraints and room confinement.

152. SVJC's Behavior Management Program 3.1-4.1 Subsection D states, "Disciplinary measures applied to residents will be reasonable and in proportion to the nature of the resident's current behavior...The record must show that every possible alternative has been exhausted to avoid removal from programming." Again, this policy was not followed by SVJC staff in either of the

incidents described above. All alternatives were not attempted that might have kept things from escalating. Dumping food on a tray and refusing to trim fingernails should not lead to the need for restraints and room confinement if handled properly.

153. SVJC's "Security And Control – Use Of Force" policy 5.23-3.0 Subsection A states that "Physical restraint shall be used as a last resort only after less restrictive interventions have failed or to control residents whose behavior poses a risk to the safety of the resident, others, or the public." Again, in the incident described in #67 above, if "less restrictive measures" had been implemented (i.e., if the progressive measures of the Behavior Management Program had been followed) then force very likely would not have been necessary.

154. On 02/13/18 [Disciplinary Report], Doe 4 was found with contraband - a ground prong from a power cord and a piece of elastic ripped from a fitted sheet. It was determined that room confinement was necessary even though Doe 4 was calm at the time because "contraband poses a serious threat to the safety and security of both staff and residents." While these items undoubtedly needed to be removed, there was no attempt to ascertain what Doe 1 was feeling (frustrated? depressed? suicidal?) or his motivations for taking these items and, therefore, whether room confinement was actually necessary or whether he could return to programming. SVJC staff did not follow the policies in 3.1-4.1 'Subsections C and D of their Behavior Management Program.

155. Doe 4 believes that room confinement is used as punishment for situations that are relatively minor. For example, on 03/12/18 [Disciplinary Report], Doe 4 failed to earn points for touching the staff station despite being repeatedly told not to. Doe 4 then swore at staff making verbal threats. He was redirected to his room, but refused to go. After several minutes, he finally went to his room. He was then placed on room confinement despite being calm and having eventually cooperated. Again, there appears to have been no discussion with Doe 4 as to what was going on that he was continuing to touch the staff station (e.g., Was he feeling neglected? Was he frustrated about something?). He was only told he had failed to earn points and then given verbal redirections to stop doing what he was doing and go to his room. The SVJC Behavior Management Program required that "Talking and Active Listening" should have been tried before verbally redirecting Doe 4 and well before telling him that he had failed to earn points.

**Summary of Findings Regarding Doe 4:**

156.    Doe 4 came to SVJC as a highly traumatized youth due to his experiences in Honduras and his terrifying journey to the U.S. These prior experiences left him angry, distrustful, and hypervigilant. However, he suffered additional traumas after being apprehended and detained (one alleged assault by U.S. Customs and Border Protection and one confirmed assault by a staff member at Children's Village). He was also punished (i.e., he received a "behavioral report") while at CV for not getting up in the morning due to having an adverse reaction to being given the wrong medications by one of the nurses. These additional experiences served to increase Doe 4's anger, distrust, and hypervigilance. This was not taken into consideration by SVJC staff in their interactions with Doe 4. It is my sense that Doe 4 was viewed as just another "detainee" at SVJC without fully taking into account his prior traumatic history or that he was an unaccompanied minor seeking asylum who was not in detention because of having committed a crime.

157.    Staff at Children's Village recognized Doe 4 was experiencing "severe trauma" and his need for residential treatment was being looked into (see paragraphs 123 and 126 above). It was then determined that his "improved behavior" would preclude him from going to residential treatment. Shortly after this, (see paragraph 127 above) Doe 4 was transferred to a staff secure facility at SVJC. This all makes no sense. The reason to send a youth to residential treatment is driven by psychological needs of the individual that are not able to be properly dealt with in their current living situation, not necessarily by whether their behavior has improved. Residential treatment facilities serve youth not only who have behavioral problems, but who also have mental or emotional problems that may be related to trauma. If Doe 4's behavior truly had improved, then he should not have been sent to SVJC. If his behavior had worsened, an RTC should have been considered.

