1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF VIRGINIA

3           HARRISONBURG DIVISION

4

5   JOHN DOE 4, by and through his next  )

6   friend, NELSON LOPEZ, on behalf of   )

7   himself and all persons similarly    )

8   situated,                            )

9           Plaintiffs,                  )

10          vs.                          ) No. 5:17-cv-0097

11  SHENANDOAH VALLEY JUVENILE           )

12  CENTER COMMISSION,                   )

13          Defendant.                   )

14

15          Deposition of GREGORY N. LEWIS, Psy.D.,

16  taken before GREG S. WEILAND, CSR, RMR, CRR, via

17  videoconference, pursuant to the Federal Rules of

18  Civil Procedure for the United States District Court

19  pertaining to the taking of depositions, at

20  Suite 3000, One North Franklin Street, in the City

21  of Chicago, Cook County, Illinois, commencing at

22  9:27 o'clock a.m., on the 16th day of October, 2018.

EXHIBIT

C

Case 5:17-cv-00097-EKD-JCH   Document 106-3   Filed 10/22/18   Page 1 of 67   Pageid#: 2566

1 PRESENT:

2

3 ON BEHALF OF THE PLAINTIFFS:

4 WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS

5 AND URBAN AFFAIRS:

6 BY: MS. HANNAH M. LIEBERMAN (via videoconference)

7 11 Dupont Circle, NW, Suite 400

8 Washington, D.C. 20036

9 (202) 319-1000

10 E-mail: hannah_lieberman@washlaw.org

11

12 ON BEHALF OF THE DEFENDANT:

13 WILLIAMS MULLEN

14 BY: MS. MEREDITH M. HAYNES (via videoconference)

15 200 South 10th Street

16 Suite 1600

17 Richmond, Virginia 23219

18 (804) 420-6225

19 E-mail: mhaynes@williamsmullen.com

20

21

22

1               INDEX

2 October 16th, 2018

3 TESTIMONY OF GREGORY N. LEWIS, Psy.D.

4 Examination by Ms. Haynes .........................4

5        DEPOSITION EXHIBITS

6 NUMBER          DESCRIPTION          PAGE

7 Exhibit 1    Document titled Appendix C        7

8 Exhibit 2    Document titled Appendix B        43

9 Exhibit 3    Letter dated September 11, 2018   33

10 Exhibit 4    [not identified]

11 Exhibit 5    Handwritten notes dated 7/25/18   128

12 Exhibit 6    Forensic Psychological            209

13         Assessment, Doe 1

14 Exhibit 7    Forensic Psychological            209

15         Assessment, Doe 1

16 Exhibit 8    [not identified]

17 Exhibit 9    Confidential Psychological        228

18         Evaluation, Doe 1

19 Exhibit 10   [not identified]

20 Exhibit 11   [not identified]

21 Exhibit 12   [not identified]

22 Exhibit 13   [not identified]

1        (Witness sworn.)

2        GREGORY N. LEWIS, Psy.D.

3 after being first duly sworn, testified as follows:

4            EXAMINATION

5 BY MS. HAYNES:

6    Q.   Good morning, Dr. Lewis.

7    A.   Good morning.

8    Q.   My name is Meredith Haynes, and I

9 represent the Defendant Shenandoah Valley Juvenile

10 Center Commission in this case.

11        Before we get started, could you just give

12 me your name and business address for the record.

13    A.   Yes.  My name is Dr. Gregory N. Lewis,

14 L-e-w-i-s.

15        I work at different places, but my main

16 office is at the Alliance Clinical Associates, which

17 is 7 Blanchard Circle, Suite 201, in Wheaton,

18 Illinois 60189.

19    Q.   And I can hear you pretty well.  Are you

20 having any problems hearing me?

21    A.   None at all.

22    Q.   Great.  If that changes, just let me know.

1    A.   All right.

2    Q.   I know you've been deposed before, so I

3 won't spend a lot of time going through the rules.

4        But just as a refresher for both of us,

5 and especially because we're on video today, will

6 you try to let me finish a question even if you know

7 exactly what I'm about to ask, and I'll do the same

8 for your answers?

9    A.   Okay.

10    Q.   And I think we're doing a good job of this

11 so far, but try to verbalize your answers,

12 especially because I can't really see what your head

13 nodding or shaking to.

14    A.   All right.

15    Q.   And you understand you're under the same

16 oath today as you would be as if we were in a

17 courtroom?

18    A.   That's correct.

19    Q.   I think we have a lot of material to

20 cover, and I'll try to take breaks, you know, every

21 hour, hour and a half or so.

22        But will you let me know if you need a

1 break? I'm happy to take one on this end too.

2    A. I will.

3    Q. Great. Did you bring anything with you to

4 your deposition today as far as notes or an outline

5 to work from?

6    A. I did not bring an outline. I did bring

7 some of the documents. I wasn't sure exactly what

8 would be here, but I'm just going to leave them in

9 the bag.

10    Q. Okay. Did you do anything in particular

11 to prepare for your deposition today?

12    A. I reviewed a variety of documents,

13 documents that I had written. I reviewed the bulk

14 of the documents that have, you know, developed in

15 this case.

16    Q. Okay. And we will go through those in a

17 little bit, but first I wanted to get a little bit

18 of an idea of your expert work.

19    Do you have an exhibit binder in front of

20 you, by chance?

21    (Whereupon, an off-the-record

22    discussion was held.)

1    THE WITNESS: Did you want me to look

2 through this?

3    (Exhibit 1 was marked for

4    identification.)

5 BY MS. HAYNES:

6    Q. Yes, Dr. Lewis, not through all of them.

7 But could you just look at Exhibit 1 for now, and

8 that should be Appendix C to your report.

9    A. Actually it's Exhibit 1, but it says

10 Appendix C.

11    Q. Is there a second page with the actual

12 appendix hopefully?

13    A. There's an Exhibit 2 and Appendix B.

14    (Whereupon, an off-the-record

15    discussion was held.)

16 BY MS. HAYNES:

17    Q. Let's do it this way, Dr. Lewis: Do you

18 have a copy of your report with the appendices?

19    A. Which report?

20    Q. Your --

21    A. September 11th?

22    Q. September -- yes, your September 11th,

1 2018 report.

2    A. I believe I did bring that.

3    Q. Okay.

4    A. Actually, you know, I don't know that I

5 did -- oh, here it is. Yeah, I did bring it.

6    MS. HAYNES: So, Greg, we can go off the

7 record for a second.

8    (Whereupon, an off-the-record

9    discussion was held.)

10 BY MS. HAYNES:

11    Q. So now we're both looking at -- it says

12 Appendix C at the top and Exhibit 1 at the bottom,

13 right?

14    A. That's right.

15    Q. And this is the Appendix C that you

16 attached to your September 11th, 2018 report?

17    A. Yes.

18    Q. And I think you described this as a list

19 of the cases in which you've recently been involved;

20 is that right?

21    A. Well, recently, many of these go back to

22 like 2009, but yes.

1    Q. Okay. Well, can you give me an idea of

2 what your expert experience is beyond these cases?

3    A. Let me just think for a minute.

4    In terms of civil cases, these would be

5 the only civil cases that I've been involved with

6 other than the current one. I've served as an

7 expert on immigration cases, for asylum or special

8 immigrant juvenile status, but that's different.

9 That's not civil cases. So those I've done many.

10    Q. Okay. So the first case, the Kimberly Doe

11 versus the United States, that was a case it's my

12 understanding where women were alleging sexual

13 assault.

14    Is that a fair description of the general

15 allegations in that case?

16    A. That's correct.

17    Q. And I think you said that you were deposed

18 in that case, and the case ultimately settled?

19    A. That's correct, yes.

20    Q. And I assume since you were deposed did

21 you also write a report in that case?

22    A. I actually wrote several. I evaluated --

3 (Pages 6 - 9)

1 there were a total of eight women. I saw four of
2 them for evaluation, so I submitted four reports.
3     Q.   Okay.  And were any of them minors, or
4 were they all adults?
5     A.   They were all adult women.
6     Q.   I noticed that a motion to exclude your
7 testimony was filed in that case.
8         Were you aware of that?
9     A.   You know, I'm not sure -- yes, I was.  I
10 mean, this goes back quite a while.  Yes, I was
11 aware of that.
12    Q.   Yeah, and I don't intend it to be a memory
13 test at all, so if you can't remember, that's fine.
14        Do you know what the outcome of that
15 motion was?
16    A.   I do not.  I know that I was --
17    Q.   Do you know if any other --
18    A.   Well, I know that I was -- this goes back
19 to 2017, that in March of 2017 I was contacted by
20 the lawyers.  This had gone through several
21 different lawyers at this point, so it was a new
22 group that I had not had communication with, and

1 they told me to prepare to testify in April of 2017.
2 This was in March.  And then I got a call about two
3 weeks later that the case had been settled.
4         So that's as much as I know.
5     Q.   Understood.  So the second case, D.B., as
6 next friend of R.M.B., versus Cardall, what was the
7 nature of that case?  I think you said you submitted
8 a brief to the Fourth Circuit.
9         What does that mean?  What was your work
10 in that case?
11    A.   There was about seven of us that were
12 involved with this brief.  I was the only
13 psychologist.  The others were people that had
14 worked in immigration and child welfare.
15        The allegation in this case was that a
16 child had been separated from his mother, who was
17 living in the United States; and essentially I
18 believe the Office of Refugee Resettlement believed
19 that the mother was not fit to have custody of the
20 child, so the child remained in the custody of ORR.
21        So this brief was basically -- so I did
22 not evaluate the child or the mother.  It was simply

1 a brief talking about the difficulties and the
2 problems in separating a child from their parent.
3 So this was a minor child.
4     Q.   Okay.  So you didn't evaluate anyone in
5 that case, but you gave an expert opinion --
6     A.   Opinion.
7     Q.   -- that was included in the brief?
8     A.   That's correct.
9     Q.   Fair?
10    A.   Yes.
11    Q.   Okay.  And was ORR a defendant in that
12 case, do you know?
13    A.   You know, I did not bring that with me.  I
14 believe -- I believe they were, yes.
15    Q.   And are you currently involved in that
16 case, or has that case concluded --
17    A.   That case has concluded.
18    Q.   -- as far as you know?
19    A.   Yes.
20    Q.   And then the third case you've listed
21 there, the Abraxas litigation, what was the nature
22 of that case?

1     A.   This was a case that involved alleged
2 abuse of several minors who were in custody with ORR
3 at the Abraxas facility in Texas, and it was
4 alleged -- I actually observed videotapes in that
5 case of alleged abuse, which we determined that -- I
6 felt that there was abuse based on what I witnessed
7 in these videos.
8         So I evaluated I believe it was six,
9 possibly seven youths, and did the reports on each
10 one of them.  I do not -- actually I believe I was
11 deposed for that one.  I think it was here in
12 Chicago.  Did not go to trial.  My understanding, it
13 was settled but that there was some -- the Abraxas
14 facility was either closed down as a result of that
15 case or required to do a variety of different
16 things.
17        One -- I should also say that as part of
18 that case several of the youths were deported.  I'm
19 not sure if they chose voluntary deported or whether
20 they were deported by the government to Honduras;
21 and I actually traveled to Honduras with a lawyer
22 and a translator, and we were able to locate the

4 (Pages 10 - 13)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  three youths who were a part of this case and get
2  their testimony.
3       So I did reports on those three youths,
4  and there had been several others that I had
5  evaluated previously.
6       I believe that case was --
7    Q.  Was that --
8    A.  Well, I'm not sure if it was settled or if
9  they actually won.  I never actually did hear the
10  specific findings of that.
11       But my understanding was the boys each got
12  $10,000 as a result of that for punitive damages and
13  that there was significant constraints put on
14  Abraxas in terms of what they needed to do in the
15  future in terms of treatment and care.
16    Q.  Was that case a class action?
17    A.  Yes, it was.
18    Q.  And I think in your report you said that
19  you evaluated five youths.
20       Are you remembering more like seven now,
21  or do you think five is the right number?
22    A.  You know, as part -- initially it was

1  Abraxas and Nixon.  I evaluated youths at the same
2  time for both.  So I think I'm thinking about some
3  other.  No, I think five is the correct number.
4    Q.  Okay.  And I think also in your report you
5  say a settlement agreement was reached with the
6  facility and the employees, but the case against the
7  United States and its employees was lost.
8       Does that --
9    A.  Was that for Abraxas?
10    Q.  -- refresh your memory?
11    A.  I think that's correct.  That's right.
12    Q.  Yes, sir.
13    A.  That's right.
14    Q.  So in that case ORR and other governmental
15  agencies were defendants?  Is that your memory?
16    A.  That's right, they were.
17    Q.  And in serving as an expert in that case,
18  did you provide opinions against ORR and the
19  governmental agencies as well as against the Center
20  defendants?
21    A.  That's correct.
22    Q.  Okay.  And it's fair to say your opinion

1  as to all defendants was that the youths had not
2  been cared for adequately?
3    A.  That's correct.
4    Q.  Okay.
5    A.  And just to reiterate, I did watch videos,
6  several videos.  I don't know if you want me to go
7  into some of the things I saw, but that was part of
8  what I observed.  I saw kids being punched and
9  tasered, so that was part of what factored into any
10  decision there or my opinion.
11    Q.  Thanks for that detail.
12       And then in the Abraxas case, do you
13  know -- so that center was a juvenile detention
14  center.
15       Was it a center for immigrant youth in
16  particular, do you know?
17    A.  No, it was just -- it wasn't just for
18  immigrant youth.  I believe it was just a juvenile
19  detention center.  I'm not sure if it was staff
20  secure.  I believe it may have been either staff --
21  staff secure.
22    Q.  You anticipated my next question.

1       So you think it was staff secure versus
2  secure, or do you know?
3    A.  You know, I don't.  I don't remember for
4  sure.  I don't know.  I believe it was staff secure.
5    Q.  Okay.  And then the last case you've
6  listed, the Fabian case, what was your involvement
7  there?
8    A.  Essentially the same as the Abraxas case,
9  evaluating -- I don't remember the exact number of
10  youths, but evaluating each of the youths; then also
11  doing a report for each of them.
12    Q.  Do you remember how many youths you
13  evaluated in that case?
14    A.  You know, without looking at the specifics
15  I don't recall.  It might have been -- if it was
16  five in the other one, it might have been four.  I
17  just don't recall exactly.
18    Q.  I'd have to find the right paragraph in
19  your report, but I think you said you evaluated six
20  in the Fabian case.
21       Does that sound right?
22    A.  That's probably correct, yes.

5 (Pages 14 - 17)

1    Q.   Okay.  So six in the Fabian case and five
2  in the Abraxas case?
3    A.   That's right.
4    Q.   Okay.  And do you know what type of
5  facility was a defendant in the Fabian case?  Was it
6  staff secure or secure, do you know?
7    A.   I don't know for sure, but I believe it
8  was staff secure.
9    Q.   And the Government was a defendant in that
10 case as well?
11   A.   Yes, it was.  I believe --
12   Q.   Were your opinions -- I'm sorry, go ahead.
13   A.   -- Maureen Dunn was the head of ORR at
14 that time.  That's where it says versus Dunn, yes.
15   Q.   And I think -- did you say that your
16 opinions in Case Number 4 were like those in Case
17 Number 3?  You found that the youths were not being
18 adequately cared for to say the least?
19   A.   Yes, that's correct.
20   Q.   Okay.  And were your opinions in the
21 Fabian case with respect to the governmental
22 defendants as well as with respect to the facility?

1    A.   Yes.
2    Q.   Okay.  Have you -- I think you -- is it
3  fair to say that these four cases that you listed I
4  think you said are the only civil cases you've been
5  involved in?  And my understanding when you say that
6  is that all other cases you've been involved in are
7  with asylum or immigration proceedings.
8        Am I understanding you correctly?
9    A.   Yes.  I just need to think for a minute.
10 I don't think there have been any other cases of a
11 civil nature.
12       There was one other case of a civil
13 nature, but it was many, many years ago involving
14 two girls, two minors from I believe it was
15 Guatemala; and there was a custody dispute between
16 the grandmother and the mother, and the mother I
17 believe was in Guatemala and the grandmother was
18 here in the United States.
19       So I was asked to do a competency
20 evaluation on the two young girls as to whether they
21 were able to inform the judge as to where they would
22 like to live.

1        I do not know how that case -- I'm not
2  sure what happened in that case, but that was
3  probably 10 or 12 years ago.
4    Q.   So more distant in time than these cases
5  you've listed here?
6    A.   That's right.
7    Q.   So is it true then that you've never
8  served as an expert in a case where you found that
9  the center was providing adequate care for the
10 youths?
11   A.   That's correct.
12   Q.   You've never been --
13   A.   I've never been --
14   Q.   -- supportive, in summary?
15   A.   That's right.
16   Q.   Okay, okay.  And have you ever served --
17 it doesn't seem like you've ever served as an expert
18 in a case where the center is the only defendant.
19       I think in these other cases there were
20 government agencies also involved as defendants,
21 right?
22   A.   That's right.

1    Q.   Okay.  Doctor, could you explain -- I
2  appreciate that what -- your involvement in this
3  case is as a -- is to do forensic psychological
4  evaluations, right?
5    A.   That's correct.
6    Q.   And could you just explain to me as a
7  layperson the difference, if any, between a
8  therapeutic assessment and a forensic assessment?
9    A.   A therapeutic assessment essentially is
10 just done to evaluate an individual's psychological
11 problems.  Usually you come up with a diagnosis and
12 recommendations for treatment, so it's what we would
13 refer to as a clinical evaluation, primarily for the
14 purpose of understanding diagnosis and treatment and
15 making recommendations.
16       A forensic evaluation is done by someone
17 who is independent, so it includes a clinical
18 evaluation but it's done independently of -- in
19 other words, the forensic psychologist is going to
20 look at different possibilities for problems that a
21 person is having.  So it isn't just coming up with a
22 diagnosis and a treatment plan, but also there's a

1 psycho-legal context in a forensic evaluation where
2 there's a question being asked by the court, so that
3 the tests that are done, the evaluation that's done
4 is done to inform the court of how this individual's
5 psychological problems are affecting the particular
6 legal question.
7     So it's a very specific kind of evaluation
8 that's not routinely done in a clinical or
9 therapeutic evaluation.
10    Q. Are you always -- when you do a forensic
11 psychological evaluation, is it fair to say that
12 you're practicing as a forensic psychologist? Is it
13 a different specialty than what you do as a clinical
14 psychologist?
15    A. That's correct, yes.
16    Q. Okay. And are you always wearing that
17 forensic psychology hat when you serve as an expert
18 in a case, or are there cases where you can be
19 wearing your clinical psychologist hat as an expert
20 in the case?
21    A. Are you talking about in a civil case?
22    Q. Yes.

1     A. Yes -- no, I would simply be wearing the
2 forensic psychologist hat.
3     Q. What about in other cases?
4     A. The only other -- I guess the exception to
5 that would be if there was somebody -- when I used
6 to work at the hospital that I used to work at --
7 I'm retired from there -- we would often get youths
8 referred to us and then later find out there was
9 court involvement, and so I would get subpoenaed to
10 go to court to testify what my findings were.
11     So when I initially saw that youth or that
12 child, it was not done as a forensic psychologist.
13 It was done simply as a clinician, and I would go
14 simply to report my findings to the court.
15     But if it's a civil case that I know about
16 up front or if there's a legal question involved,
17 then you're wearing the forensic hat right from the
18 start.
19     Q. You mentioned that you've done forensic
20 psychological assessments and special immigrant
21 juvenile status and asylum cases, right?
22     A. That's correct, yes.

1     Q. What is special immigrant juvenile status?
2 What does that mean?
3     A. It's commonly referred to as SIJ's.
4         MS. LIEBERMAN: Objection, calls for a
5 legal conclusion.
6         THE WITNESS: Yes, special immigrant
7 juvenile status, basically it's similar to a child
8 abuse case, so for a minor that's here from another
9 country who is reporting abuse from their parents or
10 whatever. It could be, you know, somebody that
11 that -- it could be a babysitter, but they're
12 reporting abuse, so it would be similar to a child
13 protective services case here versus asylum is
14 looking at persecution due to being part of a
15 special group and the failure of the government to
16 protect that child.
17        So this is simply like an abuse case. So
18 I'm evaluating for their history and alleged abuse
19 and do the symptoms they are reporting of trauma or
20 depression, are they consistent with being abused;
21 and then we try to find any corroborating evidence
22 of that that we can. I don't do that personally,

1 but social workers might go out and talk to the
2 family, so there's an attempt to try to corroborate
3 that.
4         But it's essentially looking at child
5 abuse and neglect.
6 BY MS. HAYNES:
7     Q. Okay. Thank you. And just to address the
8 objection, I understand and I'm not -- that's not an
9 area that I'm familiar with.
10    A. Okay.
11    Q. So I just wanted to know what your
12 involvement was in those cases.
13        So what is the purpose of a forensic psych
14 eval. in an SIJS case to your understanding?
15    A. The purpose is to first get their history
16 and find out what abuse may -- they're alleging may
17 have happened, what neglect may have happened, and
18 then to evaluate -- I mean, it is a clinical
19 evaluation in the sense that I'm asking about their
20 history and current symptoms that they might be
21 having.
22        And then I have to look for a connection

7 (Pages 22 - 25)

1  between whatever symptoms they're reporting to me.
2  For instance, if they're reporting depression, did
3  this depression start as a result of this alleged
4  abuse; or if they're reporting posttraumatic stress
5  disorder symptoms, is there a connection between
6  those symptoms and that abuse or is the
7  posttraumatic stress disorder due to something else
8  that has nothing to do with the abuse. So I have to
9  show what's called a nexus connection between
10  symptoms and the alleged abuse.
11      If we have corroborating evidence, and
12  many times we don't, you're simply looking at a
13  consistency between someone that says they've been
14  abused and the symptoms that they're reporting, so
15  that's the forensic part.
16      If I was simply doing a clinical
17  evaluation, I would just do an evaluation and I
18  wouldn't have to show that it's connected to the
19  alleged abuse in any way.
20  Q.  So you're trying to find a causal link?
21  A.  Yes.
22  Q.  Is that fair?

1  A.  That's right.
2  Q.  Okay.
3  A.  That's right.
4  Q.  And how do you get involved in those
5  cases? Who asks you to come do an evaluation?
6  A.  When I first started doing this was in
7  2004, and largely it comes from the Young Center,
8  which is at the University of Chicago. It's called
9  the Young Center for Immigrant Children's Rights,
10  and they often would refer cases to me of youths
11  that needed to be evaluated.
12      Other groups would be the National
13  Immigrant Justice Center has referred to me. And
14  then many times they try to find pro bono lawyers to
15  take these cases, so I ultimately often end up
16  working with other law firms, either in the city or
17  around the country.
18  Q.  And do you work on these cases pro bono?
19  Are you compensated in some way to do the psych
20  eval.?
21  A.  Most of those cases are done pro bono.
22  I'm able to do them here in Chicago or my office up

1  in -- I have another office in Evanston where I do a
2  lot of these cases.
3      When I was at the hospital, the hospital
4  allowed me to bring them in without charging them.
5      I do sometimes get payment for covering
6  expenses, and I've recently had some cases in the
7  last two years where they've paid me like $500 just
8  as a bit of a stipend, just as a, you know -- I
9  didn't request that but they gave that to me. So
10  most of the time they're done pro bono.
11      Civil cases I don't because they're much
12  more involved, and I have a fee for that.
13  Q.  And that's the $300-per-hour fee I think
14  you mentioned in your report?
15  A.  That's right.
16  Q.  And do you charge the same -- is that your
17  rate for any civil case, or does it change depending
18  on the case?
19  A.  No, that's my rate.
20  Q.  Okay.
21  A.  Yeah, and I should say ten years ago it
22  used to be $250 so like with the Nixon and Abraxas

1  cases, so it has gone up, but that's what I charge.
2  Q.  Understood. You also mentioned asylum
3  cases.
4      Do you do forensic evals. in asylum cases?
5  A.  Yes, I do.
6  Q.  And to your understanding, what's the
7  purpose of your evaluation in an asylum case?
8  A.  So with the asylum cases I'm looking for
9  not just -- I'm not looking for abuse and neglect as
10  in an SIJ case. I'm looking for some form of
11  persecution, failure of the government to protect;
12  and then I'm having to look at whatever -- let's say
13  there's posttraumatic stress disorder there, and I
14  don't always find that, but if there is can I link
15  it to the alleged perpetration that they're talking
16  about or does it not seem related to that.
17      So, again, looking for a nexus or a causal
18  connection, and then making recommendations to the
19  court regarding, you know, what my findings were,
20  whether there's a consistency between, let's say,
21  their posttraumatic stress disorder and their
22  alleged abuse that occurred of them, their

8 (Pages 26 - 29)

1  persecution.
2        And then they have to be part of one of
3  the groups, you know, either for political
4  persecution or part of a special social group, you
5  know, religious persecution.  It has to be one of
6  the five categories that people can seek asylum for.
7     Q.  And how do you get involved in those
8  cases?  Who asks you to do an evaluation?
9     A.  Those largely come -- either can come
10 through the Young Center, although many of the
11 Young Center cases are SIJ cases, so it can start
12 off with them; or it could come from various clinics
13 around the country.  The DePaul Asylum Clinic refers
14 to me.  I've done the Bosch Clinic in Oklahoma, so
15 different people.
16       Once I started doing this work my name got
17 out there, and a variety of different people would
18 hear about me and ask if I could do a case.
19    Q.  Do you do forensic psych evaluations in
20 asylum cases that involve adults as well as
21 minors --
22    A.  Yes.

1     Q.  -- or just in cases that involve minors?
2     A.  Yes, most of the asylum cases were adults,
3  yes.
4     Q.  Okay.
5     A.  Maybe two-thirds of them.
6     Q.  And do you -- I think you mentioned you
7  started doing the SIJS cases in about 2004?
8     A.  That's correct.
9     Q.  Did I hear that right?
10    A.  Yes.
11    Q.  What about for asylum cases, do you know a
12 time frame of when you started doing those?
13    A.  Probably around I'll say within a year or
14 two of that, probably 2 -- well, actually it was
15 2005 because I remember the first case that I got
16 involved with for that.
17    Q.  How did you get involved at the
18 Young Center or start working with them on these
19 cases in that time frame?
20    A.  A former colleague of mine, a psychologist
21 who was at -- it was called Cook County Hospital at
22 that time, left to work at a place called the Kovler

1  Center here in Chicago, which works with torture
2  survivors.  They have a very specific mandate on who
3  they can see.  They can only work with people who
4  have clearly alleged being tortured.  There are many
5  people who are seeking asylum who haven't been
6  tortured.
7        So she had connections with the
8  Young Center, and the director of the Young Center,
9  Maria Woltjen, was given my name by my former
10 colleague, and she just called me and asked if I --
11 she said you were recommended to me; would you be
12 interested in doing this type of work.
13    Q.  In your report you say you've done 25
14 forensic psych evaluations for UCs and asylum and
15 SIJS cases.
16       Does that sound right?
17    A.  Yeah, I was trying not to -- I was not
18 including the civil cases.  That number has probably
19 gone up since then.  It's probably, probably closer
20 to 30 or 35.
21    Q.  Since 2004?
22    A.  Yes.

