## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

JOHN DOE 4, by and through his next friend,
NELSON LOPEZ, on behalf of himself and all
persons similarly situated,

        *Plaintiffs,*

v.

SHENANDOAH VALLEY JUVENILE
CENTER COMMISSION,

        *Defendant.*

Civil No. 5:17-cv-00097-EKD/JCH
Judge Elizabeth K. Dillon

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Hannah M. Lieberman (admitted *pro hac vice*)
Tiffany Yang (admitted *pro hac vice*)
Mirela Missova (admitted *pro hac vice*)
WASHINGTON LAWYERS' COMMITTEE
 FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
Bradley C. Tobias (VSB No. 88046)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page(s)

Table of Authorities ..................................................................................................................... iii

INTRODUCTION AND STATEMENT OF THE CASE ................................................................ 1

COUNTERSTATEMENT OF DISUPTED MATERIALS FACTS ................................................ 2

I.   IN DIRECT CONTRADICTION TO ITS WRITTEN POLICIES, SVJC'S
     BEHAVIORAL MANAGEMENT PROGRAM DISPROPORTIONATELY AND
     EXCESSIVELY RELIES ON PUNITIVE MEASURES ...................................................... 2

     A.   SVJC Has Engaged In A Policy Or Practice That Subjects Vulnerable Children to
          Excessive Force and Restraints ................................................................................. 3

     B.   SVJC Has Engaged In A Policy Or Practice That Imposes Excessive Solitary
          Confinement On Traumatized Children ..................................................................... 7

II.  SVJC'S POLICIES AND PRACTICES REGARDING THE PROVISION OF MENTAL
     HEALTH TREATMENT FAIL TO PROVIDE AN ADEQUATE MEASURE OF CARE
     TO VULNERABLE CHILDREN .................................................................................... 10

III. DESPITE KNOWLEDGE OF PLAINTIFFS' VULNERABILITIES AND TRAUMA,
     SVJC IMPLEMENTED POLICIES AND PRACTICES THAT RESULT IN
     PERMANENT AND LONG-LASTING HARM TO THE CHILDREN IN ITS CARE .. 15

     A.   SVJC Is Well Aware That The Unaccompanied Immigrant Children It Detains
          Have Suffered Profound And Far-Reaching Trauma ............................................. 15

     B.   Plaintiffs' Experts Concluded That SVJC's Practices And Policies Involving
          Inadequate Mental Health Care And Excessive Force, Restraints And Solitary
          Confinement Reflect Both Deliberate Indifference To The Children's
          Constitutional Rights and Fall Far Short Of Meeting Professional Standards Of
          Care ....................................................................................................................... 17

STANDARD OF REVIEW ......................................................................................................... 22

ARGUMENT .............................................................................................................................. 24

DEFENDANT HAS NOT ESTABLISHED, AND CANNOT SHOW, THAT
UNDISPUTED MATERIAL FACTS DICTATE JUDGMENT AS A MATTER OF
LAW IN ITS FAVOR ................................................................................................................. 24

I.   SVJCC, AS AN ENTITY, BEARS DIRECT SUPERVISORY LIABILITY FOR
     VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS ................................. 25

     A.     The Facts Support A Reasonable Inference That Defendant
Has Engaged In A Policy or Practice Involving The Use Of
Excessive Force and Restraints Against The Plaintiffs ........................................27

     B.     The Facts Support A Reasonable Inference That Defendant
Has Engaged In A Policy or Practice Involving The Imposition Of
Excessive Solitary Confinement Against The Plaintiffs........................................30

     C.     The Facts Support A Reasonable Inference That Defendant Has
Engaged In A Policy or Practice Of Failing To Provide The Plaintiffs
With Constitutionally-Adequate Care For Their Serious Mental Health
Needs...................................................................................................................31

II.     THE RECORD SUPPORTS A FINDING THAT DEFENDANT'S ACTS AND
OMISSIONS WITH RESPECT TO THE PLAINTIFFS REFLECT DELIBERATE
INDIFFERENCE TO PLAINTIFFS'CONSTITUTIONAL RIGHTS AND FALL
SHORT OF MEETING PROFESSIONAL STANDARDS GOVERNING THE
OPERATION OF JUVENILE DETENTION FACILITIES ...............................................34

CONCLUSION...........................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Farmer v. Brennan,*
    511 U.S. 825 (1994)................................................................................................35

*Guessous v. Fairview Property Investments, LLC,*
    828 F.3d 208 (4th Cir. 2016) ...............................................................................23

*Heyer v. U.S. Bur. of Prisons,*
    849 F.3d 202 (4th Cir. 2017) ...............................................................................32

*Kingsley v. Hendrickson,*
    135 S. Ct. 2466 (2015)..........................................................................................28

*Lytle v. Doyle,*
    326 F.3d 463 (4th Cir. 2003) ...............................................................................26

*Matherly v. Andrews,*
    859 F.3d 264 (4th Cir. 2017) ...............................................................................31

*McAirLaids, Inc. v. Kimberly-Clark Corp.,*
    756 F.3d 307 (4th Cir. 2014) ...............................................................................23

*Milligan v. City of Newport News,*
    743 F.2d 227 (4th Cir. 1984) ..........................................................................26, 30

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978)..............................................................................................25

*Newbrough v. Piedmont Reg'l Jail Auth.,*
    822 F. Supp. 2d 558 (E.D. Va. 2011) .......................................................32, 34, 35

*Newland v. Borders,*
    649 F. Supp. 2d 440 (W.D. Va. 2009) .............................................................26, 30

*Pattern v. Nichols,*
    274 F.3d 829 (4th Cir. 2001) ...............................................................................31

*Sanchez v. R.G.L.,*
    761 F.3d 495 (5th Cir. 2015) ...............................................................................34

*Schall v. Martin,*
    457 U.S. 253 (1984)..............................................................................................28

*Sharma v. USA Int'l LLC,*
 851 F.3d 308 (4th Cir. 2017) ..............................................................................................23

*Shaw v. Stroud,*
 13 F.3d 791 (4th Cir. 1994) .................................................................................................27

*Short v. Smoot,*
 436 F.3d 422 (4th Cir. 2006) ...............................................................................................36

*Slakan v. Porter,*
 737 F.2d 368 (4th Cir. 1984) ...............................................................................................27

*Spell v. McDaniel,*
 824 F.2d 1380 (4th Cir. 1987) ........................................................................................26, 30

*Thompson v. Commonwealth,*
 878 F.3d 89 (4th Cir. 2017) .................................................................................................35

*Tolan v. Cotton,*
 134 S. Ct. 1861 (2014) *(per curiam)*....................................................................................23

*Youngberg v. Romeo,*
 457 U.S. 307 (1982)........................................................................................................31, 35

**Rules and Regulations**

Fed. R. Civ. P. 19...................................................................................................................34

iv

Plaintiffs John Doe 4, *et al.*, by their attorneys, submit this Memorandum of Law in Opposition to the Motion for Summary Judgment and supporting Brief filed by Defendant Shenandoah Valley Juvenile Center Commission ("SVJCC") on October 22, 2018. *See* ECF Docket Nos. 99, 100.

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff John Doe 1 commenced this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 on October 4, 2017, seeking to protect the rights and interests of himself and a putative class of unaccompanied immigrant children ("UACs") in the custody of the U.S. Department of Health and Human Services Office of Refugee Resettlement ("ORR") and detained at the Shenandoah Valley Juvenile Center ("SVJC") from a pattern and practice of unlawful, harmful conduct to which these children were subjected at SVJC, including verbal and physical abuse, imposition of excessive solitary confinement, and deprivation of adequate mental health care, all in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.

Although, due to the inherently transient nature of the population of UACs detained at SVJC, changes in the identity of the individual named plaintiffs/class representatives have occurred over time, necessitating amendments to the pleadings, the substance of this case, certified to proceed as a class action by Order of this Court pursuant to the mutual consent of the parties, has remained the same: Plaintiffs seek to bring to an end an ongoing systemic pattern and practice of unconstitutional treatment by the Defendant to which detained UACs have been subjected at SVJC that commenced before the suit was filed, was continuing as of the date of filing, and persists through the present. *See, e.g.* Second Amended Class Action Complaint ("SAC"), ¶¶ 2-3 at 2 (filed July 11, 2018) (ECF Dkt. No. 68).

The fact discovery phase of the case having recently concluded, Defendant has filed a Motion for Summary Judgment, and supporting Brief, pursuant to which it seeks a determination

by the Cout that it is entitled to judgment as a matter of law resolving this action in its entirety

based upon a dispositive resolution of all of Plaintiffs' causes of action and claims for relief in

Defendant's favor.  Defendant contends that there are no genuine issues of material fact in

dispute with respect to the substance of any of the constitutional violations Plaintiffs have

alleged, and therefore that no trial is needed to resolve this case.  Plaintiffs submit, however, that

Defendant's wholly one-sided, self-serving portrayal of the factual record cannot be credited,

much less sustained.  On the contrary, a substantial volume of factual evidence including, most

tellingly, facts derived from the Defendant's own documents and the testimony of its own

personnel, revealsubstantial support for the ultimate merits of Plaintiffs' claims and, at a

minimum, requires that Defendant's attempt to short-circuit this litigation cannot succeed.

