CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

12/13/2018

JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

JOHN DOE, by and through his next friend, )
NELSON LOPEZ, on behalf of himself and )
all persons similarly situated, )
                                     )

      Plaintiffs, )
                                     )    Civil Action No. 5:17-cv-97
  v. )
                                     )    By: Elizabeth K. Dillon
SHENANDOAH VALLEY JUVENILE )         United States District Judge
CENTER COMMISSION, )
                                     )
      Defendant. )

## MEMORANDUM OPINION

Pending before the court and addressed herein is defendant's motion for summary

judgment, in which defendant seeks summary judgment on all of John Doe 4's (Doe 4) claims

and consequently—according to defendant—summary judgment as to the entirety of plaintiffs'

case. (D.'s Br. Supp. Mot. Summ. J., Dkt. No. 100.) The motion was briefed, argued before the

court, and supplemental briefs were filed as required by the court. (Pls.' Suppl. Mem. Opp'n

Def.'s Mot. Summ. J., Dkt. No. 164; Def.'s Sup. Br., Dkt. No. 165.) For the reasons discussed

below, the court concludes summary judgment in defendant's favor is appropriate as to Doe 4's

claim regarding inadequate mental health treatment. It further concludes that there are disputed

issues of fact precluding summary judgment with regard to Doe 4's excessive force claim

(including use of restraints) and his claim based on the use of room confinement, which the court

construes as a conditions-of-confinement claim. These disputes exist both as to whether Doe has

suffered an underlying constitutional violation and to the remaining elements of his *Monell*

claims.[1] If Doe 4 is able to prevail at trial on his underlying constitutional claim alleging

---

[1] *Monell v. Dept. of Soc. Servs.*, 436 U.S. 568 (1978).

1

excessive force or his conditions-of-confinement claim, then he and plaintiffs will be permitted to proceed in presenting proof on the other prongs of their *Monell* claims. Accordingly, the court will grant defendant's motion for summary judgment in part and deny it in part.

## I. BACKGROUND

On October 4, 2017, plaintiff John Doe 1 filed suit for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, seeking to protect the rights and interests of himself and a putative class of unaccompanied alien children (UACs)[2] detained at the juvenile detention center (Center) operated by defendant Shenandoah Valley Juvenile Detention Center Commission (Commission). Initially, the named plaintiffs consisted of John Does 1, 2, and 3. On August 8, 2018, Doe 4 became the only named plaintiff and class representative. Without objection, the class was certified on June 27, 2018, and is composed of Latino UACs who are currently detained or will be detained in the future at the Center who either: (i) have been, are, or will be subject to the disciplinary policies and practices used by the Center's staff; or (ii) have needed, currently need, or will in the future need care and treatment for mental health problems while detained at the Center (hereinafter Detainees). The second amended complaint, filed July 1, 2018, alleges the Commission violated and violates these Detainees' rights under the Fifth and Fourteenth Amendments through a pattern and practice at the Center of 1) excessive force and restraints, including use of the restraint chair, 2) inadequate mental health care based under both the deliberate indifference standard and, alternatively, the professional judgment standard, and 3) national origin and race discrimination.[3] Plaintiffs also include excessive use of solitary or room

---

[2] An unaccompanied alien child is a child who: "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom . . . (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

[3] At the summary judgment hearing, plaintiffs' counsel withdrew the national origin and race discrimination claims.

2

confinement as part of their excessive force claim, but it is properly analyzed as a separate conditions-of-confinement claim.[4]

UACs are in the custody of the Office of Refugee Resettlement (ORR) of the United States Department of Health and Human Services. The Commission provides secure housing and other services at the Center to the UACs pursuant to a cooperative agreement with ORR. The purported objective for the UACs' placement at the Center is to provide a safe and appropriate placement "taking into consideration the risk of harm to the [UAC] or others, the community and the risk of flight." (Cooperative Agreement 1–2, Ex. B-1, Dkt. No. 100-2.)[5] The Center serves as a secure detention facility and provides secure placement "until [the UACs] are released to a sponsor, obtain immigration legal relief, age out, or are discharged by the Department of Homeland Security." *Id.*

It is clear from plaintiffs' complaint, briefing, and expert witness reports, that plaintiffs are frustrated with a system that greets immigrant children fleeing oftentimes violent and traumatic backgrounds by housing them, sometimes for long periods of time, in detention facilities that are designed to house—and do house—juveniles who have been adjudged delinquent and charged juveniles awaiting trial. These circumstances sometimes lead to the immigrant children acting out, that then results in continued or additional restrictions on them. Not surprisingly, plaintiffs desire and advocate for a best practices approach, but the law does not require best practices. Rather, it requires constitutional practices, and that is the issue before the court. So, the court must determine on summary judgment whether the case may proceed to

---

[4] Defendant has responded and briefed the issue of plaintiffs' room confinement claim and has not objected to its inclusion as part of plaintiffs' excessive force claim. Nonetheless, as discussed below, it is properly construed and analyzed as a conditions-of-confinement claim.

[5] All citations to lettered exhibits are attached to defendant's brief in support of its motion for summary judgment, while all citations to numbered exhibits are attached to plaintiffs' memorandum in opposition to defendant's motion for summary judgment. Exhibit numbers 20 and 24, cited herein, were provided to the court but not docketed. Plaintiffs are asked to promptly docket these exhibits, with redactions, if necessary.

