IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| JOHN DOE 5, JOHN DOE 6, and JOHN DOE 7, by and through their next friend, NELSON DELORES LOPEZ, on behalf of themselves and all persons similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> SHENANDOAH VALLEY JUVENILE CENTER COMMISSION, <br><br> Defendant. | Civil Action No. 5:17-cv-00097 <br><br> By: Elizabeth K. Dillon <br> United States District Judge |

**MEMORANDUM OPINION**

John Does 5, 6, and 7 (Does) are immigrant minors detained at the Shenandoah Valley Juvenile Center (SVJC), which is owned and operated by the Shenandoah Valley Juvenile Center Commission (Commission). The Does represent a class of similarly situated detainees, each deemed an "Unaccompanied Alien Child" (UAC), who allege SVJC has denied them constitutionally adequate health care in violation of 42 U.S.C. § 1983. SVJC moves to dismiss the plaintiffs' third amended complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 229.) For the reasons stated below, the court will deny the motion to dismiss for failure to state a claim, and take defendant's motion to dismiss for lack of subject matter jurisdiction under advisement pending an evidentiary hearing to further consider the standing issue.

I.  BACKGROUND

A. **Factual Background**[1]

The Shenandoah Valley Juvenile Center (SVJC) is a secure residential detention facility in Staunton, Virginia, owned and operated by the Shenandoah Valley Juvenile Center Commission (Commission).  (Third Am. Compl. ¶¶ 38–39, Dkt. No. 228.)  The Commission is a public body pursuant to Virginia Code § 16.1-315.  SVJC houses both noncitizen immigrant minors deemed UACs and citizen youth between the ages of ten and seventeen.  (*Id.* ¶ 43.)  Minors deemed UACs are transferred to SVJC by the Office of Refugee Resettlement (ORR) of the U.S. Department of Health and Human Services when UACs "behavior[], primarily aggression and self-harm, appear to make them a danger to themselves or others or suggest that they are a flight risk." (*Id.* ¶ 53.)  ORR and SVJC have a cooperative agreement that outlines SVJC's responsibilities as a "care provider."  (*Id.* ¶ 54.)  These responsibilities include, among other things, physical care, educational services, necessary mental health interventions, "[a]t least one individual counseling session per week," and "[g]roup counseling sessions at least twice a week."  (*Id.*)

The plaintiffs are immigrant youths who have been deemed UACs by ORR.  (*Id.* ¶ 1.)  At the time the third amended complaint was filed, the Does were detained at SVJC.  (*Id.*)  The Does represent a class comprised of UACs currently detained at SVJC as well as UACs who may be detained there in the future.  (*Id.*)

Doe 5 is a 15-year-old from Honduras.  (*Id.* ¶ 7.)  He fled Honduras to escape gang violence in 2020.  (*Id.* ¶ 8.)  Upon entering the United States, he was apprehended and detained.  (*Id.* ¶ 10.)  After an escape attempt at a facility, Doe 5 threatened to harm himself and

---

[1] For the purposes of this motion to dismiss under Rule 12(b)(6), the court takes the allegations in the third amended complaint as true.

subsequently spent four days in the hospital.  (*Id.* ¶ 11.)  He was then transferred to SVJC.  (*Id.* ¶ 12.)  At SVJC, Doe 5 has a counselor, who he sees "once a week for five to 15 minutes at a time," and he has "spoken with a psychiatrist once…for approximately 20 minutes."  (*Id.* ¶¶ 12–13.)  Doe 5 complains that his counselor focuses only on behavior management; the counselor does not give him advice on "how to cope with any of [his] underlying issues or concerns.  (*Id.* ¶ 13.)  Further, his psychologist only prescribed him medication; the psychiatrist "did not ask him how he was doing."  (*Id.* ¶ 14.)