158.    SVJC should have been aware not only of Doe 4's prior behavioral problems, but also of his trauma history, that he had been considered for an RTC, and that he had been abused by CV staff. This would have alerted them to their need to understand his behavioral problems as symptoms of his underlying trauma and distrust of authority figures vs. simply being a behavior that needed to be curtailed.

159.    There is considerable research indicating the deleterious effects of cumulative trauma on an individual and that pre-existing trauma can be exacerbated by subsequent trauma especially if the environment is not safe and supportiveFor many children, detention "maintains or aggravates existing trauma and other psychological conditions. For others, the detention experience is the worst thing that has happened to th Although it is not possible to determine to what extent Doe 4's detention experiences - especially those at SVJC – may have further traumatized him and contributed to his PTSD, there is no doubt that these experiences have exacerbated his previous traumas and PTSD, increased his distrust of others, his anger, and his hypervigilance, and

caused him to become demoralized and depressed. Doe 4 admits to being "hardened" by his early traumatic experiences, but also says that his experiences at SVJC have "hardened" him. He openly admits to problems managing his anger and to not getting enough help in dealing with this. Although he acknowledges that many of the staff were "nice" and tried to help him, nevertheless, he felt they mostly focused on telling him to calm down or behave better and not on how to do this. He essentially felt that the counseling offered did not go far enough in assisting him and he would have liked to have seen a psychologist if given the chance.

160.    SVJC staff did not follow their own behavior protocols consistently and largely used control and punishment to control Doe 4 hidden behind their frequent statements that "Per policy, room confinement (or force) was necessary." For example, there were several incidents (see paragraphs 151-156 above) in which efforts to verbally engage Doe 4 about what he was doing or feeling (vs. simply verbally redirecting him or telling him that he had lost points) could have led to his being cooperative and not needing restraints or room confinement. There is a sense that the review and appeal procedures are either not followed consistently or are done very superficially and lead to essentially "rubber stamping" the actions of staff thereby reinforcing their continuing to demonstrate their actions in the same way going forward. There were no indications in the records that staff might have mishandled a situation, could have handled a situation differently, or had received corrective feedback with regards to following SVJC Behavior Management policies more consistently and in the *progressive* manner that was intended.

161.    SVJC staff's often inappropriate responses to Doe 4's threats and "disrespectful" behaviors show a lack of understanding regarding: 1) how Doe 4's past traumatic experiences were getting re-triggered at SVJC; 2) that Doe 4's acting out was largely due to his feeling treated unfairly and inconsistently at SVJC; 3) that Doe 4 did not feel safe at SVJC and that this led to his uncooperativeness; and 4) that their failure to listen and try to empathically understand Doe 4, as well as their over reliance on point loss, force, and room confinement, further traumatized Doe 4 and increased his anger and uncooperativeness.

162.    Despite Doe 4's prior traumatic experiences, nonetheless, his experiences at SVJC have been further traumatizing to him and have led to substantial emotional suffering as manifested in his ongoing nightmares, his anger management difficulties, his feelings of being unsafe, depressed, and treated unfairly, and his occasional suicidal actions.

163.    It is my opinion that SVJC staff was negligent in it treatment of Doe 4 and that the care provided him fell well short of the standards of care expected in the juvenile justice system. Their tendency to too quickly utilize force and/or room confinement to manage Doe 4's verbal or physical anger, their tendency to

overreact aggressively to relatively minor issues that should have been resolvable at a verbal or discussion level in most cases, their lack of consistency in following their own policies (e.g., taking away points and not implementing less restrictive and aggressive measures in a progressive manner), their inability to understand how their own actions impacted and at times provoked Doe 4 to aggression and despair, and their inadequate mental health services all served to create an environment that was unsafe, unpredictable, and substantially harmful to Doe 4.