1     Q.  How many -- do you know how many you've
2  done total of adults and minors in SIJS and asylum
3  cases?
4     A.  If I could just ask, the 25, was I stating
5  that -- because I don't have my report in front of
6  me.  Did I say that was just for minors?  I couldn't
7  remember.
8     Q.  Let me look real quickly, and we will look
9  at your report too.
10    A.  I think --
11       (Exhibit 3 was marked for
12       identification.)
13 BY MS. HAYNES:
14    Q.  But in Paragraph -- in Paragraph 8 of your
15 report, you say, "I have personally evaluated about
16 25 UACs since 2004 for reasons of asylum and special
17 immigrant juvenile status.
18       And it's Exhibit 3 if you have that in
19 front of you.
20    A.  Okay.
21    Q.  Exhibit 3, Page 3, Paragraph 8.
22    A.  Yes, so that -- yes, so that 25 number is

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 probably closer to 30 at this point. And then
2 you're right, there would be adult cases of asylum
3 in addition to that, probably another, oh, I'm going
4 to say 20 to 25.
5    Q.   So 50 to 55 total in those types of cases,
6 SIJS and asylum?
7    A.   Approximately, yes.
8    Q.   Okay. And then I think in Paragraph 12,
9 while you're looking at it, I think you said you
10 evaluated six youths in one of the civil cases
11 you've worked on and five in another, which we
12 talked about earlier when we were looking at
13 Appendix C.
14        So 11 UCs in civil cases that you've done
15 forensic psych evals. of; is that right?
16    A.   Not including the current case, yes.
17    Q.   Including the --
18    A.   No, not --
19    Q.   Including the case would it be 11 or 12?
20    A.   Well, if it's including the current case,
21 because I evaluated two youths as a part of the
22 current case, so it would be two additional ones to

1 this.
2    Q.   13 total?
3    A.   13, yes. I'm trying to think if there's
4 any other ones.
5        No, it would just be 13.
6    Q.   Okay. While you have it in front of you,
7 I wanted to ask you a little bit about your training
8 in forensic psychology, and I think you start
9 talking about that in Paragraph 7 of your report at
10 the bottom of Page 2.
11    A.   Okay.
12    Q.   And you start by saying, "I have completed
13 the training by the Physicians for Human Rights
14 Asylum Program on 'Aiding Survivors of Torture and
15 Other Human Rights Abuses'" and then a long
16 subtitle.
17        When was that training?
18    A.   That was in 2009.
19    Q.   And what type of training was it? Was it
20 a conference that you went to or a seminar?
21    A.   It was an all-day -- it was on a Saturday,
22 all-day conference in Houston, Texas, with -- well,

1 I mean, it was done through a PowerPoint, handouts,
2 questions and answers. There was some small group
3 types of stuff, that type of thing.
4        So essentially it's a conference, a
5 one-day conference.
6    Q.   Okay. And I'm just guessing from the
7 title that it seems like it was targeted toward
8 helping individuals obtain asylum status based on
9 their past trauma and experiences.
10        Is that a fair description?
11    A.   Yes, it is.
12    Q.   Okay. And then next you say you're
13 familiar with the Istanbul Protocol: Manual on the
14 Effective Investigation and Documentation of Torture
15 and Other Cruel, Inhumane or Degrading Treatment or
16 Punishment.
17        Could you elaborate on that a little bit
18 for me? I've heard of the Istanbul Protocol, but
19 how did it inform your work in this case?
20    A.   I don't recall who developed this, but I
21 believe it was several physicians and psychologists
22 that were involved with the Physicians for Human

1 Rights and groups like that who were concerned about
2 people from other countries primarily who were
3 reporting torture and yet they were here in this
4 country.
5        So it was a set of guidelines and an
6 understanding of how torture affects these
7 individuals and how to ask -- you know, what
8 questions need to be asked for them.
9        So this is a large manual. It's probably
10 an inch thick; it's probably about 200 pages. And
11 it talks about how to evaluate both from a medical
12 perspective as well as a psychological perspective,
13 what questions to ask, how to document this; and,
14 again, there has to be a clear link between whatever
15 findings the doctor or psychologist finds, and it
16 has to be linked to the alleged torture.
17        So when I say "familiar with," I haven't
18 read through every single page, but I've read
19 through large sections of that because I have had
20 the opportunity to evaluate many, many people from
21 countries and other countries in the world who have
22 alleged torture. So I wanted to familiarize myself

1 with that manual.

2     Q.  Okay.  Thank you.  And then next you say

3 you've received training in forensic psychological

4 assessment and testimony, as well as forensic

5 assessment of trauma and emotional injury from the

6 American Psychological Association.

7        Could you give me a little bit more detail

8 as to what you mean by that?

9     A.  Yes.  All of the -- everything that I'm

10 referring to here both for the American

11 Psychological Association and the American Academy

12 of Forensic Psychology were one-day essentially

13 workshops or conferences that are -- we get

14 continuing education credits for.  Usually it's

15 either six or seven credits.

16        So it's an -- these are all day.  I don't

17 think any of them were two days.  I'm just looking.

18 No, they were all one-day workshops or conferences.

19     Q.  Do you know how many of those one-day

20 workshops or conferences you've been to that you

21 mentioned here with regard to your forensic psych

22 evaluation work?

1     A.  Well, each of these was one day, so the

2 assessment of trauma -- I'm sorry, the one on

3 psychological assessment and testimony was one day.

4 Trauma and emotional injury was one day.  And then

5 the next part goes into the American Academy of

6 Forensic Psychology.

7        So the comprehensive assessment of

8 feigning was one day, report writing was one day,

9 the one on immigration proceedings was one day.  So

10 I guess that would be a total of five.

11     Q.  Okay.  And then are you stopping that

12 count at the sentence that starts by "I have done

13 training for"?

14     A.  That's right, yes.

15     Q.  Okay.  So the paragraph up to that point

16 describes the five one-day trainings you've been to,

17 and then you say "I have done trainings for

18 Physicians for Human Rights" and you go on?

19     A.  Yes, yes.

20     Q.  Okay.  And so when you say "I have done

21 training for," does that mean that you've taught the

22 trainings or participated in the trainings?  What do

1 you mean by that?

2     A.  Both.  There are times that I have -- I go

3 to other people's lectures, but these are

4 essentially hour and a half like symposiums where

5 I've been asked to either be a part of a panel or

6 I'm the person, the primary person for the hour and

7 a half, and it's talking about issues of trauma, how

8 to evaluate for trauma, how trauma affects people,

9 particularly in the context of immigration or

10 asylum.

11     Q.  Okay.  And I count that you've described

12 four of those one-and-a-half type symposiums or

13 meetings; is that right?

14     A.  Well, I've probably done more than that

15 because I've done several.  Like, for instance, the

16 Loyola Center for the Human Rights of Children, I've

17 done several for them over the years.  I've done

18 webinars for the Young Center also.

19        So I've probably done -- let's see.  I did

20 one for the Physicians for Human Rights.  I did one

21 for the Vera Institute of Justice; that was in

22 Arizona.  For the Young Center I've done probably

1 three, and Loyola I've probably done at least three.

2     Q.  So total can you give me a ballpark idea

3 of how many of those you've done?

4     A.  So I guess probably around eight.

5     Q.  Okay.  And you mentioned that the Young

6 Center is in Chicago.

7        They have an office in D.C. too, right?

8     A.  They actually have several offices.  They

9 started right around I believe it was 2004.  They've

10 expanded in the last several years.  They have an

11 office in Arlington, Texas; they have an office in

12 Washington, D.C., I believe one in New York now as

13 well.  And there might be another one.

14     Q.  And did you initially get involved in this

15 case through the Young Center?

16     A.  Well, indirectly.  In other words, Doe 1,

17 I was asked to evaluate Doe 1 by the Young Center,

18 so that's how I got involved.  And then after that

19 was done, then I got involved with the civil case.

20     Q.  Did you get involved in the other four

21 civil cases that we talked about that are listed in

22 Appendix C through the Young Center as well?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    A.  No, the other four civil cases, no.  They
2 were totally separate from the Young Center.
3    Q.  Okay.  Is forensic psych a specialty
4 recognized by the American Psychological
5 Association, a subspecialty?
6    A.  Yes, it is.
7    Q.  Is there a separate board certification
8 that you can get for forensic psychology?
9    A.  Yes, there is.
10    Q.  Do you have that subspecialty
11 certification?
12    A.  I do not.
13    Q.  Any particular reason why not?
14    A.  I -- again, when I was working at Cook
15 County Hospital, like I said, I got involved with
16 this work.  You know, my primary purpose for being
17 there was to obviously treat people and work in a
18 lot of different medical settings.  And, again, I've
19 been doing this work for a long time.  The ABPP
20 certification you're talking about as the
21 professional certification is not a required
22 certification.  It's highly recommended.  And it's

1 simply just been a matter of, you know, not having
2 time to do that, and I've been able to get a lot of
3 my training through workshops that I've gone to.
4        So I'm not certified in that, but many
5 people that do forensic work are not certified.  My
6 guess is that will change over the next several
7 years.  It will probably be a requirement.
8            (Exhibit 2 was marked for
9            identification.)
10 BY MS. HAYNES:
11    Q.  Understood.  Doctor, if you could turn
12 to -- in front of you there should be Exhibit 2, and
13 at the top it should say Appendix B.
14    A.  All right.
15    Q.  And my understanding is that this is the
16 list that you made of the documents you reviewed in
17 writing your September 11th, 2018 report; is that
18 right?
19    A.  That's right.
20    Q.  Okay.  I just want to go through this list
21 and ask you a few questions about what you reviewed.
22        The first four are the declarations of

1 Plaintiffs John Doe 1 through 4, right?
2    A.  That's right.
3    Q.  And do you -- I mean, what was your
4 understanding of the drafting of those documents?
5 Who drafted them and for what purpose?
6    A.  My understanding is that either the
7 lawyers that I worked with or some of their I don't
8 know if it would be paralegals or people that worked
9 with them evaluated these youth, either in the
10 detention center or -- I assume it was in the
11 detention center or somewhere else and took their
12 report, and then had it recorded and written up --
13 well, not recorded but had it written up.  Actually
14 I don't know if it was recorded or not.  I'm not
15 aware of that.
16    Q.  Okay.  And my understanding is that you've
17 met John Doe 1 and John Doe 4 but not John Does 2 or
18 3, right?
19    A.  That's correct.
20    Q.  Okay.  And so when you met John Doe 1 and
21 John Doe 4, did you review their declarations with
22 them?

1    A.  I did.
2    Q.  You did?
3    A.  Yes.
4    Q.  And in what way or what was the purpose of
5 reviewing the declaration with them?
6    A.  Mostly to get clarifications of areas that
7 appeared to perhaps be inconsistent or that were
8 rather vague.  So if they're telling me one thing --
9 I'd have to look at them specifically to give you an
10 example, but if they told me something that didn't
11 seem to be consistent with what was in the report or
12 just seemed much vague, I would say, well, here, you
13 know, you apparently reported to your lawyer or
14 whatever and I'm confused about the difference and
15 see what response they would give me.
16    Q.  Did you go through any exercise with
17 regard to comparing these declarations to other
18 documentation, charts or ORR files?
19    A.  Yes.
20    Q.  And so how did you go about doing that?
21    A.  Well, for John Doe 1 in particular, since
22 that was the first one I was really involved with

1 and the most extensive, I was given his ORR file, so
2 I was able to look at case management notes,
3 progress notes, various reports that were done by
4 other professionals, physicians. I'm trying to
5 think if there's anything else.
6        I think those were the main -- incident
7 reports, what are called SIRs, the serious incident
8 reports, I was able to look at those and the same
9 for Doe 4.
10    Q.   What about John --
11    A.   I'm sorry.
12    Q.   I'm sorry, go ahead.
13    A.   With Doe 4 I did the same thing.
14    Q.   What about --
15    A.   Yeah, I was able to look at similar types
16 of things for Doe 4.
17    Q.   What about with John Does 2 and 3?
18    A.   No. All I was able to look at -- I have
19 to think for a minute. I believe it was just their
20 declaration. I may have been given -- you know
21 what, can I look back to trigger my memory on that?
22 I know I looked -- I did not evaluate them, so

1 that's part of it.
2    Q.   Take your time.
3    A.   Yes. So as the case developed I did get
4 records for Does 3 -- when I say "records," ORR
5 records for Does 2 and 3. So I was able to look at
6 again disciplinary reports, progress notes if they
7 were available, medical reports, any medical reports
8 that were available.
9    Q.   And in addition to looking at those
10 documents, did you compare them side by side with
11 their declarations, or did you just review both?
12    A.   Well, I did both. Sometimes it was just a
13 general sense, and other times I tried to look at --
14 especially if there were dates that lined up, I
15 tried to look at what was reported perhaps by the
16 youth and then what was reported by the Center, by
17 the facility.
18        So not in every single case, but I did try
19 when I could to look for, you know, comparing apples
20 to apples.
21    Q.   Were there instances where there were
22 disparities between what was in the declaration and

1 what was reported in the documentation?
2    A.   Yes. Yes, there were.
3    Q.   And how do you reconcile or deal with
4 those disparities?
5    A.   Are you talking about for Does 2 and 3 or
6 just any of the Does?
7    Q.   Well, how about we start with any of the
8 Does and then we will talk about 2 and 3.
9    A.   Well, if I was aware of that while I was
10 evaluating, like for instance Doe 1, I was aware of
11 many of the allegations against him, and so -- or
12 many of the reports. He had a number of SIRs, and
13 so I was able to ask about that and get
14 clarification from his perspective as to what
15 happened, and in his case he admitted he was a very
16 angry kid who acted out a lot.
17        So there was, you know, a fair amount of
18 consistency there.
19        For Doe 4, I should say that many of his
20 records due to nobody's fault just came in late,
21 came in right at the end when this initial report
22 had already been given. And it was a large amount,

1 so I didn't really get to review that until later.
2        So when I saw Doe 4 I didn't have access
3 in the same way that I did for Doe 1, so I wasn't
4 able to compare to him, but I still tried to look at
5 those consistencies. And the same for 2 and 3, who
6 I did not evaluate, and just tried to make sense of
7 that.
8        And, again, on the one hand, it could very
9 well be the kids were not being fully honest about
10 what happened. It could be there was some kernel of
11 truth and it was distorted in some way. I'm not
12 sure that the staff were always being honest either.
13        So I was just trying to make sense in any
14 given situation as to what I felt may have happened.
15    Q.   Can you think of specific instances where
16 you weren't sure if staff were being honest?
17    A.   There are. Again, I would need to look at
18 my report. There are -- I mean, again, that's part
19 of what I tried to put in my report was, again,
20 concerns that I had. But yeah, I can give you
21 examples if you want.
22    Q.   Please do.

13 (Pages 46 - 49)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  A. Can I look at this report?

2  Q. And if you want to, we can -- well, sure.

3 Let's go ahead and do that. We can go through it

4 now if you can think of specific paragraphs that are

5 coming to mind for you. Take your time and take a

6 look. I think it's Exhibit 3 in front of you.

7  A. Okay.

8  Q. Doctor, this particular exercise might

9 take a few minutes I imagine. Is it okay if we take

10 a five-minute comfort break?

11  A. That's fine. I'm fine with that.

12   MS. HAYNES: Okay.

13    (Whereupon, a recess was taken

14     from 10:20 a.m. to 10:27 a.m.)

15 BY MS. HAYNES:

16  Q. Dr. Lewis, before we took this break, I

17 had asked you if you could point me to places in

18 your report where you felt like the staff were not

19 being truthful, and before we go through that I

20 wanted to ask you. I think you mentioned it was

21 John Doe 1 you had an opportunity to ask for

22 clarification with respect to parts of his

1 declaration because you had him in front of you.

2   Did I understand that correctly?

3  A. That's correct.

4  Q. Were you able or did you undertake any --

5 were you able to do that with the staff at the

6 Center?

7  A. No.

8  Q. Did you talk to any of them?

9  A. Well, when I went -- not for Doe 1 I did

10 not, no.

11  Q. Okay. What about for any of the -- for

12 John Does 2, 3 or 4?

13  A. For Doe 4 I did evaluate him at

14 Shenandoah. So when you say talking to the staff,

15 just in terms of, you know, courtesy and just

16 getting let into the facility and getting

17 comfortable in the room, so just had a conversation

18 with them but nothing, nothing of substance.

19  Q. Okay. So I'm taking from you that to mean

20 that you're sort of interactions with them didn't

21 have any bearing on whether you think parts of the

22 declarations are true or untrue or parts of the

1 documentation are true or untrue. It was just

2 pleasantries?

3  A. That's right.

4  Q. So when you say there are parts of the

5 record where you feel that staff were being

6 untruthful, you're relying on your own review of the

7 documentation and your interviews with John Doe 1 or

8 4, is that fair, or just with John Doe 1?

9  A. Well, it would probably be with all the

10 Does. It's just that with 1 and 4 I was able to ask

11 them about it if I was aware of the discrepancies.

12 Again, for 1 I was aware of much of this; for 4 I

13 was not when I saw him. I knew what was reported,

14 but I hadn't had a chance to review extensively the

15 documents for him.

16   And for 2 and 3 I never got to evaluate

17 them, but I could see what was alleged, for

18 instance, in their declaration versus what was said

19 in some of the other reports that I looked at later.

20  Q. Okay. And did you find parts of their

21 declaration -- much like you found parts of the

22 documentation where you felt staff were not being

1 truthful, did you find that to be true with the

2 declarations as well with respect to John Does 1

3 through 4?

4  A. Yeah. So let me -- yeah, I think it's

5 good to talk about just general and then get into

6 specifics.

7   So, you know, just in general, if you've

8 got somebody reporting something to you and you

9 don't have any corroboration of that, one

10 possibility is they're telling the truth; one is

11 that they're lying or not telling the truth or

12 exaggerating; or, you know, maybe there's some

13 kernel of truth there.

14   And I guess the same for the staff

15 records. It could be all totally accurate. It

16 could be things were left out. It could be some

17 elements of truth. So, again, I was trying to be

18 fair to look at that.

19   So, for instance, well, I can give you --

20 well, a couple of examples that come to mind. I

21 believe it was in Kelsey Wong's -- I believe it was

22 her affidavit or her notarized statement that -- I

1 think it was a notarized statement that points are
2 never I think she said taken away. I don't have her
3 document here, but she was going through the
4 protocol and the procedures and policies.
5      After talking to a number of these kids,
6 and I could look specifically for Doe 1, but it's
7 clear that in my view that there were times that
8 points were taken away. There were several
9 references, and I can come up with specific examples
10 here in a minute, where behavioral levels were lost
11 as a result of a behavior where they lost all their
12 levels.
13      And so for me, you know, I don't want to
14 say that's a lie, but clearly I didn't feel that was
15 accurately portrayed.
16      I think I did feel that there was some
17 misinterpretation on the part of some of the youths
18 that, for instance, if they were to get points for
19 doing something positive and they didn't do that
20 positive thing they would lose a point that they had
21 not already obtained, and I came to understand that
22 as I reviewed these records. However, there were

1 times, and I think I could point to some specific
2 documents, where behaviors that had already been
3 earned points for that those points were then taken
4 away. And for me that's a difference. And I felt
5 that in that case staff were not being fully honest
6 about the fact that some points were taken away from
7 these kids and they lost all their behavioral
8 levels, not for not having done something but for
9 having done something that they'd already earned
10 points for, and for me that was a difference.
11      So, again, I tried to be fair. I do think
12 the kids distorted in some of these situations.
13      My big concern with a point system --
14 because it's actually appropriate to have a point
15 system, it's a positive system, and I'm totally in
16 favor of that. Other places where I'm familiar
17 with, even at Cook County Juvenile Center here in
18 Chicago use that type of system.
19      My main concern is I think it's used
20 inconsistently and in an arbitrary fashion as to
21 when these kids can earn their points and when
22 they're taken away. I think certain things are

1 clear when they're supposed to get points. Other
2 times it seemed to me from a number of these kids
3 that it was up to the staff and their own discretion
4 of whether they give points for this or that, and
5 that's been my main concern here with the point
6 system.
7      Q. Okay.
8      A. I think there was one --
9      Q. Let me stop you there for a second -- I'm
10 sorry, go ahead.
11      A. No, no.
12      Q. Let me stop you there for just a second.
13      So my understanding is that the policy
14 with regard to the point system changed in
15 August 2016.
16      Is that your understanding too?
17      A. I don't -- I believe so. I know there
18 were a number of changes in 2016, I think somewhere
19 in the summer or fall, but I don't know for sure
20 about that system.
21      Q. Okay. And just to make sure I understand,
22 you never talked to Ms. Wong in any substantive

1 fashion?
2      A. I did not.
3      Q. Okay. And that's true for all of the
4 staff at the Center?
5      A. Yes, that's true.
6      Q. Okay. Before we get into the details of
7 your report, I want to ask you a few more questions
8 about Exhibit 2, which is Appendix B to your report.
9 That's the list of documents.
10      Do you have that in front of you?
11      A. I do.
12      Q. Okay. I think we talked about 1 through
13 4.
14      And then Number 5 is your forensic
15 psychological assessment of John Doe 1 dated
16 October 10th, 2017?
17      A. Yes.
18      Q. And I have two of those. I have one dated
19 October 10th, 2017, and one dated October 17th,
20 2017.
21      Do you -- why are there two?
22      A. And I wasn't sure which ones you had. I

15 (Pages 54 - 57)

1 think initially I submitted the one for the 10th,
2 and then later we were asked to submit all of them.
3     So there were -- initially I was asked to
4 evaluate Doe 1 through the Young Center for his
5 immigration case; in other words, to make
6 recommendations about what types of
7 psychiatric/psychological problems he was having,
8 what my recommendations were for treatment because
9 they weren't sure what recommendations for him would
10 be best.
11     I was also then asked -- the CAIR
12 organization, the Capital -- I forget what it stands
13 for, Capital Area Immigrants Rights, CAIR, Coalition
14 also got involved after I talked to the Young Center
15 and asked if I would do a competency evaluation on
16 Doe 1 for the court because they weren't sure if he
17 was capable of even functioning in the courtroom
18 setting to work with his lawyers.
19     So I was asked to do two. Initially they
20 asked me to do one report, and after evaluating him
21 I just said to them I can't -- these are two very
22 different things; I need to do two separate reports.

1     So I forget which one was which. I
2 believe the competency report was the one for the
3 10th and the immigration or the trauma or the
4 treatment recommendations report I believe was the
5 later one.
6   Q. Okay. And then number 6 is the -- 6 and 7
7 are the Complaint and the First Amended Complaint.
8     Do you know if you've seen a Second
9 Amended Complaint?
10   A. Yes, I believe, yes. That probably should
11 have been included on here too.
12   Q. Okay. And then Number 8 is the
13 Defendant's Brief in Opposition to the Plaintiffs'
14 Motion for Preliminary Injunction.
15     Did you also review the materials attached
16 to that brief? You referenced Ms. Wong's statement.
17 Did you review the remainder of them?
18   A. I forget. What else besides Ms. Wong?
19 There were other ones you said.
20   Q. Yes. I think there were affidavits for
21 Ms. Wong, Ms. Gallardo, Ms. Twigg, Ms. Rocks and
22 Ms. Contreras.

1     Do you know if you reviewed --
2   A. I did not.
3   Q. -- some or all of those?
4   A. I did not have access to any of those, no.
5   Q. So you think Ms. Wong's is the only one
6 that you reviewed?
7   A. I believe so, yes.
8   Q. And then Number 9 through 12 are ORR SVJC
9 records for Plaintiffs John Does 1 through 4.
10     Can you tell me a little bit -- I mean,
11 were they the entire files? Were they parts of the
12 files? What did you review for John Does 1 through
13 4?
14   A. Essentially I don't think it was the
15 entire file for any of them. That would have been
16 pretty overwhelming, and there were certain things
17 that were irrelevant.
18     So it would be things like disciplinary
19 reports, serious incident reports, if they had
20 progress notes available, case management notes, any
21 medical or psychological evaluations that were done
22 that they had access to or -- yes, that were

1 included as part of the record.
2     I had much more for John Doe 1 than I did
3 for the others. Doe 4, again, a lot came in, but it
4 came in literally days before I submitted the
5 report. So I did review some of his records prior
6 to submitting the report but was not able to look at
7 a lot of it until afterwards.
8   Q. And John Doe 1 is the only one that you
9 were able to review the documentation in a time in a
10 way that you could talk about the documentation with
11 him, right?
12   A. That's right.
13   Q. With John Doe 4 you didn't have that
14 opportunity because you would have evaluated him
15 before you got those records?
16   A. Well, I mean, I knew some things. I just
17 wasn't able to do it in as comprehensive a way.
18     And I should say too that the initial
19 report, the initial evaluation that I did on Doe 1,
20 even though it was a forensic evaluation because it
21 just wasn't -- again, I was not involved in the
22 civil case at all at that point. So it was forensic

16 (Pages 58 - 61)

1 in the sense that it was for immigration and for the
2 competency question that the judge needed help with,
3 so it was forensic in that there was a psycho-legal
4 question being asked, but I wasn't -- I didn't have
5 the mind set of a civil case at that point.
6         So, again, I mean, all I can say is that's
7 part of why I didn't compare and contrast as much
8 even with Doe 1.
9         So I was aware of things, and I just
10 routinely do that anyway, but it wasn't a part of
11 the civil case. It was simply immigration and
12 competency at that point was the primary focus.
13         So I didn't ask as much about his
14 experience in detention. I mean, I did ask about it
15 because I needed to know that, and I could see that
16 he was struggling and there had been a lot of
17 reports of aggression, so I needed to understand
18 that. So in general I did that, but it wasn't like
19 a fine-tooth comb where I was going through a lot of
20 specifics with one. There just wasn't time. It was
21 a two-day evaluation, and I just didn't have time to
22 do all of that, so just so I'm clear on that.

1     Q. Yes, thank you for the explanation.
2         Did the materials for these minors contain
3 documentation for other facilities, or were they
4 just Shenandoah documents?
5     A. I'd have to look at each of them
6 specifically, but yes, they either referenced the
7 other facilities without including those records.
8 In some cases they actually had records from those
9 facilities.
10         I believe Doe 4, for instance, there were
11 records from Children's Village and from -- and they
12 were not ORR records that I had from Children's
13 Village. They were through the care -- no, I'm
14 sorry, they were through Catholic Charities in his
15 case, in that case.
16         So mostly they were Shenandoah records
17 primarily.
18     Q. Did you review documentation for any minor
19 besides John Does 1 through 4?
20     A. Yes. Or I reviewed declarations. I'd
21 have to look at the original report that I did.
22 There were -- yes, I believe there were three, maybe

1 four other youths that I did not evaluate personally
2 but I reviewed their declarations only.
3         I'd have to go back and look and see what
4 I got in terms of other records for them. I'm not
5 sure I had very much. I don't think I had much in
6 terms of records to look at other than their
7 declarations.
8     Q. Is there a reason you didn't list those
9 declarations along with the other declarations on
10 this appendix?
11     A. Part of what I wasn't sure about when we
12 submitted this was I was under the assumption that
13 the original report I had done was -- well, actually
14 this -- I've got to get -- refresh my memory as to
15 which -- yeah, was that I assumed that that was
16 going to be submitted separately from this. So I
17 assumed that was already known, so I just didn't
18 include it here.
19     Q. So you intended Appendix B to be
20 supplemental to whatever you listed in your first
21 report?
22     A. I did, originally I did, yes, yes.

1     Q. Okay. So you believe you might have
2 reviewed three or four declarations from other
3 unaccompanied children besides 1 through 4, right?
4     A. I know it was at least three, and it might
5 have been four, yes.
6     Q. And I think you said some limited
7 documentation with respect to those other UCs; is
8 that fair?
9     A. Because it wasn't a big focus in this last
10 report, I'd have to go back and -- yeah, it was very
11 limited, if any, documentation other than the
12 declarations. I'm not sure I had -- I'd have to go
13 back and look.
14     Q. And I don't think, in reading your report,
15 I don't think that you reached any conclusions with
16 respect to unaccompanied children specifically with
17 respect to a specific child besides John Does 1
18 through 4.
19         Is that consistent with your
20 understanding?
21     MS. LIEBERMAN: Object to form.
22

17 (Pages 62 - 65)

BY MS. HAYNES:

Q. Let me try again because I'm trying to understand where these other declarations came into your opinions.

So I didn't see in your report -- you discussed sort of assessing of trauma on children and on immigrant children in particular generally.

A. Right.

Q. But I did not see a conclusion or an opinion with respect to a specific child other than with respect to 1 through 4.

Am I right in reaching that conclusion?

A. Yes. In other words, those four are listed in here and very specifically to them. But with that said, I mean, all of them, primarily these, but all of them factored in to some extent in my conclusions, but I just didn't specifically -- because I didn't have enough to go on to make any -- again, there was inconsistencies, but I had no -- I mean, I couldn't evaluate them, so I just felt like I really couldn't say as much about them, whereas 2 and 3 I had substantial records for so I felt like

there was some means of comparison.