## COUNTERSTATEMENT OF DISPUTED MATERIAL FACTS

**I.     IN DIRECT CONTRADICTION TO ITS WRITTEN POLICIES, SVJC'S
BEHAVIORAL MANAGEMENT PROGRAM DISPROPORTIONATELY AND
EXCESSIVELY RELIES ON PUNITIVE MEASURES**

SVJC has retained "a culture that relies on punitive measures" when addressing the

behavior of unaccompanied immigrant children detained within its walls. Ex. 1, Weisman[1]

Report at 21.  "[P]unishment" and "control[]," achieved "through methods such as solitary

confinement, physical restraint, [and] strapping to a[n] [emergency restraint] chair," form "[t]he

predominant approach utilized to manage youth at SVJC." Ex. 2, Lewis Report at 1.  Despite the

existence of written policies that purportedly govern the use of restraints, force, and confinement

---

[1]     Plaintiffs expressly reserve all arguments and bases for admitting testimony from Dr.
Weisman, Dr. Lewis, and Paul Diver, PhD as set forth in their Oppositions to Defendant's
Motions to Exclude and all materials filed in support thereof.

at SVJC, the policies are themselves treated "as jokes" by supervisors. Ex. 3, Wykes[2] Depo. Tr. 205:16-22. Even in the instances in which these policies are implemented, their application is "subjective" and varies "like day and night" depending on the shift or individual supervisor responding to the scene. *Id.* 32:6-12, 192:25-193:17.

## A. SVJC Has Engaged In A Policy Or Practice That Subjects Vulnerable Children To Excessive Force And Restraints

Staff at SVJC use a range of mechanical restraints, which include metal handcuffs, metal leg shackles, and soft restraints (non-metal straps that "go around the hands and the feet"). Ex. 4, McCormick Depo. Tr. 123:7-24; Ex. 3, Wykes Depo. Tr. 222:4-13. SVJC also uses an emergency restraint chair that restrains a child "by their arms, legs, and torso" and may be accompanied by a "spit mask" secured over the child's face. Answer to SAC ¶ 91(b) (ECF Dkt. No. 69). In addition to the emergency restraint chair and mechanical restraints, SVJC staff also use physical restraints and force when interacting with children at the Center: the "handle with care" program used at SVJC instructs all staff with the use of various holds and actions, including the use of "hands-on restraints" called the "primary restraint technique" ("PRT"), "high speed takedown," "rear elbow strike," pressure on a child's mandibular nerve, and "positional asphyxia." *See, e.g.*, Ex. 5, Mayles Depo. Tr. 74:23-75:19; Ex. 6, Mayles Depo. Ex. 6, 2017 Handle With Care Cert.; Ex. 7, Wong Depo. Tr. 31:21-32:2, 138:15-23, 139:19-24.

The use of the emergency restraint chair and mechanical restraints has been routine at SVJC. *See infra.* From approximately June 2015 to May 2018, the emergency restraint chair was used over forty times on the immigrant children detained at SVJC. *See* Ex. 8, Diver Report

---

[2]     Anna Wykes is a former resident supervisor who worked with both the local and immigrant children at SVJC from August 2016 to October 2017. *See* Ex. 3, Wykes Depo. Tr. 22:11-14, 23:19-24:12, 128:3-4.

at 13-14. Eight unaccompanied immigrant children have cumulatively spent more than an hour in the chair at SVJC, and three of these children spent more than eleven hours in the chair during their detention at the Center. *Id.* at 19. During this same time period, mechanical restraints were used on over 140 occasions; over 25 instances revealed the use of restraints for a time period exceeding SVJC's maximum timeframe of two hours. *Id.* at 10-11. At least twenty children were subjected multiple times to mechanical restraints, and twelve children have cumulatively spent more than forty minutes in mechanical restraints while at SVJC, including a handful of children who each spent over 1,000 minutes in restraints. *Id.* at 13.

According to SVJC staff, the emergency restraint chair should be used only in "absolutely emergency situations where the child is in dire straits, and in [a] serious position to seriously harm themselves if not die if [staff] did not intervene." Ex. 4, McCormick Depo. Tr. 142:18-143:3. *See also* Ex. 9, Cook Depo. Tr. 263:10-19 (the "only times" SVJC uses the restraint chair "is in an emergency situation"). However, SVJC straps children in the chair as a result of "fairly minor behavioral issue[s]," such as "pushing or trying to start a fight." Ex. 3, Wykes Depo. Tr. 240:4-8. Minor incidents, such as an argument about point losses or a child approaching another in an allegedly "threatening manner," have resulted in the use of physical restraints, mechanical restraints, and the emergency restraint chair. Ex. 10, Kann Depo. Ex. 9 (Doe 2 11.18.17 Incident); Ex. 2, Lewis Report ¶¶ 60, 75, 187; Ex. 11, 07.05.17 Incident. As examples, a child was placed in the chair despite his compliant actions of "immediately s[itting] down" when staff entered his cell, and another was secured in the chair due to verbal threats he

4

made while his wrists were already locked in handcuffs. Ex. 12, McCormick Depo. Ex. 6 (Doe 1 05.04.17 Incident) at 1; Ex. 13, McCormick Depo. Ex. 7 (09.13.16 Incident) at 1.[3]

SVJC policy limits the use of the restraint chair to a cumulative two hours in any 24-hour period, *see, e.g.*, Ex. 7, Wong Depo. Tr. 157:17-21, and SVJC's corporate representative testified she was not aware of any instances where a child was in the chair more than once in the same day, *id.* 167:12-20 (affirming that this practice would cause concern). However, the chair has been used on an immigrant child in a single calendar day, often multiple times throughout the same day, for over two hours, Ex. 14 (10.03.16 Incident), Ex. 15 (Kann Depo. Ex. 7, 12.14.16 Incident) *and* Ex. 16 (12.26.16 Incident), for approximately 3.5 hours, Ex. 17 (01.05.17 Incident), for nearly five hours, Ex. 13 (09.13.16 Incident) *and* Ex. 4, McCormick Depo. Tr. 163:23-164:12 (acknowledging that this use exceeds SVJC policy), for nearly 6.5 hours, Ex. 18 (01.18.17 Incident), and for nearly nine hours, Ex. 19 (Mahiri Depo. Ex. 4, 01.19.18 Incident).

SVJC also uses restraints, including the emergency restraint chair, in response to children who self-harm or children whom they know have engaged in self-harm. *See, e.g.*, Ex. 4, McCormick Depo. Tr. 137:10-138:19, 143:20-144:7; Answer to SAC ¶¶ 71(b), 91(a). From June 2015 to May 2018, for immigrant children who had previously engaged in self-injurious behavior, mechanical restraints were imposed over 60 times, the emergency restraint chair was imposed over 40 times, and physical restraints were used on over 140 occasions. Ex. 8, Diver Report at 36-37. And although SVJC policies indicate that mechanical restraints as well as the emergency restraint chair "will be avoided if at all possible on residents with self-injurious

---

[3]     Even an SVJC former employee questions this approach. While reflecting on an incident in which the chair was brought for a child already in mechanical restraints, Ms. Wykes wondered: if staff "already have him on the ground and he's already about to be shackled and brought back to his room," "[w]hy is [the chair] necessary?" Ex. 3, Wykes Depo. Tr. 193:24-194:14.

behavior" and will be "only used until an emergency mental health screening can be accomplished," Ex. 4, McCormick Depo. Tr. 133:15-22, 143:15-19, SVJC staff use both forms of restraints on self-harming children even where an emergency mental health screening has been considered and denied, *id.* 137:10-138:19, 143:20-144:7. Indeed, a floor staff member[4] acknowledged that, on at least one occasion, staff were directed to immediately place a child in the chair if they saw "any behavior . . . that he's about to cut himself or do anything," without any attempt at engaging in less-intrusive interventions. Ex. 20, Mahiri Depo. Tr. 175:21-176:2, 177:12-20.

SVJC also "relies too heavily on the use of force," including a "reli[ance] on the use of take-down procedures to calm a situation." Ex. 21, Weisman Depo. Tr. 15:12-16:7. For example, from June 2015 to May 2018, physical restraints lasting more than a minute were used on an immigrant child on over 170 occasions. Ex. 8, Diver Report at 20. Indeed, SVJC staff acknowledge that physical restraints are used on these children even when a child's behavior is not "immediate[ly] threat[ening]" but is simply "interfering with the routine of the other children." Ex. 4, McCormick Depo. Tr. 113:1-14.

Doe 4's experiences illustrate the type of routine use of excessive force common to the class.[5] A disagreement about cutting his fingernails, an attempt to "talk calmly" to staff members about a point loss, and a question about receiving a beverage or deodorant spray – the

---

[4]     "Floor staff" or "floor staff members" are those "individuals who primarily deal with the daily programming," colloquially described as "guards," but labeled by SVJC as "resident supervisors," "assistant supervisors," and "shift supervisor[s]." Ex. 23, Aleman Depo. Tr. 66:7-68:6.

[5]     Indeed, Doe 4 testified that he has seen staff hit "[m]ore than ten" children and reported at least some of those incidents to his case manager, clinician, and teacher. Ex. 24, Doe 4 Depo. Tr. 62:6-63:19. This testimony contradicts Defendant's assertion that Doe 4 could recall only 2 instances in which other children were subjected to excessive force. Def. SJ Br. at 7-8.

types of interactions that are "fairly minor," *see, e.g.*, Ex. 22, Lewis Depo. Tr. 172:20-174:19 –

escalated into physical altercations where SVJC staff punched and hit Doe 4 in the ribs, face, and

hand, hit him with metal handcuffs, restrained him with such force that he felt staff might "break

or pull [his] arm off," restricted him from breathing (and informed him it was "good" he could

not breathe), and marked him with bruises. Ex. 25, Doe 4's Resp. D's First Int. at 4, 5; Ex. 24,

Doe 4 Depo. Tr. 51:1-52:5, 88:3-89:9, 112:15-113:8.