3

trial with regard to the alleged excessive force and inadequate mental health care claims based on constitutional requirements.

**A. Use of Force and Doe 4**

Doe 4 is a 17-year-old citizen of Honduras who arrived in the United States on or about May 15, 2017, and was transferred to the Center on or about December 1, 2017. The Center uses a program approved by the Virginia Department of Juvenile Justice called Handle with Care. This program allows the use of force as a last resort and requires use of the least amount of force reasonably necessary. Restraints may be used, not as punishment, but if necessary after less restrictive measures are unsuccessful. A Detainee is not to be left unsupervised while in mechanical restraints, such as handcuffs, and the use of restraints is to be discontinued as soon as safely possible. The Center also notes that use of excessive force is grounds for dismissal and the filing of a child abuse complaint with Child Protective Services. Indeed, the Center has terminated employees for use of force—even in circumstances where the employee was being assaulted and returned punches.

Doe 4 sets forth three instances of alleged excessive use of force while detained at the Center. While the parties' briefing lacked detail about the record evidence regarding the incidents, the court has endeavored to provide a more fulsome account. First, in his response to defendant's interrogatories, Doe 4 recounts an incident where he "got mad at staff," and staff members grabbed him, fell on top of him, and hurt him. Doe 4 states that they put him in handcuffs and placed him in his cell, and he was forced to stay in handcuffs inside his room and lie on the floor without a mattress. Doe 4 stated that the handcuffs left marks and bruises and hurt him. He does not provide a date for this incident. (Doe 4 Resp. to Interrog. 5, 17, Ex. F, Dkt. No. 100-6.)

4

Defendant highlights that, despite the grievance procedure available to Detainees, it has no reports from Doe 4 regarding his allegations from this particular incident. And, although Doe 4 does not remember the date of this incident, defendant believes that he is describing the events that occurred on February 4, 2018, because that is the only incident in the Center's records during which Doe 4 was placed in mechanical restraints. (Def.'s Br. Supp. Mot. Summ. J. 5; Ropp Aff. ¶¶ 10–11, Dkt. No. 100-8.) In the Center's "Significant Incident Report" (SIR) describing this incident,[6] it states: Doe 4 became frustrated with staff when he was instructed to trim his fingernails and told that he would fail to earn a behavioral point if he did not; when he requested to speak with a supervisor and the supervisor told him he could earn the point back if he trimmed his fingernails, Doe 4 refused and continued arguing; Doe 4 then threatened to assault a staff member and punched a table; Doe 4 was instructed to return to his room to cool down, and when staff members spoke to him to attempt to deescalate his behavior, he continued to argue with them; Doe 4 began punching a staff member in the face and was consequently placed in a two-man physical restraint, which he resisted, and he would not let go of the staff member he had punched; Doe 4 was then lowered to the floor while physically restrained, where he continued to struggle against them; mechanical restraints were put on his wrists and he continued to struggle and was escorted to his room; the restraints were taken off after six minutes and he was secured in his room. (SIR 1–2, Ex. H-4, Dkt. No. 100-8; Ropp Aff. ¶ 9(f).)

In the second incident, Doe 4 recounts that he had reported issues with a staff member, specifically, that on one occasion the staff member hit him "[i]n the ribcage and the face and on

---

[6] Defendant states in its brief that it offers the SIRs to "supplement testimony that rarely includes details of any substance" and not to contradict Doe 4's testimony. (Def.'s Br. Supp. Mot. Summ. J. 6 n.3.) And it is accurate that there have been instances at the Center where he could not remember what he had done while he was angry. (Doe 4 Dep. 81:25–82:1, Dkt. No. 100-7.) Nonetheless, to the extent that Doe's account of those incidents contradicts the account in the SIRs, the summary judgment standard compels the court to credit Doe's testimony and take reasonable inferences therefrom in his favor.

5

the arm" when Doe 4 was outside and in his room.  Doe 4 stated that when he and other UACs

were talking to a staff member about problems they had, staff said they were being disrespectful,

and one staff member said he was going to take away a behavioral point.  Another staff member

then pushed Doe 4 against the wall and said he wanted to put him in restraints, to which Doe 4

replied by asking if they could keep "talking calmly."  The staff member then told Doe 4 to go to

his room for a time-out.  In his deposition testimony, Doe 4 agreed that he stood against the wall

and refused to take a time-out at this point because he was angry, but this contradicts his

response to interrogatories in which he stated that he pulled himself off the wall.  Then, staff

members allegedly grabbed him, Doe 4 moved his arms down to protect himself, and staff hit

him in the ribs and face and held his hands behind his back while they pinned him against the

wall.  Doe 4 testified that once he was in his room with more than ten staff members, the

Center's staff put his hands behind his back and moved him to the corner of the room, where a

staff member twisted his arm and banged him against the cement.  When a staff member fell on

top of him and Doe 4 said he could not breathe, they allegedly said it was "good" that he could

not breathe.  Doe 4 stated that a staff member also hit his hand with something hard, he had

bruises from this incident, and his face, ribs, and hand really hurt.  When asked if he tried to hit

or kick staff at any time during this incident, Doe 4 replied, "maybe."  (Doe 4 Dep. 50:23–54:18,

87:24–88:18, 91:23–92:5, Dkt. No. 129-4; Doe 4 Resp. to Interrog. 5.)