Doe 6 is a 16-year-old from Guatemala.  (*Id.* ¶ 15.)  He left Guatemala to help his family.  (*Id.* ¶ 16.)  Doe 6 was apprehended at the border and sent to a psychiatric hospital for a week.  (*Id.* ¶ 18.)  While there, he "believes he was diagnosed with a mental health condition," but he does not know which one.  (*Id*.)  In May 2021, Doe 6 was apprehended and detained at the border while attempting to return to Guatemala.  (*Id.* ¶ 20.)  He was detained at a facility in Texas until being transferred to SVJC, apparently for fighting with other youth.  (*Id.* ¶¶ 20–21.)  Doe 6 has a counselor at SVJC "with whom he hardly speaks"; he has met with his counselor "four or five times for approximately 10 to 30 minutes."  (*Id.* ¶¶ 22–23.)  On several occasions, his counselor has been "too busy, or not in the office" when Doe 6 has requested a meeting.  (*Id.* ¶ 20.)  Doe 6 also complains about his counselor's focus on behavior management.  (*Id.*)  He has not talked to his counselor about "instances of self-harm because his counselor only wants to speak with him after [he] is involved in a behavioral incident."  (*Id.* ¶ 25.)  Doe 6 "has not met with a psychiatrist, but believes he has an upcoming appointment with one."  (*Id.* ¶ 24.)  While at SVJC, Doe 6 has been "subjected to physical assault…at least twice."  (*Id.* ¶ 26.)

Doe 7 is a 15-year-old from Honduras.  (*Id.* ¶ 28.)  He fled Honduras in the wake of hurricanes hoping to help provide for his family.  (*Id.* ¶ 29.)  Upon arriving in the United States,

Doe 7 was apprehended and then detained at a facility in Texas. (*Id.* ¶ 31.) In May 2021, he was transferred to SVJC, apparently for fighting other youth. (*Id.* ¶ 32.) Doe 7 "believes he has been diagnosed with a mental health condition, but does not recall what it is." (*Id.* ¶ 34.) Doe 7 has a counselor "whom he sees on a weekly basis." (*Id.* ¶ 33.) During counseling sessions, Doe 7's counselor talks with him about his behavior, facilitates calls to his mom, and sometimes lets him listen to music. (*Id.*) He also has a psychiatrist, who he meets with over video. (*Id.* ¶ 34.) His psychiatrist has prescribed him medication to help him calm down and sleep. (*Id.*) Doe 7 has been subject to physical assault by staff at SVJC and witnessed staff assault another youth at the facility. (*Id.* ¶¶ 35–36.)

Plaintiffs allege that SVJC staff members are "unable to recognize and properly react to the obvious needs of youth who have experienced known, serious trauma." (*Id.* ¶ 57.) SVJC allegedly "takes a 'one size fits all' approach" to mental health treatment rather than tailoring treatment to an individual child's needs. (*Id.* ¶ 58.) "Each child is assigned a counselor, with whom they usually meet once a week, although some of the youth…reported speaking with their counselors less frequently." (*Id.*) "Some, but not all, of the youth…have also met with a psychiatrist"; however, the psychiatrist is focused on medication management rather than psychotherapy. (*Id.* ¶ 59.) "Only one youth described anything resembling regular group therapy." (*Id.* ¶ 60.) SVJC follows this approach despite youth who "engage, have engaged, or have threatened to engage in self-harm." (*Id.* ¶ 61.)

Additionally, plaintiffs allege regularly occurring physical assault by SVJC staff in response to "minor behavioral incidents." (*Id.* ¶ 63.) They allege these "applications of force add to the severe psychological trauma" the youth already suffer. (*Id.*) Further, plaintiffs allege SVJC has the "policy or practice of confining immigrant detainees to their rooms for lengthy

4

periods of time and/or using handcuffs to restrain them." (*Id.* ¶ 65.) As punishment, SVJC allegedly strip the youth of all their personal items, including blankets, overnight. (*Id.* ¶ 67.) In conclusion, plaintiffs plead that "[i]solating, punishing, and failing to provide clearly-needed mental health treatment to children who are severely traumatized or may be self-harming is extremely damaging to their well-being and violates well-established professional standards," and they have been "harmed by the lack of…appropriate, trauma-informed mental health care treatment." (*Id.* ¶¶ 70–71.) Thus, the Commission has violated their "Fifth and Fourteenth Amendment[]" rights to adequate medical care. (*Id.* ¶ 80.)