## Youth in the Juvenile Justice System/Detention:

164.    Immigration detention has a significant detrimental effect on the mental health of all children and youth no matter whether they have suffered previous trauma or whether they are UACs. Psychological harm has consistently been associated with detention.[15] Children held in detention are at risk for many psychological problems such as depression, anxiety, PTSD, suicidal ideation, and self-destructive behavior. The longer children and youth are detained, the greater the chance of mental health problems developing.[16] Immigrant children and youth who are detained even for very short periods of time show signs of psychological deterioration.[17]

165.    Research indicates that a high percentage of youth involved in the juvenile justice system have been exposed to multiple types of traumatic events including violence, family abuse, and traumatic losses.[18] These youth often become distrustful, hypervigilant, impulsive, reactively aggressive, and display lack of empathy for others.[19]I observed or read about these reactions in my evaluations or analyses of John Does 1, 2, 3, and 4.

---

[15] Kronick, R., Rousseau, C., & Cleveland, J. (2015). Asylum-seeking children's experiences of detention in Canada: A qualitative study. *American Journal of Orthopsychiatry*, 85, 287-294.

[16] Australia Human Rights and Equal Opportunity Commission. (2004). A last resort? National inquiry into children in immigration detention, 357-454, https://www.humanrights.gov.au/sites/default/files/document/publication/alr_complete.pdf

[17] Lorek, A., Ehntholt, K., Nesbit, A., Wey, E., Githinji, C., Rossor, E., & Wickramasinghe, R. (2009). The mental and physical health difficulties of children held within a British immigration detention center: A pilot study. *Child Abuse & Neglect: The International Journal*, 33, 573-585. http://dx.doi.org/10.1016/j.chiabu.2008.10.005

[18] Ford, J., Grasso, D., Hawke, J., & Chapman, J. (2013). Poly-victimization among juvenile justice-involved youths. *Child Abuse and Neglect*, 37, 788-800, http://dx.doi.org/10.1016/j.chiabu.2013.01.005

[19] Report of the Attorney General's National Task Force on Children Exposed to Violence (2012).

41

166.    Punitive approaches such as prolonged isolation, restraints, and physical abuse are harmful and ineffective. For example, 50% of all suicides in juvenile facilities occur while youth are held in isolation.[20] Thus, the frequency and length of time juveniles are held in isolation at SVJC as captured by BRG statistics are truly alarming. Facilities, including SVJC, continue to harm youth by using force (e.g., aggressively restraining youth) and isolation as means of behavioral control rather than using de-escalation, conflict resolution, and trauma-informed strategies that are more effective and not harmful.[21]

167.    UACs, asylum seekers, and other displaced persons experience mental health problems at higher rates than the general population.[22] Their mental illnesses get worse when they are detained, especially when interventions such as solitary confinement and force are utilized.[23]These types of practices serve to re-traumatize already vulnerable youth and can retrigger painful feelings of fear, helplessness, powerlessness, and loneliness.[24]Furthermore, the harm caused by these practices can often be long-term and difficult to remediate. Their use falls well below professional standards for treating detained youth.

**Use of Solitary Confinement and Seclusion in Youth:**

168.    Solitary confinement can lead to severe psychological and physical effects including difficulties with thinking, overt paranoia, panic attacks, illusions and hallucinations, self-injurious behavior, hopelessness, sleep disturbances, headaches, heart palpitations, and dizziness.[25]

---

[20] Puzzancherra, C., & Hockenberry, S. (2016). *Data reflect changing nature of facility populations, characteristics, and practices.* Pittsburgh, PA: National Center for Juvenile Justice.
https://www.ojjdp.gov/ojstatbb/snapshots/DataSnapshot_JRFC2014.pdf
[21] Bilchik, S., Umpierre, M., & Lenhoff, C. (2017). A roadmap for change: How juvenile justice facilities can better serve youth with mental health issues. *Focal Point*, 31, 13-16, www.pathwaysrtc.pdx.edu/publications
[22] Fujio, C. (2011). *Dual loyalties: The challenges of providing professional health care to immigration detainees.* Physicians for Human Rights, www.physiciansforhumanrights.org
[23] Holman, B., & Ziedenberg, J. (2006). *The dangers of detention: The impact of incarcerating youth in detention and other secure facilities.* Justice Policy Institute, www.justicepolicy.org
[24] Burrell, S. (2013). *Trauma and the environment of care in juvenile institutions.* Los Angeles, CA & Durham, NC: The National Center for Child Traumatic Stress, www.NCTSN.org
[25] Fujio, C., & Corradini , M. (2013*). Buried alive: Solitary confinement in the US detention system.* Physicians for Human Rights, http://physiciansforhumanrights.org/solitary