Q. Fair enough. So let me ask you while we're on this subject.

John Does 2 and 3 you've reviewed you think sufficient documentation to reach an opinion about their care, right?

A. I believe so.

Q. But you haven't met them, right?

A. That's right, right.

Q. Do you -- have you done forensic -- in other cases have you reached opinions about individuals without evaluating them?

A. I need to think about that for a moment.

Q. Sure. Take your time.

A. I don't -- I've often been asked to consult, you know, perhaps by a lawyer or another clinician on cases but did not submit any formal reports. I never went before the court; I never had to testify.

So render an opinion, I guess it would be more informal or consultive, but not in terms of legal. It never went to court. I was never asked

to produce a report.

Q. So more like a consultation, right?

A. Consultation type of thing, yes.

Q. So it sounds like it's fair to say that you've never reached conclusions about an individual that you've put in a report that was submitted in a case without evaluating that person in person, right?

MS. LIEBERMAN: Objection to form.

BY MS. HAYNES:

Q. Let me try to make it a little clearer.

You've consulted on cases and reviewed records regarding unaccompanied children or minors that you didn't meet personally, right?

A. Yes.

Q. But you've never put opinions in a report about a specific child in a civil case without evaluating that child in person?

A. I'm just thinking for a moment.

Q. Until now. Yes. Take your time.

A. I believe that's correct.

I believe that's correct, yes.

Q. Okay. Almost through our list in Exhibit 2.

Number 13 are the CAIR records for John Doe 4, which I think you referenced before.

A. That's right.

Q. Do you know what -- and I think you said a couple times you got more, is it fair to say you got more records for John Doe 4 than for the other three?

A. Yes. I mean, about 2,000 pages came in towards right before we submitted this last report. I had a lot for Doe 1. I don't know if it was 2,000, but it was considerable. But yes, Doe 4 I had much more.

Q. Do you know about how much documentation you had for John Doe 4 when you evaluated him, which I think was in July, this past July?

A. Well, I believe all the documentation had been given to me. It was just a matter of timing in terms of -- well, actually July, I'd have to go back and look as to when I got -- no, let me take that back. The bulk of it did not come in until a week

1 or whatever, a few days before we submitted the last
2 report.
3        I'd have to go back and look.  I don't
4 know.  I don't know the answer to that.
5     Q.   Okay.
6     A.   If I could look at Doe 4 for a minute, I
7 could probably recollect.  Is that --
8     Q.   Sure.
9     A.   If I could do that?
10     Q.   Take your time.
11     A.   Okay.
12        So I actually had a lot of the I guess it
13 was the clinical evaluations that had been done on
14 him.  I was aware of -- so I have a fair amount.
15 Again, a large amount came in right before we
16 submitted this, but I also had a fair amount at that
17 point in terms of clinical evaluations, the care
18 records.  So I was able to ask about those things
19 with him.
20        What I didn't have as much of at that
21 point were progress notes or I didn't review
22 progress notes and case management because they were

1 just voluminous, and I had to get this evaluation
2 done because of timing.  So that factored in later
3 when I reviewed those in more detail and then added
4 that to the report.
5        So I had a fair amount of clinical
6 information and, you know, when I did the initial
7 evaluation.
8     Q.   Okay.  Thank you for looking back to
9 clarify that.
10        And then the last item on Appendix C [sic]
11 is your supplemental report dated April 3rd, 2018,
12 right?
13     A.   Yes, yes.
14     Q.   I think we talked about the Second Amended
15 Complaint, which you have reviewed and it's not on
16 here, and declarations of three or four other
17 unaccompanied children that you remember reviewing.
18        Are there other documents you've reviewed
19 that are not on this list?
20     A.   I don't -- I'm trying to think.  Like you
21 mentioned, like I wasn't aware that there were these
22 other documents attached to the Wong, that there

1 were other things there.  I'm just trying to think
2 if there were other primary documents where other
3 things were submitted to me.
4     Q.   So to make it easier, if I confine it to
5 other documents you've reviewed that are not on
6 Appendix B but were significant to you in writing
7 your report and reaching your conclusions.
8     A.   Okay, yes.
9     Q.   So are there any that you can think of
10 that are not on this list?
11        MS. LIEBERMAN:  That were significant to
12 the report?
13        MS. HAYNES:  Right.
14        THE WITNESS:  I would say the significant
15 ones are listed here, and I believe that it's
16 complete.  I'm just trying to think if there's
17 anything I reviewed because, again, some things came
18 in right at the deadline, and I have looked at
19 those.
20        So the expert witness, that we got, report
21 I looked at later, so that was not a part of this,
22 the expert from the Government.  I'm talking about

1 the Nelson report.  That came later.  I did review
2 that.
3        I think if I could just take one second
4 and look, see if there's anything that I brought
5 that I didn't include here because I didn't bring
6 all the documents but I brought the main ones.  I
7 included that, included this.
8 BY MS. HAYNES:
9     Q.   And, Dr. Lewis, if you wouldn't mind kind
10 of as you're going through that just generally
11 telling me what you have.
12     A.   Sure.  Well, this is Exhibit B, what we're
13 looking at right now.  Well, I'm not sure why it's
14 Exhibit B, but September 11, so it's just that
15 report.
16        I think this was the report -- which one
17 was this?  This was -- some of these are duplicates.
18 I'm sorry, I've got to find the front of it here.
19        Okay.  This is Ann Nelson's report, but
20 this came later.  That was not a part -- I wasn't
21 sure if you were going to ask about that today so I
22 brought that.  I wasn't sure if I had access to it,

19 (Pages 70 - 73)

1  but that was not included here.
2        This we have.  This is the supplemental
3  report.
4     Q.  The April 3rd, 2018 report?
5     A.  Yes, April 3rd, 2018.
6        The -- well, this is just an article that
7  I had with me that I was reviewing on the use of
8  restraints.
9     Q.  What is that article?
10    A.  I believe I referenced it in here.  It's
11  by Kennedy and Mohr, M-o-h-r.  It's called A
12  Prolegomenon on Restraint of Children: Implicating
13  Constitutional Rights.  It is referenced in my
14  report.
15       This was Dr. Gorin's evaluation of Doe 4,
16  which I had not reviewed.  I reviewed after.  I did
17  not review that when I did the report.  I reviewed
18  it afterward because it came in late.
19       This is an article on again utilizing
20  restraints.
21       Is that for you?
22    Q.  Which one is that?

1     A.  It's by Day.  Let's see, Examining the
2  therapeutic utility of restraints and seclusion with
3  children and youth: the role of theory and research
4  in practice.  I'm quite sure I referenced it in my
5  report.
6        And the last one is -- this is the one I
7  submitted on February 27th, which I thought was
8  originally -- I thought that's why I didn't include
9  some of the things in my appendix.  This is dated
10  February 27th, 2018.  It was the original, the first
11  report that I did, and it lists in that one a lot of
12  the records that I had for John Doe 1, case
13  management and progress notes, clinical addendums,
14  medical evaluations, and various other psychological
15  evaluations that were done.
16    Q.  And just so we're clear, your intention
17  was that the documents you listed in that
18  February 27th report are in addition to the
19  documents listed here on Appendix B?
20    A.  Yes.
21    Q.  Okay.
22    A.  Yes, and there again, there are three

1  declarations listed here, so I said it was either
2  three or four.  It was three that were listed in
3  Appendix A:  The declaration of ▪▪▪, declaration of
4  ▪▪▪, and declaration of ▪▪▪.  They were also --
5  they were all from January of 2018.  So I assumed
6  that was part, that that was already submitted.
7     Q.  Okay.
8     A.  And that's all.
9     Q.  Okay.  Let me ask you this:  Your report
10  in a couple of places mentions some Shenandoah
11  policies.
12       Did you review policies of the Center?
13    A.  As much as I could, yes.  I mean, there's
14  a lot of policies, but the ones that seemed relevant
15  to what I was looking at, like use of force,
16  behavioral management I reviewed in a fair amount of
17  detail.
18    Q.  Okay.  I don't have your February 27th
19  report in front of me.
20       Did you list policies as documents you
21  reviewed in that report?
22    A.  February 27th, that was the -- was that

1  our first report?
2     Q.  Yeah, that was the one that you just had.
3     A.  No, because I didn't -- I'm just trying to
4  think for a minute.
5        No, I did not have access to the policies
6  at that point.
7     Q.  Okay.  Do you remember when you got access
8  to the policies?
9     A.  Specific date, no, but it would have
10  been -- well, let's see.  The last report was
11  submitted in September, so a couple of months.
12  Let's see.
13       I don't remember exactly, but, I mean, I
14  had it for quite a while, maybe August or -- no, it
15  would have been probably at least July.
16    Q.  Did you have all of the Center's policies,
17  do you know, or was it a subset?
18    A.  That I don't know.  I know there was quite
19  a bit there because I was also sent records of some
20  of the kids that I evaluated and some that I didn't
21  evaluate.  So there was a lot there, but I can't say
22  if I thought it was all of the policies, but it was

1 a lot.

2    Q.   And is there any particular reason that
3 you didn't list the policies in Appendix C?

4    A.   In terms of the last report that we just
5 did --

6    Q.   Yes, sir.

7    A.   -- to the last report?

8    Q.   To Exhibit 2.

9    A.   No, I would say simply an oversight.  I
10 mean, I guess by referencing it I was assuming it
11 was kind of known, but yeah, I think simply an
12 oversight.

13    Q.   Okay.  You referenced Dr. Nelson's report,
14 which I think you said you reviewed.

15    A.   I did, after the report, after this report
16 was submitted, yes.

17    Q.   Right.  Did you review reports of any
18 other experts in the case, whether for the plaintiff
19 or the defendant?

20    A.   I -- for the defendant I don't -- I didn't
21 see any.  I think Ann Nelson was the only expert
22 report that I saw for the defendant.

1       I have seen one report done by
2 Andrea Weisman, by Dr. Weisman, so I did review
3 that.  That would have been after the February
4 report was submitted, so 17th or whenever that was,
5 so sometime after that I reviewed that.  That did
6 not factor into my decision, but I did review that.

7    Q.   Okay.  Have you ever discussed the case
8 with her?

9    A.   I have never met her or talked with her,
10 no, or discussed it with her.

11    Q.   What about Dr. Nelson, or Ann Nelson, do
12 you know her?

13    A.   I do --

14    Q.   Have you ever met her?

15    A.   I do not, no.

16    Q.   Have you read Dr. Diver's report?

17    A.   What was the last name, Guyver?

18    Q.   Dr. Diver.

19    A.   I'm not sure.  Is that an expert?

20    Q.   He's another -- yes.

21    A.   No.

22    Q.   He's another expert.  Okay.

1    A.   No.  This is the first time hearing of it.

2    Q.   So it sounds like Dr. Weisman and
3 Ann Nelson's reports are the only other expert
4 reports you've reviewed?

5    A.   I believe so, yes.

6    Q.   Okay.  I want to turn to Exhibit 3, which
7 is your September 11th, 2018 report, and I wanted to
8 start on Page 1 with your Executive Summary.

9    A.   Okay.

10    Q.   And I just kind of wanted to sort of
11 30,000-foot view talk about your opinions here in
12 your Executive Summary.

13       And I think your first one is that
14 Shenandoah staff do not demonstrate an understanding
15 of the manifestations of trauma and stress in youth,
16 do not utilize and, therefore, do not appear to be
17 well-trained in utilizing trauma-informed approaches
18 that are the standard of care in all stages of the
19 juvenile justice system.

20       So there's a lot to unpack there, but
21 first, generally, I just wanted to ask you how you
22 came to that conclusion and what your basis in your

1 words is.

2    A.   So this was based on just in general
3 reading through progress notes and case management
4 notes as well as the youth that I talked with and
5 their declarations.  In other words, it was globally
6 based on that there are certain things I would look
7 to see in a truly trauma-informed environment that I
8 did not either see in their documents or hear from
9 the youth that I evaluated, and it just felt like it
10 was lacking to me.

11       So that's -- I mean, globally that's where
12 that came from.  I mean, with Doe 1 there were very
13 specific things that I feel got missed there, but as
14 far as globally it was based on what the kids told
15 me and what I saw or didn't see in the notes.

16    Q.   You mentioned there are some truly
17 trauma-informed approaches that you didn't see.

18       Can you give me some examples of what
19 you're thinking of when you say that?

20    A.   Truly -- I didn't hear what you said.
21 Truly prominent?

22    Q.   I think you said -- I heard you say there

1 were some truly trauma-informed approaches that were
2 lacking or that you didn't see, and I was just
3 wondering if you could give me some examples of what
4 you mean when you say that.
5      A. So let me start with what -- and, again,
6 trying to look at what trauma aspects I felt were
7 attempted. It was clear that there is a brief
8 assessment. I forget the name of the form offhand.
9 I know there's a checklist. It's a structured -- so
10 there is some attempt to identify trauma and abuse
11 when the kids first come into the program wherever
12 they enter. There were some diagnoses by some of
13 the clinicians that these kids had trauma.
14      So there were different aspects of trauma
15 that clearly were attempted. My concern was that it
16 didn't seem to be integrated into the treatment of
17 many of these youth, particularly Doe 1.
18      I also felt like what one clinician might
19 recommend or Dr. Kane, whatever, that I just didn't
20 see any evidence that they were having team meetings
21 or times to really talk about how these kids were
22 traumatized.

1      And one of my big concerns was that in a
2 truly trauma-informed environment, this is my
3 feeling based on other centers I'm familiar with, is
4 that it isn't just about, you know, assessing a
5 child initially or a youth as to whether they've
6 been traumatized or experienced abuse and then
7 giving them a diagnosis. It's also about training
8 all of the staff who are participating with those
9 youths. So be it the guards, be it, you know, the
10 secretary, be it whomever, that everyone needs to
11 understand trauma because it's a very different way
12 of viewing the problems that these kids are having,
13 you know. As many of the reports state, these
14 youths have conduct problems, they have depression,
15 they have various kinds of anxiety; and that's not
16 necessarily -- I mean, that's true, but if we just
17 look at it as these are various problems these kids
18 have and not understand that the underlying cause
19 for many of these kids is trauma, it's going to be
20 dealt with in a very different way. We're just
21 going to target conduct disorder or depression and
22 not understand that there are things in this

1 environment, for instance, that may be triggering
2 past traumas that these kids have had.
3      With Doe 1, I mean, I don't know if you
4 want me to give you a specific example.
5      Q. Let me stop you there so I can ask you
6 some questions.
7      A. Okay.
8      Q. So you mentioned that you felt this
9 opinion was particularly true with respect to Doe 1.
10      Did you feel like the approach to trauma
11 or the trauma-informed approaches had increased or
12 improved by the time you were reviewing John Doe 4's
13 records?
14      A. No.
15      Q. So what do you mean when you say
16 particularly with respect to John Doe 1 you did not
17 feel that there was a trauma-informed approach?
18      A. What I'm referring to there is because I
19 was actually able to meet with him over a two-day
20 period and see how he responded and hear his story,
21 I just felt like I had much more -- I mean, it was
22 just, you know, I could see it in front of me. I

1 could see how he responded when I was asking him
2 about, you know, whether I felt he was competent and
3 just things. I mean, he just totally shut down.
4      And he talked about one specific example
5 where one of the things that happened when he was at
6 Shenandoah was that one of the guards, I don't know
7 how many times this happened but at least on one
8 occasion, the tone of voice and what the guard said
9 reminded him of his dad; and I don't remember
10 exactly at that point if he went off on the guard or
11 if he detached, but for me it was a very clear
12 example of the prior trauma that he had had.
13      And the reason that's significant for me
14 is that if kids have been traumatized, that trauma
15 stays with them unless they get treatment, most
16 cases. Some people, occasionally people can work
17 through a trauma without getting therapy. There's a
18 lot of variables that go into that. But for many
19 people and many of these kids, without treatment
20 those traumas stay inside of them and are easily
21 reignited in settings where they don't feel safe.
22      So, for instance, if he felt disrespected

22 (Pages 82 - 85)

1 he might swear back at the guard. And what I felt
2 from, again, reviewing his records as well as some
3 of the other records was that the guards were quick
4 to react to that without going through the protocols
5 of active listening and really trying to engage
6 these kids. I felt they were much too quick to go
7 to either a point loss or room confinement.
8        And if you understood it from a trauma
9 perspective, it's important to engage these kids and
10 to have a thicker skin in terms of like if they're
11 swearing. I realize there needs to be some
12 intervention there. I'm not saying there shouldn't
13 be, but I just felt like there was an overreaction
14 because of not understanding that this kid isn't
15 just trying to disrespect me. This is probably
16 something triggered from his past; I need to
17 understand that so I don't overreact to this kid.
18        So much of my concern, and, again, I don't
19 know what -- I'm aware that there is some basic
20 annual training and that type of thing. My concern
21 is whether it's really hands-on training and
22 understanding trauma that the guards get and the

1 staff as a whole so that they can really integrate
2 this into their work. So that's one of my main
3 concerns.
4    Q.  Have you reviewed any of the training
5 materials for the Center?
6    A.  I'm familiar -- no, I have not. No.
7    Q.  Okay. Have you reviewed any deposition
8 testimony at all?
9    A.  I have not.
10   Q.  It sounds to me like a trauma-informed
11 approach is a continuum. Is that fair?
12       You can have a trauma-informed approach,
13 and at one end of the continuum you're implementing
14 a certain number of trauma-informed practices, and
15 at the other end you might be implementing one or
16 two.
17       Is that an accurate description of the
18 concept?
19   A.  Well, I don't -- I mean, that's not how I
20 would describe it. I think there's a continuum of
21 people who are traumatized, you know, some severely,
22 others not so much. Some people that have been

1 traumatized are functioning well; others that have
2 been traumatized are not.
3        So I think the continuum is the nature of
4 the trauma. I don't think in terms of the
5 trauma-informed approaches -- I mean, there's
6 different kinds of therapies that people do, but the
7 trauma-informed approach is really a comprehensive
8 approach to doing everything from assessing that
9 child to providing treatment to working to train the
10 staff and understanding trauma so that they're not
11 just reacting to kids as if they're acting out, you
12 know, or need to be -- you know, simply lose points
13 or whatever, that the trauma needs to be understood.
14       Staff, what we call counter-transferring,
15 staff need to understand, you know, that they're
16 going to get triggered at times by what these kids
17 do. And if they just react because they're pissed
18 off at a kid, don't understand that this is a
19 traumatized kid, they're going to respond in a very
20 different way.
21       So it's really a comprehensive I guess
22 package, if you will. It's like a wheel or a circle

1 where you've got different aspects of the trauma,
2 but they all are considered part of a
3 trauma-informed approach. I don't know if there's a
4 continuum of a trauma-informed approach. I mean,
5 there might be different ways that I work with
6 someone who has been traumatized depending on the
7 nature of their trauma, so there's some flexibility
8 there. I don't know if that's what you're getting
9 that.
10       But I don't see a continuum of
11 trauma-informed approaches.
12   Q.  So what I'm trying to understand is I
13 think I heard you say your opinion is that
14 Shenandoah does not have a truly informed --
15   A.  Right.
16   Q.  -- or truly trauma-informed approach,
17 right?
18   A.  Right.
19   Q.  But at the same time you recognize they're
20 doing a couple of things that you would describe as
21 trauma-informed, and you gave the example of
22 assessing at intake for trauma, right? Did I

1 understand that correctly?
2     A.  Yeah, it would be kind of like looking
3 at --
4     Q.  So what I'm trying --
5     A.  Yeah, yes, yes.
6     Q.  So what I'm kind of struggling with is can
7 you say, okay, Shenandoah, if you do X, Y and Z
8 approaches that are trauma-informed, then, okay, I
9 think you're doing what you're supposed to be doing?
10 Can you give a concrete three or four or five or
11 however many things that they would need to do to be
12 what you consider truly trauma-informed?
13     A.  That would require me to look at the
14 report, but I think I can give you some.
15     Q.  Okay.
16     A.  So I'm looking at the September 11th
17 report.
18         So if we could look at Doe 4, which starts
19 on Page 28, as I said before, I did evaluate Doe 4
20 over two days.  And then if we look at Number -- I'm
21 trying to find where I put my diagnoses.
22     Q.  Paragraph 133 maybe?

1     A.  That's probably what I'm looking for.
2 Yes.
3         So, again, I evaluated him, and I did
4 specific tests regarding trauma as well as my
5 clinical interview and felt that he met criteria for
6 chronic posttraumatic stress disorder.
7         This is also based partly on the fact that
8 he had also been -- even though my own independent
9 evaluation showed that, I believe there were other
10 records that I had seen, yes, that talked about
11 another facility having evaluated him as being
12 traumatized.
13         So if we look at that and then go to --
14 let me just pick one of the incidents here.  I'm
15 just trying to find more of a clear example that --
16     Q.  Sure.  So, Dr. Lewis, we have somewhat
17 limited time today, so maybe if -- we are going to
18 go through your report in some detail.  So if you
19 would just point out to me when we come across those
20 things.  I'm looking for specific, concrete
21 examples --
22     A.  Yeah, and that's what I was trying to --

1     Q.  -- of things that Shenandoah doesn't do
2 that it should be doing.  And will you just point
3 those out to me as we go through the deposition, and
4 I'll ask you about them when we --
5     A.  That would probably be a better way to do
6 it, I agree.
7     Q.  Okay.  So let me ask you this:  In your
8 first opinion you conclude by saying "that are the
9 standard of care in all stages of the juvenile
10 justice system."
11         And accepting that -- you believe the
12 standard of care is a trauma-informed approach,
13 right?  Is that a fair way of describing it?
14     A.  Yes.
15     Q.  So what authority or source are you basing
16 that on when you say X is the standard of care and
17 trauma-informed care is the standard of care?
18     A.  I mean, there were two primary groups that
19 I referenced here.  One was the National Child
20 Traumatic Stress Network.  The other was referencing
21 the Attorney General's report of I believe it was
22 2012 that basically stated that.

1     Q.  Okay.  And so in looking at the National
2 Child Traumatic Stress Network, my understanding is
3 that their mission is to raise the standard of care,
4 and the way they describe it is and improve access
5 to services for traumatized children, their families
6 and communities throughout the U.S.
7         Is that your understanding of their kind
8 of reason for being and mission?
9     A.  Yes.  They were established by Congress, I
10 forget exactly, I think it might have been in 2000,
11 but that was their purpose, to begin to look at
12 juvenile centers and the whole system and to improve
13 and, like you said, raise the standard of care, yes.
14     Q.  So to me, if an organization whose reason
15 for existence is to raise the standard of care says
16 here is the standard of care, that would seem to me
17 to be an aspirational standard.
18         Does that not seem to you to be the case?
19     MS. LIEBERMAN:  Objection to form.
20     THE WITNESS:  So aspirational, well, I
21 guess where you're going is that it's --
22

24 (Pages 90 - 93)

BY MS. HAYNES:

2    Q.  Let me ask it this way, Doctor:  Do you
3  think that --

4    A.  At one point it was aspirational, yes, but
5  at this point I think --

6    Q.  When do you think it became -- when do you
7  think it became not aspirational but in your mind
8  just a standard?

9    A.  I mean, a standard as far as being
10  codified, I don't know that it has been codified,
11  you know, mandated, let's put it that way.  But,
12  again, this organization started in 2000, and I'm
13  aware of a number of centers starting in 2010 that
14  moved towards this approach, you know.  Even in the
15  Cook County Juvenile Detention Center where I've
16  spent some time, you know, it's been there for
17  years.

18       So in terms of being codified or mandated,
19  no, I don't see it being mandated, but I think it's
20  much more than aspirational.  I think it was
21  certainly in 2000.  And so when did it -- I think
22  it's been standard for years.  People that do the

1  work with whether it's delinquent kids who are in
2  detention centers or immigrant kids have to
3  understand trauma, and that's really -- that's the
4  treatment.  That's really the primary, in my mind
5  the primary standard even if it's not mandated.

6    Q.  Are there any other sources that you know
7  of or you can think of besides the National Child
8  Traumatic Stress Network or the Attorney General, I
9  think you said 2012 Attorney General report?

10    A.  Right, I believe that was the other, the
11  other main one that I'm referencing, the Attorney
12  General's report.

13    Q.  Okay.  The last thing I wanted to ask you
14  about this statement is at the end where you say "in
15  all stages of the juvenile justice system."  And I
16  guess you mentioned earlier that in some of your
17  other cases you think the defendant centers were
18  staff secure.

19       Can you tell me kind of what your
20  understanding of the different levels?  Is it your
21  understanding that ORR contracts with certain
22  facilities to send unaccompanied minors there?

1    A.  Yes.

2    Q.  While their status is being determined; is
3  that fair?

4    A.  Yes.

5    Q.  And then within the facilities that ORR
6  contracts with there are certain levels as far as
7  security is concerned?

8    A.  Yes.

9    Q.  And do you know where Shenandoah falls on
10  that spectrum?

11    A.  My understanding is they're a secure
12  facility that normally -- well, I guess normally the
13  youth that are there would be youth that are more
14  behaviorally problematic or disregulated, perhaps
15  have been more aggressive or violent.

16    Q.  And do you know how the determination is
17  made to send a UC to a specific facility and to a
18  specific -- whether it's to a specific security
19  setting or level?

20    A.  I don't know specifically, no.

21    Q.  Okay.  Do you know whether or to what
22  extent Shenandoah has any say in which kids come to

1  them?

2    A.  My understanding would be that ORR
3  primarily makes those determinations.  I do believe
4  that -- so I believe it's ORR.  But my concern is
5  that particularly, I don't know if it was Doe 4 --
6  no, I think it was Doe 3 actually, who I did not
7  interview, who had been on good behavior, for
8  instance, for 96 days that -- and yet it was quoted
9  by I believe his clinician that he wasn't giving her
10  enough good behavior to fight his case for a step
11  down.

12       So it seemed clear to me that Shenandoah
13  has some responsibility to either facilitate or
14  advocate for these kids.  I know they fill out -- I
15  mean, I don't know, but I assume they fill out some
16  recommendation at some point if the kids have 30
17  days or whatever of good behavior, no SIRs, that
18  they do expedited process.

19       My concern was that I believe it was
20  Doe 3, I'd have to go back and look at it, but he
21  was moved from staff secure to secure within two
22  days but yet he had 96 days of good behavior and no

25 (Pages 94 - 97)

1 step down, and that was clearly a part of what
2 discouraged him and demoralized him. And I just
3 feel like Shenandoah could have done much more to
4 advocate.
5 And, in fact, his therapist or the case
6 manager -- I'd have to go back and look at the
7 specifics -- stated, you know, this is after 96 days
8 he acted out, and they were told no more, you know,
9 you're not going to get a step down at this point;
10 and then it was quoted in one of the -- I'd have to
11 go back and look, I can find it for you, that two
12 days later, you know, she said to him you're not --
13 unless you give me good behavior I can't advocate
14 for you or I can't fight your case for a step down.
15 So that tells me that Shenandoah, there
16 are things that they can do off the record to
17 expedite.
18 And also this is a young man that was
19 moved -- within two days was moved from I think it
20 was Arizona or wherever he was at to Shenandoah.
21 Q. Do you know whether -- I mean, what's your
22 understanding of who has the final authority to make

1 that call? Like if Shenandoah advocates, are they
2 able to make any kind of final decision with respect
3 to where a youth goes or does not go?
4 A. I suspect they do not. I suspect it's
5 ORR, but, again, I would think they'd have a strong
6 say, you know, in advocating or facilitating.
7 Q. Going back to the different levels of
8 centers with which ORR contracts to take these
9 youth, do you know, do you have a sense of how many
10 secure facilities like Shenandoah there are?
11 A. An accurate number, no. I think I heard
12 at one point that there might be two other ones in
13 the country. I think they're limited is my
14 understanding, a limited number.
15 Q. And do you have any familiarity with what
16 has a bearing on whether a youth goes to a secure or
17 staff secure setting?
18 A. Specifically, no. I believe I read in one
19 of the -- I forget exactly where it was, that if
20 there was a history of I think prior criminal
21 behavior or I guess significant aggressive episodes
22 perhaps that that might -- I don't know

1 specifically, but I suspect it has to do with that,
2 going to a secure facility, a kid that they felt was
3 basically unmanageable or just acting out
4 aggressively.
5 Q. And do you think that the same standard
6 should apply from a clinical psychology perspective
7 to a secure setting as to a staff secure as to a
8 residential center?
9 A. The same standard in -- could you ask it
10 again?
11 Q. So I understand your -- I understand your
12 opinion to be that a trauma-informed approach is the
13 standard of care when it comes to clinical
14 psychology, your field.
15 Is that your opinion?
16 A. Well, for facilities. I mean, everyone I
17 see is not traumatized, so I guess -- just when I do
18 my work as a private practitioner. But if we're
19 talking about facilities like you mentioned, yes, I
20 think standard of care is considered a standard -- a
21 trauma-informed approach is considered the standard
22 of care.