**B.      SVJC Has Engaged In A Policy Or Practice That Imposes Excessive Solitary Confinement On Traumatized Children**

From approximately June 2015 to May 2018, over 930 incidents resulted in solitary

confinement[6] exceeding the American Medical Association's one-hour confinement standard,

and almost 820 incidents resulted in solitary confinement exceeding the Juvenile Detention

Alternative Initiative's[7] four-hour confinement standard. Ex. 26, Diver Supp'l Report at 3. Doe

1's total time in solitary confinement during his detention exceeded 2,400 hours, and other

immigrant children were isolated for cumulative periods exceeding 550, 590, 610, 670, 830, and

970 hours. *Id.* at 5. Twenty immigrant children were placed in solitary confinement on fourteen

or more occasions during their detention, with some reaching forty or more instances of

isolation. *Id.*

The record confirms Ms. Wykes's testimony that, in practice, "[i]t could be anything,"

including a "very small" infraction, that results in extended periods of solitary confinement for

---

[6]      "Removal from programming," a disciplinary response used on detained children at
SVJC, occurs by placing a child alone in his or her cell, and SVJC's Lead Case Manager
acknowledges that it constitutes solitary confinement. Ex. 27, Ropp Depo. Tr. 144:19-23; Ex. 7,
Wong Depo. Tr. 110:20-111:2. *See also* Ex. 22, Lewis Depo. Tr. 105:20-108:3 (explaining that
a child is experiencing the harm of solitary confinement when he is "isolated by [himself] in [his]
room" with only "periodic[]" exposure to outside check-ins, and that the terms used by SVJC to
describe this form of isolation are a matter of "semantics.")

[7]      *See* Ex. 1, Weisman Report at 5-6

children at SVJC. Ex. 3, Wykes Depo. Tr. 211:8-10. For instance, "disrespect" that is non-threatening "should never lead to removal" under SVJC's policies, Ex. 4, McCormick Depo. Tr. 101:18-20, and children who commit a "minor offense" such as "disruptive behavior" or using profane language should not be removed from programming under SVJC policy, *see* Ex. 7, Wong Depo. Tr. 126:16-21, 127:12-128:5, 129:7-10; Ex. 28, Wong Depo. Ex. 16 (Consequences Continuum) at 1. However, SVJC routinely isolates children who engaged in such minor and non-threatening conduct. *See, e.g.*, Ex. 29, 09.30.16 Incident (isolation for too slowly eating his breakfast and getting dressed) [8]; Ex. 25, Doe 4's Resp. D's First Int. at 7-8 *and* Ex. 24, Doe 4 Depo. Tr. 83:16-84:18 (isolation for sitting in a chair and calmly asking to speak with his clinician); Ex. 31, 04.28.18 Incident (removed for 49.5 hours after being charged with "disruptive behavior"); Ex. 32, 03.20.17 Incident (removed for an additional 23 hours after being charged with "disruptive behavior" for "yelling that he did not receive enough food at dinner"); Ex. 33, 11.18.17 Incident (removed for 17 hours after being charged with "disruptive behavior" for "banging and kicking on his cell door" and yelling an obscenity); Ex. 34, Doe 3 10.10.17 Incident (removed for yelling and kicking or hitting the door from inside his cell). Indeed, children have been forced into isolation even when they *comply* with staff instructions. *See, e.g.*, Ex. 35, 11.20.16 Incident (removed for almost 22 hours after he stopped arguing and voluntarily returned to his cell); Ex. 36, 11.13.16 Incident (removed for 24 hours after he backed up and stood against a wall).

---

[8]     The same disciplinary report also states that the child made a disrespectful statement to a staff member, but the "comments" section of the room isolation document indicates that the child made this statement at 10:30 am, over two hours after he had already been removed from programming. Ex. 29, 09.30.16 Incident at 3.

Moreover, contrary to Defendant's contention, *see* Def. JS Br. at 2, SVJC's own documentation[9] demonstrates that, once a child is removed, he is not returned from solitary confinement as soon as safely possible and, in fact, continues to be isolated even if subsequent four-hour evaluations provide no indication of lingering safety concerns. For example, although four-hour evaluations following removal indicated that a child was "cooperative," was "calm on [his] bunk," was "doi[n]g ok" or "sa[id] he [wa]s ok," had "no major issues," or simply "nodded at [the staff member]," the child remained in confinement for extended periods of time without justification. *See* Ex. 37, 11.13.16 Incident at 6, 8; Ex. 38, 09.10.17 Incident at 4; Ex. 39, 11.11.16 Incident at 4, 6.

Solitary confinement, too, is used on children who engage or have engaged in self-harm. For example, children who had previously engaged in self-injurious behavior were placed in solitary confinement for a period exceeding seven hours on over 270 occasions. Ex. 26, Diver Supp'l Report at 9.

---

[9]     SVJC, upon instruction and/or encouragement, asserts that reports are created when a child is removed from programming or a restraint is utilized, *see* Def. SJ Br. at 3, 4 – but staff at SVJC have edited these reports to omit relevant facts or to retroactively include language about the preceding events. *See* Ex. 40, McCormick Depo. Ex. 5, 10.30.15 Email (regarding a local child pre-August 2016); Ex. 41, 01.06.17 Email (regarding a UAC); Ex. 42, 12.18.16 Email (regarding Doe 1); Ex. 43, 08.17.16 Email (regarding Doe 1).

## II.    SVJC'S POLICIES AND PRACTICES REGARDING THE PROVISION OF MENTAL HEALTH TREATMENT FAIL TO PROVIDE AN ADEQUATE MEASURE OF CARE TO VULNERABLE CHILDREN.[10]

The clinical services provided at SVJC are deficient in staffing, in frequency, in substance and in scope. *See infra*. The clinicians at SVJC are the only staff members[11] who purportedly provide the Center's day-to-day mental health services, Ex. 23, Aleman Depo. Tr. 22:9-24:8; Ex. 27, Ropp Depo. Tr. 93:20-25; contrary to SVJC's assertion, Def. SJ Br. at 9 (ECF Dkt. No. 100), psychiatrist Dr. Timothy Kane is focused on medication management and does not provide any other therapeutic services to the children he meets, Ex. 23, Aleman Depo. Tr. 196:20-197:10; Ex. 27, Ropp Depo. Tr. 97:9-16; Ex. 5, Mayles Depo. Tr. 132:11-15; Ex. 7, Wong Depo. Tr. 198:22-199:8; Ex. 21, Weisman Depo. Tr. 74:19-75:2. SVJC's Lead Case

---

[10]    Indeed, the staff at SVJC demonstrate cruel and disparaging attitudes towards unaccompanied immigrant children, especially those that experience mental distress. When shift supervisors learn of a child self-harming, they have responded with remarks such as "[l]et them cut themselves" or "[l]et them go bleed out." Ex. 3, Wykes Depo. Tr. 121:22-25, 123:5-7. A supervisor once "laughed in [an employee's] face" upon hearing her report of a child's suicidal thoughts, and he refused to complete a check on the child. *Id.* 262:6-21. The cultural environment at SVJC is such that staff "pok[e] fun" at a child in the emergency restraint chair while he "bl[eeds] from his arm" or "jok[e]" about a child who, in a moment of crisis, smeared ejaculation on his face. *Id.* 143:13-21, 166:9-23. When a child placed objects in his self-inflicted wounds or attempted suicide, staff "glorified" and "[v]ery casual[ly]" discussed these stories "almost like a form of entertainment." *Id.* 235:22-237:5. Even email messages about a child's self-harm or behavioral manifestations of trauma are responded to with callousness by SVJC staff. *See, e.g.*, Ex. 44, 04.16.17 Email (message re: Doe 1); Ex. 45, 07.24.16 Email (message re: Doe 1). Indeed, SVJC is well aware that children have faced discrimination on the basis of their race and national origin. *See, e.g.*, Ex. 59, 02.21.16 Grievance (staff called a child a "fucking dog," closed the door on his foot, and said "Fuck Mexico"); Ex. 60, 12.08.16 Grievance (staff told a child the "color of [her] skin was very ugly" and she "wouldn't like to have that color of skin so brown"); Ex. 61, 01.05.17 Grievance (staff told child she "never liked Hondurans because their culture is only violence," that "people like [the child] are worth nothing" and "should not exist"); Ex. 62, 02.23.18 Grievance (staff told child he was "trash").

[11]    The contracted psychologists provide no other services beyond psychological evaluations, and they do not provide day-to-day mental health services for the children. Ex. 9, Cook Depo. Tr. 52:23-53:4; Ex. 23, Aleman Depo. Tr. 24:5-8. Case managers are not required to and do not have any clinical experience or education, *see* Ex. 27, Ropp Depo. Tr. 13:5-6, nor are they qualified to provide therapeutic services, Ex. 9, Cook Depo. Tr. 151:17-19.

Manager acknowledges that relying solely on these clinicians, who at times have caseload ratios of thirteen children to one clinician, Ex. 23, Aleman Depo. Tr. 18:2-5, is "challenging, given the [immigrant] population that [SVJC] serve[s]." Ex. 27, Ropp Depo. Tr. 93:20-25.

Regarding frequency, SVJC's Lead Case Manager describes the ORR-required once-per-week individual counseling session and twice-per-week group sessions as "not a lot of clinical time." Ex. 27, Ropp Depo. Tr. 92:12-15. Most unaccompanied immigrant children meet with their clinician for individual sessions only once per week; for example, Doe 1 – who reported that he was prone to self-harm within two weeks of his arrival at SVJC and, according to his clinician, "became more and more frequently self-harming while at [SVJC]," *see* Ex. 23, Aleman Depo. Tr. 96:6-97:2 – met with his clinician only once-per-week for eighty of the ninety weeks he was detained at SVJC in 2016 and 2017.[12] Ex. 46, Aleman Depo. Ex. 24 (2016 and 2017 calendar of individual sessions for Doe 1). Indeed, when unaccompanied immigrant children attempt to call their clinician for assistance, clinicians have at times "blatantly ignore[d]" these calls. Ex. 3, Wykes Depo. Tr. 249:4-15.