Defendant points out that Doe 4 reported this incident to his mental health clinician, who

reported the allegations to CPS.  (Doe 4 Dep. 53:3–9; Doe 4 Resp. to Interrog. 6–7; Letter to

Shenandoah Valley Social Services, Ex. H-7, Dkt. No. 100-8.)  In response, CPS decided not to

conduct an investigation, finding that the incident did not meet the legal definition of child abuse

or neglect.  (Letter from Shenandoah Valley Social Services, Ex. H-8, Dkt. No. 100-8.)

6

Defendant states that the date of Doe 4's report to his counselor corresponds with events that occurred on April 1, 2018, for which two SIRs were created. (Def.'s Br. Supp. Mot. Summ. J. 6.) The first SIR describes Doe 4's allegations. It states that Doe 4 was directed to return to his room for time-out after he asked if he had lost any behavioral points, he initially refused but then agreed to a time-out, and as he was walking toward his room, the shift supervisor punched Doe 4 in the rib cage. Thereafter, the SIR states that Doe 4 resisted attempts to put him in physical restraints and he was moved into his room, where the same supervisor punched him on the right side of his face and Doe 4 also sustained a puncture wound to his right hand. (SIR, Ex. H-6, Dkt. No. 100-8.) The second SIR recounting the events on April 1 describes the actions taken by staff members during the incident. It states that during free time, Doe 4 was acting in a disruptive and disrespectful manner and was consequently directed to take a time-out in his room. When he refused and stood against the wall, staff attempted to deescalate the situation. After Doe 4 refused, continued disobeying the staff's instructions, and showed aggressive behavior, staff placed him in a two-man restraint and escorted him to his room, where he struggled against staff and additional staff was needed. Once in the room, Doe 4 scratched and kicked staff and was then placed in a one-man restraint, after which he continued fighting by attempting to kick and headbutt the staff. After five minutes, the staff released Doe 4 and left him in his room. Some of the staff members had scratches and red marks from their interactions with Doe 4. After he was left in his room, Doe 4 started punching the door and sink in his room. (SIR, Ex. H-5, Dkt. No. 100-8.)

In the third instance of alleged excessive force, which Doe 4 believes occurred in mid-July, Doe 4 asked for deodorant spray and was told no because shower time had passed. When the supervisor left, Doe 4 asked a staff member to open the closet so he could get deodorant

spray.  The staff member denied Doe 4's request because the supervisor had, and Doe 4 felt

angry.  Doe 4 stated that five or six staff members then surrounded him, he tried to protect

himself as one approached him, and "a lot of staff members" fell on top of him and grabbed him.

He says that they then folded his arms up to his neck so it felt like they would break or pull his

arms off, and were hitting him, moving him around, and struggling to get a hold on him.  Then,

Doe 4 alleges that once he was "calm and collected," they brought him into his room, where they

tried to restrict his arms and legs, one staff member held his feet, and another hit him with metal

handcuffs, leaving a bruise close to his neck.  Doe 4 stated that he punched a staff member in the

face after the staff members grabbed him.  He could not recall if he "head-butted" another staff

member.  (Doe 4 Resp. to Interrog. 6, 15.)

Defendant states that it has no report of allegations of mistreatment from this incident by

Doe 4.  (Def.'s Br. Supp. Mot. Summ. J. 7; Ropp Aff. ¶ 15.)  In the Center's SIR from this July

incident, it states that Doe 4 requested deodorant and refused to go to his room, and when staff

unsuccessfully attempted verbal redirection, they called for assistance.  After multiple attempts at

verbal redirection, a staff member was directed to help guide Doe 4 to his room.  As he

approached Doe 4, Doe 4 responded aggressively by punching him in the face.  Then, because

they had exhausted all forms of less intrusive intervention, staff placed Doe 4 in a physical

restraint and called for additional assistance.  Doe 4 head-butted a staff member as he was trying

to open the door to his room.  Because of his continued struggle against physical restraint, Doe 4

was placed in a two-man physical restraint.  Doe 4 continued struggling and became more

aggressive, and staff was thereafter able to place him in his room.  (SIR, Ex. H-9, Dkt. No. 100-

8.)

**B. Solitary Confinement (or Room Confinement) and Doe 4**

The Center also uses a technique that it calls room confinement—and plaintiffs call solitary confinement—in which a Detainee is confined for a period of time in the room to which he is otherwise assigned. Prior to the implementation of its current behavioral management program in August 2016, the Center confined Detainees to their rooms for predetermined amounts of time when their behavior crossed certain thresholds. Under the new program, room confinement is only used when necessary to ensure safety. If a Detainee is in room confinement, he or she is supposed to be monitored every 15 minutes, reevaluated at least every four hours, and released as soon as safely possible. Additionally, an SIR is required if the confinement results in removal from programming.