B. **Plaintiffs' Next Friend, Nelson Delores Lopez**

The plaintiffs seek to proceed in this litigation by and through their next friend, Nelson Delores Lopez. (*Id.* ¶ 4.) Lopez is an adult resident of Virginia who "has met with John Does 5–7, and they consent to [him] serving as their next friend." (*Id.* ¶ 5.) Further, plaintiffs contend "Lopez is well-suited to serve in this role," due to his status as a law student intern and past experience as a "community advocate" and "paralegal at an immigration legal services organization." (*Id.* ¶ 6.) As a paralegal, "Lopez frequently visited detained immigrant adults and children to educate them about their legal rights and assist them in navigating the immigration legal system." (*Id.*)

C. **Relevant Procedural History**

Preceding the complaint and this motion, the plaintiffs, through other named representatives, filed a complaint asserting claims of 1) excessive force, 2) excessive conditions of confinement, and 3) inadequate mental health treatment against the Commission. On December 13, 2018, this court granted summary judgment in favor of the Commission on the inadequate mental health treatment claim, finding there was no dispute of material fact when

applying the deliberate indifference standard to the record. *Doe by and through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 355 F. Supp. 3d 454, 468–69 (W.D. Va. 2018). Further, this court dismissed the excessive force and conditions of confinement claims with prejudice on July 23, 2019. (Dkt. No. 204.)

Plaintiffs appealed the ruling on the mental health treatment claim. In *Doe 4 by and through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, the Fourth Circuit reversed this court, holding that the proper standard to apply to the minors' mental health treatment claim is the professional judgment standard, not the deliberate indifference standard. 985 F.3d 327, 338–44 (4th Cir. 2021).

Plaintiffs filed their third amended complaint, again claiming the Commission unconstitutionally denied them of adequate mental health treatment in violation of § 1983. Defendant filed a motion to dismiss, which was fully briefed and argued.

II.  ANALYSIS

**A.  Motion to Dismiss for Lack of Standing**

Defendant argues that plaintiffs' next friend, Nelson Lopez, cannot proceed on plaintiffs' behalf because there is no "significant relationship" between them. Defendant contends that Lopez has an "interest in the case and past experience with detainees" but has no relationship at all with these plaintiffs. (Dkt. No. 230 at 6.) Plaintiffs argue a significant relationship is present because "[Lopez] met with the [p]laintiffs in person and secured their consent to his participation in the case as their representative." (Dkt. No. 232 at 6.) Further, "[Lopez] is not pursuing vindication of an abstract legal construct," rather, "he has a long history of working in support of immigrants' rights." (*Id.*)

6

Rule 17(c) of the Federal Rules of Civil Procedure authorizes minors to sue by a next friend if the minor lacks a general guardian or a duly appointed representative. Fed. R. Civ. P. 17(c)(2). "The question of next friend standing….is jurisdictional and thus fundamental." *Hamdi v Rumsfeld*, 294 F.3d 598, 607 (4th Cir. 2002). "The burden is on the 'next friend'" to "establish the propriety of his status." *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990). A next friend must 1) provide an adequate explanation why the real party in interest cannot appear on his own behalf to prosecute the action and 2) be truly dedicated to the best interest of the person on whose behalf he seeks to litigate. *Id.* at 163. Additionally, the Fourth Circuit has added a third requirement to proceed as a next friend: The next friend must have a significant relationship with the real party in interest.[2] *Hamdi*, 294 F.3d at 604. The *Hamdi* court declined to decide how significant of a relationship is needed, holding only that no preexisting relationship whatsoever is insufficient.[3] *Id.* But the court qualified: "We do not have here the situation of someone who has no significant relationships. If we did, this might be a different case." *Id.* at 606.

Looking to the third amended complaint, it is unclear the extent of Lopez's relationship with the plaintiffs. Have the parties met once or on several occasions? For how long? In their briefing, plaintiffs state that Lopez has assisted detainees *at SVJC*. What other relationships do the plaintiffs have? Further legal questions also exist. In the class action context, must a next friend have a significant relationship with all the named plaintiffs? Or must each individual

---

[2] The court reasoned that the significant relationship requirement helps ensure goals of Article III standing such as concrete adverseness between parties, restricting the federal forum to persons with a real stake in the litigation, and keeping policy-laden proceedings in the political arena. *See Hamdi v. Rumsfeld*, 294 F.3d 598, 604-07 (4th Cir. 2002).