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 42 of 51   Pageid#: 2556

169.    Youth are frequently subjected to solitary confinement for one of three reasons: to punish them (disciplinary segregation); to manage them because they are considered dangerous (administrative segregation) or vulnerable to abuse (protective custody); or as a form of treatment (e.g., seclusion after a suicide attempt). Youth held in solitary confinement, especially when it is frequent or prolonged, needlessly suffer a great deal and can become depressed and suicidal, self-injurious, acutely anxious or psychotic, and aggressive. They are at increased risk of having psychological problems if they have a history of trauma and abuse. Youth are also at increased risk simply because their bodies and brains are still developing physically and psychologically. When youth are placed in solitary confinement they are often restricted from getting adequate exercise and recreation, socialization, nutrition, and education.[26]

**Interpersonal dynamics in working with youth in facilities such as hospitals, schools, and detention centers:**

170.    Youth who are hospitalized for psychiatric reasons (e.g., being a danger to themselves or others) will sometimes "act out" towards themselves or others while hospitalized. While these episodes may be a manifestation of their mental illness (e.g., their depression or psychosis), they may also occur in response to either inappropriate actions or inappropriate monitoring on the part of the staff. For example, staff that react in verbally or physically aggressive and punitive ways to youth who are getting out of control will often trigger further acting out because the youth feel angry and unsafe. Milieu meetings (when staff and adolescents meet together) and team meetings (when the entire treatment team meets) are held regularly to address these issues. Periodic staff trainings address the kinds of psychological problems youth experience and appropriate ways of treating them while hospitalized.

171.    Youth who are hospitalized for medical reasons (e.g., complications of a chronic illness or surgery) often display behavioral and emotional difficulties due to such things as the degree of pain they are experiencing, the enforced dependency brought about by being hospitalized, anxieties about their illness and the treatment they will need to undergo, and being separated from their parents. However, hospitalized youth will also exhibit behavioral and emotional difficulties (e.g., refusing to comply with recommended treatments) when they feel misunderstood or mistreated by medical and nursing staff. For this reason, multidisciplinary team meetings, case conferences, and regular staff trainings are held to enable staff to discuss their frustrations and concerns regarding particular adolescent patients, to coordinate patient care, to educate staff on the problems the youth are experiencing and more effective approaches in dealing with these problems, and to help the staff become aware of how their

---

[26] Human Rights Watch/American Civil Liberties Union. (2012). Growing up locked down: Youth in solitary confinement in jails and prisons across the United States, https://www.aclu.org/files/assets/us1012webwcover.pdf

Case 5:17-cv-00097-EKD-JCH   Document 106-2   Filed 10/22/18   Page 43 of 51   Pageid#: 2557

communication and behavior at times triggers their adolescent patients' noncompliance and acting out.

172.     All teachers, but especially those working with youth with various developmental and psychological difficulties, need help in understanding the emotional and learning needs of their students, to develop appropriate ways of behavior management, and to understand how their own verbalizations and behaviors may at times unintentionally provoke their students to act out. In-service training and consultation are provided to assist teachers with these issues.

173.     The interpersonal dynamics that exist in hospitals and schools that treat and work with youth are also manifested in juvenile detention centers. Just as medical personnel and teachers need education, training, and consultation to understand how their own reactions can provoke negative reactions in youth, so too do detention center staff that work with youth. Training juvenile detention center staff in conflict de-escalation strategies and trauma-informed care would help them to better understand youth who are traumatized, to better understand interpersonal situations and dynamics that can trigger traumatic reactions in youth, and to learn more effective ways to manage these situations. This, in turn, would enable staff to meet basic professional standards of care in ways that are not harmful to detainees.