1 Q. And do you think that that standard
2 applies to any detention center regardless of
3 whether it's a staff secure center or a secure
4 center or just a residential center?
5 A. I believe it should simply because of
6 especially if we're talking about immigrant youth or
7 even just youth that are, you know, American kids,
8 that there's so many of them that have been
9 traumatized that if we don't look at it, the trauma
10 nature of that and really embrace all the aspects of
11 trauma-informed care, it's going to -- so yes, I
12 guess my answer is yes to that.
13 Q. How do you balance the need for security
14 in a setting like a staff secure center or a secure
15 center like Shenandoah against trauma-informed
16 approaches?
17 MS. LIEBERMAN: Objection to form.
18 THE WITNESS: How do I balance? There are
19 always -- certainly --
20 BY MS. HAYNES:
21 Q. Let me ask it this way: Do you take into
22 consideration in looking at a facility whether it is

26 (Pages 98 - 101)

1  a staff secure facility, a residential facility or a
2  secure facility in determining what standard should
3  apply?
4      A.  For me the -- obviously there are
5  differences in these facilities and the general
6  nature of the kids that are there, and I guess in
7  some ways that has to be looked at.  But for me, it
8  doesn't matter if I have kids that are highly
9  aggressive or maybe more on the depressed side who
10  are not acting out in the same way.  The trauma,
11  particularly for immigrant kids, unaccompanied
12  minors, the trauma has to be looked at.  And while
13  there are situations that -- I mean, I've worked in
14  residential facilities.  I've worked in a hospital
15  setting.  I've worked in therapeutic day schools
16  where there at times clearly, for instance,
17  restraints have been necessary.
18      So I'm not going to say that that's never
19  appropriate.  I think those are very rare.  I have
20  particular concerns about restraint chairs.  But in
21  general, yes, there are going to be times that that
22  needs to be factored in.

1      But I do believe that if the environment
2  is safe and the kids know that it's a safe
3  environment where they're going to be treated with
4  respect, where whatever trauma is there has been
5  recognized, and it's safe to talk to staff, staff
6  are trying to relate and engage with them, that it
7  would decrease the acting out no matter what
8  facility we're talking about, no matter what the
9  nature of that facility.
10      Q.  Your second opinion in that Executive
11  Summary paragraph, which is back on Page 1 of
12  Exhibit 3, and you say, "The predominant approach
13  utilized to manage youth at SVJC is punishment and
14  behavioral controls through methods such as solitary
15  confinement, physical restraint, strapping to a
16  chair and loss of behavioral levels."
17      And what I'm wondering is, it sounds like
18  from our conversations so far you've reviewed
19  records for John Does 1 through 4 and some limited
20  records for I think three other unaccompanied
21  youth --
22      A.  Yes.

1      Q.  -- is that right?  Okay.
2      And so is your opinion here necessarily
3  limited to your review of those documents?  Do you
4  have any information with respect to other youths at
5  Shenandoah?
6      A.  Not specific documentation regarding that,
7  no.
8      Q.  So to the extent that you have this
9  opinion with respect to youths other than John
10  Does 1 through 4 and perhaps those three youths
11  whose limited records you reviewed, you're
12  extrapolating?
13      A.  I am generalizing from the records in the
14  kids that I've evaluated, yes.
15      Q.  Okay.  Do you know how many unaccompanied
16  youths are at Shenandoah at any given point in time?
17      A.  I'm going to say I don't know
18  specifically.  I believe in one of the documents it
19  talked about 30 to 40, and I don't know if that
20  included the American or kids from the United States
21  that were there.
22      So undocumented I'm going to say perhaps

1  around 30.  I don't know for sure.
2      Q.  What's your understanding as far as the
3  time period you were asked to review in the case?
4      A.  Specific dates I don't know.  When I
5  evaluated Doe 1, that was in last year in 2017.  I
6  had records going back to 2016.  I've actually seen
7  some -- well, I'm trying to think of the dates
8  specifically, but I don't think I was given a
9  specific time period to review that I'm aware of.
10      So I think it's covering whatever I
11  uncovered.  I mean, I don't know.  I was never told
12  just to review during -- as long as those kids were
13  in detention I was asked to review that period of
14  time, so I guess whether that was two years or eight
15  months.  And the Doe 1 case, I know it goes back to
16  2016 or 2015, I can't remember, so anything that
17  goes back at least that far.
18      Q.  I wanted to ask you about -- you used the
19  term "solitary confinement" in that statement.
20      Do you have a specific definition that you
21  use when you say "solitary confinement"?  What does
22  that mean to you?

A. Well, essentially that's placing an individual in a room that they don't have contact with others other than perhaps somebody checking on them periodically. So they're essentially isolated by themselves in their room with probably really nothing in the room where they could potentially hurt themselves. And they're there for however long a period of time the staff have them there for.

So they're essentially isolated from other people in terms of ongoing contact, from other activities.

Q. So to me -- I'm a layperson. So to me solitary confinement sounds much more severe than another term like room confinement or administrative confinement.

Is there not room in this case for use of those terms? Why do you feel like solitary confinement describes what happens versus administrative confinement or room confinement?

A. Well, for me, yes, there can be some interchangeability with that. However, you know, for me a room is like when you go to a hotel, not

when you go into a setting like a juvenile center, which is essentially a cell, you know. I mean, it is a room I guess technically, but it's also a cell with a little window.

So for some of it is semantics, and for me the room confinement or solitary confinement, solitary confinement speaks to the nature of it being for one individual alone, and that's why that's significant for me. And also because of much of the research that's been done on the use of solitary confinement, and they refer to it as solitary confinement mostly in the literature, that's another reason that I use that, talks about the highly detrimental effects it can have on individuals, whether they're adults but particularly for minors and youth when they're in confinement by themselves with very little stimulation from the outside, particularly if it goes for a long period of time, but even if it's for a short period of time it can be very detrimental. It can lead to further acting out either against themselves or others.

So for me solitary confinement just speaks

more specifically to what I consider the deleterious effects of putting an individual in their cell or in their room for an extended period of time.

Q. Have you -- I know you went to Shenandoah to evaluate John Doe 4.

A. Yes.

Q. Did you see the rooms or the pods there?

A. Not -- well, I mean, I walked down the hall. I was put in a room myself, but it was just an actual like room where people meet, so it wasn't like one of the rooms or cells that the kids are in.

I did walk down a hallway to use the bathroom, but I don't know if it was a pod. So I think the answer is I didn't see much of that, no.

Q. Okay. So it's not like you walked around the facility or took a tour or anything like that?

A. No, I didn't take a tour. I did -- again, this is after this report was submitted when a lot of the documentation came in. I did see videos, did review seven or eight videos that I could see what a pod looks like. You couldn't really see into the room, but you could see where the rooms were.

So I'm at least familiar more with the pods.

Q. So you've seen seven or eight videos but not until after your September 11th, 2018 report was submitted?

A. That's right.

Q. Okay. Then you also used the term "physical restraints."

What does that term encompass in your mind?

A. So physical restraints, again, there can be I guess a continuum of that from simply, you know, one or two people needing to pull a youth back and just, you know, constraining them, you know, manually. It could be use of handcuffs or partial leather restraints, you know, for their -- you know, holding their hands together or their feet.

Again, you used the word "continuum" before. I think there's a whole continuum here where it could also be ultimately up to use of a restraint chair.

So restraint really encompasses any time

1 you're taking somebody's I guess freedom away from
2 them, usually done if there is a concern for safety
3 to themselves or others. And there's mechanical
4 restraints, and then there's human restraints, and
5 then there's restraint chairs, so there's a whole
6 continuum.
7    Q.  That term is all-encompassing for you?
8    A.  Well, unless you give me a specific, yes.
9 I mean, if you said mechanical restraints, but
10 restraints can refer to it, yes.
11    Q.  Okay.  And then at the end of that
12 statement you refer to strapping into a chair, and
13 you referenced a restraint chair a couple of times.
14       Of John Does 1 through 4, do you know
15 which have been or were in the restraint chair ever?
16    A.  I'd have to go back and look specifically.
17 Well, I know Doe 1 was, for instance, and he was in
18 there a long period of time.  I know there were
19 situations where -- and I forget which ones reported
20 to me or I read in their declaration they were in a
21 restraint chair, and I believe in some -- at least
22 in one case the records from or one of the rebuttals

1 stated that this person had never been in a
2 restraint chair.
3       But I know that Doe 1 for sure was, and I
4 know several of the others were reported to be.
5    Q.  Okay.  Do you know how many times a
6 restraint chair was used at Shenandoah in 2017, for
7 example?
8    A.  I don't know.
9    Q.  Okay.  Or 2018, same?
10    A.  I -- I think we did get some data looking
11 at that, but I have not looked at that in any kind
12 of detail other than I know --
13    Q.  It's not something that you relied -- it's
14 not something that you relied on to write this
15 report?
16    A.  Well, it was in terms of John Doe 1
17 because I know, you know, from looking at that I
18 could see that he was in restraints and a restraint
19 chair and so forth for a certain number of minutes,
20 700 minutes, I forget how many it was.
21       So in that case yes, but I didn't have
22 time to -- again, a lot of that information came in

1 very late before this, you know, right before this
2 report was submitted, so I only took what I thought
3 I could use for John Doe 1 at that point.  I just
4 didn't have time to review the rest.
5    Q.  At the end of that paragraph, the
6 Executive Summary paragraph, you say, "In summary,
7 both the mental health care and overall care
8 provided at Shenandoah are deficient and fall well
9 below professional standards of care in the juvenile
10 justice system."
11    A.  Yes.
12    Q.  So as far as mental health care is
13 concerned, you understand that there's a distinction
14 between a secure facility and a residential
15 treatment center, right?
16    A.  Well, yes, right.
17    Q.  And Shenandoah is not a residential
18 treatment center?
19    A.  Yes, that's right.
20    Q.  And I think you mentioned that every
21 unaccompanied youth undergoes a mental health
22 screening at intake?

1    A.  As far as I can tell they do, yes.
2    Q.  And unaccompanied youth undergo mental
3 health assessments by a clinician after that point
4 at Shenandoah, is that your understanding?
5    A.  My understanding is there's an initial
6 intake done, I'm not sure who exactly does that, but
7 some type of an initial intake where I believe there
8 are some questionnaires given and then just a
9 general intake that's done.
10       I believe that -- I'm not sure if there's
11 then another more formal intake that's done.  I do
12 know that psychologists, for instance, are referred
13 to or psychiatrists if there's more explicit
14 concerns from that first intake.  I don't know if
15 it's one or two intakes that are done initially, but
16 that I believe triggers the need for more
17 evaluation, and it's not done for every single
18 child.
19    Q.  Do you know if ORR has to approve that or
20 if Shenandoah is able to just unilaterally have that
21 happen?
22    A.  Well, if I'm understanding your question,

29 (Pages 110 - 113)

1 I know there is a policy in place of initial
2 screening, which I don't -- I mean, that's a policy
3 I believe that's just initiated.
4       As far as their -- if there's concern that
5 they need further evaluation, I don't know for sure.
6 I would suspect they're encouraged to do that to get
7 the kid care, but I don't know if they have to
8 get -- I know they have to make perhaps
9 transportation requirements or get things set up.
10     So I don't know. I suspect they probably
11 do have to have approval, but I don't know for sure.
12  Q. Okay. Do you know what the ratio of
13 clinicians to unaccompanied youth at Shenandoah is?
14  A. Oh, clinicians, let's see. Clinicians
15 to -- I'm sorry, clinicians to --
16  Q. Clinicians to unaccompanied youth
17 specifically.
18  A. Unaccompanied youth, you know, I did -- it
19 might have been in the Ann Nelson report. I believe
20 I read something about that. I don't recall. I
21 want to say it was two per eleven. I don't know for
22 sure.

1  Q. So what in your opinion does Shenandoah
2 need to do that it's not doing with respect to
3 mental health care, understanding that it is a
4 secure facility and not a treatment center?
5  A. Well, I'm going to respond to that in two
6 ways because mental health is also intertwined with
7 following their policies. And the way they're
8 intertwined, first and foremost I think it's
9 following the policies that they do have.
10     So, for instance, their behavioral
11 management program, I feel that there are a number
12 of situations that I reviewed, a number of incidents
13 where I did not feel that progressive approach was
14 followed, and because of that these kids got
15 triggered either for more acting out or more
16 depression, more self-injurious behavior.
17     So I think the context, I think what I'm
18 saying is that for it to be truly -- the mental
19 health care to be truly appropriate in my mind and
20 not harmful has to look at trauma that gets
21 triggered not just from these kids being traumatized
22 from the past but what's getting retriggered in the

1 environment at Shenandoah by, for instance, a guard
2 just, you know, rushing too quickly to put a kid in
3 restraints, let's say, versus talking to that kid.
4 If the kid is already acting aggressively, sure,
5 we've got to contain that child.
6     But if the kid is simply being
7 disrespectful or swearing or angry, there are
8 situations where I felt that wasn't dealt with, that
9 there was no real verbal -- I felt like they perhaps
10 redirected them, you know, to go to your room, but
11 the first step is active listening and engagement
12 with that child. And I felt like if that engagement
13 was there that that would decrease a number of the
14 incidents that they're having with these kids. But
15 to understand that guards have to understand trauma.
16     So for me, if we go back to your question
17 about mental health, it's not that they don't have
18 mental health providers there. They do, and they
19 all appear to be licensed. But it doesn't feel like
20 they're talking with each other or talking with the
21 guards about understanding trauma, you know,
22 understanding look at, you know, this is a kid

1 that's traumatized; he's going to react, he's going
2 to swear at you occasionally. You've got to -- yes,
3 maybe you've got to intervene, but intervention
4 doesn't have to be punitive. It can be engaging and
5 bringing that kid's anxiety down.
6     So for me, that's a lot of what gets
7 missed here is the integration of understanding
8 trauma in every aspect of what Shenandoah does, not
9 just an assessment and then referring them for some
10 treatment. There has to be more involvement with
11 the guards understanding it.
12     And I don't see anything about staff. For
13 instance, I'm aware of some facilities where staff
14 have to -- the clinical staff are there, you know,
15 until late at night and on weekends. I don't know
16 for sure when they work here, but I didn't see very
17 much involvement particularly with evening stuff
18 that the clinicians were involved until one or two
19 days later when they talked to them in their therapy
20 sessions.
21     So my concern was that the guards were
22 simply having -- I know occasionally they would

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 consult with an outside doctor if they had to put a
2 child, let's say, in a restraint chair or whatever,
3 so I'm aware of that. But in terms of active
4 consultation from the mental health staff, I see
5 that lacking here, and that could greatly help to
6 reduce the problems that are there, that I feel that
7 are there; you know, helping guards to better
8 understand, not to overreact, not to -- you know, to
9 follow the policies that are there.
10     So the mental health part for me that's
11 lacking is really understanding the nature of trauma
12 and how everybody has to be onboard, you know,
13 understanding that.
14     Q. Do you have any issue with the policies as
15 written?
16     A. Which policy are we talking about?
17         MS. LIEBERMAN: Which policies?
18 BY MS. HAYNES:
19     Q. Do you disagree with the policies as they
20 are written?
21         MS. LIEBERMAN: Object to form, vague.
22 Any of them?

1 BY MS. HAYNES:
2     Q. Well, the ones that you reviewed, sure. I
3 think a couple of times you said you reviewed a
4 policy and you believed the policy is not being
5 followed.
6     A. Yes.
7     Q. But with respect to those policies that
8 you're referring to, do you have any issue with the
9 way that they're written if they were being
10 followed? In your opinion would that be sufficient
11 in your mind?
12     A. You know, I'm just thinking about that.
13         It certainly would help. In other words,
14 I understand that juvenile centers, you know, do
15 need to have positive behavioral systems in place,
16 incentives and point systems. So in that sense,
17 just kind of looking at the general format of the
18 policy, it generally looked appropriate.
19         So the first answer is I don't think it's
20 sufficient. I think it would certainly help if
21 those were followed.
22         What I think is missing in some of the --

1 what's missing for me is some aspect of
2 understanding; in other words, a little bit more
3 about what it means to verbally engage, you know,
4 what does it mean to -- in other words, the trauma,
5 the traumatic nature of it I think probably should
6 be written a little bit more into the policy.
7         But for me, a lot of it is that if they
8 did follow, for instance, the behavioral management
9 policy, I believe that again it would be sufficient.
10 It wouldn't quite go far enough for me because this
11 gets into the training that the guards need and
12 staff need to understand trauma and how it can
13 easily get retriggered; that a kid that's acting
14 out, for instance, is in a fight or flight mode
15 because of trauma perhaps versus they're just angry
16 for the sake of being angry or wanting to get back
17 at somebody.
18         So I just feel like there's an aspect that
19 probably could be enhanced in these policies to get
20 at the traumatic nature a bit more to make it
21 integrated.
22         But, anyway, so I guess sufficient but

1 wouldn't go far enough or adequate in that sense but
2 wouldn't go far enough.
3     Q. Okay. And then you also refer in that
4 last sentence to overall care. You mention mental
5 health care, and then you also say "and the overall
6 care provided."
7         What do you mean by "overall care"?
8     A. Well, I'm referring there to -- in other
9 words, the mental health care would be specifically
10 the counseling staff and the psychiatrists and that.
11 Overall care would be what I look at as the guards
12 interacting with the kids, using restraints,
13 following the policies.
14     Q. So you're not referring to like medical
15 care, right?
16     A. I'm just trying to think. I mean, I guess
17 loosely it would refer to that. I didn't -- since
18 I'm not a physician, I didn't review -- I saw some
19 of the medical reports, but that wasn't a big part
20 of what I looked at, so I can't really comment on
21 the medical care.
22         I mean, I know that the kids -- and there

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  was documentation that they had gotten treatment for
2  various things, but I don't -- I mean, I did not
3  really look at that.
4       So it's not really referring to medical in
5  that sense.
6    Q.  Is it fair to say that you're confining
7  your opinions to your field of clinical psychology,
8  overall care within the perspective or within the
9  context of clinical psychology?
10   A.  Well, yes and no.  It's coming -- I mean,
11 that's the lens that I'm looking at it through, but
12 it's also looking at the interaction of the milieu,
13 which would be the guards; in other words, how they're
14 interacting with the kids based on, again, what I
15 read in the reports and what I heard from the kids.
16   Q.  Okay.  And then, again, you say in the
17 juvenile justice system, and again I'm just
18 wondering if you expect the same standard to be
19 applied in a secure facility that houses
20 unaccompanied youth as is applied in, say, any
21 juvenile detention center that maybe only houses
22 local youth who have been adjudicated or are in the

1  process of being adjudicated.
2    A.  I do, yes.
3    Q.  And then lastly, you say professional
4  standards of care, and I think we've talked about
5  this a little bit already, but who are you -- as
6  defined by who?  What professional standards of care
7  specifically are you referring to there?
8    A.  Well, I mean, the two that I listed before
9  would be two main ones, you know, the Attorney
10 General's report and the National Child Traumatic
11 Stress Network, and also just my own experience with
12 other facilities and what they're doing, you know,
13 in terms of types of trauma systems that they're
14 using, you know.  There may be specific -- I mean,
15 it's all part of trauma-informed care, but it's more
16 comprehensive.
17      For instance, for some of the therapies,
18 just as an example, if we're looking at a pie and
19 there's different aspects of trauma-informed care,
20 one is what kinds of work are the counselors doing,
21 are the therapists doing, and there are very
22 specific -- you know, one program is called Target.

1  I think I mentioned that, at least in the first
2  report, maybe in the second one as well, that is
3  specifically a trauma-informed therapy approach that
4  through research has shown to lead to significant
5  improvement in kids' trauma and acting out less.
6       So I'm forgetting exactly what your
7  question was, but I think so the standards would be
8  also, you know, research that I've looked at where
9  these approaches are utilized in juvenile justice
10 centers, and it's also my own experience with what I
11 know other facilities do.
12   Q.  Okay.  Is it your understanding that
13 unaccompanied youth come to Shenandoah pursuant to
14 an agreement with ORR, a written agreement?
15   A.  Well, I'm sure there's some paperwork.
16 When you say "agreement," I'm not -- I guess I'm not
17 clear what the question is.
18   Q.  So unaccompanied youth come to Shenandoah
19 at ORR's behest.
20      Would you agree with that?
21   A.  Yes.
22   Q.  And is it your understanding or do you

1  know if there's a written agreement that governs
2  that relationship between ORR and Shenandoah?
3    A.  I'm sure there must be, yes.
4    Q.  Okay.  But you haven't seen it, right?
5    A.  You know, I've had a lot of records that
6  I've looked at, and I know I tend to pass over some
7  of the stuff that clearly isn't relevant to me.
8       So I know there are -- so my guess is I
9  probably have seen it in passing, but, you know, I
10 can't really -- nothing comes to mind.
11   Q.  Can we say that if you don't recall
12 specifically reviewing it it wasn't relevant to the
13 opinions that you set out in your report?
14   A.  Yes.
15   Q.  Okay.  Do you know if that -- so I guess
16 you wouldn't know if that agreement speaks to the
17 care that's provided to unaccompanied youth at
18 Shenandoah?
19   A.  You know, I have seen some -- it didn't
20 factor into my -- I mean, I guess that's where
21 you're going.  It didn't factor into my report.
22      I have -- I mean, I know there's some

32 (Pages 122 - 125)

1 basic things that talk about their rights or
2 something like that. I don't know if that's part of
3 what you're referring to here. I mean, I have
4 loosely seen some of that and kind of read through
5 it quickly where they talked about, you know, this
6 is what will be provided for you.
7      So, again, I'm assuming there's some paper
8 agreement there, and I know I see the kids sign
9 certain things. So I am aware of that, but it
10 wasn't a factor in what I looked at.
11     Q. So fair to say regardless of whether the
12 agreement between ORR and Shenandoah speaks to
13 standards for care of unaccompanied youth at
14 Shenandoah, that's not something you considered or
15 considered relevant?
16     A. I think that's correct. I'm just trying
17 to think what I did look at that might be getting at
18 what you're talking about.
19     Q. I think you've answered the question.
20     A. Yeah, I don't think so. I don't think it
21 really did, yeah.
22     Q. What about do you know if there are

1 regulations specific to Virginia that speak to the
2 care of unaccompanied youth or juveniles? Do you
3 know?
4      A. Most states have different regulations,
5 and I know there's some state flexibility there.
6      So I have not seen those, but I'm quite
7 sure there are, yes. In fact, I know there are.
8      Q. Okay. I don't know about you, Dr. Lewis.
9 On our end it smells like it's lunchtime here, so
10 maybe we could take a few minutes for lunch.
11     A. That's fine.
12     Q. How much time does everyone -- is 30
13 minutes enough? 40 minutes?
14     A. That should be fine.
15          (Whereupon, a lunch recess was
16          taken from 12:01 p.m. to
17          12:50 p.m.)
18 BY MS. HAYNES:
19     Q. Dr. Lewis, I wanted to turn to the part of
20 your report that discusses your evaluation of
21 John Doe 4, and that starts on Page 28 of Exhibit 3.
22     A. I'm sorry, which page was it again?

1      Q. 28.
2      A. 28, okay. All right.
3      Q. And you evaluated him in person at
4 Shenandoah, right?
5      A. That's correct.
6      Q. In July 2018, and for a total of 10-1/2
7 hours?
8      A. Yes.
9      Q. Was that -- do you know if that was split
10 evenly between the two days, or was it mostly one
11 day and then the remainder of those hours on the
12 second day?
13     A. Yes, it was split. The bulk was on the
14 first day, and the second day was like a half day;
15 so it was probably 7 and 3-1/2 or something like
16 that.
17          (Exhibit 5 was marked for
18          identification.)
19 BY MS. HAYNES:
20     Q. Okay. And then if you'll turn to
21 Exhibit 5, if you have that handy in front of you.
22     A. Okay. Okay.

1      Q. Are these your handwritten notes from your
2 evaluation on July 25th and 26th?
3      A. Yes. Yes, they are.
4      Q. And would you have taken these notes in
5 realtime as you were meeting --
6      A. Yes.
7      Q. -- with John Doe 4?
8      A. Yes.
9      Q. Okay. Are these all of the notes that you
10 would have taken during that evaluation?
11     A. Yes, this is all that I -- let me just
12 think. I was asked for two things.
13          Oh, yes, yes, this is both days are here.
14 In fact, you can also see the hours at the top of
15 how it was broken up. So the first day was from
16 9:00 to 4:30. I was just looking to make sure the
17 second day was included, and that's on Page 13.
18          Yes, so this is everything.
19     Q. Okay. Thank you. And what was -- could
20 you tell me what your proficiency is in Spanish?
21     A. I basically understand some words kind of
22 in a passive way. I don't speak it fluently.

33 (Pages 126 - 129)

1    Q.   And what is -- what was John Doe 4's
2  proficiency in English?
3    A.   I think he understood, you know, some
4  basic words.  The interview was done primarily
5  through -- well, it was done fully through a
6  translator, and occasionally like basic words he
7  understood, and he could say thank you or, you know,
8  good day or whatever.
9        So I really don't know.  I suspect not a
10 lot.
11   Q.   And the translator that you worked with
12 for this evaluation was Mr. Jeff Divers?
13   A.   Yes.
14   Q.   Had you ever met or worked with him
15 before?
16   A.   Yes.  I had worked him with Doe 1.
17   Q.   Have you worked with him any time or any
18 other time other than that?
19   A.   No.
20   Q.   Do you know what his -- if he has any
21 training in mental health?
22   A.   Let me think for a minute.

1        Offhand I don't know.  I'm trying to think
2  what he had told me.  Most of the vetting for him
3  was done by the lawyers that basically interviewed
4  him for the position -- not position but for working
5  with me.
6        What I usually say to them is obviously I
7  need someone who is fluent in Spanish.  It would be
8  nice if they were from the same country, but that
9  often doesn't happen.  Also I'd like if they've had
10 some involvement with youth or with trauma cases or
11 immigration.  That's usually what I ask for.
12        So I don't know exactly what his
13 experience was with mental health issues and per se.
14 I know he had worked with youth, but I don't know --
15 like in school systems, but I don't know exactly
16 more than that.
17   Q.   How often when you are doing a forensic
18 psych eval. are you working through a translator?
19   A.   A forensic psych eval., a high percentage
20 of the time, 90 percent of the time.  Some of the
21 people that I've seen, like for instance from
22 Africa, often do speak English, you know.  They've

1  learned British English or whatever.  Occasionally
2  I'll have a young person from Central America or
3  Mexico who for whatever reason is quite fluent in
4  English.
5        So I'm going to say probably 90 percent of
6  the time that I use a translator.
7    Q.   Do you think working through a translator
8  has any detrimental effects on your evaluation?
9    A.   I'm sure there's -- I mean, there's
10 usually some slippage.  I mean, again, words can be
11 misconstrued, you know.  So there can be language
12 issues that present themselves or the context.
13        Again, often, you know, the translators
14 will -- if they feel like there's something that's
15 happening, they'll explain to the client that they
16 need to talk to me for a moment, and they'll explain
17 to me I think that there's a context here that I may
18 not be understanding or the kid might not be.  So
19 they'll talk to me about it.  And then if that's
20 relevant, I might ask the question in a different
21 way.
22        So I do try to account for that, but I'm

1  sure there's always some things that are
2  misconstrued.
3    Q.   Could you walk me through how you do a
4  forensic psych eval., what are the steps you take?
5    A.   Well, first is just greeting the person,
6  introducing myself, saying nice to meet you.  I
7  often will ask a little bit about what their
8  understanding is of who I am or what I'm there for,
9  you know, why I'm going to be meeting with them just
10 to see what they understand.
11        I then explain the purpose of the
12 evaluation.  And, again, if it's, you know, a case
13 like this that's a civil case that's looking at the
14 impact of their living in detention, I will explain
15 that to them, that part of what I'm going to be
16 doing is talking to you about your experiences, for
17 instance, here at Shenandoah.  If it's about asylum
18 or SIJ I'll explain that I'm going to be asking
19 about their history more and their psychological
20 history, whatever traumas they may have had, how
21 that's affected them, and how they're functioning
22 currently.