The scope of clinical services provided at SVJC are also inadequate; "[t]here is no indication" in SVJC's clinical documentation "that the clinicians are engaging in such an analysis to which individualized responses could be tailored, even in cases of repeated self-injury." Ex. 1, Weisman Report at 18. Individual treatment plans[13] are not created for the

---

[12]     During this time frame, Doe 1 met with or spoke to his clinician over the weekend on only one occasion. *See* Ex. 46; *see also* Ex. 23, Aleman Depo. Tr. 147:7-148:14 (confirming that if he spoke with Doe 1 over a weekend, he would document the conversation in a progress note).

[13]     SVJC does create a document entitled "Individual Service Plan" for each immigrant child, *see, e.g.*, Ex. 47, Ropp Depo. Ex. 9 (Doe 4 ISP); Ex. 48, Contreras Depo. Ex. 2 (ISP), but these documents are "identical": they all "list identical interventions, and the same frequency with which they are offered." Ex. 1, Weisman Report at 18. These documents "do not address or provide for routine monitoring of goals and objectives" and "appear to be little more than

11

children at SVJC, Ex. 9 (Cook Depo. Tr. 128:11-23), Ex. 23 (Aleman Depo. Tr. 178:17-24), Ex. 5 (Mayles Depo. Tr. 113:6-16), nor do clinicians create any long-term objectives for treatment for these children, Ex. 9 (Cook Depo. Tr. 128:4-6). In fact, a child's serious mental health issues – such as visual hallucinations or suicidal ideations – that have been documented at SVJC and experienced by the child as recently as the prior week are simply not raised, discussed, or worked through in an individual session. Ex. 9, Cook Depo. Tr. 161:18-162:10. A clinician will help a child manifesting such issues only if the child is, while sitting in front of the clinician during a session, actually presenting with those mental health symptoms. *Id.*

Moreover, the individual sessions held by the clinicians at SVJC lack analyses or discussions regarding the triggers of misbehavior and underlying trauma that a child experiences. *See, e.g.*, Ex. 22, Lewis Depo. Tr. 239:8-240:10; Ex. 2, Lewis Report ¶¶ 38, 40. SVJC's Lead Clinician admitted that clinicians at SVJC do not treat or discuss the trauma underlying a child's mental health issues, and she justified this practice with the assertion that "it would be unethical and inappropriate" for SVJC clinicians to "treat trauma." Ex. 9, Cook Depo Tr. 190:14-21. In fact, even when clinicians receive diagnoses or treatment recommendations from a child's psychological evaluation, they do not provide counseling specific to individual diagnoses or are unqualified to provide the therapeutic services recommended by the psychologist. *Id.* 178:23-179:4, 232:2-233:8, 235:3-7, 254:18-24.

The progress notes documenting each child's individual sessions with their clinician further suggest that clinicians at SVJC fail to identify or teach the children the different coping skills they need to manage their mental health. Ex. 1, Weisman Report at 18; Ex. 21, Weisman

formulaic check-offs," which renders them "completely useless as a treatment guide." *Id.* at 18-19.

Depo. Tr. 83:19-84:10, 86:7-15. Instead, the individual sessions appear to be limited to discussions about punitive consequences of a child's lack of behavioral control. *See, e.g.*, Ex. 2, Lewis Report ¶¶ 41, 42, 72, 93, 96. *See also* Ex. 24, Doe 4 Depo. Tr. 40:20-41:2 (noting that in his individual sessions, his clinician speaks only "about behaving properly"). Rather than providing adequate mental health counseling, SVJC engages in an "overreliance on medication to control the youth's [so-called] 'bad behavior.'" Ex. 2, Lewis Report ¶ 176.

What is more, a clinician at SVJC acknowledged that "well-structured group therapy" is simply not offered at SVJC. Ex. 23, Aleman Depo. Tr. 204:22-205:1. The purported group sessions provided by SVJC are "informal," Ex. 27, Ropp Depo. Tr. 92:12-15, last no more than fifteen minutes per session, Ex. 9, Cook Depo. Tr. 132:8-12, and can be led by non-clinical staff, Ex. 23, Aleman Depo. Tr. 164:4-12, 168:21-24; Ex. 5, Mayles Depo. Tr. 118:3-8. The subject matter of these sessions has included topics such as symptoms of colds, flus, and sinus infections and the cultural differences surrounding Christmas. Ex. 49, Cook Depo. Ex. 3 (Doe 3 Dec. 2017 Group Session Log). Attendance is not mandatory at these group sessions, nor is attendance documented. Ex. 9, Cook Depo. Tr. 130:12-19, 133:8-10. At times, only one child has participated in a "group" session, or the session has been canceled when no child chose to participate. Ex. 23, Aleman Depo. Tr. 167:20-168:2; Ex. 5, Mayles Depo. Tr. 117:21-24.

SVJC also fails to provide appropriate trauma-informed trainings for all its staff. Trauma-specific training is not provided to new hires at SVJC, Ex. 9, Cook Depo. Tr. 77:14-16, and some staff did not receive it until after their first year at the Center, Ex. 3, Wykes Depo. Tr. 181:10-182:2. Moreover, the techniques purportedly taught as an element of SVJC's trauma training, such as active listening and empathy, are not implemented by staff in their interactions with the immigrant children, and the training has had little to no effect on the procedures or

practices at SVJC. Ex. 3, Wykes Depo. Tr. 185:11-187:1. In practice, SVJC floor staff routinely fail to recognize that a child's behavior is "a symptom of his . . . trauma" rather than an act of random or willful disobedience or misconduct. Ex. 22, Lewis Depo. Tr. 183:4-185:8. A floor staff member at SVJC candidly acknowledged he "d[id]n't have th[e] type of training" required to "calm . . . down" a child who "seem[ed], you know, reluctant or mad." Ex. 50, Uraje Depo. Tr. 23:10-20.

Finally, despite the clinicians' awareness of the children's mental health needs,[14] floor staff and mental health staff at SVJC are not "talking with each other" or "active[ly] consult[ing]" each other about how to properly respond to these traumatized children. Ex. 22, Lewis Depo. Tr. 116:16-118:13. There are no "formally structured treatment team[s]" that holistically address a child's mental health needs, and the few conversations that do occur between the floor staff and clinicians happen informally – which is "not the way to really address an acute clinical crisis." Ex. 21, Weisman Depo. Tr. 89:13-90:11, 106:4-8. *See also* Ex. 5, Mayles Depo. Tr. 205:3-25 (asserting that such communications occur "very informal[ly]"). Floor staff at SVJC acknowledge they do not know which children have mental health issues, they do not know the kinds of mental health issues experienced by these children, and that this

---

[14]    If the child was at a different provider within the ORR network, the clinician gains access to the child's mental health documents – including psychological evaluations, assessments, case summaries, hospitalization records, counseling notes, or significant incident reports – from these other systems before the child's arrival to SVJC. *See, e.g.*, Ex. 5, Mayles Depo. Tr. 85:16-87:6; Ex. 9, Cook Depo Tr. 106:24-107:12. From these documents, the clinician could learn the child's social or experiential history, presenting behaviors, history of trauma, and history of significant incidents before the intake process even takes place. Ex. 5, Mayles Depo. Tr. 87:24-88:17. Clinicians also have access to other mental health documentation that may be created during a child's detention at SVJC, including psychological evaluations and summaries, recommendations, evaluations from a child's psychiatric hospitalization, clinical progress notes, and documentation of self-harm. *Id.* 31:7-21, 102:12-23; 129:16-130:9; Ex. 23, Aleman Depo. Tr. 162:8-24.

information is kept "confidential" from them. Ex. 51, Fields Depo. Tr. 55:15-56:8; Ex. 50, Uraje

Depo. Tr. 22:25-23:9, 28:23-29:3. When a child arrives at SVJC, floor staff are provided no

information about the child's prior trauma or experiences. Ex. 50, Uraje Depo. Tr. 24:12-15.

Moreover, the clinicians generally work from 8 am to 4 pm, Monday to Friday on a forty-hour

workweek, *see* Ex. 23, Aleman Depo. Tr. 177:17-178:16, 139:7-9, and their physical absences

from the Center – and resulting inability to work with the floor staff during the weekends, when

the majority of the children's incidents occur, Ex. 3, Wykes Depo. Tr. 245:1-13 – "ma[kes] a big

difference" in the ways SVJC responds to these vulnerable children. Ex. 22, Lewis Depo. Tr.

205:15-21.

## III.    DESPITE KNOWLEDGE OF PLAINTIFFS' VULNERABILITIES AND
TRAUMA, SVJC IMPLEMENTED POLICIES AND PRACTICES THAT
RESULT IN PERMANENT AND LONG-LASTING HARM TO THE CHILDREN
IN ITS CARE

### A.    SVJC Is Well Aware That The Unaccompanied Immigrant Children It
Detains Have Suffered Profound And Far-Reaching Trauma

It is difficult to fathom the magnitude of trauma that unaccompanied immigrant children

have suffered before arriving at SVJC. Unaccompanied immigrant children experience

unspeakable horrors: they have witnessed the murders of loved ones, experienced torture,

abandonment, and neglect, suffered physical and sexual harm, weathered "days without food,

water, or shelter," and are "likely to have suffered extensive and multiple instances of abuse and

trauma." Ex. 2, Lewis Report ¶¶ 13, 19. SVJC's own training materials outline the types of

trauma common to unaccompanied immigrant children, *see* Ex. 23, Aleman Depo. Tr. 108:13-22

*and* Ex. 52, Aleman Depo. Ex. 16 (ORR Clinician Training) at 2-3, and SVJC staff acknowledge

that "[a] high percentage," if not all, of the children in SVJC's care suffered trauma prior to

entering ORR custody. Ex. 9, Cook Depo. Tr. 74:6-9; Ex. 5, Mayles Depo. Tr. 107:2-4; Ex. 53,

Wong Depo. Ex. 8 (Senate Subcommittee Written Statement) at 2; Ex. 7, Wong Depo. Tr. 58:23-

15

59:21; *see also* Ex. 4, McCormick Depo. Tr. 42:14-43:12 ("quite comfortable" that

unaccompanied immigrant children "have experienced things a lot of our local children can't

even begin to fathom."). Once children experience trauma, "that trauma stays inside of them"

and is "easily reignited in settings where they don't feel safe." Ex. 22, Lewis Depo. Tr. 85:13-

21.