Doe 4 recounts several instances of confinement in his responses to defendant's interrogatories. Doe 4 states that he has been put in restriction in his room for over an hour many times, and often, this was for small things that did not involve fighting. Doe 4 describes several incidents of confinement that he specifically remembers: 1) after the incident described above when he "got mad at staff" and was put in handcuffs, he was "forced to stay in cuffs in [his] cell, [and] forced to lie on the hard floor with no mattress"; 2) after the incident described above when he was hit in the ribs and face, he was in restriction for four hours; 3) on one occasion when he asked to speak with his counselor and his request was denied, he was in restriction for seven or eight hours; 4) when he kept asking staff members why he could not play video games in his pod and became angry and said "a bad word they understood," he was locked in his cell for four or five hours; 5) on two occasions, when he accidentally kicked another child and kicked the ball into a camera while playing soccer, he was placed in restriction for four hours; and 6) the longest time he was put in restriction was for three days. (Doe 4 Resp. to Interrog. 17–19.)

9

In addition, in his deposition, Doe 4 confirmed that there was an incident where he became upset and dumped his food and drink on the lid of his tray. But in his own words, he did not want to eat and was told by a supervisor to throw away his food, he became confused and said he needed time to think, and the supervisor "grabbed the plate and threw it out." (Doe 4 Dep. 81:2–13.) Dr. Lewis recounts this incident in his report with more detail, noting that after Doe 4 dumped his food, he refused several requests to return to his room. When he struggled and tried to kick staff, he was put in room confinement, where he "became upset and tied a shirt around his neck and was given a suicide blanket." (Dr. Lewis Report ¶ 150, Dkt. No. 106-2.)

Also in his deposition, Doe 4 stated that there were other instances during which he was confined to his room for longer than one day, in addition to the three-day confinement, but he could not remember specifically how many times. When asked if he knew the reasons why he was being confined in those incidents, Doe 4 replied: "just because supposedly I'm not being respectful," and explained that he used the word "supposedly" because "sometimes they do things that are not true." (Doe 4 Dep. 80:5–22.) Doe 4 provided a more thorough explanation in his deposition regarding the incident when he asked to speak to his counselor. Doe 4 stated that he remembered the incident described by defense counsel as the time he became "upset about not being able to sit in the chair and about point losses," but said, contrary to defense counsel's description of the event, that he was not angry. However, in his response to defendant's interrogatories, Doe 4 stated that he was "frustrated about something that staff had done" to him. In his words, Doe 4 stated that he asked to talk to his counselor several times, to which a staff member repeatedly responded no and asked him to get up from the chair. Then, Doe 4 said that he talked to the supervisors, who told him that he was insulting the other staff member and not following his instructions. When the supervisors asked him to take a time-out, Doe 4 says he

10

responded by stating, "That's okay. I want to talk to my counselor." At this point, Doe 4 states that the staff ignored him when he asked them not to touch him, grabbed his hands and arms, took away everything, and put him in his cell for seven or eight hours. He believes that the only thing he did in this situation was sit in a chair and ask for help. (*Id.* 83:11–84:18; Doe 4 Resp. to Interrog. 8–9.)

As to the time when Doe 4 states he was held in confinement for three days, defendant refers to that period as a "three-day modified programming schedule," and points out that Doe 4 attended educational programming and was given an opportunity for recreation, and that this period of confinement and modified programming resulted from Doe 4's assault of punching a staff member in the face. (Def.'s Br. Supp. Mot. Summ. J. 3; Ropp Aff. ¶¶ 9(c), 20.) Defendant asserts that this was the only instance it knows of during which Doe 4 was held in confinement for a period of 24 hours or more, relying on the lead case manager's statement in her affidavit that "Doe 4 was placed in room confinement for 24 hours after punching a staff member in the face several times and refusing to let go," and he "continued to be disruptive by cursing at staff and banging on the door and wall of his room" after being placed in his room. (Def.'s Br. Supp. Mot. Summ. J. 3–4; Ropp Aff. ¶ 18.) The lead case manager also stated that Doe 4 has been placed on a three-day modified programming schedule on several occasions, including the time he punched a staff member, and had access to education programming and recreation whenever he was on this modified schedule. (Ropp Aff. ¶ 20.)

## C. Mental Health Claim and Doe 4

A Detainee, upon arrival at the Center, is given a mental health screening to determine if an assessment is required. If so, an assessment is performed by a mental health clinician. If the assessment indicates a need for a psychological evaluation, then the Center requests approval

from ORR. Each Detainee is provided with a case manager and a mental health clinician, who are bilingual in Spanish. Each Detainee is supposed to have one-on-one counseling with his or her clinician at least once a week, and clinicians are supposed to provide two group counseling sessions each week, although there is some evidence that those informal group sessions are not always run by clinicians and do not always occur. A psychiatrist sees Detainees every three to six weeks, and Detainees may schedule additional appointments with him without limitation.

When Doe 4 arrived at the Center, he underwent a psychological evaluation and, although he was uncooperative, he was diagnosed with post-traumatic stress disorder and attention deficit hyperactivity disorder based on his history. The psychologist that conducted the investigation recommended that Doe 4 be placed in residential treatment. (Psychological Evaluation 10, Ex. H-10, Dkt. No. 100-8.) The Center had attempted to transfer Doe 4 to several residential treatment facilities on several different occasions, but those requests require approval by ORR and acceptance by the receiving facility. Because Doe 4 had a history of violence at the Center, other facilities would not accept him. (Ropp Aff. ¶¶ 21–22.)