[3] In *Hamdi*, a Federal Public Defender and a private citizen, who were found to have no relationship with the plaintiff at all, were denied standing as next friends. In a subsequent case, the plaintiff's father was allowed to proceed as a next friend. *Hamdi v. Rumsfeld*, 296 F.3d 278 (4th Cir. 2002).

named plaintiff have their own next friend? Considering the plaintiffs' unique status as detained unaccompanied noncitizen minors, there is a need for an evidentiary hearing to determine the extent of Lopez's relationship with the plaintiffs and the plaintiffs' other relationships, if any, before the court answers the question of Lopez's standing to proceed as the plaintiffs' next friend.

## B. Motion to Dismiss for Failure to State a Claim

### 1. Legal Standards

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The principle that the allegations in a complaint must be accepted as true is "inapplicable to legal conclusions," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

### 2. Section 1983 *Monell* Claim

Plaintiffs bring their third amended complaint pursuant to 42 U.S.C. § 1983, which allows individuals to sue parties acting under the color of state law for civil rights violations. *See Maine v. Thiboutot*, 448 U.S. 1, 100 (1980). Indeed, plaintiffs alleging a violation of § 1983 "must show that (1) they were deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir.

8

2003). A local government entity may be liable under section 1983 if "it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014). An official policy or custom can take the form of (1) an express policy, such as a written ordinance or regulation; (2) the decision of a person with final policymaking authority; (3) an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle,* 326 F.3d at 471. Under any theory, a plaintiff must "(1) identify[] the specific 'policy' or 'custom'; (2) fairly attribute[e] the policy and fault for its creation to the municipality; and (3) find[] the necessary 'affirmative link' between identified policy or custom and specific violation." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

To serve as the basis for their claim under § 1983, plaintiffs allege that defendant deprived them, as state detainees, of constitutionally adequate mental health treatment in violation of the Fourteenth Amendment.[4] "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). This responsibility includes providing for a person's mental health needs. *See Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) ("We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.") On appeal in this case, the Fourth Circuit held that the professional judgment standard announced in *Youngberg v. Romeo*, 457 U.S. 307 (1982), governs "the

---

[4] In the complaint, plaintiffs assert "violations of the Fifth and Fourteenth Amendments." (Third Am. Compl. ¶ 80, Dkt. No. 228.) Plaintiffs bring an action against state, not federal, actors. Such an action is properly brought under the Fourteenth Amendment. *United States v. Hornsby*, 666 F.3d 296, 310 (4th Cir. 2012).

adequacy of mental health care provided to [] detained immigrant child[ren]." *Doe 4*, 985 F.3d at 339.  Under the *Youngberg* standard, "'liability may be imposed only when the decision by the professional' represents a 'substantial departure from accepted professional judgment.'" *Id.* (quoting *Youngberg*, 457 U.S. at 320–23).  The Fourth Circuit more fully explained the professional judgment standard:

> To be clear, this standard requires more than negligence. "[E]vidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation[.]" The evidence must show "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Under this standard, courts do not determine the "correct" or "most appropriate" medical decision. "Instead, the proper inquiry is whether the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one."  By applying this standard, a court "defers to the necessarily subjective aspects of the decisional process of institutional medical professionals and accords those decisions the presumption of validity due them." Nonetheless, a decision earns this deference only if it reflects an actual exercise of medical judgment.

*Id.* at 342–43 (internal citations omitted).  While the *Doe 4* court noted that the Fourth Circuit had yet to truly define the contours of the professional judgment standard, it is clear the standard is objective, rather than subjective, and "a court must do more than determine that some treatment has been provided—it must determine whether the treatment provided is adequate to address a person's needs under a relevant standard of professional judgment." *Id.* at 343–44.

In sum, to properly allege a § 1983 claim against defendant, plaintiffs must plead facts showing that defendant had a "policy" or "custom" that caused plaintiffs to receive mental health treatment that substantially departed from accepted professional judgment.

10

### a. Constitutional Harm

To proceed under § 1983, plaintiffs must first plead sufficient facts to show they have been deprived of their constitutional rights. Defendant argues that the plaintiffs have not sufficiently alleged that their constitutional right to adequate mental health treatment has been denied by defendant. That is, plaintiffs have not pleaded sufficient facts to show that defendant "substantially departed from accepted professional judgment." The court disagrees.