**Trauma-Informed Treatment of Juveniles:**

174.     Trauma-informed approaches are the standard of care in all stages of the juvenile justice system.[27] UACs, because of their substantial histories of trauma and loss, are members of a particularly at-risk population that is in need of specialized mental health services including comprehensive clinical assessments that consider both their early traumas as well as their current hardships and stressors.[28]

175.     Recent research suggests child abuse and neglect targets certain brain regions and pathways and can lead to brain abnormalities. Essentially, once a child has experienced maltreatment, the world is experienced with a different nervous system.[29] Psychological treatment must address the chronic emotional

---

[27] The National Child Traumatic Stress Network. (2016). Essential elements of a trauma-informed juvenile justice system, www.NCTSN.org
[28] Betancourt, T., Newnham, E., Birman, D., Lee, R., Ellis, H., & Layne, C. (2017). Comparing trauma exposure, mental health needs, and service utilization across clinical samples of refugee, immigrant, and U.S.-origin children. *Journal of Traumatic Stress*, 30, 209-218.
[29] Teicher, M. and Samson, J. (2016). Annual research review: Enduring neurobiological effects of childhood abuse and neglect. *Journal of Child Psychology and Psychiatry*, 57, 241-266.

dysregulation, ruptured attachments with caregivers, and deficiencies in personal identity and competence caused by the trauma of the abuse and neglect. Treatments and approaches that simply try to control behavior rather than working to restore the underlying brain abnormalities and treating the "trauma" will be ineffective and likely harmful.[30]

176.     Treatment of detained youth is served when the social ecology in which these youth are embedded is addressed – i.e., when it is understood that the social environment and the interpersonal dynamics to which the youth is exposed can also contribute to the youth's problems and re-victimize them. More specifically, there needs to be an assessment of the extent to which a detention facility is capable of helping traumatized, emotionally-dysregulated youth to regulate their emotions and behaviors.[31] Often, there is a disconnect between these two leading to a punitive, coercive approach that just treats the particular youth as the problem and easily leads to punishment, seclusion, aggressive force, and over reliance on medication to control the youth's "bad behavior." This approach essentially ignores the fact that many, if not most, detained youth have been previously traumatized and/or will be traumatized while in detention and that their "bad behaviors" are often trauma based. That is, the "bad behaviors" are often traumatic reactions to being detained or to provocative peer and staff behavior.

177.     The primary purpose of a trauma-informed juvenile detention system is to provide an environment in which youth feel safe, are assisted in coping when past traumatic experiences are triggered, and in which exposure to potentially traumatizing reminders or events is reduced.[32] This would necessitate: appropriate trauma-informed policies and procedures; appropriate methods of screening, assessing, and treating traumatized youth; culturally sensitive, trauma-informed programs that strengthen the resilience of youth; and culturally sensitive, trauma-informed staff education and training.[33]

178.     There are three major implications of utilizing a trauma-informed approach. The first is that understanding behaviors as symptoms of trauma will lead to appropriate interventions that can reduce these symptoms and improve

[30] Van der Kolk, B. (2016). Commentary: The devastating effects of ignoring maltreatment in psychiatry – a commentary on Teicher and Samson 2016. *Journal of Child Psychology and Psychiatry*, 57, 267-270.

[31] Saxe, G., Ellis, B., & Kaplow, J. (2007). *Collaborative treatment of traumatized children and teens: The trauma systems therapy approach*. New York: The Guilford Press.

[32] Buffington, K., Dierkhising, C., & Marsh, S. (2010). *Ten things every juvenile court judge should know about trauma and delinquency*. Reno, NV: National Council of Juvenile and Family Court Judges.

[33] The National Child Traumatic Stress Network. (2016). Essential elements of a trauma-informed juvenile justice system, www.NCTSN.org

45

overall functioning. The second is that this type of approach will encourage a more global or systems perspective on traumatized youth such that other alternatives to detention can be considered which are less restrictive and allow for more comprehensive trauma treatment.[34] The third is that staff trained in trauma-informed care rely less on the use of restraint and seclusion, are better able to manage their own emotions and behaviors, and find their work more rewarding.[35]

### Failure to Utilize a Trauma-Informed Approach at SVJC:

179.     My evaluations of Doe's 1 and 4, along with the records provided me, along with my review of the declarations of the other plaintiffs, suggests that the approach utilized with the detainees at SVJC was primarily based on behavioral control and punishment that was often of a humiliating and abusive nature. Although there is documentation that Doe 1 received some mental health treatment, there is no documentation or other indication of efforts to utilize a trauma-informed treatment approach, or to address staff behaviors that were abusive and provocative in contributing to the detainees' behavior. In other words, the approach utilized at SVJC is based on the notion of needing to control and punish "bad behavior" on the part of youth vs. understanding that many, if not most, of these youth are demonstrating traumatic "fight or flight" reactions in response to being detained, as well as in response to being secluded, confined, mistreated, and misunderstood by staff.

180.     When the behavior of youth in juvenile facilities is simply seen as "bad" behavior and not seen from a trauma-informed lens (in which the behaviors are viewed as originating in trauma and adversity) then the behavioral problems worsen, the chances for rehabilitation are reduced, and the likelihood of youth becoming further involved in the juvenile justice system is increased.[36]

181.     Simply put, it is not sufficient to offer general mental services to youth who are UACs and/or are involved in the juvenile justice system, given the high likelihood they have been previously traumatized. When youth have been exposed to violence, abuse, and neglect growing up they may respond by becoming defiant, appearing indifferent, or becoming aggressive as a means of protecting themselves. Their attempts to protect themselves from further

---

[34] Kretschmar, J., Capizzi, A., & Shafer, E. (2017). A decade of diversion: Ohio's behavioral health juvenile justice initiative. *Focal Point*, 31, 22-24, www.pathwaysrtc.pdx.edu/publications

[35] Marrow, M., Knudsen, K., Olafson, E., & Bucher, S. (2012). The value of implementing TARGET within a trauma-informed juvenile justice setting, *Journal of Child & Adolescent Trauma*, 5(3), 257-270.

[36] Kinscherff, R., & Keator, K. (2017). Adversity, trauma, and behavioral health needs among justice involved youth. *Focal Point*, 31, 17-19, www.pathwaysrtc.pdx.edu/publications

victimization and helplessness when in detention are often motivated by a desire to feel safe and in control rather than by the callous indifference and antisocial qualities often attributed to them as "delinquents."[37] When this difference is not understood and the role played by traumatic stress is overlooked (as is often the case in detention facilities), then harsh, punitive, and harmful approaches such as seclusion, restraint, and staff aggression become the default methods utilized.

## Opinions:

182.    Doe 1 experienced abuse and neglect from his parents, as well as teasing from his peers, when growing up in Mexico. These traumatic experiences were replicated when he was detained at SVJC. He experienced teasing, humiliation, physical assault, confinement, chair restriction for long periods of time, and was handcuffed and shackled many times. These experiences instilled a legacy of shame, resentment, fear, and distrust in Doe 1 that he will likely never fully recover from without proper trauma-informed treatment over a considerable period of time in a safe setting.

183.    The mental health care provided to Doe 1 at SVJC was deficient. The main approach was to emphasize the consequences of his continuing to engage in aggressive behavior as a way to deter him. There was no attempt to understand the underlying traumas that were being triggered in Doe 1, and there was very little effort to help him learn more adaptive self-soothing and self-regulating strategies.

184.    Although Doe 1 had a history of being depressed as a child in Mexico, nevertheless, his feelings of being abused and trapped at SVJC greatly exacerbated his depression and at times led to self-injurious and suicidal behavior. At other times this led to aggressive behavior. However, rather than viewing these behaviors as "survival-in-the-moment" behaviors in which Doe 1 was essentially coping the best that he could in a prison-like environment, these behaviors were viewed as "bad" behaviors in need of punishment through confinement, being put in restraints, and loss of behavioral levels.

185.    The psychological evaluation of Doe 1 conducted by Gustavo Rife, Psy.D appears to have been heavily relied upon to direct Doe 1's treatment. Dr. Rife largely viewed Doe 1 as a depressed, conduct-disordered adolescent in need of confrontation and containment for his antisocial and delinquent tendencies. There was no attempt to understand these behaviors from a complex trauma framework in which his aggression could be seen as reactive to his environment and those around him as a way to protect himself from being victimized. As a

---

[37] Ko, S., Ford, J., Kassam-Adams, N., Berkowitz, S., Wilson, C., & Wong, M. (2008). Creating trauma-informed systems: Child welfare, education, first responders, juvenile justice. *Professional Psychology: Research and Practice*, 39 (4), 396-404.

result, Dr. Rife's report served to further justify the behavioral control and confrontation approach utilized by both mental health and other staff, which exacerbated Doe 1's preexisting trauma.

186.     Doe 1 spent an inordinate amount of time in solitary confinement and restraint, including being placed in the restraint chair 11 times for a total of 767 minutes. While there may be rare occasions that require the use of a restraint chair, the number of times that Doe 1 was placed in the chair is highly disturbing and far exceeds the bounds of any professional or mental health standards. To place a depressed and traumatized adolescent even once in a restraint chair, let alone 11 times, clearly represents abuse and borders on torture as this is a highly degrading and anxiety-provoking experience.

187.     Doe 2 is a 16-year-old adolescent born in Mexico who has lived in the U.S. with his mother since 10 months of age. He had multiple emotional and behavioral problems and was diagnosed with depression, anxiety, conduct disorder, and ADHD for which he was prescribed medications. He was evaluated by two psychologists and was recommended for residential treatment, which he never received. He was frequently placed in solitary confinement for behaviors that were primarily disrespectful and should have been managed with less intrusive measures. He was also placed in the restraint chair on one occasion in which SVJC staff did not utilize progressive interventions to de-escalate the situation with him as required by the SVJC Behavior Management Program. As previously mentioned, placing emotionally disturbed and vulnerable youth such as Doe 2 in the restraint chair can be traumatizing to them and cause substantial emotional harm.

188.     Doe 2 was then further abused and traumatized when he was put in solitary confinement the following day for almost the entire day despite being calm in the morning. SVJC's treatment of Doe 2 in this situation highlights the punitive approach that was often used to control detainees such as Doe 2 even when they were not an imminent danger to themselves or other.

189.     Doe 3 is a 15-year-old youth from Honduras who fled Honduras due to gang violence. He was detained at SVJC even though he not had any SIR's for 96 days and several mental health professionals had previously recommended he be stepped down do a less secure facility. He became depressed and demoralized when his step down did not occur and this eventually led to increased room isolation and restraints due to his aggressive acting out. Had SVJC more actively advocated for Doe 2's step down his mental deterioration likely would not have happened. As his behavior regressed, he was increasingly put in isolation. In several instances, SVJC staff did not follow the policies of the Behavior Management Program, which requires progressive implementation of interventions prior to putting someone on room confinement.

190.    Doe 4 is a 17-year-old youth from Honduras who came to the U.S. due to fears of being killed by gangs. I diagnosed him with Posttraumatic Stress Disorder (PTSD), Chronic and Adjustment Disorder with Mixed Disturbance of Emotions and Conduct. Doe 4 experienced the murders of many of his childhood friends due to gang violence. He describes his experience at SVJC as "horrible" due to being angry and depressed, feeling unsafe, and feeling discriminated against.

191.    Doe 4 was punished with losing points for certain of his actions. This clearly goes against the SVJC Behavior Management Program, which states that "points are never taken away." This was demoralizing to Doe 4 and left him feeling treated unfairly many times. He described his experience at SVJC as "horrible" and frequently got into arguments and power struggles with staff that would lead to his going into restraints and being put in isolation. In many of these situations SVJC did not progressively implement the Behavior Management Program, which, if implemented properly would likely have eliminated, or at least decreased, Doe 4's number of restraints and room confinements.

192.    A number of disturbing patterns have emerged upon review of the evaluations that were done and the documents that were reviewed. First, SVJC does not consistently implement the progressive interventions outlined in its Behavior Management Program. Staff over rely on redirection, restraints, and room confinement rather than attempts to de-escalate situations by engaging the youth through "talking and active listening" (which is one of the first steps in the SVJC behavioral policy). This then unnecessarily leads to situations escalating that should be able to be managed non-aggressively and non-punitively. Second, there is a lack of consistency in the implementation of the point system and in how long youth remain in restraints and in isolation. This causes confusion in the detainees as to what to expect and leaves them with feelings of mistrust and resentment. This, in turn, leads them to become depressed and angry and to increased aggression towards themselves and/or others. Third, staff tend to overreact aggressively to youth who are being disrespectful rather than making efforts to relate to them by talking and listening to them. This leads relatively minor situations to needlessly escalate.

193.    The predominant approach utilized at SVJC is that of punishment and behavioral control through such methods as solitary confinement, physical restraint, strapping to a restraint chair, and loss of behavioral levels. These approaches are not only unsuccessful, but are extremely detrimental to detained, traumatized youth – especially to UACs. At times the use of solitary confinement and restraint chairs reached the level of what could be considered torture and other cruel, inhuman or degrading treatment or punishment. The use of these kinds of methods leads to a vicious cycle in which youth, who are already distrustful and traumatized, become further distrustful and traumatized when staff punish them. This leads them to act out even more and then justifies to the staff the need for further efforts to control and punish the youth.

49

194.    From my evaluations of Doe's 1 and 4, along with the declarations and documents I reviewed for Does 1, 2, 3,and 4, it is my opinion that SVJC facility staff do not understand the manifestations of trauma and stress in youth and are not well trained in dealing with highly traumatized children and youth. To avoid harming youth, SVJC needs to implement trauma-focused approaches that will help staff to understand how easily the past experiences of abuse and trauma in some youth, especially UACs, can be triggered, especially when staff are abusive or insensitive. Implementing these approaches will require appropriate trauma-informed policies and procedures, appropriate methods of screening, assessing, and treating traumatized youth, culturally sensitive and trauma-informed programs that strengthen the resilience of youth, and culturally sensitive, trauma-informed staff education and training.

195.    While all detainees (adults as well as children) should be treated with dignity and respect, this is especially critical for children and youth because of their inherent vulnerabilities. Approaches that violate the rights of children and youth, that do not consider their "best interests", and that are punitive are detrimental to them and have no place in the juvenile justice system. Irreparable harm can result from punitive, physically abusive approaches because of the residual psychological scars brought about by youth no longer feeling safe in the world and no longer being able to trust others to treat them with dignity and respect. While the extent of damage caused by these approaches cannot always be determined in the moment, it is likely that many of these detained youth will never fully recover from their traumatic experiences prior to and during detention, particularly if effective trauma-informed treatment is not available to them.

196.    SVJC staff frequently did not follow the SVJC protocol for managing behavior which led them to violate the rights of youth in their custody by becoming overly aggressive, and at times abusive, as a way to maintain control. The punitive methods used by SVJC staff often reached the threshold of torture and cruel, inhuman, and degrading punishment and likely did substantial, if not irreparable, harm to these youth.

197.    Detention, in and of itself, is traumatizing to youth, but even more so when their physical and emotional needs are not met, when they are subjected to abuse, and when their environment does not keep them safe. It is my opinion that the mental health care and the overall care provided at SVJC are deficient and fall far short of the standards of care expected in the juvenile justice system, and that this represents deliberate indifference to the health and mental health needs of the Plaintiffs, as well as the other detainees at SVJC.

Sincerely,

Gregory N. Lewis, Psy.D.