34 (Pages 130 - 133)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1      And then I have them tell me back what
2  they understand so that I have some sense of whether
3  they're grasping the purpose of the evaluation, and
4  we will get that clarified if it needs to be.
5      And then I usually just start in doing my
6  interview.  Usually I start with things like just
7  tell me a little bit about -- well, it might vary.
8  Some people want to just talk about their current
9  situation, so I might start by talking about, you
10  know, their -- for people that are living in the
11  community, you know, where they're living and what
12  they're doing.  But then I quickly go to their
13  history.  I want to understand who this person is
14  that's in front of me, where they were born; and
15  they give me their birth date, what kind of family
16  environment were they raised in, their schooling, so
17  getting at things of that sort kind of to build
18  rapport and get their history.
19      I will ask about, or if they haven't
20  reported already, any particularly stressful events
21  that may have happened in their childhood.  If
22  they're in this country where I'm evaluating them,

1  and most of them are, I'll ask what the
2  circumstances were that led them to come to the
3  United States and how they got here, what that
4  journey was like.  And then I'll ask about their
5  current situation, where they're living, how they're
6  functioning.
7      Depending on the nature of the evaluation,
8  there will be some what we call paper and pencil
9  like questionnaires that I'll use.  It just depends
10  on, you know, how much time I have and what the
11  nature of the evaluation is.
12      So with most of the youth that I evaluate
13  for these cases I do try to do some type of trauma
14  assessment besides the clinical interview.  There's
15  a number of different tests that I may use.  I
16  may -- I will do some questionnaires that get at
17  issues of depression and anxiety just as a way as an
18  adjunct to the clinical interview.
19      I will do a mental status exam.  It may
20  not be a formal exam.  Certain parts might be if I
21  suspect, you know, some -- a lot of the mental
22  status exam could be gleaned from the interview.  I

1  can tell if somebody is alert, you know, versus
2  they're being comatose.  I can tell; I don't have to
3  ask them that.  But I don't know if they know the
4  date and where they are, so I will specifically ask
5  that for instance.  So I will do a mental status
6  exam.
7      And then in this case would ask about
8  their experiences at whatever facility they're at,
9  how that may be affecting them, any particular
10  problems, and then get into some detail with that.
11      As I mentioned before, I will -- if I have
12  records available, and sometimes I don't have any,
13  it might be an affidavit this person has submitted
14  or a declaration or maybe records from ORR, I try to
15  look for areas of consistency and inconsistency, and
16  where there's inconsistency I do try to ask about it
17  in a way that lets them know that, you know, I don't
18  understand why you said this and now you're saying
19  that or what -- help me better understand this.  I
20  do try to get to some of that as well.
21      Q.  You mentioned that you did some paper and
22  pencil evaluations.

1      In Paragraph 103 at the top where you say
2  "administered several psychological questionnaires,"
3  is that what you're talking about when you say paper
4  and pencil evaluations, or is that something
5  different?
6      A.  No, that's what I'm referring to.
7      Q.  Okay.  And I assume there are specific
8  questionnaires that you use for this purpose?
9      A.  Yes.  It may vary somewhat from individual
10  to individual, but yes.
11      Q.  Do you know which ones you used for
12  John Doe 4?
13      A.  I'd have to -- I don't -- yeah, I don't
14  think I included that here, and I didn't bring his
15  report.  Let me see if I can recall.
16      I did the -- well, one -- I believe there
17  were five that I gave him.  One was the Beck
18  Depression Inventory 2, Spanish version.  One was
19  the trauma -- it's called the Trauma Symptom
20  Checklist for Children, the TSCC, also the Spanish
21  version.  So as much as I can I try to utilize tests
22  that are in Spanish.

35 (Pages 134 - 137)

1        There was three other ones.  Let's see.  I
2  did the Beck Anxiety Inventory as well.  I believe
3  that was also in Spanish.  And I don't recall what
4  the other two were off the top of my head.
5        Q.   And what is the purpose of those
6  questionnaires in the evaluation?
7        A.   So, again, each questionnaire usually has
8  a time frame.  The Trauma Symptom Checklist for
9  Children, there's no time frame.  It basically
10  assesses for trauma across the life span, so there's
11  no defined time frame.
12        For instance, the Beck Depression
13  Inventory, I believe it's any symptoms.  There's a
14  variety of symptoms they ask about, and there's a
15  range of never occurs to sometimes to always, and
16  there's numbers like zero to 4.  So it's in the
17  Likert scale where they have to rate it.
18        And they -- basically it's within the last
19  either week or two weeks.  Some tests it's the last
20  month.  So there's often a time frame, have you had
21  any of these symptoms in the last two weeks, any of
22  these symptoms in the last month.

1        Some of the tests are not within a time
2  frame.  It's more just within a -- it could be a
3  life span type of thing.
4        And, again, these are used as not so much
5  for the score.  It's used to kind of get --
6  sometimes a score is helpful if it's a test that's
7  validated on these particular youth; it's in
8  Spanish.  There are times that I've simply had to do
9  this as a way to get a different way of asking
10  questions just to make sure I'm not missing
11  something.
12        So it's used as an adjunct primarily.  The
13  main information comes from the clinical interview.
14        Q.   Are the tests something that you put in
15  front of the youth and ask them to complete, or do
16  you go through it with him and fill it out as he
17  gives you answers?  How does it work?
18        A.   It depends.  Many of the youth, depending
19  on -- and most of these tests are written at like a
20  second-grade or fourth-grade reading level, so
21  they're very basic.  But some of the youth just
22  don't have that ability to do that.

1        So the translator, you know, again, I'll
2  be here, and the translator will go through each
3  question.  At first we might have the youth read it
4  if they can, and if they can't read the translator
5  or interpreter will read it for them, make sure
6  they're understanding the directions, you know, so
7  make sure for the first couple of examples they're
8  understanding what's being asked and how they should
9  respond accordingly.
10        So I would say it's probably maybe a third
11  of the time the youth, some of the youth are bright
12  enough to just read through it.  You can tell; you
13  know, I'll have them read it out loud, they clearly
14  understand it and they get it maybe a quarter.  The
15  other three-quarters, the translator or the
16  interpreter helps them with it.
17        And if they run into a problem they'll ask
18  me, like they'll say, you know, he's having a hard
19  time with this particular issue because it's not
20  something a part of his culture, so together we will
21  try to work with it.  That might happen maybe one
22  question on a particular exam.  So we will talk

1  about a way of asking that that's consistent with
2  what the question is getting at.
3        Q.   And what was the case with John Doe 4?
4  Was he able to read it and fill it out himself, or
5  was it something that you and the interpreter worked
6  on with him?
7        A.   I think there was a combination.  Again, I
8  can't remember all the five tests I gave him.  He
9  was quite verbal, that I do recall; and my sense was
10  he had, you know, probably average intelligence.
11        I don't recall offhand -- yes, I'm just
12  not recalling whether he was able to just -- I think
13  one of the tests he was able to -- one of the
14  inventories he was able to do on his own.  I just
15  don't recall.  It was probably a combination is my
16  guess.
17        Q.   All of the tests, were all of the tests
18  you gave him translated into Spanish?
19        A.   Again, if I had all five I could say for
20  sure.  I know the three I gave you were, the Trauma
21  Symptom Checklist.  These are tests that are ordered
22  and they're standardized, and so you have to order

36 (Pages 138 - 141)

1  them and pay to use them.  So they come in a packet.
2         So yes, the three that I listed were in
3  Spanish.  I can't remember what the other two were
4  offhand, so I'm not sure if they were in Spanish.
5    Q.   Do you know if -- and so if it's not
6  translated into Spanish, the translator would as
7  needed translate verbally?
8    A.   Right.
9    Q.   And then you would take the answers down
10  as you go?
11    A.   Yes, right.
12    Q.   Okay.  And in addition to being translated
13  into Spanish with respect to the three that you do
14  remember were translated into Spanish, do you know
15  if those tests have been used in and standardized to
16  Spanish-speaking youth?
17    A.   So the issue of standardization, it's kind
18  of a tricky one.  Some of them have, but to be
19  honest with you there are no, that I'm aware of, no
20  let's say questionnaires or tests that have been --
21  in other words, to be truly validated and
22  standardized, it has to be a population similar to

1  yours.  But are we just talking Spanish-speaking
2  populations, of which there are varieties even there
3  in terms of, you know, the region they're from.  But
4  then there's also the fact that these are immigrant
5  or refugee or unaccompanied minors, and I don't know
6  of any validation that's been done on any refugee --
7  well, for refugees there has been.  There are tests,
8  but those are more for adults.  But for youth I'm
9  not aware of any.
10         So at times we have to just get as close
11  as we can, so I try to at least get tests that have
12  validation and norming on Spanish-speaking youth.
13  Often they're youth that are in this country that
14  were living here versus youth that are coming from
15  another country here.
16         So that's one of the dilemmas of using
17  these tests.
18    Q.   It seems like there's a need there.
19    A.   There's a huge need, yeah.
20    Q.   Do you record the interview in any way
21  either audio or video?
22    A.   I do not, no.  I just take notes.

1    Q.   And so in portions of your report where
2  there are paragraphs in quotes and italics, are you
3  taking those from your notes?
4    A.   Yes.  As close as I can I try to get it
5  verbatim.  Obviously it's not perfect, but I try to
6  get -- you know, what the translator is translating
7  for me, I try to get that down verbatim, but I'm
8  sure it's not perfect.  But I think I clearly get
9  the gist of it accurate most of the time.
10         And if there's something I'm not sure
11  about, I go back and I ask them, you know.  That's
12  the purpose of doing this over a couple of days too.
13  One is to develop trust with these kids, and there's
14  a lot to get through.  But if I look over my notes
15  on the first day and I'm realizing something is not
16  clear from what they said, I can then go back the
17  second day and clarify.
18    Q.   With respect to the evaluation, is it fair
19  to say that those are all self-reporting, meaning
20  it's a checklist for a questionnaire where the
21  subject is providing the information asked for?
22    A.   I believe that's correct with the tests

1  that I used with Doe 4.  They were all
2  self-reported.  Even if he was being assisted, they
3  were primarily self-reported, that's right.
4    Q.   I know there's some tests out there that
5  have validity scales.
6         What does that mean?
7    A.   Validity scales are scales that are
8  embedded -- well, there's two kinds of validity
9  scales.  One are tests that simply assess for
10  malingering, you know, that someone -- the problem
11  is a lot of those are based on adults.  It's a whole
12  different context from working with youth.
13         So the validity tests basically get at
14  whether someone, and they ask questions to -- they
15  throw a few very preposterous questions in.  So, for
16  instance, if somebody agrees to a lot of this,
17  they're thinking, you know what, they're likely not
18  telling the truth because nobody would ever agree to
19  this kind of question.  If it's embedded in a test,
20  and it was in the Trauma Symptom Checklist for
21  Children, that's one reason I use that.  There is a
22  Spanish version.  There is a validity scale in

37 (Pages 142 - 145)

1  there. And it basically gets at whether they're
2  trying to overexaggerate or underestimate their
3  situation, their symptoms basically.
4       So it's looking at -- it's not so much
5  looking at are they telling the truth about X, Y and
6  Z; are they telling the truth about their current
7  functioning. So it doesn't say if he's telling the
8  truth about what happened at Shenandoah, but it
9  tells me there's some validity -- and his scales
10  were okay as I recall, I'd have to go back and look,
11  but they were valid, meaning that he wasn't trying
12  to overexaggerate or underestimate his current
13  symptoms.
14       And why might people do that? Well, to
15  win a lawsuit, to get certain benefits. If they
16  exaggerate certain disability symptoms they can get
17  disability.
18       So there's other things that we look at
19  for validity besides what's in these scales, but
20  that's the reason to try to use some. The problem
21  is there's no malingering test that's validated and
22  normed on adolescents, particularly adolescents who

1  speak Spanish or who are migrants or unaccompanied
2  minors, so, again, that's part of the problem.
3       Q. You mentioned that I think the TSCT had a
4  validity scale.
5       Do you know if any of the other tests you
6  gave him did?
7       A. No. For Doe -- no. For Doe 4, I believe
8  that was the only one that had a validity scale. I
9  know for Doe 1 there were two that had validity
10  scales, but for Doe 4 that was the only one.
11      Q. And I think when you evaluated Doe 1 you
12  used ten tests.
13      Is there a reason why you would use ten
14  with John Doe 1 and only five with John Doe 4?
15      A. Off the top of my head, I believe part of
16  it was because I was doing a number of things in
17  that evaluation. I was having to assess for
18  competency plus looking at his immigration case, so
19  I had to get at trauma in different ways.
20      I think part of it had to do with the
21  complexity of the case, you know, because, again, it
22  wasn't just one evaluation. It was several.

1       I think part of it was -- again, I'd have
2  to look at the specific tests to say why I chose
3  that for him versus for Doe 4. I think there was
4  some that I used that were the same, but I think
5  there were some that were different.
6       Q. And do you still have copies of the tests
7  that you administered? Do you have --
8       A. Yes.
9       Q. -- your own files for these --
10      A. Yes.
11      Q. -- individuals?
12      A. Yes.
13      Q. In Paragraph 105 you kind of summarized
14  your -- I think you talked about this when I asked
15  you how you do these evals., your kind of discussion
16  with him about the purpose of the evaluation and
17  what you're there to do. And you say, "He was
18  informed I would be providing a written report to
19  his lawyers that would also be submitted to the
20  court."
21      Was it your understanding at the time --
22  this would have been July 2018 -- that this report

1  would be used in the lawsuit?
2       A. We're talking about Doe 4 now, right?
3  Okay.
4       Q. Yes.
5       A. This current lawsuit, I believe -- well,
6  yes, yes. Well, I didn't know -- I mean, when I
7  give a report to a lawyer, it's up to them whether
8  they want to use it.
9       So in that sense I knew it was potentially
10  going to be used, but I never know if it's going to
11  be rejected or not.
12      Q. Right. And I assume that it was
13  John Doe 4's lawyers who asked you to do the
14  evaluation, right?
15      A. I'm sorry, that it was who?
16      Q. It was John Doe 4's lawyers who asked you
17  to do the evaluation?
18      A. I've got to think about that for a minute.
19      Q. If it wasn't, let me know.
20      A. Well, you're talking about for the civil
21  case, yeah. The reason I hesitated is because with
22  the Young Center I get involved with so many

1 different -- yeah, no, this simply came as a result
2 of this case, that's right.
3     Q.   And my understanding was that you were
4 initially -- and I think we talked about this
5 morning, but you initially evaluated John Doe 1 at
6 the request of the Young Center, and then --
7     A.   Yes.
8     Q.   -- the lawyers who were involved in this
9 case --
10     A.   That's right.
11     Q.   -- asked you to look at John Does 2, 3 and
12 4 --
13     A.   Right, whereas this was --
14     Q.   -- right?
15     A.   -- the other way around and I haven't been
16 involved with the Young Center or anybody else on
17 this case, on Doe 4, just the civil attorneys,
18 right.
19     Q.   Right.  And did he know that, that you
20 were there at the request of his attorneys?
21     A.   Yes, he did.
22     Q.   Okay.  Was anyone else in the room with

1 you besides the translator and John Doe 4?
2     A.   No.  Well, no, I take that back.  For the
3 first 10 minutes Ms. Lieberman was with me just to
4 make sure that everything was calm and that
5 everything was functioning well, and she sat over in
6 the corner and then she left.  She stayed just for
7 the first part of the evaluation, the first five,
8 ten minutes where I was just getting to know him and
9 explaining the purpose of it, and she left after
10 that.  That was on the first day that I was there.
11     Q.   Thanks for the clarification.
12     A.   Yes.
13     Q.   In Paragraphs, flipping ahead a couple of
14 pages, 124 and 125, you talk about John Doe 4's --
15 I'll wait until you're there.
16     A.   Yes.
17     Q.   You kind of reviewed some of John Doe 4's
18 history at other facilities.
19     A.   Yes.
20     Q.   What is the -- could you kind of elaborate
21 or tell me what the importance of that is or why you
22 do that when you evaluate someone?

1     A.   Well, just in general, for any -- you
2 know, whether it's a medical doctor or a
3 psychologist, clinical social worker, if we have
4 access to other records, it helps us to know prior
5 history just to be consistent with things; so, I
6 mean, it's pretty much a standard that we all
7 utilize.  Sometimes we don't have access to prior
8 records, so when we do, the reason in this case to
9 have access to that is to understand what his
10 experience has been through the detention system,
11 just looking at how he functioned, why he was
12 transferred.
13         In this particular case the reason I -- so
14 there are times that I would review records and it
15 might not be relevant to a case at all.  In this
16 case I felt it was because there was abuse that had
17 occurred at one of the facilities, and I felt that
18 that was important to be aware of also because this
19 is a young man who I found to have posttraumatic
20 stress disorder who experienced a great deal of
21 trauma in his home country; and I felt that it was
22 important to be aware of that trauma because that's

1 going to affect then how he behaves in his new
2 facility and then how he is treated and dealt with.
3     Q.   And in these paragraphs I understand that
4 you're evaluating him, you're giving him the tests
5 that we've talked about, and you also reviewed some
6 records.
7     A.   Right.
8     Q.   How do you synthesize all of that into
9 your report?
10     A.   When you say "how," do you mean like what
11 weight do I put on things?  Or, I mean, I just try
12 to integrate -- I mean, I write the report in a
13 certain format, you know.  I start with the history.
14 I mean, I follow a pretty similar outline for each
15 report.  Obviously it's going to change depending on
16 the circumstances.
17         So I first talk about family history and
18 trauma.  I then do a section on the results of what
19 I call the testing or the questionnaires, and I'll
20 often go through each test and talk about what I've
21 found in those tests.  And then I try to do a
22 synthesis at the end where I bring it all together.

39 (Pages 150 - 153)

So as far as collaborative records, usually they're simply brought in just to highlight certain points. Again, it just depends on the situation. You know, they're alluded to in the report and they're looked at, and if there's something specifically that I'm relating to that like here I document that.

So there is a synthesis at the end and a summary, but there's also specific sections that like highlight the testing and what's done.

Q. In Paragraphs 124 and 125 specifically, can you tell by looking at them if the two of you talked about those events or if that's from your review of documentation or both?

A. We're referring to 124 here and 123 did you say?

Q. 124 and 125.

A. Oh, okay. This was -- this was actually both. I was aware of this when I evaluated him, and I just -- I think I asked at one point, you know, what his experience was like there, and he just talked about this and he corroborated what was here,

so I didn't take any separate notes on that. But this was from both, for example, 123 and 124.

Q. And you know that because you can remember sitting here today talking about it with him?

A. Yes.

Q. Okay. And then ultimately Doe 4 was transferred to Shenandoah because of behavioral problems and because he was deemed a flight risk, right? I'm getting that from 128.

A. I believe that's correct, yes, right, yes.

Q. Do you know any more of the specifics with regard to his behavioral problems?

A. And, again, for his case I did not have ORR records, so I didn't have access. I believe he had had a number of SIRs. I don't know how many. And, again, I did not have access to that. I mean, I did but I didn't -- yeah.

Q. And do you know --

A. I'd have to go back and look at the dates.

Q. Do you know from a --

A. I'm sorry.

Q. Do you know from an overarching

perspective who or what entity would have made that decision to transfer him to Shenandoah?

A. Well, I'm assuming ORR, yeah. I don't know.

Q. Okay. And then in Paragraph 134 you go into what I think you've talked about a little bit already, the idea of complex trauma.

A. Yes.

Q. And I think, correct me if I'm wrong, but I think in John Doe 1's evaluation you decided that he does not meet the requirements for diagnosis of PTSD; is that right?

A. That's right.

Q. And I'm just wondering for my own curiosity why John Doe 1 no on PTSD but John Doe 4 yes on PTSD.

A. So I'll give you the general answer then the specific one. Someone can have been traumatized but not have symptoms of trauma. It doesn't mean they weren't traumatized. They just aren't reporting nightmares or flashbacks or whatever.

So in Doe 1's case, he either -- I'd have

to go back and specifically look at it, either didn't -- my guess is he didn't have enough symptoms to give him that diagnosis whereas Doe 4 clearly did and it was very specific. He talked about nightmares, and so there was specific symptoms that he gave that met that criteria. And you have to, again, according to DSM-5 you have to look at the number of different criteria that have to be met and over what period of time. So Doe 1 did not meet that and Doe 4 did.

But the other point that I'm making here is that, and this goes back to the trauma-informed care issues that you were asking about earlier, is that a young man or a young woman who has been traumatized, even if they don't specifically have a diagnosis of PTSD, their diagnosis might be depression, it might be conduct disorder, which Doe 1 did have, for instance; but what gets missed there is that when they've been traumatized, and Doe 1 clearly was traumatized by his father in particular, that the underlying issue beneath those depression and behavioral problems is the trauma.

40 (Pages 154 - 157)

1	And so if we're just going to treat the
2	conduct disorder or the depression, it's missing, in
3	my mind and in my opinion, it's missing the
4	underlying trauma that's the cause of those
5	acting-out behaviors or that depression. So part of
6	it is not just dealing with symptoms but dealing
7	with the underlying issues.
8	But Doe 1 did not meet criteria for PTSD.
9	He just didn't meet DMS-5 criteria, but I felt like
10	he had complex trauma simply because what complex
11	trauma is is multiple, prolonged experiences of
12	trauma, and he had multiple instances of abuse by
13	his dad, and difficulties in what we call
14	self-regulation, managing emotions, managing
15	behaviors. They get triggered very easily in
16	situations.
17	So that's part of what we look at with
18	complex trauma. It's not officially in DSM at this
19	point. It likely will be in the next one that comes
20	out. Obviously that remains to be seen. But it is
21	something that's been talked about for a good ten
22	years and is part of what has to be looked at

1	particularly with migrant youth, who many are
2	traumatized, as well as kids who are in detention
3	centers.
4	Q.	Is it safe to say on a theoretical level
5	that different individuals and different kids
6	respond to trauma in different ways?
7	A.	Sure.
8	Q.	And does that kind of very generally
9	describe what you're talking about when you talk
10	about why John Doe 1 might not meet the requirements
11	for a PTSD diagnosis but John Doe 4 does?
12	A.	Say that to me again. I just want to make
13	sure I'm following your reasoning.
14	Q.	What I'm getting at is the idea that you
15	might have two kids who have equally horrific
16	experiences in their past.
17	A.	Right.
18	Q.	One might have a diagnosis of A, B and C,
19	and the second one might have a diagnosis of D, E
20	and F, and that's just the manifestation of trauma
21	in individuals, right? Is that a fair way of saying
22	it?

1	A.	There's going to be variability.
2	Q.	Okay. Okay. And I think you mentioned
3	complex trauma is not in the DSM yet, and is that
4	what you mean by not yet recognized by the APA?
5	A.	That's right.
6	Q.	Okay. In Paragraphs 136 and 137 you quote
7	John Doe 4 talking about some specific events.
8	Was he able to identify names and dates
9	for you when you talked to him?
10	A.	In general, no. There might have been one
11	time he did. I'd have to go back and look at my
12	note, but in general, no.
13	I also have to say I did not ask -- he did
14	not offer that and I did not specifically ask for
15	dates and names.
16	But the answer is generally no, I don't
17	think he did.
18	Q.	And the purpose, I think you talked about
19	this a little bit or alluded to it when you talked
20	about validity scales, but the purpose of this
21	evaluation was to assess John Doe 4's psychological
22	functioning, right?

1	A.	Well, yes, and, again, just as part of any
2	good psychological evaluation, I do want to get at
3	his history. So, I mean, I'm going to ask about his
4	childhood history, and I need to know about that and
5	his reason for coming here.
6	So even though that's not the primary
7	focus, that's all relevant. I can glean how he
8	relates to me by doing that, what he can tell me
9	about his history, does that compare to other things
10	that I know about his history. So there's a number
11	of things.
12	So yes, it is primarily about his
13	functioning now and his experience at Shenandoah.
14	Q.	And is verifying the details of what he's
15	saying particularly important to you in that
16	exercise?
17	A.	I mean, I always try to look for that, and
18	yes. So, I mean, important in the sense that do I
19	have -- do I always know the reason why things
20	might -- if it's consistent it tells me one thing;
21	if it's inconsistent it tells me something else.
22	If there are things that are, you know --

41 (Pages 158 - 161)

1 I mean, it could be a variety of things, but it's
2 important in the sense that it's relevant to the
3 evaluation. It could be relevant to their
4 credibility, for instance.
5    Q.   In Paragraph 142 you write that Doe 4
6 reported there were some nice people at Shenandoah
7 who tried to help him and teach him to calm down.
8        Do you know who specifically he would have
9 been referring to?
10    A.   He didn't give me names. He just said --
11 well, he did mention Evenor, which I think I quoted
12 there, that had he tried to help him to some extent.
13 He didn't feel he went far enough. And I think he
14 was referring to there some of the guards that I
15 think he felt were good people or nice people. He
16 didn't give me names. He did give me Evenor's name,
17 but the other names he did not give me.
18    Q.   But your understanding was that he was
19 referring to four staff as opposed to a clinician?
20    A.   Yes. I mean, he did say guards at some
21 point. When I asked him who that was, he said,
22 well, Evenor and then some of the guards or

1 something like that.
2    Q.   Okay. And then in Paragraph 147 Doe was
3 asked what he would change about Shenandoah if he
4 were in charge, and he responded with the following:
5 "The way they treat us, improve the food, be less
6 strict, get us outside more, different types of
7 games, change the color of the walls - everything is
8 white, more comfortable chairs, and teach kids how
9 to work, be organized, and manage their money."
10        And I'm not trying to be flippant in any
11 way, but to me this kind of seems like a complaint
12 list for any kid in John Doe's 4 situation and maybe
13 even a lot of teenagers who aren't detained.
14        Did it not strike you that way?
15    A.   Let me -- and again, remember, I was
16 simply at the end of the interview, I just was --
17 sometimes I'll end on a note and just say is there
18 any -- like if I know it's going before a judge,
19 I'll say is there anything particular you feel is
20 important for me to know or for the judge to know.
21        So in this case I just said, you know, if
22 you were in charge here what -- I just kind of

1 wanted to see where he went with that, so that was
2 the context for it.
3    Q.   Sure.
4    A.   As far as what he said, yeah, I mean, go
5 outside more, different kinds of games, manage their
6 money, yeah, I mean, I think this probably would be
7 consistent with what most of the kids would say.
8        What I found interesting though is that
9 he -- I mean, he basically said this all in one
10 sentence, so he clearly had some thoughts about it.
11 And the fact that he even commented on the color of
12 the walls, I mean, yeah, I mean, it's a minor issue,
13 but his point there was that it's a very sterile
14 environment, and I realize it's not a hotel, but I
15 think that's part of -- I mean, if there was a way
16 to make it more aesthetically comfortable for the
17 kids it would help in terms of some of their acting
18 out.
19        But yeah, I agree with you. It's probably
20 pretty typical of what most of the kids might say.
21    Q.   In Paragraph 151, if that's the paragraph,
22 you describe something I think you've talked about a

1 few times, this concept of losing a point versus not
2 being awarded a point because you haven't earned it.
3    A.   Right.
4    Q.   And kind of on a conceptual level and
5 understanding that it may have been documented as
6 having a point taken away, do you know if that's how
7 it was communicated at all times to John Doe 4 or to
8 any of the Does?
9    MS. LIEBERMAN:  Object to the form.
10 BY MS. HAYNES:
11    Q.   Let me try again because it's a
12 complicated issue, and I'm trying to understand.
13    A.   Sure.
14    Q.   So before a certain point -- we agree
15 there was a change in the behavioral management
16 program; is that right?
17    A.   My understanding was there was. I mean, I
18 can't attest to that. I never saw the before and
19 after, but that's what I'm hearing.
20    Q.   Okay. My understanding is that was
21 August 2016.
22    A.   Okay.

42 (Pages 162 - 165)

1    Q.   And I take it to be your opinion that the
2  distinction between losing points or not being
3  awarded points because you haven't earned them has
4  never been successfully implemented based on your
5  review of the documentation.
6    A.   I would say --
7    Q.   Is that fair?
8    A.   Yes, not successful in the sense of not
9  consistently done.  I believe there probably is some
10 misinterpretation on the part of the kids, but I
11 also do believe that there were times that young
12 people had already earned points for certain things
13 they had done and that those points were taken away,
14 and, I mean, that -- I mean, there were just a
15 number of kids that talked about that.  And you can
16 say, yes, some of that was slippage, but just the
17 way it was documented, there was one in particular,
18 and I don't remember which one, where clearly there
19 was a point that had already been earned for a
20 behavior, and it was documented in the note that
21 this was taken away.  So for me that was a clear
22 example of a point lost.

1        So my guess is there's some slippage
2  there.  Either way for me -- and I'm for point
3  systems.  I mean, I want to make that clear.  I
4  mean, you need to have that way of behavioral
5  management in systems like this.  But how it's
6  implemented, if it's done inconsistently or
7  unfairly, it triggers for these kids a
8  demoralization and acting out.  And I do believe
9  there were times that staff did not follow the
10 protocol properly and actually did take points away,
11 and other times I think the kids misinterpreted it.
12 Other times the kids misinterpreted it, so I think
13 it's both.
14   Q.   Okay.  Are you able to say what percentage
15 was which scenario, what percentage of kids
16 misunderstanding and what percentage is guards not
17 following or staff not following the procedure?
18   A.   No.  I mean, what percentage?
19   Q.   Do you remember --
20   A.   I don't know.
21   Q.   -- which -- you were referring to that
22 specific instance that you saw in documentation

1  where a point had been earned and then that earned
2  point was taken away.
3        Do you remember which Doe or which youth
4  that occurred with?
5    A.   You know, I tried to -- I didn't quite get
6  finished.  Over lunch hour I was trying to go
7  through just to give you some examples, and I was
8  looking for that in particular.
9        I believe -- well, I'm assuming you just
10 looked over Doe 4, so if it was Doe 4 you probably
11 would have picked up on it because I did put it in
12 the report.  So it must have been one of the other
13 Does.  I'm thinking it was either 2 or 3.  I think
14 it was either 2 or 3.
15   Q.   Okay.
16   A.   But I did document where I got that
17 information from, and I took it verbatim from the
18 report.  And that was one example for me that just
19 seemed very clear cut because it did mention that
20 their points had already earned and now they were
21 being taken away, and that's part of what triggered
22 this kid to act out.

1    Q.   Did you ever feel like you wanted to or
2  should talk to the people who were doing the
3  documenting to get kind of what their perspective
4  was on it?
5    A.   I mean, that certainly would be nice.  I
6  mean, again, the more information I have the better,
7  you know, place I'm at to make an accurate opinion.
8  That simply was -- well, there was no time to do
9  that.  Again, my primary reason to be there was to
10 evaluate the young man.
11       So, you know, I think point well taken
12 again if I'd had that access, but that simply --
13 generally in these cases that's not what -- I don't
14 know if it's that we haven't been allowed to do that
15 or it just hasn't been done.  I don't know.
16   Q.   No, I understand, and I'm not trying to
17 be -- I'm not trying to pick an argument with you.
18 I just have trouble with that concept as a semantic
19 issue.
20       In Paragraph 153, and this looks like --
21 again, this is a paragraph where I look at it and it
22 looks like you were looking at documentation when

43 (Pages 166 - 169)

1 you drafted this particular paragraph, but can you
2 tell if you also discussed this incident with
3 John Doe 4?
4    A.   Which, I'm sorry?
5    Q.   It kind of goes with the preceding.
6    A.   Which number are you looking at?
7    Q.   I'm looking at 151 --
8    A.   Oh, okay.
9    Q.   -- to 153.
10   A.   Okay.
11   Q.   It talks about this incident on
12 February 4th, 2018.  And as I read it, it looks like
13 you obviously were referring to documentation
14 because you have specific dates.
15        But can you tell by looking at this
16 paragraph if there was something you would have
17 talked about with John Doe 4 too?
18   A.   I did not talk to him about this one.
19   Q.   Okay.  And is that just because of your
20 recollection?
21   A.   No.
22   Q.   Do you just remember whether you talked

1 about it with him?
2    A.   No.  As I'm looking at this I realized
3 when I -- well, it's a recollection, but also like
4 the Children's Village situation I explicitly -- we
5 did talk about that because I just wanted to see
6 because for me that's some corroboration, you know.
7 If he says I was abused at the other facility, and
8 then they found that it wasn't, that might tell me
9 one thing.
10       So in that case I specifically wanted to
11 know about that, so that's why I remembered that.
12       In this case when I put on Page 36 review
13 of Doe 4's declaration and disciplinary reports, for
14 the most part that's done simply by reviewing
15 documents.  So only in exceptional circumstances
16 like the Children's Village situation would I
17 specifically have asked about it.
18   Q.   Okay.  That makes sense.
19       So in Paragraph 153 your conclusion kind
20 of is in this incident, if less -- and the incident
21 I guess you're referring to is in 151 and 152, if
22 less restrictive measures had been implemented,

1 i.e., the progressive measures of the behavior
2 management programs had been followed, then force
3 very likely would not have been necessary.
4        And I just wanted to know what less
5 restrictive measures you had in mind when you wrote
6 that.
7    A.   So with all of these examples that I'm
8 giving I try to give examples where -- because there
9 were examples that I reviewed where I felt it was
10 handled appropriately.  But the examples that I gave
11 here were examples I took literally from the records
12 from reviewing the disciplinary reports, the SIR
13 reports as well as the case management and progress
14 notes, if there was any connection there.  In other
15 words, sometimes the dates didn't match up, but I
16 tried to as much as I could look at all of that and
17 report -- even though I wasn't there and didn't ask
18 the young man about it tried to put down what I was
19 gleaning from the report.
20        So in this particular case he was -- I
21 believe it was about his fingernails, led to his
22 failure to earn a point, led to -- again, this came

1 from -- I pulled this right from the report,
2 argument/power struggle, he assaulted staff and
3 punched a table.
4        So I think where I was going in this case
5 was that -- let's see.  He was known to show -- so
6 my point here, and I guess this is a point that I
7 felt with many of the disciplinary reports that I
8 looked at and SIR reports that an incident that was
9 considered fairly minor -- I mean, not cutting your
10 fingernails is one thing, and, you know, hitting a
11 staff number is another, there's a continuum
12 there -- just felt to me like many times these minor
13 incidents all the sudden went into some major either
14 room confinement, room isolation or going into
15 restraints.
16        And when I went back and looked at what
17 the staff, the progressive policy that they were
18 implementing, they would often talk about verbally
19 redirect a patient or in this case a detainee client
20 or then went to point loss, but they didn't start
21 with engaging in verbally active listening.  And
22 that's the first thing that's talked about in the

44 (Pages 170 - 173)

1  protocol.  And it is an -- it's an act of listening
2  that's important but it's engaging this kid.
3        So, for instance, you know, Doe 4, come
4  on, what's going on with your fingernails?  I mean,
5  come on, let's not make this a big issue here.
6  What's happening?  In other words, trying to engage
7  the kid rather than going to, look at, I need you to
8  do your fingernails or whatever happened here
9  because something happened where it quickly went to
10  an escalation.  I realize at that point they've got
11  to intervene.  I'm not questioning that.
12        What I'm questioning is it's like the bell
13  curve, you know.  When the kid has got the temper
14  tantrum up here, you've got to deal with it, but if
15  you can catch it on the way up, and I felt in a
16  number of these situations it wasn't caught on the
17  way up because verbal de-escalation and engagement
18  was not used by the staff, so that's really what I'm
19  getting at here.
20    Q.  Understood.  Is it possible in at least
21  some of those circumstances that there was some
22  attempt at verbal de-escalation and it wasn't

1  documented?
2    A.  You know, I come from a medical
3  environment where if it's not documented it didn't
4  happen.  It's possible, but that's where I come
5  from.
6    Q.  Gotcha.  You said that there were some
7  examples you reviewed where you felt that things
8  were handled appropriately.
9        Can you think of examples?
10    A.  Where they were handled appropriately, is
11  that what you said?
12    Q.  (Nods head.)
13    A.  Yeah, you know, I didn't put those in this
14  report, but, yeah, I mean, there were.  I mean, I'd
15  have to go back and look at, you know, my -- you
16  know, the specific situations.
17    Q.  Is there a report that you did put them
18  into?
19    A.  No.  I mean, an example would be if the
20  kid was already, you know, just went and hauled off
21  on another kid and started beating him in the gym, I
22  mean, at that point, you know, staff had to

1  intervene, and it just seemed like what they did was
2  appropriate, even if it was one of, you know, the
3  kids -- well, it was probably either Doe 1 or Doe 4
4  or 2 or 3 where it seemed like, you know, that's
5  appropriate; I can't fault them for that.  But no,
6  so there's no report I put that in.
7        I did try to be fair with both with the
8  mental health and whatever if I felt there was at
9  least some efforts being made.  I didn't go into
10  specifics with that.  Well, sometimes I did with the
11  mental health stuff.  I did.  I think I listed in
12  here, it might have been for Doe 4, some efforts
13  that were made by the counselors to try to
14  appropriately respond to him.  I just felt they
15  didn't go far enough.  But I didn't do the same
16  thing with the disciplinary reports, you know.  I
17  didn't put the times in that they had done it
18  properly or where I felt they had done it properly.
19    Q.  Was there any particular reason why you
20  did include some of that with respect to mental
21  health but not with the disciplinary reports?
22    A.  To be honest with you, no particular

1  reason.  I just -- no, no.  I mean, there was no --
2  I just didn't think about it.
3    Q.  I do appreciate you keeping the report
4  under 75 pages.
5    A.  Yeah, and I would -- I mean, just to be
6  honest, the reason I'm even sharing that with you is
7  I wouldn't necessarily say it was an oversight.
8  It's not something I'm trying to hide.  I mean, I do
9  think, again, just like with the mental health, I
10  think there were some things that they did that they
11  tried to do what was right and even with the guards.
12  But for me the bulk was overweighed by other
13  situations that I felt just they missed the boat and
14  they didn't use verbal de-escalation, things
15  escalated, and I feel like they missed the whole
16  trauma impact on.
17        And I can also give you other examples if
18  you want later.  I did go through and pick out some
19  things that I think might help you understand more
20  where I'm coming from.
21        So I'm not afraid to say that yes, I think
22  at times they handled a situation properly but just

45 (Pages 174 - 177)

1 didn't put it in the report.

2    Q. Okay. Okay. In 156 -- give me a minute

3 to find it.

4      At the bottom of that paragraph you

5 conclude by saying, "It is my sense that Doe 4 was

6 viewed as just another 'detainee' at Shenandoah

7 without fully taking into account his prior

8 traumatic history or that he was an unaccompanied

9 minor seeking asylum who was not in detention

10 because of having committed a crime."

11      And I guess I was wondering what your

12 understanding was of why he's in detention. I mean,

13 obviously I think we all understand he was in

14 detention because of his immigration status but why

15 he was at Shenandoah specifically.

16    A. Could I go back and look at earlier --

17    Q. Sure.

18    A. Because sometimes -- I don't want to mix

19 the kids up.

20      Okay. I don't want to waste a lot of the

21 time here. I know there was one, and I don't --

22 that's the reason I wanted to be sure. I know for

1 the most part it's due to aggressive or assaultive

2 behavior, you know, that's been quite frequent; or

3 if there has been I guess a committed crime in the

4 past particularly of a violent nature.

5      I know there was one youth, and I don't

6 think it was Doe 4, I'm pretty sure it wasn't, who

7 had gone on record initially as saying that he, I

8 don't know if it was through gang activity or

9 whatever, may have killed somebody or did kill

10 somebody and later recanted that, and I believe that

11 was part of the reason that he was sent. It might

12 have been Doe 3 or Doe 2, but that's the reason I

13 was checking.

14      So I don't remember specifically, but I

15 suspect it was for aggressive behavior and possibly

16 being a flight risk as I recall.

17    Q. Okay. In the next paragraph, 157, you

18 sort of recount some things that happened at

19 Children's Village and how he got to Shenandoah.

20 You say sort of in the middle shortly after this

21 Doe 4 was transferred to a staff secure facility.

22      And actually Shenandoah would be a secure

1 facility?

2    A. Secure, you're right.

3    Q. And "This all makes no sense."

4      So I guess what I was trying -- is there

5 anything with this paragraph that has to do with

6 Shenandoah in your mind?

7    A. Yeah, I understand.

8    Q. My understanding is that you're being

9 critical of the process --

10    A. Right.

11    Q. -- that got him there, but it's not

12 anything that Shenandoah had anything to do with.

13      Is that fair?

14    A. Let me just quickly look at the paragraph

15 before and after. There's no traumas, right. So he

16 came in. Let's see.

17    Q. And I want to ask you about 158 too, but

18 with respect to 157, that's about other things.

19    A. I mean, to a point you're right, but I'm

20 also tying it to the last sentence in 156 where it's

21 my sense that Doe 4 was viewed as just another

22 detainee, which you read before. What I was trying

1 to highlight was that here was a young man who

2 had -- who, first of all, clearly had a history of

3 trauma that he reported to me anyway. And actually

4 when I looked at the records he had reported this to

5 other professionals in his other facilities. And I

6 believe the psychiatrist at Children's Village had

7 diagnosed him with PTSD. I thought he did an

8 excellent -- it was an excellent report there.

9      I just felt like now he's coming to

10 Shenandoah, so I think this bridge paragraph of 157

11 was to highlight two things. One, he had a prior

12 history of trauma; they were recognizing his need

13 for residential treatment because of that, and that

14 was documented -- I don't know if it was San Antonio

15 or whatever -- but also that while he was in custody

16 he was abused. And that -- for me that was

17 significant for Shenandoah to be aware of is that

18 this is a young man who is going to come in not

19 trusting authority figures, not feeling safe just

20 because of what's happened to him not only in his

21 own history but also at the prior facilities.

22      So I just felt, again, it was a bridge

46 (Pages 178 - 181)

1 paragraph to then get into I just felt like he
2 wasn't dealt with in a trauma-informed way. I felt
3 like they saw him as having bad behavior versus
4 trying to understand. This is a kid who is getting
5 triggered in the moment who is either fighting or
6 fleeing this situation, and we need to understand
7 that and talk to him and engage him rather than to
8 say, look at, you're going to lose points or
9 whatever other interventions they went to. I just
10 feel like they missed -- if they had a better
11 understanding of what was going on they would have
12 engaged him differently.
13      So that was really the point of 157.
14      Q. Okay. Thank you for the explanation. And
15 I think that's kind of where you make that
16 conclusion in 158, and now I understand how these
17 paragraphs work together.
18      But I guess when you say Shenandoah should
19 have been aware -- this is 158 -- Shenandoah should
20 have been aware not only of Doe 4's prior behavioral
21 problems but also of his trauma history, that he had
22 been considered for a residential treatment center

1 and that he had been abused by Children's Village
2 staff, I mean, what makes you think that they did
3 not know those things?
4      A. Well, I'm going back to just the few
5 examples we talked about earlier with him, that
6 where I'm coming from is that like with the nail
7 experience, for instance, if I'm going to see that
8 as a kid, you know what, you're simply disobeying,
9 these are basic rules, you've got to follow the
10 rules, I'm going to go one way. And for the average
11 kid that maybe is fine; look, you've got to follow
12 the rules, if you don't here's the consequence.
13      But for traumatized kids who are refusing
14 to -- let's say who are being disrespectful or are
15 not following the rules, it's not necessarily coming
16 from a place of just trying to be bad. It may be
17 something about they're just angry kids because of
18 their prior trauma. They're going to act tough at
19 times because they don't trust the guards or the
20 staff. And if that's understood, I'm not going to
21 intentionally try to just confront that kid, you
22 know, or say look at, you've got to do something.

1 That approach is not going to work with them. It's
2 got to be, you know, engaging him around this nail
3 thing and just, hey, Doe, what's going on here?
4 Help me understand; this isn't a big deal, you know,
5 giving them some room, as long as he's not hurting
6 himself or whatever at that point or others to give
7 him some room, say look at, let me check back with
8 you in two minutes, maybe we can talk about it a
9 little bit more, something to just slow that process
10 down because I realize this may be a symptom of his
11 just acting out his trauma rather than simply
12 disobeying a rule.
13      And the same when these kids would get
14 angry or curse at the guards, they're acting out
15 their anger. And, again, nobody likes to have that
16 happen. You know, if that happened to me I would
17 feel something. But if I'm just going to react and
18 provoke the kid back, well, that's it, and this is
19 what I felt happened, that the guards were just too
20 reactive to situations that could have been handled
21 through engagement, relationship building and
22 building trust and realizing these kids don't trust.

1 These are vulnerable kids who have been traumatized
2 who don't trust very easily, and so little things
3 can just set them up. It's like a spark.
4      And if that's not understood, it basically
5 leads to more of a punishment or what I feel is a
6 punishment or control of that behavior rather than
7 getting at the underlying trauma that's triggering
8 that behavior.
9      Q. So what I hear you saying is you don't
10 think that they took that information into
11 account --
12      A. Yes.
13      Q. -- or responded to his history
14 appropriately.
15      A. Right.
16      Q. But are you also saying that they didn't
17 know the facts of this prior history?
18      A. I'm not necessarily saying that. I can't
19 say because I don't -- I think more what I'm saying
20 is I don't see them taking it into account.
21      Q. Okay.
22      A. I mean, that's based on, again, reading

Case 5:17-cv-00097-EKD-JCH   Document 106-3   Filed 01/22/18   Page 47 of 67   Pageid#: 2682

1 the notes and not seeing them use that to deal with

2 these kids differently, so it's more that.

3    Q. I think I understand what you're saying.

4 And when you say "should have been aware," you're

5 kind of more talking about --

6    A. Yes.

7    Q. -- aware in the theoretical sense,

8 responding to taking into account not the -- they

9 literally did not know that these things had

10 happened to him or that he had been suggested to go

11 to an RTC?

12    A. Right. It's more that he has been

13 traumatized and how can we use that to work with him

14 differently, yes.

15    Q. In 163, which is at the bottom of Page 40,

16 you say, "It is my opinion that SVJC staff was

17 negligent in its treatment of Doe 4."

18      Obviously negligent has a legal meaning,

19 but I was wondering what negligent means to you.

20    A. I'm just reading the paragraph here.

21    Q. Sure.

22    A. Well, I guess just off the top of my head

1 negligence for me would be, whether it's intentional

2 or unintentional, would be a blatant disregard for

3 what would be appropriate in a situation or what

4 would be ethical. I mean, I'm talking in general

5 here.

6      So I guess it would be a disregard for

7 either a commission or an omission, you know,

8 something directly done or something not done.

9    Q. Okay. In Paragraph 164, the next one on

10 Page 41, you talk about -- one thing I was

11 wondering, I guess I should pay more attention to

12 your subtitles, this section is Youth in the

13 Juvenile Justice System/Detention, and it's more

14 about or seems to be more about research and the

15 literature and your knowledge in the field.

16      Is this something that you would have

17 drafted for this case in particular, or is this

18 something that you can use from other cases or other

19 work that you've done?

20    A. A little bit of both, primarily for this,

21 primarily for this case, but, I mean, these are

22 things that I've read.

1      So, for instance, I do talks in various

2 universities around Chicago or whatnot, so I'm aware

3 of this literature and do talk about it, but I don't

4 think -- in some of these individual studies I've

5 referenced in other reports that I've done on not so

6 much in the civil cases because those were years and

7 years ago, and some of this is newer literature.

8 But this is primarily for this case, but it's

9 information that I was aware of prior to the case.

10    Q. And Paragraph 164 seems particularly bleak

11 to me.

12      Can I summarize that paragraph by saying

13 psychological harm is inevitable in detention?

14    A. Loosely, yes. I think so. It doesn't

15 mean that, you know, detention isn't appropriate for

16 some kids, but that's why many centers like, for

17 instance, the one here in Chicago, the Cook County

18 Detention Center, has gone to what's called

19 restorative justice and, again, looking at

20 least-restrictive alternatives to get a lot of

21 these, quote, kids who are there with crimes, you

22 know, being charged with delinquency in the

1 community and different placements rather than

2 keeping them in detention, and much of that is

3 because of just being in detention in and of itself

4 for a minor.

5      I mean, sometimes it's perhaps necessary,

6 but just being in detention deprives them of their

7 freedom. And even if they've done something to put

8 them in detention, they're with kids who have

9 sometimes done serious, very serious crimes, you

10 know, maybe murders or whatever, and other kids who

11 got caught with an ounce of marijuana and whatever.

12 And so it's mixing. And then they get influenced by

13 those kids and just has a very -- and there's a lot

14 of research from Australia and from England as well

15 as the United States on the harmful effects of just

16 being in detention independently of anything else

17 for a child or for a youth.

18      So yes, you're right.

19    Q. In Paragraph 166 over on the next page,

20 about the middle of that paragraph you say, "Thus,

21 the frequency and length of time juveniles are held

22 in isolation at Shenandoah as captured by BRG

1 statistics" ...

2    A.   I'm sorry, where are we?

3    Q.   So my understanding --

4    A.   Where are you?

5    Q.   It's about --

6    A.   Oh, yes, okay.

7    Q.   Paragraph 1 --

8    A.   Okay.

9    Q.   What are the BRG statistics?

10   A.   This is a -- I think it's a research group

11 that was utilized by the lawyers on this case to

12 look at documents provided by Shenandoah and to look

13 particularly at statistics of how often restraints

14 were used per kid per month per year and try to

15 develop -- well, not try but developed an overview

16 so that we could look at that.  That's what I got

17 the information for Doe 1 from in terms of how often

18 he had been put in restraints.

19   Q.   And I think you said before that you

20 didn't look at Dr. Diver's report, but did you look

21 at -- I guess you looked at these tables that were

22 compiled?

1    A.   So is that the person that's from BRG?  Is

2 that why -- okay.

3    Q.   Yes.

4    A.   His name was never mentioned to me before.

5 Okay.

6        So I have not looked at all of the

7 statistics.  I've just looked at -- I mean, I know

8 they exist, and the ones that I'm aware of are the

9 ones from Doe 1 because I really tried to do --

10 because there was so much to look at, and there

11 was -- and, again, this came in I think two days

12 before we submitted the report.

13       So, I mean, I didn't include that other

14 than just quickly getting what I needed for this

15 report.

16   Q.   Understood.  And so at that point you

17 assumed their reliability and accuracy and all that?

18   A.   Well, I just assumed that, yes, right.

19   Q.   Okay.

20   A.   And I think partly why I assumed that with

21 Doe 1, if I could just add, is that I knew that he

22 had had -- I mean, that I was aware of both from his

1 report as well as information from the ORR records,

2 he had had multiple -- I knew he had been in

3 restraints multiple times.  I mean, that was clear.

4        So when I saw that, it didn't seem unusual

5 to me.  I mean, what seemed unusual was the amount.

6 I mean, it was a lot of time.  I mean, it just jumps

7 out at you.

8        But it did seem consistent with what he

9 was telling me and what ORR records indicated,

10 so ...

11   Q.   Okay.  Jumping over to Paragraph 174 on

12 Page 44, and I think we've covered this a little bit

13 already, but you say, "Trauma-informed approaches

14 are the standard of care in all stages of the

15 juvenile justice system," and we talked about the

16 National Child Traumatic Stress Network and the

17 Attorney General report that you cite in your

18 report.

19       Have I covered what you're referring to

20 when you refer to standard of care as far as

21 authorities that say this is the standard of care?

22   A.   I think for the most part, yes.  I mean,

1 it is also based on my experience of what I know, so

2 not in terms of a regulatory authority but in terms

3 of what I know other centers utilize.  And I know

4 there are other states that do this.  I didn't list

5 those.

6        Well, actually I think I did put down -- I

7 forget.  It was somewhere else in this report where

8 I think I did list some of the states.  It was a

9 footnote, I believe.  At least it was in one of

10 my --

11   Q.   I remember that too.

12   A.   So that was part --

13   Q.   I remember that too and I'm not --

14   A.   Yeah, it wasn't a regulatory authority in

15 that sense, but it was indicating other states that

16 have gone to revamping their juvenile justice

17 systems utilizing trauma-informed care in a

18 comprehensive way.

19       And, again, just so I'm clear, I think

20 there are certain things, aspects that are utilized

21 at Shenandoah, but it's not in a comprehensive way.

22 It's not integrated and woven into their work.

49 (Pages 190 - 193)

1 That's my concern. I feel like one hand doesn't
2 often know what the other is doing or that if the
3 approach is primarily to get these kids to behave
4 better, and I understand they want the kids to
5 behave better, but you can't just tell a kid to
6 behave better and give them an incentive if he has
7 been traumatized because his trauma is going to get
8 retriggered no matter what the intentions of staff
9 are; and if they don't understand that, that's where
10 the collision occurs.
11      So that's where I'm coming from with that.
12   Q.  I asked you about this earlier, and I'm
13 not sure I understood what you said, so I'm going to
14 try again.
15   A.  Yeah.
16   Q.  So to me a trauma-informed approach seems
17 to lend itself to a continuum really well because
18 you have some facilities that are doing a couple
19 of -- or you have some facilities that are not doing
20 anything in a trauma-informed way, and they're at
21 one end of the spectrum; and then you have some
22 facilities that are doing a couple of things that

1 are trauma-informed; and then at the other end of
2 the spectrum you have a facility that is fully
3 trauma-informed and doing all the things that you
4 can imagine or suggest in that realm.
5      So is it not -- I mean, tell me what I'm
6 misunderstanding, if I am, but is it not a continuum
7 of compliance with what you say is the standard of
8 care of some facilities being at one end and some
9 facilities being at the other?
10      MS. LIEBERMAN:  Asked and answered.
11 BY MS. HAYNES:
12   Q.  You can answer.  I'm just trying to
13 understand.
14   A.  Yeah, I'm just thinking about your
15 question.
16      Yeah, I mean, yes and no.  I'm going to
17 say yes and no.  I see your point.  And when
18 facilities are maybe changing their approach or
19 whatever, there has got to be a starting point.
20      So in that sense I understand your point
21 that, you know, a system that's been using some kind
22 of trauma-informed care for ten years is going to be

1 well ahead of a system that just started it a month
2 ago.  On the other hand, there's an unfolding of an
3 entire process that has to happen right from the
4 beginning.
5      So when I say yes and no I do get your
6 point, but I look at it as more of an immature
7 versus a mature system.  And for me trauma care
8 isn't just doing an assessment on a kid and asking
9 about abuse, making sure they get the right
10 medication for that or the therapy for that.  It's
11 also the entire environment has to be viewed as
12 being a part of what could retrigger that kid's
13 trauma, and that's where staff training, staff
14 understanding their own reactions, having support
15 groups for the staff, whatever, to help them to
16 process what's happening so they don't trigger the
17 kids.
18      That's part of why I put in the section on
19 interpersonal dynamics from places where I've
20 worked, which has included hospitals, schools,
21 inpatient, residential, where if staff don't
22 understand how they're getting triggered, they can

1 easily consciously, unconsciously, verbally or
2 nonverbally provoke a kid; and if I don't understand
3 that, this kid is going to be off and running.  It's
4 that type of stuff that I see getting missed, and
5 that should be there right from the beginning in
6 some form.
7      So I kind of understand where you're going
8 and I agree with that, but I also think that right
9 from the beginning there needs to be -- the whole
10 pie needs to be there even if it's in its beginning
11 stages.
12   Q.  Understood.  Thank you for explaining it
13 to me.
14      And it sounds like what you're saying is
15 you can implement some trauma-informed approaches or
16 trauma-informed tools and still not have a
17 trauma-informed approach because of the way you're
18 implementing it.
19      Does that kind of get at what you're
20 saying?
21   A.  Yeah, I think that's more -- that's how
22 it's implemented, right, and it's got to be full

50 (Pages 194 - 197)

1 circle, comprehensive in that not just the detainee
2 and the immediate clinical staff. A lot of times
3 people think of trauma-informed care as just being
4 the clinical staff providing understanding, but it's
5 all of the staff.
6     So, for instance, maybe another way of
7 looking at this is the anti-bullying programs that
8 have come out over the last several years, the ones
9 that are the most effective don't just target the
10 individual being bullied and the person doing the
11 bullying. It also targets the bystander, the kid
12 walking by, the teacher who looked the other way.
13 There has got to be a buy-in from the principal on
14 down to the janitor so that everybody understands
15 that we don't tolerate certain things in this
16 school, you know; there's a culture of respect.
17     So that's what I mean by a total buy-in
18 and a total package that I just don't see happening
19 here. And the reason I don't see it happening is I
20 don't see it indicated in the notes, you know, that
21 they were understanding it from a trauma-informed
22 perspective.

1     The best example would be Doe 1, and I
2 don't want to get us off of this, but I can give you
3 a clear example that might help you to understand
4 kind of where I'm coming from, but you can let me
5 know if you want me to go there at some point.
6     Q. If you know off the top of your head, go
7 ahead.
8     A. Yeah, again, I was trying to pull some
9 things over lunch, the examples.
10     So if we go to Page 9 -- well, yeah, we
11 can just start with Number 38 where he refused to
12 leave his room, and he engaged in self-injurious
13 behavior. He carved initials on his chest, began
14 banging his head against the wall.
15     The note on 7/11 -- I couldn't find the
16 note from 7/10, so I assume they didn't see him on
17 7/10, they saw him the next day, the clinician, the
18 counselor, suggested that they noticed the
19 self-destructive behavior was in response to being
20 chronically bullied by one of his peers. However,
21 the focus in that session was then on what it was
22 that he was carving in his chest, and I think they

1 assumed it was initials, gang-related, I don't
2 remember that part of it, but that's clearly where
3 the focus went. And what got missed there was that
4 almost independently of what he is carving is that
5 he's hurting himself, and, you know, what's going on
6 there? If it was about being bullied, that's what
7 needs to be focused on. That's the trauma in that
8 moment.
9     And the kids that were bullying him,
10 again, this is going to be a trigger related to
11 stuff with his father, and he reported that -- and I
12 forget which one it was, it's one of the next where
13 he clearly talks about being reminded of his father
14 the way the guards were speaking to him, it was a
15 huge trigger for him.
16     So the therapist has to help him make
17 those connections in that moment of being bullied,
18 hearing that, does this remind you of your dad, does
19 this -- let's understand this is a part of trauma,
20 and explain to that kid here's what happens when
21 you're traumatized. You're going to have these
22 things that remind you of that, and it's going to

1 cause you to do whatever. So we need to understand
2 that; now let's start working out a way to help you
3 to manage that better.
4     So, again, my point here was that his
5 underlying feelings of being ashamed, the
6 self-loathing did not get addressed, which might
7 have reduced his whatever. What got focused on was
8 what he actually carved. They just simply missed.
9 My guess is it was somebody who was a bit younger,
10 not as sophisticated clinically.
11     The issue --
12     Q. That --
13     A. Go ahead.
14     Q. I'm sorry, that to you stands out as an
15 example of what you see as the problem and issue?
16     A. It may not be the best example, but it's
17 an example, yeah. Superficial things get reported
18 on, the behavior gets focused on, but not the
19 underlying feelings or the underlying trauma that
20 may be triggering it.
21     Q. I want to back up a little bit to
22 Paragraph 159, which is Paragraph -- or I mean

51 (Pages 198 - 201)

1 Page 39.

2     A.  Page -- mine got out of order here.

3     Q.  Page 39, Paragraph 159.

4     A.  Okay.

5     Q.  It's about halfway through the paragraph.

6 You start a sentence with "although."

7     A.  Yes.

8     Q.  And you go on to say, and I'm

9 paraphrasing, that while it's not possible to

10 determine to what extent his experiences at

11 Shenandoah exacerbated his PTSD if they did somehow,

12 and I just wanted to ask you about that as a general

13 idea.

14         Is it possible to tease out what trauma

15 resulted in what diagnosis under any circumstance?

16     A.  It's very difficult.  The only times that

17 you can be more confident in that is if you've got

18 somebody here who maybe is seeking asylum, let's

19 say, and you have history or you have documentation

20 that they were -- you know, they really didn't have

21 any psychiatric history, there were no problems,

22 but -- now I'm just thinking of someone who I saw

1 who, and I won't go into details, but clearly had

2 been tortured, and I had from supporting groups that

3 investigated that, there was confirmation of that,

4 and the trauma that he experienced was clearly

5 linked to that specific issue.  There was no

6 premorbid or prior problems; it was clearly linked

7 to that.  And since being here in this country there

8 hadn't been any issues.  So that's a situation where

9 you can feel pretty confident that this seems very

10 clearly linked to that.

11         In situations like, let's say, Doe 4 or

12 many of the Does where there is prior trauma, in his

13 case there was, which I was able to document, prior

14 to coming to the United States, his journey here was

15 very traumatic, now you've got situations where, you

16 know, he was abused at Children's Village, for

17 instance.  You can't tease out, well, how much --

18 there is cumulative.  There is research showing that

19 trauma is cumulative in many cases.

20         Here it's clear to me there's an ongoing;

21 it's trauma added upon trauma.  But to say how much,

22 that's what I was saying, I can't say for sure how

1 much is due to his prior experiences, how much was

2 due to current things happening.  But I do feel that

3 even though Children's Village clearly was

4 documented there was trauma there and that the guard

5 lied about it.  I mean, that's in the record; that

6 we don't have, quote, any formal abuse reports that

7 were corroborated at Shenandoah.  The abuse I'm

8 talking about here is more the trauma of not dealing

9 with him appropriately, not understanding his trauma

10 and that that's going to retraumatize him.

11         So I do feel confident saying that in my

12 mind it did because he reported -- you know, the

13 first thing out of his mouth when I said, well, just

14 tell me about your experience here, now his first

15 words were it's horrible.  So I'm sure most kids

16 would say that, but he then went in to talk about

17 situations where he felt that he was mistreated.

18 And it's that type of thing that I've heard and read

19 in his reports that even if it's not totally true,

20 everything they're reporting, there was a flavor of,

21 you know, points being lost and demoralization,

22 guards overreacting to situations that could have

1 been handled differently.

2         And the other theme was that violence -- I

3 think even Doe 4 said they used violence; they

4 provoke us, we provoke them, we're off and running.

5 He didn't say it exactly like that, but he said

6 violence begets violence.  Violence encourages more

7 violence.  And that's been my concern, and that's

8 what I see as traumatizing.

9         So it's not just what's done.  It's what's

10 not done is the trauma and understanding and dealing

11 with it, and then what's done is the not following

12 the protocols, reacting too quickly to point loss

13 and room confinement or whatever versus engaging,

14 having a relationship with these kids.

15         I also -- the other thing, again, this I

16 don't know about, but I know other centers where the

17 counseling staff are there until late at night and

18 on weekends, and I just didn't get a sense from any

19 of the notes I read that they were available to

20 consult with the guards in the evening, and that

21 might have made a big difference.

22         I'm also aware of other facilities where,

1 for instance, they play more relaxing music in the
2 evening. Now, maybe they do that here and I just
3 didn't see it written anywhere but where they try to
4 create a calmer environment. Again, part of that is
5 understanding trauma, understanding these kids are
6 in a place where they don't want to be.
7     So, anyway, you can't tease out exactly
8 how much is due to Shenandoah, you're right, but I
9 do feel that there is responsibility there on the
10 part of Shenandoah staff.
11     Q.  Understood.
12     A.  And if I could just add one thing again
13 because I realize that, you know, sometimes I
14 understand and we're coming from a different
15 perspective, but keep in mind this is a young man
16 who clearly had prior traumas, horrible things that
17 he witnessed growing up and then his father not
18 being there and his mother abandoning him. Then we
19 go through these horrible things happening on his
20 journey here.
21     Now, he alleged that Customs and Border
22 Patrol abused him. I don't know if that's true, but

1 that's his allegation. But then he clearly was
2 abused at Children's Village in a government
3 organization. So, again, that's going to -- right
4 there he's going to carry distrust with him. So now
5 I'm going to come to your facility, and I'm not
6 going to be trusting. So I might be a bit
7 provocative to you to test you out to see if you
8 really care; I might be angry; I might not trust
9 anything you say. If you don't understand that,
10 you're going to see me as just another kid who is
11 getting angry and acting out rather than, you know
12 what, no wonder this kid doesn't trust us. We can't
13 expect him to trust us. We've got to engage him in
14 a different way to build his trust.
15     And part of that is being consistent with
16 our own protocols so they realize that we're not
17 just doing things arbitrarily and also engaging them
18 and spending time talking to them.
19     So that's part of what I just feel that
20 Doe 4 in particular got missed.
21     Q.  I want to go back to standards for just a
22 minute.

1     A.  Yeah.
2     Q.  Are you familiar with the American
3 Correctional Association standards? Do you know if
4 they speak to juvenile detention facilities and/or
5 to trauma-informed care?
6     A.  I know that the standards exist. I know
7 they do speak -- I don't know about the
8 trauma-informed care aspects of it. I'm not sure
9 what they say about that.
10     Q.  Okay. I assume you're familiar with the
11 Flores settlement?
12     A.  Yes.
13     Q.  Is that something that you reviewed as
14 part of your work on this case?
15     A.  The settlement itself?
16     Q.  Yes.
17     A.  I'm just aware of it from before. I mean,
18 mostly where I was coming from there was the least
19 restrictive setting, and, I mean, I'm sure there's a
20 lot of other aspects to the case, but that's what I
21 was focused on and referencing. And a lot of that
22 was driven by what I saw as, like, for instance, I

1 think it was Doe 3, whichever one had the 96 days of
2 good behavior that clearly he did not need the
3 setting, in my mind, the setting that he was in. He
4 should have been in a lesser restrictive setting.
5     So that's part of why I referenced that.
6     Q.  Do you know if the Flores agreement
7 referred to specific standards?
8     A.  You know, it's been a long time, and it's
9 been at least ten years since I've read that. I
10 don't -- I don't know the answer to that.
11     MS. HAYNES: Okay. Fair enough. Why
12 don't we take a ten-minute break.
13         (Whereupon, a recess was taken
14         from 2:21 p.m. to 2:30 p.m.)
15         (Exhibit 6 and Exhibit 7 were
16         marked for identification.)
17 BY MS. HAYNES:
18     Q.  Dr. Lewis, I wanted to talk about your
19 evaluation of John Doe 1, and if you turn to -- if
20 you find Exhibit 6 and Exhibit 7.
21     A.  These look the same to me though.
22     Q.  I think the difference is --

53 (Pages 206 - 209)

1    A.   Okay, they are different.  We're good.
2  One is the competency and I think the other one is
3  the immigration.
4    Q.   Right.  And tell me if I'm wrong, but I
5  think Exhibit 6, which is dated the 10th, that's the
6  competency?
7    A.   No, that's the -- oh, dated what, the
8  10th?  Wait a minute.
9    Q.   Yes, it's marked Exhibit 6.
10   A.   That's the immigration one -- oh, no,
11  you're right, that's the competency one, you're
12  correct.
13   Q.   And then the one marked Exhibit 7?
14   A.   Yes, that was about immigration and
15  treatment recommendations.
16   Q.   Okay.  And I think I understand from
17  everything we've talked about so far today is you
18  were asked to do both of these by the Young Center,
19  right?
20   A.   Yes, originally, but then quickly care got
21  involved with the competency part of it.  Actually I
22  think initially it was not competency.  Initially it

1  was just, if we look at Number 7, that was the
2  initial -- let's see.  Where is it here?
3       Yeah, there was actually nothing about his
4  competency in what I was initially asked to do, but
5  then within a day or two they asked if I would talk
6  with the lawyer from CAIR who knew that I was coming
7  and asked if that could be worked into the
8  evaluation, so I agreed to do it.
9       Anyway, so that came secondarily to the
10  initial request.
11   Q.   And you had already done all the work that
12  you needed to do to produce those reports, right?
13  It's not like you had to meet with him again --
14   A.   Right.
15   Q.   -- to develop the second report?
16   A.   It was all essentially done -- ideally not
17  the best way to do things, but because of time and
18  whatnot, I mean, normally you want to do separate
19  evaluations, but there is overlap.  I mean, things
20  that I needed for one I need for the other, but then
21  there are things that I need for one that I don't
22  need for the other, and that's where they diverged,

1  and that's why I did two reports.
2    Q.   Can you explain to me to the extent that
3  you know and based on your understanding why is the
4  Young Center involved in some kids' cases and not in
5  others'?
6    A.   Well, okay.  The simple answer to that,
7  they try to get involved, I think they would ideally
8  like to be involved with every child if they could,
9  so I think it's primarily a resource issue.  The --
10  and that's why they've expanded over the years
11  because, again, what they provide primarily is child
12  advocacy for detained youth who are immigrants who
13  are here undocumented who -- just to help them get
14  through the system, so getting them medical
15  evaluations if need be, psychological evaluations,
16  making sure they have the proper shelter, getting
17  lawyers involved with their case, that type of
18  thing.  So they're there to provide advocacy.
19       So I think their feeling is that every
20  child should have an advocate, but, again, you know,
21  it's not required that every child have an advocate,
22  and there's no money obviously, even if it was

1  required, there's no money to back that up.  So I
2  think partly it's a resource issue.
3       They don't -- I think they'd like to have
4  almost every child see a psychologist just because
5  it helps to inform everybody of what's going on with
6  that child, but, again, it's a resource issue.
7       So they tend to refer, you know, more
8  difficult cases to me.  And also, you know, I was
9  one of the only ones doing this in the Chicago area
10  for a long time, so now, you know, other people are
11  getting involved with that.
12       So I don't know if that answers your
13  question, but ...
14   Q.   It does.  Thank you.
15       On Page 3, and I guess we can use --
16   A.   I should also say, just so you're clear,
17  that like in the case of Doe 1 that the Young Center
18  wasn't aware that I was going to -- I wasn't aware
19  at that time that he was going to be involved in a
20  civil case, so they had no understanding of that.
21       And they also, just so you're aware, are
22  partly funded by ORR, so they try to stay very

54 (Pages 210 - 213)

1  independent of this entire process, and they have
2  been, other than when they asked me to do an
3  evaluation. And if they have records, I always --
4  and that's with any lawyer that I work with where I
5  do a forensic evaluation, I ask do you have any
6  records, medical, psychological, affidavits that I
7  can look at. So that's standard.
8       But other than that -- and just so you
9  know, partial funding comes from ORR, so, again,
10  they try to be very objective with this. And that's
11  why -- I'm outside of their system as well, even
12  though they refer to me a lot. It's simply, you
13  know, not too many people doing this, but they also
14  know that I'll be independent of whatever their
15  system is, so ...
16      Q. I appreciate the background.
17          I'm going off of Exhibit 7 because that's
18  the report that's later in time, and I think it has
19  a couple more paragraphs to it.
20      A. Okay.
21      Q. And then on Page 3 -- and before I ask
22  this question, what did you ultimately determine

1  with respect to competency?
2      A. I determined that he was not competent.
3  And when you're looking at competency, you also have
4  to look at not just do they understand, you know,
5  why they'd be going to court, how the court works,
6  what are the different possible outcomes, but do
7  they understand the impact on them and then can they
8  function in that setting to help their lawyer.
9          And so I felt that even though some of the
10  basic workings of the court could have been
11  explained to him and he could have been remediable
12  for that, that in his case the depression and his
13  prior trauma was getting triggered. Even in his
14  evaluation with me, I mean, he just totally shut
15  down. And I'm talking to him like I am to you now.
16  I mean, I wasn't trying to drill into him about
17  anything, and he just wasn't able to handle that.
18  When I specifically asked him about -- both when he
19  talked about his dad he shut down, and when I
20  started to get into his understanding of court and
21  immigration and what could happen, what he was
22  accused of, he just melted. And that was the

1  concern the lawyers had, that he kept doing that
2  with them when they were meeting with them.
3          So that's why I recommended that even if
4  he could understand at a basic level intellectually,
5  which I felt he could have, he wouldn't have been
6  able to use that in a rationale way to assist his
7  case, so that's why I found him not to be competent.
8      Q. How often do you do competency
9  evaluations?
10     A. This is particularly in the area of
11  immigration a pretty new area, so, you know, I
12  actually just went to this I think it was in 2 --
13  what's this? 2017. I think it was last year. Or
14  was it 2016? It was either 2016 or 2017 that I went
15  to the workshop that Jack Weil did where we went
16  through all this. And basically as far as
17  immigration goes it a brand new area.
18          Now, there's competency for juveniles.
19  Those I have not done. I've never done those
20  before.
21          So this is just -- I've only done a couple
22  of -- well, this one actually, and I have one other

1  one that I'm going to be doing in a few weeks.
2      Q. Okay. Do you have -- I mean,
3  understanding that it's not something that you have
4  done much of yourself at this point, do you have an
5  understanding of how common it is to be -- to have a
6  UC determined incompetent?
7      A. Offhand I don't know data on that. I
8  suspect it's -- I think it's one of two things.
9  It's probably pretty unusual to find a UAC that's
10  incompetent. I suspect it's more either that
11  they're going to be competent or they're going to be
12  remediable; in other words, they're not competent
13  for a temporary period of time because they simply
14  don't understand the court language and the roles
15  and that they can be educated on that, or they have
16  some type of psychiatric problem that's more
17  amenable to treatment; so through medication,
18  through therapy over a few months they can get to a
19  place where they are competent. So I suspect
20  there's probably a fair amount of those out there.
21          I think where someone is found totally
22  incompetent like I'd found for Doe 1, I think that's

55 (Pages 214 - 217)

1 probably quite rare. That's just a guess that I
2 have.
3     Q.  On Page 3, Item 12, your Collateral
4 Information Sources Reviewed, do you know -- you
5 list case management and progress notes.
6     Do you know which -- it's Page 3.
7     Do you know which case management and
8 progress notes you reviewed? Was it all of them?
9 Was it a section? Was it notes from Shenandoah?
10     A.  You know, I have all of them at home.
11 There is a lot of them. Let me just say that for
12 starters.
13     Yes, it was -- I believe it was just
14 Shenandoah. I don't -- I don't think -- there might
15 have been -- well, let's see. The report by
16 Dr. Kane, that was Shenandoah; Aleman was
17 Shenandoah.
18     Yeah, I think the other two, Rife is an
19 outside psychologist, and then the other woman --
20 the other two women I think were in Texas.
21     So there might have been some -- I don't
22 think there were progress notes. There was some,

1 some basic information from the other facilities,
2 but it was not anything that I looked at really for
3 this report.
4     So this was essentially Shenandoah
5 records, ORR records from Shenandoah.
6     Q.  Okay. Okay. And then how did you --
7 these remaining one, two, three, four documents, did
8 you select those from that larger set, or did they
9 come from somewhere else?
10     A.  No, I selected those from the larger set,
11 and I selected those because they were relevant for
12 me. I mean, if I see, you know, any medical or
13 psychological or psychiatric information, that's
14 information I want to know about.
15     Q.  Okay. And just you haven't met with or
16 seen or talked to Doe 1 since you evaluated him in
17 August 2017, right?
18     A.  That's right.
19     Q.  Okay. And is the same true for Doe 4, you
20 haven't met or talked to him since July 2018 when
21 you evaluated him?
22     A.  That's correct, yes. I have not talked to

1 him.
2     Q.  Okay.
3     A.  I was involved --
4     Q.  And I'm jumping around.
5     A.  With Doe 1, I was involved -- I did not
6 meet with him, but I worked on a telephone
7 conference call to try to get him into, with the
8 help of his lawyers, into a treatment facility.
9 That fell through for various reasons. I think it
10 had to do with a change in venue and where he was
11 going to be going or whatever.
12     So I didn't directly talk to him, but
13 that's the only other contact that I've had about
14 Doe 1 that's separate from this.
15     Q.  Do you know about when that was?
16     A.  I'd have to go back and look at my log.
17 It was a phone call on a Thursday night. I'll say
18 two, three months ago, probably three months ago.
19     Q.  And did I hear you say Doe 1 was on the
20 call?
21     A.  No, he was not. So he was not -- it was
22 about him to help him get into appropriate

1 treatment, but it was the facility director I
2 believe in Arkansas and Jennifer Nagda from the
3 Young Center and myself talking about what was in
4 his best interest. Apparently they had been sent my
5 report, so they wanted my opinion.
6     Q.  Okay. And is it your understanding that
7 Doe 1 is no longer at Shenandoah?
8     A.  Well, that's the other thing they wanted
9 my recommendations on. If he didn't -- because it
10 fell through for him to go to the treatment center,
11 so I got a call back just making recommendations for
12 where he would function the best since he wasn't
13 going to be in a facility. I think -- I don't know
14 where he is, so to be honest with you I don't know.
15     Q.  Let me -- so he's not there anymore?
16     A.  Right.
17     Q.  Is that --
18     A.  That's as much as I know, right. That's
19 as much as I know.
20     Q.  Okay.
21     A.  I don't know where he is.
22     Q.  Okay. Okay. On the bottom of Page 2,

56 (Pages 218 - 221)

1 Paragraph 11, and then it goes over to the next
2 page, 3, I think this is similar to the paragraph we
3 talked about in John Doe 4's evaluation where you
4 kind of explained what you're doing there and the
5 purpose of the evaluation. And then on Page 3, the
6 second half of the paragraph you say -- I'll refer
7 to him as John Doe 1 for the purposes of our record
8 and his confidentiality. John Doe 1 was able to
9 verbalize that he understood the purpose of the
10 evaluation and the limitations of confidentiality.
11 Later in the interview he said he thought the
12 purpose of this evaluation was to see if he needed
13 to be taken back to a psychiatric hospital. I
14 reassured him.
15        And I was just wondering if you know, if
16 you remember at what point during the evaluation he
17 expressed that misunderstanding? Was it day one,
18 was it day two?
19    A. It was day one. It was right after lunch,
20 after our lunch break.
21    Q. Okay. And so would you have started --
22 would that have been about midday through day one?

1    A. Midday through day one, yes.
2    Q. And at that point my understanding is that
3 he had been hospitalized for psychiatric reasons
4 three times.
5        Is that consistent with your -- he had had
6 that experience?
7    A. That's correct.
8    Q. Okay. We've already talked about the
9 tests and questionnaires, I think. You've listed
10 the ones that you used with John Doe 1 there on
11 Page 3.
12        Is that what those are?
13    A. Yes.
14    Q. Are you able to -- it looks like you've
15 listed which ones are translated into Spanish.
16    A. Right.
17    Q. So is it safe to assume that the ones that
18 don't say Spanish version are not translated into
19 Spanish?
20    A. That's correct.
21    Q. Okay. And you used 11 total here. Was
22 there a specific reason for these specific 11?

1    A. And, again, I just want to refresh. This
2 is the -- okay.
3        So on both of the reports I listed --
4 because, again, keep in mind I was doing two
5 evaluations at one time. Even though there's
6 overlap, there's also things that are distinct. But
7 for the reports I felt that it was important to just
8 put down all the tests that I gave because all of
9 that eventually becomes relevant.
10        So like the assessment of competence,
11 that's not an actual test. That was more -- there
12 was clear guidelines in there that we were trained
13 in to utilize, so I gleaned information from that
14 that probably I did use in the other -- well,
15 actually no, that was very specific, but I just felt
16 like everything I did should be -- I was trying to
17 be transparent with all the tests I had given, but
18 that's a test that was specific to the competency --
19 or not a test, the guidelines that were specific to
20 competency.
21        The other tests, the questionnaires were
22 used really across the board. Why those specific

1 tests? Well, there was a variety that were in
2 Spanish, so that's always important. Again, the
3 Beck anxiety and depression inventories are very
4 commonly used just as a kind of a screening to get a
5 sense of a child's -- so, for instance, I might have
6 somebody who talks about being very depressed to me,
7 but then I give them the rating scales and it comes
8 out nothing or vice versa. So it's a way -- and
9 then I can go back and say, look at, you know, you
10 were telling me this before but you're not rating it
11 highly here; help me understand.
12        So it's just a way to kind of confirm or
13 make sure I'm not missing anything. Again, I'm not
14 primarily going for a score there.
15        The childhood trauma questionnaire, again,
16 there's different kind of trauma questionnaires that
17 can be utilized, but it's just simply a
18 questionnaire that has about 25 different things I
19 ask to get at different kinds of trauma that a child
20 might have experienced. That's important just to
21 understand that there can be a variety of traumas,
22 and it's just helpful to know, you know, physical,

1 sexual or whatever.

2     Q. Are all of these reports or all of these

3 evaluations self-reporting like the tests that you

4 gave to John Doe 4?

5     A. I believe -- let's see.

6     Yes, they're all self-reporting. The

7 Trauma Symptom Checklist for Children, the last one,

8 does have an embedded validity scale. Again, I try

9 to include some type, you know, when I'm doing this

10 kind of work some type of test for that if I can.

11     And the Montreal Cognitive Assessment, I

12 mean, again, that's primarily used to see if

13 somebody has a brain disorder, and that's not why I

14 used it. I literally use it just to get a sense of

15 how they function. So that's a hands-on where you

16 ask people to draw a picture of a clock set to a

17 certain time. You might ask them to give me

18 specifics about numbers that they can remember.

19 I'll read some numbers to them and have them repeat

20 it back. So it's a certain set of things.

21     So that's the only test that's really

22 different than the other ones, and that's just

1 primarily to get a sense of, you know, how his

2 general cognitive functioning is. It's not so much

3 to see if he has got a brain tumor or whatever.

4     So a lot of these tests are really just

5 used as an adjunct to the clinical interview. The

6 clinical interview is primarily where I'm getting my

7 information from.

8     Q. Okay. Jumping ahead to your

9 recommendations, which are on Page 18, the last

10 page, and I'm looking back at your purpose for the

11 evaluation, which was to assess the psychological

12 functioning, understand his history and his

13 experiences in detention and provide recommendations

14 for future placement and treatment; and then your

15 recommendations are essentially that it wouldn't

16 be -- it would be detrimental for him to return to

17 Mexico for a variety of reasons, number 4 being

18 without receiving trauma-based treatment that would

19 help him to understand why he gets triggered and

20 then would be putting himself in difficult

21 situations. And then in 76 is your treatment

22 recommendation I understand, which is he is in

1 needed a residential treatment facility.

2     Is that a fair summary?

3     A. Yes.

4     Q. Okay. And I know -- so ultimately as far

5 as treatment is concerned, your conclusion was that

6 he needed to go to a residential treatment facility

7 where he could get specialized care basically,

8 right?

9     A. That's correct.

10     (Exhibit 9 was marked for

11     identification.)

12 BY MS. HAYNES:

13     Q. And I know that you take issue with some

14 of Dr. Rife's report, but wasn't that ultimately his

15 conclusion too? And that's Exhibit 9 in your stack.

16     A. Yeah. I mean, I took issue with certain

17 aspects of his report, but that was -- right, he did

18 agree with me on that.

19     Q. Okay.

20     A. Yes.

21     Q. And it seems like I can't think of a

22 situation when John Doe 1 was assessed that that was

1 not the recommendation.

2     Is that consistent with your sort of

3 overall view of his record as well? And I think

4 everyone was on the same page that he needed to go

5 to a residential treatment center.

6     A. I believe so, I believe so. Yes, I think

7 that's accurate.

8     Q. Okay. I want to -- sorry to flip around

9 so much. I want to go back to your report.

10     And if you'll give me just a minute, I

11 have to cross through parts out of my outline that

12 we've already talked about, so if I pause it's to

13 make things shorter.

14     A. Okay, no problem.

15     Q. It's a good thing.

16     Generally speaking, you said that you

17 hadn't seen videos until after you submitted your

18 September 2018 report, right?

19     A. That's correct. Not generally. I had not

20 seen anything.

21     Q. Okay. So you didn't have an opportunity

22 to compare --

58 (Pages 226 - 229)

1    A.  No.

2    Q.  -- any of the accounts to video --

3    A.  No.

4    Q.  -- which I think you said you did do in a

5  previous case, right?

6    A.  Yes, I did, and I can't remember if the

7  videos were just from Abraxas.  I think they were

8  primarily Abraxas, but yes.

9    Q.  And then Paragraph 44, beginning at

10  Paragraph 44 of your report --

11    A.  Which exhibit are we in, 7?

12    Q.  We're in Exhibit 3, I'm sorry, your

13  September 2018 report.

14    A.  Oh, okay.

15    Q.  And I'm looking at generally Paragraphs 44

16  to 46 where you talk about Dr. Rife's report and

17  some of the things that you took issue with.

18    A.  Okay.

19    Q.  In Paragraph 45 you quote Dr. Rife as

20  talking about the testing indicating that Doe 1's

21  interpersonal difficulties may be more due to social

22  anxiety than a complete lack of regard.  And then

1  you say, "It is my opinion this more accurately

2  captures the trauma and anxiety."

3    Can you kind of explain a little bit to me

4  what you mean by that?

5    A.  Okay.

6    Q.  Do you see where I'm reading from in like

7  the middle?

8    A.  Yes.  I'm just reading just to get the

9  context.

10    Well, all right.  So what -- and this is

11  where while I agree with aspects of Dr. Rife's

12  report, I felt like he was talking both sides and

13  being inconsistent because there's other parts of

14  his report where he essentially portrays Doe 1 as

15  having more -- I don't know if he used the word

16  "sociopathic" but more proactive, just an aggressive

17  kid, more of an antisocial kid.

18    And here he's getting at more what I would

19  say, which is that no, this isn't just an antisocial

20  kid who's acting out; this is a kid with other

21  issues going on, whether it's interpersonal

22  difficulties due to anxiety or in my case -- not in

1  my case but in my estimation due to his prior

2  trauma.  And so that's where I felt like I did agree

3  with that.

4    But then in other parts of his report and

5  particularly his recommendations he talks about

6  needing to confront his aggressive behavior, and,

7  you know, that's why I have issue with the report.

8  I felt it was basically all over the place.  But

9  this aspect I agreed with, and I was trying to

10  underscore that here.

11    Q.  Okay.  Do you know if the purpose of

12  Dr. Rife's evaluation differed from the purpose of

13  your evaluation in any way?

14    A.  Well, no, sure, it did because he -- well,

15  okay.  So initially I wasn't -- I'm putting the

16  civil case aside because I didn't know that this was

17  going to be a part of the civil case.

18    So different in the sense that I was doing

19  a clinical evaluation.  If I was just doing a

20  clinical evaluation I would just be reporting

21  whatever symptoms and diagnoses I found and whatever

22  my recommendations were.  I wouldn't be making any

1  recommendations with regard to immigration or, you

2  know, asylum or whatever.

3    So in that sense there's a difference, but

4  they're pretty similar in many ways.

5    Q.  Well, I guess what was making me think of

6  that is if you're able to flip back to Exhibit 9,

7  which is Dr. Rife's evaluation.

8    Do you have that in front of you?

9    A.  All right.

10    Q.  And then under Reason for Referral, the

11  last sentence says, "He was referred for a

12  psychological evaluation to determine treatment

13  recommendations," which I think is consistent with

14  what you were doing when you were evaluating

15  John Doe 1, but then also to obtain a risk

16  assessment due to his history of criminal activity,

17  aggression and mental health issues while in ORR

18  care.

19    A.  Sure, so some similarities.

20    Q.  So I didn't take that second part of it to

21  be part of what you were doing in your evaluation.

22    Is that fair or not fair?

59 (Pages 230 - 233)

1    A.  Right, I did not do a specific risk
2  assessment for criminal activity.  There's a
3  specific structured -- it's not a test but it's a
4  questionnaire that's used for that that I did not
5  use.
6    Q.  Okay.  I want to jump back to your report,
7  Exhibit 3, Paragraph 64.  And there's a lot here,
8  but 64 to 70 to me seem to kind of summarize his
9  time at Shenandoah.
10      And then in Paragraph 70, I think you
11  referred to this earlier, about the middle of that
12  paragraph you say, "His long period of good behavior
13  begs the question as to why more was not done to
14  facilitate and advocate for Doe 2 to step down to an
15  RTC."  And I don't want to replow ground.  I think
16  we talked about this a little bit.
17      But do you -- do you know of anything
18  specifically that Shenandoah could have done that
19  they did not do to effectuate this kid's transfer to
20  an RTC?
21    A.  Specifically, no, and just to keep the
22  answer simple, no.

1    I'm basing that on two things.  One --
2  well, I do know they reported having recommended him
3  or whatever they do, the paperwork they do to
4  initially recommend an RTC; so I believe I could go
5  back and find where they had done that.  So I know
6  they had done that.
7      But when I saw two things, one, the kids,
8  many of these kids felt like after 30 days that they
9  were being promoted for -- not promoted but
10  recommended for an RTC.  I understand it takes time
11  often for that to happen, but somehow in their mind
12  I believe sometimes they were told that within
13  30 days they kind of set them up to be disappointed.
14  But more what I'm concerned about here is I'm
15  assuming that there's more that they could do
16  because, again, one of the -- I don't know if it was
17  for Doe 4 or Doe 3, the therapist in the note
18  actually said, implied that he needed to do more
19  good behavior so she could fight his case, and it
20  was in reference to getting him back into -- getting
21  him not back into but getting him to an RTC.
22      So that tells me that yeah, it's not their

1  decision, I get that, but, you know, they can
2  advocate, they can facilitate.  It just felt to
3  me -- and, again, also keep in mind that my context
4  was that -- and I believe it was Doe 4, maybe it was
5  Doe 3, I think it was Doe 3 actually, that when he
6  was in another facility, within two days he was
7  stepped up; and yet with 96 days, and it was Doe 3,
8  of 96 days of good behavior he still wasn't stepped
9  down.
10      So that's where my context is coming from,
11  assuming that more could have been done for
12  Shenandoah to advocate and facilitate.
13      I realize they don't have the final
14  control.  I get that.
15    Q.  Okay.  And I think, you know, what made me
16  wonder about that is that John Doe 1's case was a
17  case that the Young Center was involved in, and I
18  think I saw three letters where the Young Center and
19  attorneys were advocating for him to get to a
20  residential treatment center, and that did not
21  immediately make anything happen.
22      Were you familiar with those letters as

1  part of his file too?
2    A.  I don't recall the letters.  I know they
3  were advocating for that.  I don't know that I
4  had -- I don't think I saw the letters.
5    Q.  Okay.
6    A.  Actually what I will say is that when they
7  first approached me they wanted to know what I
8  thought, and I -- they didn't tell me -- I knew
9  later they were thinking that's what he needed.
10  They didn't tell me that up front.  They said, look
11  at, we've got a situation that we're just trying to
12  figure out how best to be of help.  And I often get
13  involved with their more difficult cases, so they
14  wanted me to just go in and tell them.  And if I had
15  said no, I don't think that's what he needs or
16  whatever, I think they probably would have accepted
17  that to be honest with you.
18      So, again, I did learn about that that's
19  what they wanted, but that was after the fact.  That
20  was not said to me up front.  They simply said we
21  need help; we don't know what's best for him.  We
22  just know he's not doing well where he's at; we need

60 (Pages 234 - 237)

1 to understand, give us some recommendations.
2      MS. LIEBERMAN: Again, Dr. Lewis, I just
3 want to caution you that although we weren't the
4 lawyers at the Young Center that you may have a
5 privilege issue there, so you need to -- I just want
6 to put that on the record so that everybody is clear
7 that there may be limits to what you can talk about.
8      THE WITNESS: Okay.
9      MS. HAYNES: Objection.
10      THE COURT REPORTER: Could you repeat the
11 objection, Ms. Haynes? I'm sorry, it didn't come
12 through.
13      MS. HAYNES: I just said objection noted.
14 I don't totally agree, but I don't think it really
15 matters for what we're doing right now. And I don't
16 need to know anything that was discussed with
17 lawyers.
18      THE WITNESS: Okay.
19 BY MS. HAYNES:
20      Q. So could you go to Paragraph 99 of your
21 report, which is Exhibit 3. And it's a long
22 paragraph, but I think in here you talk about the

1 things that -- some of the things that are being
2 done with him. The documents suggest he received
3 individual and group counseling as well as
4 medication. Group sessions addressed a variety of
5 issues, including anger management.
6      Going along through the paragraph, you say
7 individual counseling provided him space, on and on.
8      And then towards the bottom you again say,
9 "Even though there were some positive aspects,
10 nonetheless they were limited and still fell short
11 of mental health professional standards for juvenile
12 detention settings."
13      Have we exhausted the field of the
14 standards that you're referring to in Paragraph 99
15 today?
16      A. Let me just think for a minute. I think
17 pretty much. Where I was going with this was I
18 simply, you know, after reviewing, you know, pretty
19 extensively the documents, I was trying to be fair
20 in saying that it was clear that there were some
21 mental health services that were being provided, you
22 know. I can see it in the notes, and there were

1 attempts to try to help him.
2      What I felt -- again, it goes back to the
3 standards. What I felt got missed was two things.
4 One, a more trauma-informed discussion in the actual
5 sessions about what was getting triggered, what does
6 that remind him of rather than just let's help you
7 to do this to stop doing that behavior. I felt that
8 there was too much focus on needing to act, to have
9 good behavior and not get in trouble, not have
10 further consequences rather than underlying issues.
11      And then it goes back to the
12 trauma-informed stuff that we've already talked
13 about for the guards that I just felt like the whole
14 trauma-informed care is not just what the mental
15 health counselors are doing but also what the guards
16 are doing.
17      Q. Okay. Changing tact, my copy of your CV
18 is not attached to my Exhibit 3. Nevertheless, do
19 you have a copy of your CV attached to your report
20 with you?
21      A. I don't.
22      MS. HAYNES: Do you have a copy, Hannah?

1      MS. LIEBERMAN: I didn't bring one.
2      MS. HAYNES: Okay. Well --
3      THE WITNESS: No, we don't have one here.
4 Sorry.
5 BY MS. HAYNES:
6      Q. Thank you for checking. I think I can --
7 presumably you know your CV pretty well, so I think
8 we can get by.
9      You've been a licensed clinical
10 psychologist since 1990; is that right?
11      A. That's correct.
12      Q. Okay. Have you ever -- you're currently
13 licensed in Illinois, right?
14      A. Yes. Yes.
15      Q. Have you ever been licensed anywhere else?
16      A. Yes.
17      Q. Where else have you been licensed besides
18 Illinois?
19      A. Virginia.
20      Q. When were you licensed in Virginia?
21      A. Well, I'd have to go back and look. It's
22 probably 15 years ago, a good 15 to 17 years ago.

61 (Pages 238 - 241)

1    Q.   And what's the status of that license now?
2  Is it inactive, or did you let it lapse?
3    A.   Yeah, I simply let it lapse.
4    Q.   Were you living in Virginia at the time?
5    A.   No.  I was working for a -- I was working
6  at Cook County Hospital at the time.  I was asked by
7  a colleague, a psychologist in the city, as part of
8  a major project that he was working on to
9  evaluate -- it was for the State Department, and it
10  was funded through DynCorp and the State Department
11  to evaluate peacekeepers who were going to be going
12  to Kosovo and around the world.
13        And so I was flown into a number of
14  locations.  One was in Virginia.  And so to do it
15  properly I got temporary licensure there.  Actually
16  it was more than temporary.  It was actually full
17  licensure just so that I would be able to do those
18  assessments.
19    Q.   Okay.  So you weren't in living in
20  Virginia --
21    A.   Right.
22    Q.   -- and you weren't employed in Virginia,

1  but you were working in Virginia so you got your
2  license for that limited time period?
3    A.   Right, and it was for -- well, it was for
4  that period of time, which it might have been a year
5  or two.  And then those evaluations I just didn't do
6  after -- that contract ended, and we didn't do those
7  evaluations anymore.
8        So I just let it lapse.  I had no reason
9  to continue it.
10    Q.   All right.  In your report you mentioned
11  that you worked at the Cook County Juvenile
12  Temporary Detention Center for four months?
13    A.   Yes.
14    Q.   Do you remember about when that was?
15    A.   I'd have to go back and look at it.  I'd
16  say I left, I retired from the psychiatry department
17  in 2013, and it was probably about four years prior
18  to that, so I'm going to say around 2009.  At that
19  point the Juvenile Detention Center was undergoing a
20  lot of changes, and we were -- well, we were
21  essentially told our Department of Psychiatry needed
22  to provide services for the center, so we were all

1  on a rotating basis working there over a period of
2  four months.
3    Q.   And what was the psychiatry department
4  that you said you retired from in 2013?
5    A.   It's now called Stroger Hospital of
6  Cook County.  It was called Cook County Hospital at
7  the time.  So it was the psychiatry department at
8  the hospital where I worked.  I was there for 28
9  years, and then I retired.
10        But it was under the whole Cook County
11  system, so I think they were in the process of
12  outsourcing their services, so they were going
13  through a change.  So there was an interim period
14  where they needed temporary coverage, so the
15  psychiatry department, the child and adolescent
16  psychiatry division that I was a part of was asked
17  to provide those services at the detention center.
18    Q.   And could you give me an idea of what your
19  practice is like now since you retired from the
20  department?  I know you're in private practice.
21    A.   Right.
22    Q.   How are you spending your time?

1    A.   I have -- I have two offices.  One is in
2  Wheaton, Illinois, and one is in Evanston,
3  essentially do the same thing both places where I
4  essentially just evaluate -- well, I primarily work
5  with older adolescents and then adults.  I also am a
6  Medicare provider, so I provide services to elderly
7  people, do evaluations.  I don't do testing, but I
8  do clinical evaluations that primarily provide
9  therapy, either family and couples therapy or
10  individual therapy.
11    Q.   What percentage of your time would you say
12  is devoted to forensic psych evaluations?
13    A.   Currently?
14    Q.   In the past three years.
15    A.   The past three years, percentage of my
16  time, well, I guess if I give you a percentage I'm
17  going to say -- I mean, it's kind of hard to answer.
18  I'm just going to say 15 percent.  It's hard to
19  answer because I only take on a couple of, let's
20  say, asylum cases a year.  I think the most I've
21  ever done in one year is four.  But I see up to --
22  sometimes I see 50 patients in a week.  So, again,

Case 5:17-cv-00097-EKD-JCH   Document 106-3   Filed 10/22/18   Page 62 of 67   Pageid#: 2687

1 that's small, but then those cases are much more
2 consuming.
3        So in terms of time, I do spend a lot of
4 time writing up reports, and the evaluations could
5 take a day and a half versus an hour, but it's a
6 small, much smaller percentage of my time. This
7 last year it's been more of -- the civil case, of
8 course, has taken more -- I've spent more time with
9 that than I have in other years on doing this kind
10 of work.
11        So, I mean, it's hard to answer that
12 question. I mean, I'm not primarily doing that I
13 guess if that's what you're getting at. Primarily
14 I'm a clinician who sees patients every week, you
15 know, probably 35 to 40 at this point patients,
16 sometimes a busier week. And then I either take
17 time off or I have days that I don't see patients,
18 like Fridays is when I do a lot of this kind of work
19 or I travel out of town to do that and I take time
20 off from my work here.
21     Q. I noticed that over the years you've been
22 a member of a lot of different professional

1 associations.
2        Currently are you only a member of the
3 Illinois psychological -- Psychology Association and
4 the American Psych Association? Are those your two
5 active ones?
6     A. The other one is the -- it's called ISTSS,
7 and I'm drawing a blank, or is it -- the Institute
8 for Traumatic Stress Studies. It's kind of an
9 international organization. I pay dues to that, and
10 they have conferences and whatnot.
11        So that's another organization, but those
12 are the three primary ones.
13     Q. Okay. And, I'm sorry, what was the
14 subject matter of that third one?
15     A. I'm trying to think if I have it listed
16 here. Yeah, I'm just drawing a blank. I think it's
17 ISTSS is what it stands for. It's about stress,
18 trauma and symptoms. It's an international
19 organization that researches from people all over
20 the world, psychiatrists, psychologists, social
21 workers, who work with various traumatized
22 populations and do research and share information

1 with each other.
2     Q. Okay. Dr. Lewis, we've talked a lot about
3 what you've reviewed as we went through your report
4 and your evaluations, and just to make sure that I
5 understand and I'm clear on what you did in your
6 review, I just want to run through a list that I
7 have.
8        My understanding, you haven't reviewed any
9 documents for any UC at Shenandoah other than Does 1
10 through 4 and the other three that we discussed
11 earlier; is that right?
12     A. Well, I would add that I did mention the
13 videos to you that I watched after I submitted this.
14     Q. Yeah, and I'll ask you about that
15 specifically.
16     A. Okay.
17     Q. But I'm just talking about documents.
18     A. Documents, okay. I believe that's
19 correct. I'm just trying to think if there was any
20 other. There were other documents given to me, but
21 I did not look at them.
22        So yes, I guess the answer is that's all

1 that I've reviewed for this report.
2     Q. Okay. You haven't reviewed any employment
3 or personnel files for staff at the Center?
4     A. No.
5     Q. The same for disciplinary records for
6 staff?
7     A. I have not seen anything for that.
8     Q. Okay. And I think we've covered earlier
9 that you haven't looked at any of the training
10 materials or logs of training materials for staff?
11     A. No.
12     Q. Okay. These youths go to school while
13 they're at Shenandoah.
14        You didn't I assume look at their
15 educational records or reports or things along those
16 lines?
17     A. I believe for Doe 4 there was an
18 educational report in there. I don't think for the
19 other ones there was anything. I mean, if they were
20 there I reviewed them. I know for Doe 4 there was
21 some type of educational assessment. I don't recall
22 seeing anything for 1, 2 or 3 or the others.

63 (Pages 246 - 249)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 So I think for him he was the only one.

2 Q. Okay. Was that -- do you know if that was

3 one of the documents you received before you wrote

4 the report or after?

5 A. I received it before but didn't review it

6 until afterward.

7 Q. Okay. You haven't reviewed any audits or

8 monitoring reports from ORR?

9 A. I have not.

10 Q. And the same for the Virginia Department

11 of Juvenile Justice?

12 A. That's correct.

13 Q. Or you haven't seen any audits or

14 monitoring reports related to the Prison Rape

15 Elimination Act?

16 A. I have not.

17 Q. I know you visited Shenandoah to evaluate

18 John Doe 4 over a period of two days, and we talked

19 about how you were there and walked down the hall to

20 go to the restroom but you didn't tour the facility.

21 A. Right.

22 Q. Have you seen any photographs of the

1 facility?

2 A. You mean the outward facility? I've seen

3 a photograph of the Center, not photographs of

4 inside, but I've seen a photograph of the outside.

5 Q. Okay. And you mentioned the videos. I

6 think you said you got seven or eight after you

7 wrote your report.

8 Am I remembering right?

9 A. The videos actually came in prior to

10 writing the report, but there was just -- simply I

11 didn't have time to review them, but I reviewed them

12 afterward.

13 Q. Okay. What did they depict?

14 A. I should say they were videos of multiple

15 kids, many of whom I didn't evaluate, but for timing

16 I just picked some that seemed to be related. It

17 was hard to kind of figure out, you know, was this

18 one of my cases or not. Some I could tell but some

19 I couldn't, so I just picked seven or eight just to

20 give me a flavor.

21 So -- and, again, I've evaluated Doe 1 and

22 Doe 4. I couldn't find them in these videos even

1 though it indicated that they were perhaps there, so

2 I just wasn't sure if they were mismarked or just

3 it's hard to tell, so ...

4 Q. So you watched seven or eight --

5 A. Yes.

6 Q. -- but they were not of Doe 1 or Doe 4?

7 A. One -- there was a couple that clearly

8 said they were Doe 1, but, again, it was hard to

9 tell because sometimes the kids' backs were to you

10 and things were happening fairly quickly. And these

11 were shorter segments of maybe four- to nine-minute

12 stretches, you know. Sometimes a situation would

13 happen where a kid would then go right to their

14 room, and you could see that there was an

15 intervention but you really couldn't tell who or

16 what. You couldn't tell much.

17 So it was hard to distinguish specific

18 kids. I mean, you could distinguish the kid, but I

19 couldn't identify them necessarily.

20 So I was really just trying to give --

21 Q. You're not --

22 A. Go ahead.

1 Q. You don't have any certainty with respect

2 to which kid the video was meant to show?

3 A. If I was asked, I would have to say that's

4 right. I couldn't say for sure that that was Doe 1

5 or whatever, right.

6 Q. Okay. And what was your impression after

7 watching the videos?

8 A. Well, I guess in no particular order one

9 was that it was very hard to -- there was no volume,

10 so everything was simply by just observing and

11 trying to make sense of what was being said. You

12 could tell that there were things being said back

13 and forth at times, but there was no way to know

14 what.

15 So that made it difficult to understand

16 the whole situation. I tried to look at nonverbal,

17 and I watched several of them several times to just

18 try to get a sense of the nonverbal, and I could see

19 in some cases that -- in other words, there's ways

20 you can tell from somebody's nonverbal behavior

21 whether they're in an aggressive or defensive place,

22 so, for instance, if I'm approaching you more like

64 (Pages 250 - 253)

1 this versus like this.
2      And there were times where clearly there
3 was an openness, that I could tell there was trying
4 to be an appropriate discussion, but then things
5 would often snap very quickly.
6      In one case one of the boys looked back,
7 and I couldn't see who he was talking to, but I
8 could see him go like this, like are you talking to
9 me, and he pointed at his chest.  And then right
10 after that one of the guards came out, and the guard
11 walked away and this kid then sneakily tried to take
12 his chair.  And, again, my sense was that it's hard
13 to make a judgment when you don't know what's being
14 said, but something was getting triggered in that
15 situation.
16      And I felt like that in that particular
17 case when I looked at it several times the kid ended
18 up getting taken down, but it looked like there was
19 room to have handled that in a different way.
20      There was other situations where the kids
21 were clearly about to get out of control or were out
22 of control where the guards just had to intervene.

1 That was very clear.  And it looked like what they
2 were doing was appropriate for the most part in
3 those cases.
4      Where it wasn't was that in one case the
5 one situation in the gym or whatever, I forget where
6 it was, they ended up taking the kid down who didn't
7 need to be taken down.  He simply could have been
8 held back, and I just felt like the takedown was
9 unnecessary.
10      So, again, it felt like in some of the
11 situations it wasn't -- it was preventing, but it
12 wasn't immediate danger at that point and they
13 overreacted.  Other times I felt that they had
14 reacted appropriately.
15      I think their nonverbal behavior was
16 provocative in some situations.  I could just tell
17 by the way they were -- in one case the guard kept
18 kind of finger wagging one particular kid; and he
19 probably was upset with the kid, but the finger
20 wagging looked like it really triggered this kid.
21 So that's part of when I talk about trauma.  We
22 don't know how that kid perceived what that guard

1 was saying to him.  Was he saying something bad to
2 him?  I don't know.  And that's where it's limiting
3 how much you can glean from the videos.
4      Q.  Understood.  Other than John Doe 1 and
5 John Doe 4, you haven't talked to any of the youths
6 at Shenandoah?
7      A.  That's correct.
8      Q.  And you haven't interviewed any of the
9 staff at Shenandoah?
10      A.  That's right.
11      Q.  You haven't read any of their deposition
12 transcripts?  I think we talked about that earlier.
13      A.  Well, I mentioned Kelsey Wong.  I did see
14 that one.  Or no, that wasn't a deposition.  That
15 was a declaration.
16      Q.  I thought --
17      A.  Yeah.
18      Q.  Yeah, and let me clarify.  My
19 understanding was that you reviewed her statement
20 that was attached to --
21      A.  Yes.
22      Q.  -- the defendant's opposition --

1      A.  Yes.
2      Q.  -- to the preliminary --
3      A.  That's right.
4      Q.  -- injunction brief.
5      Is that your --
6      A.  That's right.
7      Q.  Okay.
8      A.  But none of the other depositions, no.
9      Q.  Okay.  And outside of staff who are
10 employed at Shenandoah, you haven't talked to
11 Dr. Rife or Dr. Kane or anyone else who provides
12 care there that may not be employed there?
13      A.  I have not.
14      MS. HAYNES:  Okay.  I think I'm about
15 done.
16      Do you have questions, Hannah?
17      MS. LIEBERMAN:  No.
18      MS. HAYNES:  Okay.  Can I have two minutes
19 to look at my notes, and then I'll either come back
20 and ask you just a couple of questions or we will be
21 done.
22      THE WITNESS:  All right.  No problem.

65 (Pages 254 - 257)

1          (Whereupon, a recess was taken

2              from 3:24 p.m. to 3:30 p.m.)

3          MS. HAYNES:  Okay.  I think I just have

4  two more.

5  BY MS. HAYNES:

6      Q.   Dr. Lewis, do you know where John Does 2,

7  3 or 4 are currently?

8      A.   2, no; 3, no.  I don't know where 4 is.

9  I'm assuming he's still at Shenandoah, but I don't

10  know.  2 and 3 I have no idea.

11     Q.   Okay.  Are you setting John Doe 4 in a

12  separate category just because you met with him last

13  summer, which was relatively recently?

14     A.   Right, and he was there at the time, yeah.

15     Q.   Right, okay.

16     A.   Yeah.

17     Q.   And then your report with regard to

18  John Does 2 and 3 is based on documentation alone,

19  right?

20     A.   Yes, yes.

21     Q.   And I'm just curious.  I'm not asking to

22  be anything, but in your clinical practice would you

1  ever reach a conclusion about a patient based on

2  your review of documentation alone without meeting

3  that patient?

4      A.   It's -- I think it's possible to reach a

5  conclusion.  I wouldn't -- I would never diagnose

6  somebody without seeing them, you know.  Even if

7  someone else had diagnosed them, I might say they're

8  reported to be this way based on the prior

9  diagnosis, but so I wouldn't reach a diagnostic

10  conclusion, but I think it's -- I think there would

11  be situations where again as a consultant, I mean,

12  there has been times that I've asked to review even

13  medical records not for this type of case but to

14  review medical records and come to some conclusions.

15         So I guess the answer is it depends on

16  what the question is and what the conclusions are.

17         MS. HAYNES:  Fair enough.  I don't have

18  anything else, Dr. Lewis.

19         I really appreciate your time and bearing

20  with me, especially over video, which can be a

21  little bit difficult.  And it was nice to meet you

22  regardless of the points on which we disagree.

1          THE WITNESS:  Likewise.

2              (Whereupon, the deposition was

3          concluded at 3:32 p.m.)

1  STATE OF ILLINOIS  )

2                )  SS:

3  COUNTY OF C O O K  )

4          The within and foregoing deposition of the

5  witness, GREGORY N. LEWIS, Psy.D., was taken before

6  GREG S. WEILAND, CSR, RMR, CRR, at Suite 3000,

7  One North Franklin Street, in the City of Chicago,

8  Cook County, Illinois, commencing at 9:27 o'clock

9  a.m., on the 16th day of October,  2018.

10         The said witness was first duly sworn and

11  was then examined upon oral interrogatories; the

12  questions and answers were taken down in shorthand

13  by the undersigned, acting as stenographer and

14  Notary Public; and the within and foregoing is a

15  true, accurate and complete record of all the

16  questions asked of and answers made by the

17  aforementioned witness at the time and place

18  hereinabove referred to.

19         The signature of the witness was waived by

20  agreement of counsel.

21         The undersigned is not interested in the

22  within case, nor of kin or counsel to any of the

1  parties.

2       Witness my signature on this 19th day of

3  October 2018.

4

5  _____

6  GREG S. WEILAND, CSR, RMR, CRR
   License No. 084-003472

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830