SVJC's Lead Case Manager agrees there is "a high need for mental health treatment" for

the children at SVJC "given the background of these [immigrant] minors," Ex. 27, Ropp Depo.

Tr. 61:13-18, and SVJC's own staff have acknowledged that more is needed to adequately care

for these children. *See, e.g., id.* 59:11-18 (acknowledging the children's "need [for] more

individualized care"); Ex. 5, Mayles Depo. Tr. 90:24-91:23 (acknowledging that certain children

"need[ed] a higher level of care" and SVJC's services "w[ere] not working" for them).

Psychologists who evaluate the immigrant children detained at SVJC often recommend that these

children be placed in residential treatment centers ("RTC") to receive better treatment for their

mental health needs, and SVJC's Lead Case Manager has herself asserted that these children

"need" higher levels of care "in that residential setting." *See, e.g.,* Ex. 27, Ropp Depo. Tr. 57:5-

58:4, 59:11-18, 116:18-117:24; Ex. 23, Aleman Depo. Tr. 197:11-25; Ex. 7, Wong Depo. Tr.

63:4-64:21.[15]

---

[15]     Kelsey Wong, as SVJC employee who serves as the ORR Program Director at the
facility, testified before Congress that "[w]ithin the secure [UAC] population, there are a number
of youth that have been evaluated by our mental health staff or providers recommending
placement in a residential treatment center. However, residential treatment centers in the ORR
network are unable to accept some of our youth into their care due to the severity of the mental
illness, behavioral issues while in ORR care, and disclosures of significant violent or criminal
history. In these circumstances, the [UAC] remains in secure placement. As a secure care
provider, we are unable to provide the services of a residential treatment center or hospital." Ex.
53, Wong Depo. Ex. 8, Senate Subcommittee Written Testimony at 3.

**B.** **Plaintiffs' Experts Concluded That SVJC's Practices And Policies Involving Inadequate Mental Health Care And Excessive Force, Restraints, And Solitary Confinement Reflect Both Deliberate Indifference To The Children's Constitutional Rights And Fall Far Short Of Meeting Professional Standards Of Care**

Upon reviewing SVJC's own records, and in light of the "inherent vulnerabilities" and "special . . . needs" of youth, Plaintiffs' experts have concluded that SVJC's policies and practices regarding mental health care and the punishment and control of youth "are deficient," "fall far short of the standards of care expected in the juvenile justice system," and "represent[] deliberate indifference to the health and mental health needs" of the children detained at SVJC. *See, e.g.*, Ex. 2, Lewis Report 1, ¶¶ 195, 197; Ex. 1, Weisman Report at 15-16, 20-21.

First, SVJC's routine and excessive use of force, restraints, and solitary confinement "often reached the threshold of torture and cruel, inhuman, and degrading punishment." Ex. 2, Lewis Report ¶ 196. Even as reflected in SVJC's own records, "staff frequently did not follow the SVJC protocol for managing behavior," and they frequently "violat[ed] the rights of youth in their custody by becoming overly aggressive, and at times abusive, as a way to maintain control." *Id.* Although verbal de-escalation is discussed by staff, supervisors "seldomly used" de-escalation techniques in practice[16], Ex. 3, Wykes Depo. Tr. 44:14-18; rather than "engaging in verbal active listening," "de-escalation [or] engagement," the staff at SVJC "provoke" the

---

[16]     In fact, the lack of Spanish speakers on staff at SVJC raise additional material questions about the implementation of de-escalation techniques. Most of the floor staff at SVJC do not speak Spanish, Ex. 54, D. Resp. Pl.'s First Req. for Adm. ¶¶ 3-5, and their inability to communicate with the UACs impede their ability to use listening, empathy, or verbal intervention techniques. Ex. 3, Wykes Depo. Tr. 185:17-186:2. Indeed, from October 2015 to May 2018, only 33 out of 163 staff (approximately 20%) were Spanish speakers. Ex. 55, 2015-2018 SVJC Staff Directory. From May 2018 to the present, only 36 of 163 staff members are Spanish speakers. Ex. 56, Updated SVJC Staff Directory. Given these stark numbers, it is no surprise when there are no Spanish speakers to interact with a child when an incident begins. *See, e.g.*, Ex. 57, 09.12.16 Incident at 1, 3 (case manager Contreras arrived to interpret after child was already restrained in the chair).

children, "overreact aggressively," "react[] too quickly," or unduly impose punitive measures, which forces "relatively minor situations to needlessly escalate."[17] Ex. 22, Lewis Depo. Tr. 173:4-174:19, 204:11-205:14; Ex. 21, Weisman Depo. Tr. 16:2-7; Ex. 2, Lewis Report ¶ 192. Children feel as though they are treated "like animals." Ex. 25, Doe 4's Resp. D's First Int. at 12. SVJC's punitive approaches "are not only ineffective, but have a profound negative impact on youth, can seriously impair their development and psychological well-being," can "trigger" the children into acting out further, and "can cause or exacerbate mental health problems including panic attacks, suicidal and self-injurious behavior, psychotic symptoms, paranoia, and hopelessness." Ex. 2, Lewis Report at 1; Ex. 22, Lewis Depo. Tr. 115:1-117:5. SVJC's policies and practices regarding excessive force, restraints, and solitary confinement "likely did substantial, if not irreparable, harm to these youth," and "it is likely that many of these detained youth will never fully recover." Ex. 2, Lewis Report ¶¶ 193, 195, 196; Ex. 1, Weisman Report at 21.

For example, it is "universally recognized" that solitary confinement has "highly detrimental" and "very damaging effects" on youth. Ex. 2, Lewis Report ¶ 50; Ex. 22, Lewis Depo. Tr. 107:9-21; Ex. 21, Weisman Depo. Tr. 9:20-10:5. Solitary confinement carries "alarming" risks given the stage of the children's development, may result in biological changes to a child's brain structure that "persist into adulthood" or reflect "permanent[] alter[ations]," and is also likely to "cause longer-term problems" such as difficulties with emotional attachment, cognitive ability, difficulties with behavioral control, and emotional dysregulation. Ex. 1,

---

[17] Indeed, Doe 4's clinician acknowledges he has seen a child's attempt to have a conversation at SVJC be interpreted as an argument, Ex. 5, Mayles Depo. Tr. 166:22-24, and Doe 4 repeatedly asserts that children's attempts to "speak calmly" or "explain something" are interpreted by staff (and subsequently punished) as "disrespect[]." Ex. 25, Doe 4's Resp. D's First Int. at 4, 5, 12, 18.

Weisman Report at 12-13. SVJC staff know of and agree with research that "isolation can cause serious mental health trauma, retraumatization, depression, anxiety, psychosis, suicide, self-harm violence, [and] negative development." Ex. 7, Wong Depo. Tr. 206:10-23. *See also* Ex. 23, Aleman Depo. Tr. 227:3-10; Ex. 5, Mayles Depo. Tr. 158:1-11. However, despite this awareness, and as further outlined above, SVJC imposed a policy or practice of solitary confinement that "exceed[ed] the bounds of any professional standards" and "could be considered torture" or "cruel, inhuman or degrading treatment." Ex. 2, Lewis Report ¶¶ 52, 74, 193, 196; Ex. 21, Weisman Depo. Tr. 15:1-11.

So, too, does SVJC's policy and practice regarding the emergency restraint chair. *See, e.g.*, Ex. 2, Lewis Report ¶ 193; Ex. 1, Weisman Report at 10-11. Although the "[u]se of the restraint chair is an extreme measure that should seldom, if ever, be necessary with youth," it was "often implemented for convenience, as a show of strength to coerce children to obey, or as a form of punishment and retaliation." Ex. 2, Lewis Report ¶¶ 60, 75. As stated by the Deputy Director for Programs, the chair is used at SVJC so that children who self-harm simply "tire themselves out." Ex. 7, Wong Depo. Tr. 157:6-16. However, being restrained in the chair does "not help you calm down"; rather, it evokes fear, "prolongs and agitates the situation," "replay[s] or capitulate[s] the trauma and abuse experiences that [a child has] experienced in the past," and "amplif[ies]" rather than mitigates the very behaviors the chair is purportedly intended to deter. Ex. 3, Wykes Depo. Tr. 233:5-9, 234:18-24; Ex. 21, Weisman Depo. Tr. 103:16-22. Anna Wykes, a former floor staff member at SVJC, compared sitting in the chair to being "in a horror movie." Ex. 3, Wykes Depo. Tr. 233:2-4. Accordingly, "[t]o place a depressed and traumatized adolescent even once in a restraint chair . . . clearly represents abuse and borders on torture as

this is a highly degrading and anxiety provoking experience."[18] Ex. 2, Lewis Report ¶ 186.

Indeed, given the particular vulnerabilities of self-harming youth, SVJC's approach to controlling a child's self-harm behavior through isolation and restraints "is an unacceptable intervention" and falls "well below expected professional standards."[19] Ex. 1, Weisman Report at 10, 14; Ex. 2, Lewis Report at 1, ¶¶ 51-53, 74, 169, 184, 196. Even now, SVJC continues to use the emergency restraint chair on detained youth. Ex. 54, D. Resp. Pl.'s First Req. for Adm. ¶¶ 133-34.

SVJC's mental health treatment was also deficient in at least two major respects: the youth at the facility fail to "receiv[e] the clinical services they need to address their trauma and mental health issues," Ex. 21, Weisman Depo. Tr. 18:20-19:1, and SVJC fails to provide trauma-informed care at all stages of its interactions with the detained children, *see, e.g.*, Ex. 2, Lewis Report at 1; Ex. 22, Lewis Depo. Tr. 89:12-18, 195:16-197:11, 197:21-201:10.

Professional standards require clinical services that "engag[e]," "analy[ze]" and "tailor[]" "individualized responses" for a child's trauma and mental health needs, including treatment plans that "identify[] longer-term goals, short-term objectives," and interventions that facilitate the realization of a child's individualized objectives. Ex. 1, Weisman Report at 18. However, as outlined above, SVJC does not provide clinical interventions that satisfy any of these basic

---

[18] Virginia juvenile justice officials have asserted that state facilities have not restrained a child in the chair since 2015, and that its use is permitted only for transportation and only as a last resort. Oliver, Ned, *State officials say they no longer use 'restraint chairs' detailed in immigrant abuse allegations*, VIRGINIA MERCURY, Sept. 6, 2018, *available at* https://www.virginiamercury.com/2018/09/06/state-officials-say-they-no-longer-use-restraint-chairs-detailed-in-immigrant-abuse-allegations/.

[19] In fact, a consent order entered by other counsel for Doe 1 and the Commonwealth of Virginia in the Augusta County Juvenile Court indicated that SVJC's response to Doe 1's incidents of self-harm – which, in part, "has been to shackle [him]" – "has not been . . . appropriate[] or adequate[] [to] treat [him] for his mental health issues." Ex. 58, Consent Order (DOE_000711-712).

standards of care. *See id.* at 18-19. Clinicians also fail to provide adequate therapeutic services for those children exhibiting repeated symptoms of mental distress; for example, when a child "repeatedly go[es] into the restraint chair" or "repeatedly go[es] into isolation," such measures reflect an "acute crisis" "demonstrat[ing] a level of acuity that requires more clinical intervention" than SVJC clinicians have provided or are equipped to provide. Ex. 21, Weisman Depo. Tr. 104:14-20

Moreover, Plaintiffs' expert has opined that a trauma-informed approach constitutes the "standard of care in all stages of the juvenile justice system." *See, e.g.*, Ex. 22, Lewis Depo. Tr. 92:7-95:12 (this "primary" standard of care is "much more than [an] aspirational" standard). A trauma-informed approach requires a "comprehensive" provision of services that extends from screening, assessment, and trauma-informed training for all staff to clinical interventions and full staff engagement. *See id.* 83:1-84:2; 86:8-89:11; 115:1-118:13; Ex. 2, Lewis Report ¶ 177. SVJC's own employees are aware of this approach and assert that SVJC provides training on and provides trauma-informed care. *See, e.g.*, Ex. 4, McCormick Depo. Tr. 63:6-64:3; Ex. 7, Wong Depo. Tr. 137:15-20, 51:17-24. However, this assertion is flatly contracted by the factual record.

First, it is axiomatic that the trauma of children, especially that of unaccompanied immigrant children, "has to be looked at" under a trauma-informed approach, Ex. 22, Lewis Depo. Tr. 102:4-12, but SVJC's Lead Clinician has confirmed that trauma is not addressed in the mental health services allegedly provided to the children. Ex. 9, Cook Depo. Tr. 190:14-21.

Moreover, upon reviewing SVJC's own records for the various named plaintiffs in this case, Dr. Lewis concluded that SVJC staff "do not understand the manifestations of trauma and stress in youth and are not well trained in dealing with highly traumatized children and youth." Ex. 2, Lewis Report ¶ 194. SVJC's own clinicians are aware that an immigrant child's trauma

can manifest in "many different ways" beyond self-harm, including "anger outbursts," "depression," and "oppositional defiance"; as SVJC's Lead Case Manager succinctly put it, "the trauma that is leading to [an immigrant child's] self-harming behavior is also leading to acting out behaviors and aggression." Ex. 27, Ropp Depo. Tr. 57:20-58:4; Ex. 9, Cook Depo. Tr. 74:21-75:3; Ex. 5, Mayles Depo. Tr. 53:19-21. However, rather than responding to incidents "through engagement, relationship building [or] building trust" – responses that would more properly "get[] at the underlying trauma that's triggering [a child's] behavior" – floor staff routinely resorted to "punishment or control" to manage behavior. *See supra*; Ex. 2, Lewis Report ¶ 194; Ex. 22, Lewis Depo. Tr. 183:4-185:8. By departing so drastically from SVJC's own written policies regarding isolation, restraints, and force, and without any of the formal consultation of clinical staff required under this approach, the staff "triggered" and "retriggered" these children into "acting out" further, experiencing more mental health distress, or engaging in "more self-injurious behavior." Ex. 22, Lewis Depo. Tr. 115:5-116:5; Ex. 1, Weisman Report at 10, 14, 20-21. As Dr. Lewis explained succinctly: "violence begets violence." Ex. 22, Lewis Depo. Tr. 205:2-14.

## STANDARD OF REVIEW

As Defendant's Brief supporting its Motion ("Def SJ Br.") aptly notes, "[s]ummary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *See id.* at 12, *citing* Fed. R. Civ. P. 56(c). When a motion filed pursuant to Rule 56 has been properly supported by reference to ostensibly admissible facts derived from legally-sufficient affidavits, citations to deposition testimony and discovery responses, the non-moving party must do more, to survive the motion, than merely rely on allegations in the pleadings. *Id.* at 13, *citing Balance v. Young*, 130 F. Supp. 2d 762, 764 (W.D. Va. 2000).

22

By the same token, however:

"[i]t is an axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1863 (2014) (*per curiam*) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (alteration in original).

*        *        *

"A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. at Am.*, 673 F.3d 323, 330 (4th Cir. 2012). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," we must determine whether the evidence in this case "presents a sufficient disagreement to require submission to a jury or whether it is so one-sited that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 244, 251-52.

*McAirLaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014); *see generally Tolan*, 134 S. Ct. at 1866 ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." (Citations omitted.)); *see Sharma v. USA Int'l LLC*, 851 F.3d 308, 312 (4th Cir. 2017) (reversing lower court's ruling granting summary judgment where "the plaintiffs have submitted sufficient evidence of their damages based on a well-accepted income approach to permit a jury to find with reasonable certainty the damages that they suffered."); *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 2016 (4th Cir. 2016) ("'The court . . . cannot weight the evidence or make credibility determinations.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). In general, if 'an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.").

Viewed in light of these standards, as elaborated more fully below, Plaintiffs submit that it is readily apparent that the Defendant's proffered case-dispositive motion must be denied wholly or in substantial part.

## ARGUMENT

### DEFENDANT HAS NOT ESTABLISHED, AND CANNOT SHOW, THAT UNDISPUTED MATERIAL FACTS DICTATE JUDGMENT AS A MATTER OF LAW IN ITS FAVOR

Defendant, invoking its status as a governmental entity, disclaims any possible exposure to liability for the constitutional causes of action asserted by Plaintiffs pursuant to Section 1983 absent a showing by Plaintiffs of an official policy or custom of SVJCC in accordance with which the unlawful acts and omissions alleged by Plaintiffs were carried out at SVJC. Pointing principally to its own written policies which follow Virginia Department for Juvenile Justice regulations, as supplemented primarily by excerpts of largely self-exonerating testimony from SVJC employees, Defendant insists that no such actionable official policy or custom can be shown and that, to the contrary, SVJC's policies and procedures expressly proscribe unconstitutional conduct of the sort Plaintiffs have alleged. *See generally* Def. SJ Br. at 13-19.

Although Defendant repeatedly avers that Plaintiffs have failed to present "sufficient facts" to satisfy the various elements that must be met in order for Plaintiffs to establish the viability of their claims under Section 1983 -- *see, e.g.*, *id.* at 17 ("Plaintiffs have failed to present sufficient facts to demonstrate a pattern of unconstitutional behavior among SVJC staff that is caused by SVJC's policies.") -- the Court will note that Defendant's entire submission contains only the most superficial passing references to the opinions of Plaintiffs' proffered expert witnesses, essentially bypassing entirely the substance of those opinions as they concern the nature and substance of SVJC's treatment of the UAC's detained there, and is similarly limited solely to evidence concerning the specific experiences of current named plaintiff John

Doe 4. As a result, Defendant essentially ignores significant volumes of evidence that point to much different conclusions than those it would have this Court reach. Upon a more fulsome presentation of the factual records than Defendant's one-sited portrayal provides, Plaintiffs submit that, at a minimum, disputed issues of material fact emerge which foreclose the entry of judgement for Defendant as a matter of law.

## I. SVJCC, AS AN ENTITY, BEARS DIRECT SUPERVISORY LIABILITY FOR VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS

Plaintiffs' Second Amended Complaint states claims under the Fifth Amendment for which SVJCC can be held *directly*, rather than merely vicariously, liable under Section 1983. Plaintiffs have alleged facts sufficient to support a claim that SVJCC maintained official policies or customs of constitutionally infirm treatment of UACs detained at SVJC under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and its progeny. In particular, Plaintiffs have alleged that SVJCC has remained deliberately indifferent to or has actively ratified pervasive and systemic violations of the constitutional rights of the members of the Plaintiff class. As a consequence of these policies and practices, or customs of inaction, SVJCC has tacitly, if not expressly, authorized and enabled ongoing violations of Plaintiffs' rights to be free from excessive use of physical force and restraints, imposition of excessive periods of solitary confinement and denial of the constitutionally-adequate mental health care the Plaintiffs so desperately need.

A governmental entity such as SVJCC can be held liable under Section 1983 when a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694; *accord* Def. SJ Br. at 13. An actionable "policy or custom" can arise "through an omission... that 'manifest[s] deliberate indifference to the rights of citizens'" or "through a practice that is so 'persistent and

widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)(alteration in original), *quoting Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999); *see Newland v. Borders*, 649 F. Supp. 2d 440, 446 (W.D. Va. 2009). Liability arises where a plaintiff shows that the policy, practice or custom of inaction was "the 'moving force of the constitutional violation' specifically charged." *Milligan v. Cit of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). A causal connection between "a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom," *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987), as, for example, where "[governmental] employees [or agents] could reasonably infer ... tacit approval of the conduct in issue." *Milligan*, 743 F.2d at 230.

Plaintiffs have sufficiently pled a custom or practice of deliberate indifference on the part of SVJCC to the abusive treatment to which UACs detained at SVJC have been subjected. An unconstitutional "custom 'may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law.'" *Lytle*, 326 F.3d at 473, *quoting Carter*, 164 F.3d at 218. A "custom" in this sense

> may be attributed to a [governmental entity] when the duration and frequency of the practice warrants a finding of either actual or constructive knowledge by the ... governing body that the practices have become customary among its employees. ... Actual knowledge may be evidenced by recorded reports to or discussions by a ... governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them.

*Newhard*, 649 F. Supp. 2d at 446 & n.4 (*quoting Spell*, 824 F.2d at 1387). Further, such custom gains the force of law where officials "[f]ail[ ], as a matter of specific intent or deliberate indifference ... to correct or stop the practices." *Spell*, 824 F.2d at 1391.

26

Fourth Circuit precedent "firmly establish[es] the principle that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). In such circumstances, supervisory liability "is not premised on *respondent superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict upon those committed to their care." *Id.* (internal citation omitted). To establish supervisory liability under Section 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to [persons] like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). In a Section 1983 action such as the case at bar, "liability may extend to the highest levels" of government so long as the official in question falls within "the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Slakan*, 737 F.2d at 373.

While Defendant repeatedly insists that "Plaintiffs have failed to present sufficient facts" to support their allegations and satisfy the applicable liability framework described above, Plaintiffs believe, and show below, that more than ample factual support exists to back up their allegations and defeat Defendant's bid for judgment as a matter of law.

### A. The Facts Support A Reasonable Inference That Defendant Has Engaged In A Policy or Practice Involving The Use Of Excessive Force and Restraints Against The Plaintiffs

Defendant contends that, pursuant to the "Handle with Care" behavioral management training provided to the staff at SVJC, "physical intervention by staff is allowed only as a last resort and only with the least amount of force that is reasonably necessary," and that "[r]estraints

27

may never be used as a physical punishment." Def. SJ Br. at 4 (citations omitted). While these stated policies may reflect SVJC's intended approach to the use of physical force and restraints against children detained at the facility, including the Plaintiffs, actually evidence of what Plaintiffs have experienced at SVJC is considerably different. Indeed, former resident supervisor Anna Wykes has testified that supervisors and staff treated SVJC's written policies governing the use of force and restraints "as jokes," and Plaintiffs' expert, Dr. Lewis, has concluded that "[p]unishment" and "control" achieved "through methods such as . . . physical restraint, [and] strapping to a[n] [emergency restraint] chair" form "the predominant approach utilized to manage youth at SVJC." *See* Counterstatement of Disputed Material Facts ("C.S."), *supra*, Part 1 at 2-22 and record citations therein.

"[T]he Due Process Clause guarantees to juveniles who are incarcerated the right to reasonably safe conditions of confinement [and] freedom from unreasonable bodily restraint[.] . . . Safety, in [this] context . . . encompasses the Plaintiffs' right to reasonable protection from the aggression of others, whether 'others' be juveniles or staff." *Alexander S. ex rel bowers v. Boyd*, 876 F. Supp. 775, 797-98 (D.S.C. 1995); *see generally Schall v. Martin*, 457 U.S. 253, 269 (1984) ("axiomatic" that "particular . . . conditions of confinement amounting to punishment" are unconstitutional if imposed upon juveniles in pretrial detention). Moreover, if the use of excessive physical force and restraints imposed against the Plaintiffs at SVJC as alleged here was not "objectively reasonable" within the contemplation of the U.S. Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), then Plaintiffs' burden to establish Fifth Amendment substantive due process violations is met.

As set forth in detail above, information gleaned from SVJC's own records reflect the significant degree of frequency with which the use of physical and mechanical restraints,

including the emergency restraint chair, were invoked at the facility against immigrant children

from approximately October 2015 to May 2018; these numbers are compiled and portrayed in

the report of Plaintiffs' expert statistician Paul Diver, Ph.D. *See* C.S., *supra*, Part 1.A. at 3-7.

While Defendant discounts this quantitative analysis on the grounds that "Dr. Diver's statistical

analysis merely counts the number of incidents involving the use of force, restraints or room

confinement and calculates their duration, but includes no analysis as to why such measures were

utilized in any particular instance" -- Def. SJ Br. at 18[20] Defendant conveniently ignores the fact

that significant numbers of incidents addressed by Dr. Diver reflect instances in which SVJC's

own written policies, *e.g.*, with respect to time limits on solitary confinement or time of

confinement in the restraint chair, were violated. Similarly, while Defendant acknowledges that

SVJC prepares an official written report documenting each use of physical force or restraints,

including the duration (Def. SJ Br. at 4), it simply disregards the extent to which those reports

reflect acts or omissions on the part of SVJC staff that, on their face, cannot be reconciled with

the facility's own stated and written policies. C.S., *supra*, Part 1.A. at 3-7 (reviewing examples).

The compendium of written reports prepared and maintained by SVJC concerning the use

of force and restraints, and the fact that significant numbers of such reports reflect a failure to

adhere to the facility's own policies in the responding to immigrant children establishes a basis

for Defendant's awareness that SVJC engages in a pattern of conduct involving force and

restraints that is "objectively unreasonable." The absence of any indication that SVJC responded

to these repeated and flagrant violations of its own policies with corrective action efforts

---

[20]     *But see* Ex. 1, Weisman Report at 21 ("The aggregate levels of the use of force, restraints, including the chair, and isolation compiled by [Dr. Diver] are shockingly high and, in my experience have exceeded levels that frequently result in court ordered or [U.S. Department of Justice] monitoring.").

establishes a basis for a reasonable inference, as a minimum, of Defendant's tacit approval of this pattern of conduct without regard for its continuing consequences to Plaintiffs. *Spell*, 824 F.2 at 1391; *Milligan*, 743 F.2d at 230; *Newhard*, 649 F. Supp. 2d at 446. Accordingly, Defendant cannot be granted summary judgment with respect to Plaintiffs' excessive force and excessive restraint claims.

## B. The Facts Support A Reasonable Inference That Defendant Has Engaged In A Policy or Practice Involving The Imposition Of Excessive Solitary Confinement Against The Plaintiffs

Invoking the behavioral management system that SVJC adopted and implemented in 2016, Defendant avers that "[u]nder the current program, residents are placed in room confinement only when necessary to assure safety" and that "[r]esidents placed in room confinement must be reevaluated at least every four hours and returned back to normal programming as soon as safely possible." Def. SJ Br. at 2 (citations omitted).

The factual record belies Defendant's assurances. Contrary to SVJC's stated policies, it is apparent that UACs detained at SVJC have been subjected to solitary confinement for extremely minor behavioral lapses, and that "disrespect" of staff and other examples of "minor offenses" such as "disruptive behavior" and use of profanity routinely result in immigrant children being removed from programming and isolated in their rooms for extended periods of time. C.S., *supra*, Part 1.B. at 7-9, and record citations therein. Moreover, factual evidence, comprised predominantly by its own documents, flatly contradicts the Defendant's claim that, once confined, immigrant children are returned to programming as soon as safely possible. *Id.* at 9.

Defendant's implication that Doe 4's experiences with solitary confinement comprise the universe of relevant evidence on this issue -- *see* Def. SJ Br. at 3-4 -- is groundless. SVJC's own records document hundreds of incidents involving the imposition of solitary confinement, and its

30

reports concerning specific instances reflect numerous occasions in which the duration is undeniably excessive,as measured by its own standards as well as by the professional standards invoked by Plaintiffs' experts. These records -- knowledge of which is attributable to Defendant -- establish ample basis for a finding the Defendant engaged in a custom of imposing solitary confinement in an excessive manner. Given the extremely harmful consequences that can result from subjecting children to periods of confinement, which SVJC's own personnel readily recognize -- see C.S., *supra*, Part III.B. at 17-20 -- Plaintiffs' evidence unquestionably supports, at a minimum, a reasonable inference that SVJC staff regularly engage in "objectively unreasonable" use of solitary confinement which Defendant, by its inaction, has tacitly approved. Summary judgment concerning the Plaintiffs' solitary confinement claim, accordingly, cannot be granted.

C. **The Facts Support A Reasonable Inference That Defendant Has Engaged In A Policy or Practice Of Failing To Provide The Plaintiffs With Constitutionally-Adequate Care For Their Serious Mental Health Needs**

A threshold inquiry with respect to Plaintiffs' constitutional claim that Defendant fails to provide UACs detained at SVJC, which was previously fully briefed by the parties but was left unresolved when Plaintiffs' Motion for Preliminary Injunction was withdrawn, concerns the legal standard pursuant to which the facts relevant to this claim are to be judged. Defendant contends that it functions as a detention facility, vis-à-vis its detention of UACs entrusted to its custody by ORR, and therefore should be judged in accordance with the "deliberate indifference" standard. *See* Def. SJ Br. at 19-21 (citing authorities). Plaintiffs, invoking the plain language of the SVJC Contract with ORR which denominates SVJC a "care provider," believe that SVJC's acts and/or omissions relating to the provision of mental health care should be evaluated in accordance with the "professional judgment" standard. *See generally Youngberg v. Romeo,* 457 U.S. 307 (1982); *see Matherly v. Andrews*, 859 F.3d 264, 270 (4th Cir. 2017); *Pattern v. Nichols,*

274 F.3d 829, 835 (4th Cir. 2001); *Alexander S.*, 876 f. Supp. at 797-98; *cf. Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 574-75 (E.D. Va. 2011) (applicable standard depends on analysis of the principal purpose for which the claimant is detained -- *i.e.*, preventive custody or treatment).

Although Plaintiffs address the applicable standard further in Argument Section II, *infra*, their principal position is that, as in *Heyer v. U.S. Bur. of Prisons*, 849 F.3d 202, 209 n.6 (4th Cir. 2017), which standard applies is not dispositive of Defendant's Motion because the factual record is sufficient to preclude the entry of summary judgment under either standard.

Defendant seeks to cabin the scope of Plaintiffs' claim concerning deficient mental health care at SVJC by focusing on Doe 4's "principal allegation . . . that he has requested and been denied additional opportunities to speak with a psychologist rather than a psychiatrist or licensed professional counselor. Def. SJ Br. at 21. Dismissing this as nothing more than a "disagreement regarding treatment approach" that is not actionable under Section 1983, Defendant claims entitlement to judgment as a matter of law. *Id.* at 23-24.

Plaintiffs' claim with respect to deficient mental health care at SVJC cannot be so easily dismissed. Contrary to Defendant's portrayal, the claim extends far beyond Doe 4's justified requests for a greater degree of effective clinical care than he has been provided Plaintiffs have broadly alleged that "Defendant's failure to adequately treat Plaintiff's and other detainees mental health needs has caused, and continued to cause, physical pain and suffering, mental anguish, emotional distress, the deterioration of their mental health, [and] an undue risk of serious injury and/or premature death." SAC ¶ 148 at 26. The facts fully support Plaintiffs' assertions.

32

Specifically, although SVJC's clinicians and other staff are well aware, or at a minimum, have full access to information from which they should be aware, that UACs transferred to SVJC by ORR arrive there with significant mental health concerns, based in most instances upon severely traumatic experiences -- *see, e.g.*, Ex. 53, Senate Subcommittee Written Testimony at 2-3 -- the clinical services that the facility provides to address those children's needs are woefully inadequate. Although Defendant touts each UAC's one-on-one meetings with their assigned clinicians at least once per week, two group counseling sessions per week, and "treatment" by "a psychiatrist, Dr. Timothy Kane, every three to six weeks" -- Def. SJ Br. at 8-9 -- none of these assertions withstand close scrutiny. *See, C.S., supra*, Part II, at 10 (Dr. Kane provides medication administration services, not therapeutic counseling or treatment); *id*. at 11-13 (individual sessions do not focus on children's serious mental health issues and do not even attempt to address underlying trauma); *id*. at 13 (informal group sessions, generally lasting no more than 15 minutes per session if held at all, are "informal and sometimes led by non-clinician staff); *id*. at 14-15 (resident supervisors have no knowledge of children's mental health problems or needs); *see also id*., Part III.A. at 16 (SVJC clinicians admit UAC's need for greater levels of mental health care than SVJC provides); Ex. 53, Senate Subcommittee Written Testimony at 3 (same); *id*., Part III.B. at 20-22 (Plaintiffs' experts' analysis of deficiencies in SVJC mental health care system).

These facts clearly overwhelm Defendant's disingenuous effort to diminish the sweep of Plaintiffs' mental health claim to merely a disagreement about SVJC's approach to treatment and foreclose summary judgment for Defendant under any applicable legal standard.[21]

---

[21] Defendant suggests that it is somehow constrained, and thus fortuitously shielded, from taking certain actions with respect to the mental health care it is able to provide Plaintiffs because "ORR is…the final arbiter for treatment and placement decisions for each UAC," and ORR is

## II. THE RECORD SUPPORTS A FINDING THAT DEFENDANT'S ACTS AND OMISSIONS WITH RESPECT TO THE PLAINTIFFS REFLECT DELIBERATE INDIFFERENCE TO PLAINTIFFS'CONSTITUTIONAL RIGHTS AND FALL SHORT OF MEETING PROFESSIONAL STANDARDS GOVERNING THE OPERATION OF JUVENILE DETENTION FACILITIES

Most Plaintiffs are not transferred to or detained at SVJC as a result of pending criminal charges; they are not held there in anticipation of imminent deportation. Nor, at least in the capacity in which it is operating as an ORR contractor, is SVJC acting as a correctional facility." Rather, SVJC is functioning as a "care provider," charged by ORR with express responsibilities to provide UACs subject to ORR custody with "[p]roper physical care and maintenance, including suitable living conditions" as well as "[a]ppropriate routine medical . . . care . . . emergency health care services . . . [and] appropriate mental health interventions when necessary." *See* Ex. 59, ORR/SVJC Contract at 4. Given these considerations, and in light of the acknowledged severe psychological trauma and mental health problems which are characteristic of many if not most of the UACs subject to ORR custody and sent to SVJC, Plaintiffs submit that their placement in a secure ORR "care provider" facility is more closely analogous to the circumstances of persons involuntarily committed and in care of treatment than those of persons subject to pretrial detention and facing criminal charges or imminent removal from the country. On this basis, Plaintiffs believe that, under the *Newbrough* "purpose of the

---

not a party to this action, citing *Sanchez v. R.G.L.*, 761 F.3d 495 (5th Cir. 2015). Def. SJ Br. at 25-26. In *Sanchez*, however, a prior order of the Court had dictated return of the minor children involved from an ORR contract facility to their mother in Mexico, but before this could occur, the children's requests for asylum was granted. To avoid the contract facility being placed in the middle of the controversy as to whether the children should be returned – an action only ORR could direct – or whether the intervening grant of asylum should control, the Court ruled that on remand of the case to district court, the federal government should be brought into the case as a party pursuant to Fed. R. Civ. P. 19. No such issue is presented here; ORR has placed Plaintiffs in detention at SVJC and the SVJC's constitutional obligations are the only matter in question.

detention" analysis, the "professional judgment" standard established in *Youngberg* and its progeny should govern adjudication of their constitutional claims.

Both of the Plaintiffs' vastly-experienced, highly credentialed clinical psychologist experts, Dr. Weisman and Dr. Lewis, have explained in their respective reports and deposition testimony that established professional standards in their field governing the treatment of highly-traumatized mentally-ill children, especially those in a juvenile detention setting such as Plaintiffs, dictate the application of intensive trauma-informed therapy. Both experts stressed that punitive approaches to the behavioral manifestations of traumatized children's mental illness, such as those routinely applied to UACs at SVJC, are wholly divorced from accepted standards of care in the professional and can cause genuinely irreparable forms of harm. *See* C.S., *supra*, Part III.B. at 17-22, and record citations therein. Defendant's Motion offers virtually nothing in response.

However, even if the Court concludes that the more deferential "deliberate indifference" standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994) and its progeny should govern here, Plaintiffs submit that the disposition of Defendant's Motion must be the same -- summary judgment must be denied. To establish a defendant's "deliberate indifference" under Section 1983, the claimant must show (1) that they were exposed to a substantial risk of serious harm; and (2) that the defendant know of, and consciously disregarded, a substantial risk to their health or safety. *Farmer*, 511 U.S. at 834; (*Thompson v. Commonwealth*, 878 F.3d 89, 97-98 (4th Cir. 2017). To prevail on a "deliberate indifference" claim, "it is essential to show actual knowledge or awareness on the part of the alleged inflicter." *Newbrough*, 822 F. Supp. 2d at 581 (emphasis added; citations omitted). Here, there is no dispute that Defendant was aware that a significant proportion of the UACs transferred to SVJC, including former named plaintiffs Doe 1

and Doe 2, suffered from significant mental illness and, in some instances, engaged in serious self-harm. *See* C.S., *supra*, Part III at 15-16 & n.13. Such knowledge satisfied the "subjective knowledge" element of the "deliberate indifference" test. *See, e.g., Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006). Yet, Defendant unapologetically engages in a host of practices including use of an emergency restraint chair and extended solitary confinement, even with respect to children known to practice self-harm, which necessarily reflect conscious disregard for the health and safety of the Plaintiffs or, at a minimum, the creation of a substantial risk of serious additional harm. Plaintiffs' experts have attested to the severe harm, or severe risk of harm, that use of solitary confinement and a restraint chair may cause or pose to already-traumatized children. Ex. 1, Weisman Report at 10-16; Ex. 2, Lewis Report, ¶ 193. Defendant offers nothing in response

Accordingly, irrespective of the legal standard that may govern Plaintiffs' claims, summary judgment cannot be granted.

## CONCLUSION

For all of the foregoing reasons, Defendant's Motion for Summary Judgment must be denied.

DATED:     November 7, 2018

Respectfully submitted,

Hannah M. Lieberman (admitted *pro hac vice*)
hannah_lieberman@washlaw.org
Tiffany Yang (admitted *pro hac vice*)
tiffany_yang@washlaw.org
Mirela Missova (admitted *pro hac vice*)
mirela_missova@washlaw.org
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS
11 Dupont Circle, NW, Suite 400
Washington, D.C. 20036

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of November, 2018, true and correct copies of

Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment

and supporting Exhibits were served *via* electronic mail upon the following:

>Jason A. Botkins, Esq.
>Melisa G. Michelsen, Esq.
>LITTEN & SIPE, L.L.P.
>410 Neff Ave.
>Harrisonburg, VA 22801-3434
>jason.botkins@littensipe.com
>melisa.michelsen@littensipe.com
>
>Harold E. Johnson, Esq.
>Meredith Haynes, Esq.
>WILLIAMS MULLEN
>200 South 10th Street
>Suite 1600
>Richmond, VA 23219
>hjohnson@williamsmullen.com
>mhaynes@williamsmullen.com
>
>Attorneys for Defendant

_____
Theodore A. Howard

(202) 319-1000 (telephone)
(202) 319-1010 (facsimile)

Theodore A. Howard (admitted *pro hac vice*)
thoward@wileyrein.com
Bradley C. Tobias (VSB No. 88046)
btobias@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006
(202) 719-7120 (telephone)
(202) 719-7049 (facsimile)

By: _____
    Theodore A. Howard

*Attorneys for Plaintiffs*