While at the Center, Doe 4 met with a mental health clinician, who is a licensed professional counselor with a master's degree in clinical mental health, for about an hour about once a week,[7] (Doe 4 Dep. 34:3–22, 40:8–41:4), and with a psychiatrist who prescribed him medicine once every six weeks,[8] (Doe 4 Dep. 37:11–38:22). More than fifty percent of each visit with Dr. Kane is supposed to be dedicated to one-on-one counseling and coordination of care. (Ex. H-3, at 2–3, Dkt. No. 100-8.) Doe 4 did not report thoughts of suicide or self-harm to

---

[7] Doe 4 testified that his mental health clinician talked to him about behaving properly in order for him to leave the Center. (Doe 4 Dep. 40:22–24.)

[8] Doe 4 testified that the appointments lasted only one or two minutes, but he also acknowledged that the psychiatrist also asked Doe 4 how he was doing, how he was feeling, how he was sleeping, if he had anxiety, and if he had anger. (Doe 4 Dep. 38:7–18.)

either his mental health clinicians or his psychiatrist. (Exs. H-2, H-3, Dkt. No. 100-8.) The record reflects only one incident where Doe 4 harmed himself by punching a wall. (Doe 4 Dep. 44:4–10, 79:25–80:4.) In addition, Doe 4 testified that he feels better about his anger now and can think of other things to calm down when he feels angry. (*Id.* 81:25–82:9.)

Doe 4 stated that he often asked his case worker and counselor to see a psychologist who he could talk to about his feelings, but the Center did not let him. He stated that he has only seen a psychologist once since arriving at the Center. Because he has not been able to speak with a psychologist, Doe 4 testified that he has been hurt and so angry that he has harmed himself. (Doe 4 Resp. to Interrog. 8, 10.) The Center's lead case manager, however, has no record of any requests from Doe 4 to see a psychologist, and there is no record of such a request in his case file, although it should have been documented as a matter of policy. (Ropp Aff. ¶ 17.) As noted, moreover, the only record of harm is Doe 4's punching of a wall in anger.[9]

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

---

[9] In any event, it is undisputed that a request to see a psychologist had to be approved by ORR.

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.3d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

## B. *Monell* Standard

Plaintiffs bring their § 1983 claims against the Commission as an entity and not against its employees or agents. They assert liability for unconstitutional policies or customs and practices under a theory first recognized in *Monell v. Dept. of Soc. Servs.*, 436 U.S. 568 (1978). At the summary judgment hearing, plaintiffs' counsel conceded that they are not proceeding with the theory that the Commission's written policies themselves are unconstitutional, but rather that the Commission has an unconstitutional custom or practice. In order to prevail on a *Monell* claim involving unconstitutional customs or practices, a plaintiff must first show an underlying constitutional violation by an employee or agent of the defendant entity.[11] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *S.P. v. City of Takoma Park*, 134 F.3d 260, 272 (4th Cir. 1998). A class representative or named plaintiff is also required to make this showing in a class action *Monell* case. *See Agnew v. District of Columbia*, 263 F. Supp. 3d 89, 95 n.3 &

---

[10] Ignoring this requirement, plaintiffs' brief often cites to allegations in the second amended complaint and argues that certain matters have been sufficiently pled.

[11] Defendant clearly points out this requirement in its initial brief in support of summary judgment, and the brief then concentrates on the deficiencies in Doe 4's evidence. While defendant did not cite to *Doe v. Obama*, 631 F.3d 157 (4th Cir. 2011), with regard to standing, until its reply brief, in no way could plaintiffs have been surprised by defendant's argument. Rather, it appears that plaintiffs initially choose to ignore the argument with regard to the specifics of Doe 4's claims. Plaintiffs only addressed the specifics of Doe 4's claims in their supplemental brief.

14

98 n.7 (D.D.C. 2017) (given no constitutional violation suffered by the named plaintiffs and class representatives, findings regarding custom or practice were unnecessary, and the class action was dismissed for failure of the same to show a personal injury in order "to have standing on behalf of a class") (quoting *Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S. Ct. 1540, 1547 n.6 (2016)); *Newberry v. Cty. of San Bernardino*, No. 16-55466, 2018 WL 4450831, at *2 (9th Cir. Sept. 18, 2018) (finding that because the defendant had not violated the constitutional rights of a named plaintiff, the constitutional violation prerequisite to a *Monell* claim was not met and no named plaintiff had a claim against the defendant). *See also Martinez v. Haleas*, No. 07-cv-6112, 2009 WL 2916852, at *4 (N.D. Ill. Sept. 2, 2009) (in proposed class action, absent an underlying constitutional violation, there is no claim under *Monell*).

Plaintiffs rely upon *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir. 1998), in arguing that "[a] properly certified class has a legal status separate from and independent of the interest asserted by the named plaintiff." In *Whitlock*, the class was properly certified, but it was later determined that the class representative could not prove his individual claim, and summary judgment was entered against him on that claim. *Id.* Because of this, the class representative could no longer adequately serve in that capacity. *Id.* The class was not decertified; however, new plaintiffs were named as class representatives. *Id.* The court noted that this was not a case where the initial class representative never had standing, but it was a case where he had standing and ultimately lost on the merits. *Id.* at 385. Thus, the court still had jurisdiction under Article III. *Id.* *Whitlock* certainly does not stand for the proposition that an underlying constitution violation is not a required prong of *Monell* in a class action or that the class representative need not be able to prove his own underlying constitutional violation. Nor does it stand for the

proposition that a class action may continue a claim on its own without an adequate class representative, and the court will not allow this class to do so.

To prevail on a *Monell* claim and after showing an underlying constitutional violation, the plaintiff must show an unconstitutional custom or practice. These "may be found in 'persistent and widespread … practices of … officials [which,] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.'" *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (quoting *Monell*, 436 U.S. at 691 (citations omitted)). Of course, a constitutional written policy does not insulate the entity from liability for unconstitutional customs or practices. *See, e.g.*, *Marriott v. Cty. of Montgomery*, 426 F. Supp. 2d 1, 9 (N.D.N.Y. 2006) ("Constitutional words cannot erase unconstitutional conduct").

In addition to proving an unconstitutional custom or practice, a plaintiff must show that the custom or practice "is (1) fairly attributable to the municipality [or entity] as its 'own,' . . . and is (2) the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (citations omitted). In order to show attribution, a plaintiff may show "duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the [body] that the practices have become customary among its employees," . . . [or that the entity's] policymaker has actual or constructive knowledge of such a course of customary practices among employees subject to the policymaker's delegated responsibility for oversight and supervision . . . ." *Id.* at 1387. If the entity or policymaker has actual or constructive knowledge, the entity will be liable upon proof that the entity or policymaker failed, "as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Id.* at 1391. *See also Wright v. Town of Glenarden*, No. 95-2580, 1996 WL 350009, at *3 (4th Cir. June 26, 1996). Finally, "[a] sufficiently close causal link between such a known but uncorrected custom or

16

usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Spell*, 824 F.2d at 1391.

## C. First *Monell* Element—An Underlying Constitutional Violation

Given the above proof requirements for a *Monell* claim, the court first turns to whether Doe 4 has sufficient evidence of underlying constitutional violations for excessive force, room confinement, and inadequate mental health treatment.

### 1. Excessive Force

In order to prevail on an excessive use of force claim, all parties agree that plaintiffs must show that the force was not objectively reasonable under the circumstances. *Kingsley v. Hendrickson*, 135 U.S. 2466, 2473 (2015). Doe 4's evidence establishes genuine disputes of material fact with regard to whether he was the victim of excessive uses of force. So summary judgment is not available to defendant on its theory that Doe 4 cannot show an underlying constitutional violation in this regard.

With regard to the instances of excessive force and use of restraints, in the first incident described in the background section, there is a dispute of fact about whether Doe 4 was forced to lie on the floor of his room with mechanical restraints and whether the force used in response to his anger was excessive. The length of time that Doe 4 was in handcuffs also is directly in dispute. In the second incident, there is also a dispute of fact about whether the use of force against Doe 4 was excessive because the two SIRs from the incident—one recounting Doe 4's allegations and one recounting the actions of the staff—describe different circumstances that ultimately led to the use of force. Although Doe 4 stated in his deposition that he was angry when the staff members asked him to go to his room, this does not discount his statements that he also asked to "talk calmly" and pulled himself off the wall in response to their requests.

17

Further, even if Doe 4 did refuse to go to his room and displayed aggressive behavior, there is a dispute of fact as to whether the force used against him—including punching him in the ribcage, which is excluded from the Center's SIR—was excessive in response to his behavior. In the third incident, there is a dispute of fact about whether Doe 4 punched a staff member in the face before or after staff members placed him in a physical restraint following his request for deodorant. Additionally, Doe 4's description of the force used against him in that incident sets forth more aggressive behavior by the Center's staff that caused him pain and bruising, while the SIR does not include a similar description of the force used against Doe 4. Thus, there are disputes of fact as to the incidents of force and whether the use of force was unconstitutional against Doe 4.

### 2. Room Confinement

Room confinement is not a use of force, and no party suggests the legal standard applicable to confinement. The court looks to *Bell v. Wolfish*, 441 U.S. 520 (1979), which directs courts to examine the constitutionality of a pretrial detainee's conditions of confinement or restrictions under the Fourteenth Amendment by determining "whether those conditions amount to punishment of the detainee." *Id.* at 535. This is required because pretrial detainees "may not be punished prior to an adjudication of guilt . . . ." *Id.* This is not to say that restrictions on liberty may not be imposed because restrictions that are "reasonably related to legitimate government objectives are not tantamount to punishment." *Id.* at 538. *See also Youngberg v. Romeo*, 457 U.S. 307, 320 (1982).

In determining whether there are disputes of fact as to the room confinement claim, it is worth noting that defendant simply does not address some of the incidents set forth in Doe 4's responses to interrogatories. For example, defendant does not present any contrary evidence to

Doe 4's description of the incident where he requested to speak to his counselor and was placed in restriction for seven or eight hours after his request was denied. Defendant also does not address the alleged incidents when Doe 4 asked to play video games or accidentally kicked a ball in soccer and was placed in restriction. Further, there is a dispute of fact regarding the nature of Doe 4's confinement following the incident where he allegedly punched a staff member—while Doe 4 states that he had to lie on the hard floor without a mattress and with his handcuffs on, defendant disputes only the handcuff issue and does not address the other specific allegations. Instead, defendant focuses on Doe 4's opportunity for educational programming and recreation during the overall three-day period of confinement.

Thus, there are disputes of material fact regard the circumstances of Doe 4's room confinement. Indeed, based on the record before it, the court cannot say that a reasonable factfinder could not find in Doe 4's favor on this issue, if it were to entirely credit his accounts of these incidents. So, the court will deny summary judgment on defendant's theory that Doe 4 cannot prove an underlying constitutional violation with regard to room confinement.

### 3. Inadequate Mental Health Care

The complaint alleges a claim for deliberate indifference to Doe 4's serious mental health needs as well as an alternative claim for inadequate mental health care based upon failure to abide by the professional judgment standard. For purposes of summary judgment, plaintiffs' argument focused on the deliberate indifference standard, and the court finds that the deliberate indifference standard applies to plaintiffs' claims. As set forth in defendant's brief, courts have repeatedly applied the deliberate indifference standard to civil detainees, including immigrant detainees.[12] (Def.'s Br. Supp. Mot. Summ. J. 19–20.)

---

[12] The professional judgment standard is applied to programs with a treatment or rehabilitation objective. See cases cited in defendant's supplemental brief at pages 19–20. (Dkt. No. 165.)

In order to prove deliberate indifference with regard to medical care, a plaintiff must satisfy objective and subjective elements. Objectively, he must show that he had a sufficiently serious medical need. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical need exists when it has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotation marks omitted). The subjective element first requires a showing that defendant subjectively recognized a substantial risk of harm. *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]hey actually must have perceived the risk") (citation omitted). Then, the defendant must subjectively recognize that his actions were "inappropriate in light of that risk." *Id.* This standard is more than "mere negligence or even civil recklessness." *Jackson*, 775 F.3d at 178.

Indeed, under the deliberate indifference standard, negligence or a lapse in professional judgment is insufficient. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 844 (1994). Moreover a plaintiff is not entitled, under the constitution, to "the exact mental health treatment, diagnosis, and placement that he might desire." *Price v. Dixon*, 961 F. Supp. 894, 899 (E.D. N.C. 1997) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). In the Eighth Amendment context, the Supreme Court has recognized that "unqualified access to health care" is not required, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), nor is access to the "best and most expensive form of treatment," *Taylor v. Barnett*, 105 F. Supp. 2d 483, 489 n.2 (E.D. Va. 2000). A mere disagreement with medical personnel is also insufficient to show deliberate indifference. *Wright*, 766 F.2d at 849. Additionally, officials are entitled to rely upon the judgment and expertise of medical professionals. *See, e.g.*, *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990).

20

Here, Doe 4 was evaluated following his arrival at the Center by a psychologist.  He was diagnosed with ADHD and PTSD, for which he received medication.  He saw a psychiatrist at least every six weeks, and he met with a licensed mental health clinician for individual counseling for about one hour once each week.  Unlimited additional meetings with the psychiatrist were available to him, as was group counseling.

While Doe 4 states that he often asked to see a psychologist instead of his licensed professional counselor, there is no evidence indicating that a medical professional recommended that he see a psychologist in order to adequately treat a serious medical need.  Doe 4 admits that he never thought of committing suicide, that he had no thoughts of self-harm, and that the only incident where he harmed himself was when he punched a wall in anger.

There was a recommendation, following Doe 4's initial evaluation, that he be placed in residential treatment.[13]  (Psychological Evaluation 10, Ex. H-10, Dkt. No. 100-8.)  There is, however, no indication in that recommendation that failure to secure such a placement would result in any harm or risk of harm to Doe 4.  Furthermore, the Center was not deliberately indifferent to that recommendation.  Instead, it attempted to transfer Doe 4 several times to several residential treatment facilities, but to effect his transfer would require both ORR's approval and the receiving facility's acceptance of Doe 4.  As the court has previously noted, the other facilities did not accept Doe 4 due to his history of violence.  (Ropp Aff. ¶¶ 21–22.)

---

[13]  Plaintiffs cite to the case of *Scott v. Clarke*, 64 F. Supp. 3d 813, 821–22 (W.D. Va. 2014), for the proposition that a facility cannot delegate its duty to provide mental health services to Doe 4, so the fact that ORR approval is required is irrelevant to the analysis.  *Scott*, however, is inapposite.  In *Scott*, the court held that the Virginia Department of Corrections, who was the custodian of the inmate, could not escape liability by delegating its duties to a medical contractor.  Here, non-party ORR is the custodian of the Detainees, not defendant, and ORR has not delegated its duties.  Regardless, nothing indicates that residential placement of Doe 4 was required.

For the above reasons, Doe 4 has not mustered sufficient evidence to show an underlying constitutional violation with regard to his mental health claim, and the court will grant summary judgment to defendant on the mental health claim.

**D. Remaining *Monell* Elements**

  **1. An unconstitutional custom or practice**

As noted, if a plaintiff asserting a *Monell* claim can establish an underlying constitutional violation, then the inquiry turns to whether there is an unconstitutional custom or practice, attributable to the defendant, that was the "moving force" for the violation of plaintiff's constitutional rights. Given the court's conclusion that Doe 4 has only shown disputes of fact for an underlying constitutional violation for his excessive force and conditions-of-confinement claims, the court looks next to whether plaintiffs have shown an unconstitutional custom or practice, but only with regard to those claims.

Defendant's analysis on this issue is lean. It conclusorily states that there is no unconstitutional custom or practice and takes issue with the report of Paul Driver, Ph.D., an expert statistician proffered by plaintiffs, who concludes that such a practice exists. Mostly, though, defendant relies upon the other prongs of *Monell* in an attempt to show the plaintiffs cannot prevail.

Plaintiffs counter defendant's assertion by first citing to the allegations in their complaint and concluding that they have sufficiently pled a custom or usage. While this may be true, they cannot rely on mere allegations at the summary judgment stage. They also cite to case law regarding supervisory liability, but they admitted at the hearing that they are not pursuing supervisory liability, given that no individual persons are named as defendants. They then turn to Diver's report, in which he examined a spreadsheet prepared by plaintiffs' counsel that

22

summarizes defendant's reports regarding use of force, use of restraints, and use of room confinement. Using this summary, Diver notes a large number of occasions on which the Center's employees violated the Center's own policies regarding the use of force, restraints, and room confinement. Plaintiffs fail to recognize, however, that a violation of internal policies or procedures does not establish a constitutional violation. *United States v. Caceres*, 440 U.S. 741 (1978). This is even true of violations of state law to the extent it is more demanding than the constitution. *Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990). For the reasons stated in the court's opinion regarding defendant's motion in limine to exclude the expert testimony of Diver, the court will not consider Diver's opinions with regard to proof of a custom or practice.

Lastly, plaintiffs cite to testimony regarding the Center's practices. This testimony indicates that fairly minor behavioral issues, self-harm, and verbal threats, without the ability to act on them, has resulted in use of restraints. In one circumstance, staff were told to use restraints on a child, without any less-intrusive interventions, if the child attempted to cut himself or "do anything." (Ex. 20, Mahiri Dep. 175:21–176:2, 177:12–20.) A staff member also stated that physical restraint is used if the child's behavior is "interfering with the routine of the other children." (Ex. 4, McCormick Dep. 113:1–14.) Doe 4 also testified to having seen excessive uses of force.

With regard to room confinement, plaintiffs cite to staff testimony that small infractions result in long periods of room confinement, which is also confirmed by some incident reports. For example, incident reports show confinement for eating too slowly. They also provide evidence of failures to remove children from confinement after the need for confinement has ended. The extent of these practices is disputed, but the current record could allow a reasonable

fact-finder—construing all evidence in plaintiffs' favor—to find the existence of an unconstitutional custom or practice as to both the excessive force claim and the room confinement claim.

### 2. Attribution to the Commission

In addition to proving an unconstitutional custom or practice, plaintiffs must prove that the Commission had or has actual or constructive knowledge of the customs or practices and failed to take action to stop such practices. A showing of sufficient duration and frequency is one method of proving knowledge, and it appears to be the method plaintiffs seek to use.

In support of its motion, defendant points out that Doe 4 has only complained of alleged mistreatment once to the Center's knowledge. It also notes that reports are made to CPS whenever there is a complaint of excessive use of force, even if defendant believes there is no merit to the complaint. Additionally, defendant has terminated employees found to have used excessive force, even a staff member who threw a punch in self-defense while being assaulted.

As an initial matter, and in contrast to defendant's assertion that Doe 4 has only complained of alleged mistreatment once, Doe 4 states in his affidavit that he has filed complaints many times, but nothing happens, and he was told that his complaints would all be put in the archives if he filed one more complaint. Doe 4 also has stated that he does not remember all the complaints he made, including complaints of when staff used "too much force against" him. (Doe 4 Resp. to Interrog. 7, 13.)

In response, plaintiffs rely on the written reports regarding use of force, restraints, and room confinement maintained by the Center. Plaintiffs argue that some of the reports reflect a failure of the Center's employees to abide its internal policies and that there is no evidence of corrective action regarding these incidents. According to plaintiffs, this establishes awareness

and tacit approval on the part of the Commission that the Center engages in a pattern of conduct with regard to force, restraints, and room confinement that is unconstitutional. Moreover, Doe 4 states in his interrogatory responses that he has filed complaints many times, but nothing happens, and he was told that they would all be put in the archives if he filed another complaint. (Doe 4 Resp. to Interrog. 7, 13.) This evidence is sufficient to show a dispute of fact precluding entry of summary judgment.

### 3. Causal link

Finally, plaintiffs must show a causal link between the custom or practice and the specific violation(s) at issue or, in other words, that the custom or practice was the "moving force" behind the specific harmful acts of which plaintiffs complain. *Milligan v. City of Newport News*, 743 F.2d 227, 230–31 (4th Cir. 1984). "A sufficiently close causal link between such a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Spell*, 824 F.2d at 1391. The same evidence set forth above is also sufficient with regard to this *Monell* prong, so summary judgment is unavailable.

### III. CONCLUSION

For all of these reasons, the court will grant in part and deny in part defendant's motion for summary judgment.

An appropriate order will be entered.

Entered: December 13, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

25