As the Fourth Circuit explained, the treatment provided by SVJC must be "based on a medical judgment concerning the individual's specific needs, not based on policy or what services were ordinarily offered at the facility." *Doe 4*, 983 F.3d at 343 (citation omitted). Further, "[a court] must determine whether the treatment provided is adequate to address a person's needs under a relevant standard of professional judgment." *Id.* at 344. And finally, the Fourth Circuit left it to this court "to determine in the first instance to what extent, if any, the trauma-informed approach should be incorporated into the professional judgment standard in this particular case." *Id.* at 346.

Plaintiffs allege that they have been harmed by "the lack of provision of appropriate, trauma-informed mental health care treatment . . .". (Third Am. Compl. ¶ 71.) The fact that SVJC provides plaintiffs with mental health care, albeit through a "one size fits all" approach (*id.* ¶ 58), shows that plaintiffs do have mental health care needs. This is corroborated by allegations that Does 5, 6, and 7 have manifested mental illness. (*Id.* ¶ 11 (Doe 5, when captured during an attempt to escape a detention facility in Texas, threatened to harm himself and was hospitalized); ¶ 18 (Doe 6 was sent to a psychiatric hospital upon turning himself in when he crossed the border, during which time he believes he was diagnosed with a mental health disorder and

prescribed medication); ¶ 34 (Doe 7 believes he has been diagnosed with a mental health condition, but he does not recall the specifics).)

Plaintiffs further allege that Doe 6 and Doe 7 have been subjected to physical assaults by staff, and Doe 7 witnessed staff assault another class member. (*Id.* ¶¶ 26–27, 35–36.) "Such applications of force add to the severe psychological trauma from which the immigrant youth already suffer and which goes untreated due to the lack of appropriate mental health care at the facility." (*Id.* ¶ 63.) Plaintiffs also complain of aggravating effects upon their mental health due to excessive room confinement. (*Id.* ¶¶ 65–67, 69–70.) Defendant contends that allegations of excessive force and room confinement are not relevant, but the Fourth Circuit held that "these forms of punishment also tie into Appellants' claim of inadequate health care." *Doe 4*, 985 F.3d at 331. When children "act out due to untreated trauma, SVJC has shown a pattern and practice of quickly resorting to these harsh and punitive measures, retraumatizing these children and worsening their underlying conditions." *Id.*

For these reasons, plaintiffs have plausibly alleged the denial of their constitutional right to adequate mental health treatment by defendant.

### b. Policy or Custom of SVJC

Plaintiffs plead, and primarily argued at the hearing on this motion, that SVJC employs a "one-size-fits-all" approach to mental health treatment that apparently focuses on behavior management and medicine management rather than tailoring treatment to an individual detainee's needs. (*See* Third Am. Compl. ¶ 58.) Plaintiffs' mental health issues have been recognized and acknowledged in this litigation. *See Doe* 4, 985 F.3d at 330 ("SVJC recognizes that most of the unaccompanied children it cares for have experienced severe trauma."). Despite this, it is alleged that SVJC "has a policy or practice of denying [Does] and class members access

12

to appropriate mental health treatment and counseling with licensed mental health professionals, in violation of well-established professional standards," and "has a policy or practice of confining the immigrant detainees to their rooms for lengthy periods of time and/or using handcuffs to restrain them." (*Id.* ¶¶ 56, 65.) The alleged duration and frequency of these practices suggest that they can be attributed to defendant. *See Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 355 F. Supp. 3d 454, 469–71 (W.D. Va. 2018) (denying summary judgment to defendant with respect to excessive force and excessive room confinement claims based on duration and frequency of complained-of conduct, establish "awareness and tacit approval on the part of the Commission that the Center engages in a pattern of conduct with regard to force, restrains and room confinement that is unconstitutional").

While the details are somewhat sparse and, at times, contradictory, plaintiffs' allegations are sufficient to plausibly allege an unconstitutional policy or custom.

### III.  CONCLUSION

For the reasons stated above, the court will deny defendant's motion to dismiss for failure to state a claim and take defendant's motion to dismiss for lack of subject matter jurisdiction under advisement pending an evidentiary hearing regarding Lopez's standing as next friend. The court will issue an appropriate order.

Entered: September 26, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge